IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No.: 1:21-cv-814

| | | |
|---|---|---|
| LARISSA HARPER HAIRGROVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | **CLASS ACTION** |
| CITY OF SALISBURY, DOWNTOWN | ) | |
| SALISBURY INC., and LANE BAILEY, | ) | |
| in his individual and official capacity, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, by and through her undersigned attorneys, hereby make this Complaint against Defendant, and alleges, as follows:

**PRELIMINARY STATEMENT**

1.      This is an action brought by Plaintiff against Defendants for violation of 42 U.S.C. § 2000e-1 et seq (Title VII) for damages resulting adverse actions and a hostile work environment based on her sex and retaliation for complaining about the same.

2.      This is also an action brought under 29 U.S.C. § 201 et seq (the Fair Labor Standards Act) and N.C. Gen. Stat. § 95-25.1 et seq. (the N.C. Wage and Hour Act) against Defendants for violations of federal and state wage and hour laws.

3.      This is also an action brought under 42 U.S.C. § 1983 (Section 1983) for violation of Plaintiff's rights to equal protection under the United States Constitution,

1

for violations by Defendant Lane Bailey in his individual capacity for implementing a specific practice of employing Plaintiff on behalf of the City of Salisbury jointly with the Downtown Salisbury Inc. and requiring Plaintiff to work two full time positions with two full-time supervisors in knowing violation of wage and hour laws and Plaintiff's right to be treated equally to other similarly situated City employees and not differently because of her sex.

4.     This is also an action under State common law articulated in *Corum v. University of North Carolina* against Lane Bailey in his official capacity seeking to vindicate Plaintiff's rights to equal protection and the fruits of her labor under Sections 1 and 19 (*Corum* claims).

5.     Plaintiff seeks compensatory and punitive damages, attorney's fees and costs, and all other equitable relief to which she may be entitled.

## JURISDICTION

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under Title VII, the FLSA, and Section 1983.

7.     The Court may exercise supplemental jurisdiction over Plaintiff's State law claims under 28 U.S.C. § 1367.

8.     Plaintiff has exhausted her administrative remedies and is filing this Complaint within 90 days of her receipt of the Right to Sue Notice issued by the EEOC against Defendant DSI and Defendant City of Salisbury.

## VENUE

2

9.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that Plaintiff resides in this district and the Defendants either live or have their principal place of business in this district and under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

10.     Plaintiff is a resident of Davidson, County, and was formerly jointly employed by the Defendant City of Salisbury and Defendant Downtown Salisbury Inc.

11.     Lane Bailey is the City Manager of the City of Salisbury and upon information and belief resides in Rowan County, North Carolina.

12.     The City of Salisbury is a municipal corporation organized under the laws of this State with the powers and duties conferred by law. N.C. Gen. Stat. § 160A-1(2).  By law, the City's powers are to be broadly construed under N.C. Gen. Stat. § 160A-4, except that "the exercise of such additional or supplementary powers shall not be contrary to State or federal law or to the public policy of this State."

13.     Downtown Salisbury Inc. is a nonprofit corporation organized under the laws of the State of North Carolina with its principal offices located in Rowan County, North Carolina.

## FACTS

14.     Plaintiff became employed as the Downtown Development Director for

3

the City after she applied for a position advertised by the City. She received and signed an offer letter on August 28, 2017, with a proposed start date of October 9, 2017. **Exhibit A.**

15.     In fact, Plaintiff was "strongly urged" to actually come to work on October 5, 2017, without pay in order to be present for an after work-hours events which was a tour of the Empire Hotel with the developers and a public open house. Plaintiff did attend the event, but was not paid for her attendance.

16.     Plaintiff learned soon after she became employed as Downtown Development Director with the City, that she was also required to be employed as full-time 40 hours/week paid professional Main Street Manager pursuant to an agreement between the City and DSI pursuant to a contract between the City and DSI. **Exhibit B, Appendix A.** Plaintiff also learned that Lane Bailey had told the City Council at the May 16, 2017 City Council meeting that the budget he was recommending for the City "incorporates Downtown Salisbury, Inc. (DSI) into the City organization."

17.     Plaintiff learned after was hired that the City and DSI had been at risk for losing the ability to administer Main Street funds they had collected because they had not followed proper procedure in requesting and using the funds and the City had failed to follow State mandated procedures by adverting a request for quotes in the proper manner to partner with DSI.

18.     As a result of this joint employment between the City and DSI, Plaintiff

routinely worked well in excess of forty hours a week in order to attempt to fulfill the expectations of Lane Bailey, City Manager, for her duties as Downtown Development Director, along with the expectations of the various members of the Board of the DSI, for her to work 40 hours a week as the DSI Main Street Manager.

19.     While Plaintiff was theoretically employed as an exempt department head, in reality her hours and duties were under significant daily scrutiny by Lane Bailey, and the Assistant City Manager Zack Kyle, and during some portion of her employment, she was also told she was being supervised by Bailey's administrative support person.  This was in contrast to the other department heads, mostly male, who were not micromanaged and required to account for all of their time.

20.     Plaintiff kept both Lane Bailey and his assistant fully apprised of the conflicting instructions she was getting from them and from the DSI board and the impossibility of being able to make both the City and the DSI board happy given that both of them wanted her working for them 40 hours a week.  Plaintiff was forced to attending meetings prior to the regularly scheduled work day and after the regularly scheduled work day and if she was not in her office, the City manager or his assistant questioned her whereabouts.  When she was not at the offices of DSI, the DSI board members questioned her whereabouts.

21.     Plaintiff knew that none of the other male department heads were being treated the way she was and Bailey was unresponsive to Plaintiff's complaints that her workload was not sustainable.

5

22.     The DSI board also scrutinized Plaintiff's daily hours and duties and complained regularly to the City that Plaintiff was not responsive to their needs and did not promptly return emails, phone calls, and other messages.

23.     In fact, as she learned, she was actually expected to work two full-times jobs, with only two weeks of orientation with an interim director who worked primarily as an administrative assistant for the DSI board members, and had not been required to function as a full-time City department head with the requirement to attend meetings which were required of department heads.

24.     As examples of her unequal treatment as compared to male department managers, after Plaintiff was hired in 2017, the Parks & Recreation staff of the City resented Plaintiff's involvement in events which they had previously been in charge of.  As a result, Plaintiff found it difficult to get their cooperation in carrying out tasks that were assigned to her department by both the City and by DSI such as a College Night event.  The Parks & Recreation department head was male and when Plaintiff needed cooperation from the department, Bailey and his assistant routinely supported the male department head and not Plaintiff when conflicts arose.

25.     In late December 2017, early January 2018, assistant manager Kyle admonished Plaintiff for failing to have Main Street Award recipients ready to announce in March 2018.  In fact, Plaintiff was hired after the award applications were due and the applications had not been prepared by the previous interim director.

26.     In March 2018 after six months in the position, Plaintiff presented to

Case 1:21-cv-00814-CCE-JLW   Document 1   Filed 10/18/21   Page 6 of 17

both City management and the DSI board a list of the number and type of meetings she was being expected to attend as a result of her joint employment by both DSI and the City. **Exhibit C.**

27. On May 29, 2018, in her capacity as Executive Director of DSI, Plaintiff submitted a proposal to the City for DSI to become the Main Street manager for Salisbury's Downtown Municipal Service District. **Exhibit D**.

28. In June, Plaintiff submitted her Main Street Director's Work Plan for 2018-2019. **Exhibit E.**

29. When Whitney Williams became chair of the DSI board and Diane Yong became Vice-Chair, they engaged in a constant stream of communications and complaints about Plaintiff to Bailey and Zack Kyle about Plaintiff's alleged failure to prioritize the work of the DSI board over any other responsibilities she had as a result of her department chair position with the City. Plaintiff was aware of the deferential nature of the previous interim director of DSI and she was also aware that Williams expected her to be at her beck and call and that she simply could not satisfy Williams, who clearly preferred to deal with Bailey and Kyle, instead of Plaintiff.

30. In September 2018, Plaintiff was given an instruction to respond to all voicemails and emails within the same day or within 24 hours regardless of her workload or out of office responsibilities. On December 19, 2018, Zach Kyle issued Plaintiff a disciplinary action report for "lateness," "failure to follow instructions" and "other." In it, he indicated that one of the DSI board members emailed Plaintiff on

7

October 31 and she did not respond until November 12. Further he indicated that he had reviewed her email box and noted that "a number of emails" in her box had not been opened or responded to. Plaintiff knew that she was being treated differently from other male department heads whose email and response times were not being scrutinized like hers. **Exhibit F.**

31.     Beginning in January 2019, Plaintiff began keeping a calendar of the extra hours she was required to work outside of regular business hours unlike any of the male department heads. **Exhibit G**.

32.     In June 2019, Plaintiff became aware of the constant complaints by Williams to Zach Kyle and learned that Kyle had sent Williams and Dianne Young, the vice chair, and email asking them to contact Plaintiff directly with their concerns. This email was to no avail as Williams and Young made it clear to Plaintiff they did not want to work with her, though they seemed to have warm collegial relationships with many male colleagues.

33.     On June 18, 2019, Bailey's assistant, Zach Kyle issued Plaintiff another disciplinary action report. Kyle noted that he had audited Plaintiff's email when he learned she had not responded to one email. Kyle noted in the report that Plaintiff had over 1600 emails in her inbox and that "a lot" of those emails had not been "opened/read." He noted this despite the fact that Plaintiff had informed him in December that she often kept emails in her inbox marked open/unread to remind her of certain things.

8

34.     Kyle's report also noted that Plaintiff had not completed a task she was purportedly assigned on May 19, 2019, which required one of her subordinate staff to track their time and activities, and that she had failed to make changes to a PowerPoint presentation that had been requested.  Finally, Kyle indicated that her key scan entries to the building had been audited and that she had not been in her office during regular business hours between 8:30am and 5:00pm, and had been arriving after 9:30am.  Kyle noted this even though he was aware that Plaintiff had out of office meetings with downtown business owners and DSI board members and other individuals which were routinely scheduled outside of "regular" business hours.

35.     Kyle indicated that Plaintiff would be suspended for three days on June 19, 20, and 21.  Plaintiff signed the report but included a note about her belief that the disciplinary report was unwarranted and she reiterated that she had had many successes in her position.

36.     Despite her suspension, Plaintiff was required to work on those days and was not paid for them.  On June 28, 2019, Plaintiff requested that Kyle advise her about how to code her timesheet for the period of time when she worked but was actually on suspension.  Kyle told her to check with HR and refused to allow her to get paid for the time she worked.

37.     On July 2, 2019, Kyle threatened to terminate Plaintiff in an email on which he copied Brianna Kenny if she did not have a project done by July 3, the deadline which he had given her.

38.     Between July and her November performance review, Plaintiff continued to attempt to meet the expectations of both the City and DSI though with a constant lack of support from Bailey and his subordinate Kyle.  She continued to be scrutinized in a manner unlike any of the other male department heads.

39.     In November, when Kyle completed her review, he gave her unsatisfactory marks for being punctual (but noted she had improved in the last 4-6 months) and also noted she had challenges with utilizing staff to assure work was being completed.   Otherwise, her marks were all 2's (satisfactory) and 3's (exceptional).

40.     In December 2019, in response to a DSI board member complaint about a late email (7:51pm), Kyle questioned Plaintiff who indicated that she was balancing her work load during the preceding holiday weeks and exercising her discretion to prioritize her work and that the complaint was an example of how she was being micromanaged.

41.     On March 17, 2020, certain members of the DSI board wrote a letter to Lane Bailey, Zack Kyle, and Graham Corriher, the City Attorney accusing Plaintiff of "inappropriate actions," a "deliberate breach of the Board's trust" and "potential criminal acts and violations of City of Salisbury Employee policy."  Apparently, at a January 2020 and February 2020 board meeting, Chair Whitney Williams called for a closed session of the board to meet.  **Exhibit H.**

42.     Although the letter speaks for itself, after several back and forth

conversations and emails about whether the closed session was or was not recorded and listened to, at some point, assistant City Manager Kyle reached out to Chair Williams and told her that Plaintiff had listened to the closed session meeting. The letter indicates that **after** he told Williams that Plaintiff had listened to the email, he **subsequently** confirmed with Plaintiff that she had done so.

43. The letter, believed to have been authored by Chair Williams, further stated that while

> we recognize that the DSI Board has no voice in City personnel disciplinary matters, it is the opinion of the majority of Organization Committee that Harper should have been suspended, or at the very least removed from DSI matters and communication with the DSI Board, pending an internal investigation promptly upon the City's learning of her terminable and potentially criminal violation. As she was not, our Board - which continues to work actively to help downtown business owners in the retail, restaurant, and service sector who are facing the most critical test to their business's viability ever – has been placed in a difficult situation of continuing to work with an Executive Director who we hold in contempt. As it stands now, Organization Committee does not see a workable scenario where the existing Board remains intact with the current Executive Director.

44. Plaintiff was provided a copy of the letter to which she responded on April 12, 2020. **Exhibit I.** In this letter, Plaintiff detailed the hostile work environment that she had been subjected to and the treatment she had received which was quite different from how other male department heads working for the City had been treated. Plaintiff detailed how the DSI board members resented her for standing up for herself and refusing to let them bully her, which they would not have done had she been a male colleague based on her observation of how they

11

interacted with other male colleagues.

45. On June 19, 2020, Plaintiff determined that she was going to have to ask for Family and Medical Act leave in order to cope with the stress from dealing with the conflicting demands of the DSI board and the City's failure to provide her with support in her position. However, before she could do so, she was summoned to a meeting with Lane Bailey.

46. Plaintiff met with Lane Bailey who indicated that he had solicited "performance evaluations" from the DSI board members. Bailey did not provide the evaluations nor did he disclose any particulars about them. Bailey indicated that he had concerns about Plaintiff's ability to lead the Downtown Development Department.

47. On June 22, 2020, Bailey delivered a letter to Plaintiff indicating that he was considering dismissing her and instructing her to meet with him and the City's Human Resources office on June 24, 2020. **Exhibit J**

48. On June 23, 2020, Plaintiff resigned her position with the City indicating that her resignation was due to the hostile work environment and work place harassment to which she had been subjected. **Exhibit K**

## COUNT ONE – TITLE VII
### (SEX DISCRIMINATION AND
### HOSTILE WORK ENVIRONMENT DUE TO SEX)

49. Plaintiff incorporates the allegations contained in ¶¶ 1 – 48 as though fully set forth herein.

50. During her employment, Defendants jointly employed Plaintiff and jointly subjected her to performance expectations far in excess of the expectations imposed upon any other City employees similarly situated to Plaintiff.

51. As a result of these untenable and unsustainable and discriminatory expectations, Plaintiff could not fully satisfy either the City or DSI even though she still managed to achieve many accomplishments during her employment.

52. The disciplinary actions which she was issued reflected these discriminatory performance expectations as did the final performance evaluation which Defendant Bailey solicited from those he knew to be her detractors at DSI.

53. Defendants created a hostile work environment for Plaintiff which eventually resulted in her coerced resignation.

54. As a result of Defendants' action which were undertaken with malice or reckless indifference to the federally protected rights of Plaintiff, Plaintiff suffered damages and is entitled to compensatory and punitive damages and any allowable equitable relief.

## COUNT TWO – TITLE VII
### (RETALIATION FOR COMPLAINING ABOUT SEX DISCRIMINATION AND A HOSTILE WORK ENVIRONMENT DUE TO SEX)

55. Plaintiff incorporates the allegations contained in ¶¶ 1 – 54 as though fully set forth herein.

56. Plaintiff complained about how she was treated unfairly compared to other male department heads and about the hostile work environment to which she

13

had been subjected.

57.     Defendants failed to take any action to remedy the discriminatory job assignments given her or to address her concerns about her hostile work environment.

58.     Instead, Defendants worked together to sabotage Plaintiff's employment and ultimately to terminate her employment in retaliation for her opposing the discriminatory work assignments and hostile work environment.

59.     As a result of Defendants' action which were undertaken with malice or reckless indifference to the federally protected rights of Plaintiff, Plaintiff suffered damages and is entitled to compensatory and punitive damages and any allowable equitable relief.

## COUNT THREE – WAGE AND HOUR VIOLATIONS
## IN VIOLATION OF THE NCWHA AND THE FLSA

60.     Plaintiff  incorporates the allegations contained in ¶¶ 1 – 59 as though fully set forth herein.

61.     As part of its regular practice, Defendants intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiff. This policy and pattern or practice includes, but is not limited to:

(a) Willfully misclassifying Plaintiff as exempt from the overtime provisions of the FLSA;

(b) Willfully failing to pay Plaintiff overtime for hours that she worked in excess of 40 hours per workweek; and

(c) Willfully failing to record all of the time that Plaintiff has worked for the benefit of Defendant.

62.     Defendants were aware or should have been aware that federal and state law required them to pay Plaintiff the minimum wage for all hours worked, and to pay an overtime premium for hours worked in excess of 40 per workweek.

63.     Defendant's conduct has been widespread, repeated, and consistent.

64.     Defendant is liable under the FLSA and the NCWHA for, inter alia, failing to properly compensate Plaintiff

65.     Plaintiff is entitled to recover back pay, attorney's fees, costs and any equitable remedy available to her.

**COUNT THREE – VIOLATION OF STATE AND FEDERAL CONSTITUTIONAL GUARANTEES OF EQUAL PROTECTION IN VIOLATION OF SECTION 1983  (FEDERAL) AND SECTIONS 1 AND 19  (STATE *CORUM* CLAIM)**

66.     Plaintiff  incorporates the allegations contained in ¶¶ 1 – 65 as though fully set forth herein.

67.     The acts of Defendants in engaging in intentional sex discrimination, the creation and maintenance of a hostile work environment based on sex, and retaliation for opposing the same constitute violations of Sections 1 and 19 of the N.C. Constitution and the equal protection clause of the U.S. Constitution which prohibit discrimination on the basis of sex in the operation of public employment and which prohibits denial of equal protection of the law.

68.     The hostile and discriminatory treatment of was motivated, in part,

15

because Plaintiff is female and because she stood up for herself and resisted being treated differently because of her sex.

69.     As a direct and proximate result of the above described unlawful and malicious acts of Defendants, Plaintiff has suffered a loss of earnings, bonuses, retirement benefits, employment opportunities,  emotional and mental anguish, all of which are in violation of her civil rights under the N.C. and U.S. Constitutions and State and Federal laws, and in an amount to be determined at trial.

70.     Plaintiff is entitled to compensatory and punitive damages, attorneys fees, costs, and any equitable relief to which she is entitled.

WHEREFORE, PLAINTIFF requests judgment as follows:

A.     On Count One - Three, awarding compensatory and punitive damages in favor of Plaintiff in an amount to be determined at trial, plus interest, attorneys' fees, and costs and any equitable relief to which Plaintiff may be entitled; and

B.     Granting Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 18th day of October 2021.

**/S/ VALERIE BATEMAN**
NC State Bar: 13417
T/F 919-436-3592
valerie.bateman@forrestfirm.com
FORREST FIRM, P.C.
3211 Shannon Road, Ste 100
Durham, NC  27707

**/S/ RACHEL M. BLUNK**
NC State Bar:  42694
T/F 336-663-1052
rachel.blunk@forrestfirm.com
FORREST FIRM, P.C.
125 S Elm St., Suite 100
Greensboro, NC 27401

***Attorneys for Plaintiffs***