IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:21-cv-814

LARISSA HARPER HAIRGROVE,        )
                                 )
                Plaintiff,       )
                                 )
     vs.                         )
                                 )
CITY OF SALISBURY, DOWNTOWN      )
SALISBURY INC., and LANE         )
BAILEY, in his individual and    )
official capacity,               )
                                 )
                Defendants.      )
                                 )
-------------------------------

_____

DEPOSITION
OF
LARISSA HARPER HAIRGROVE
_____


TAKEN AT THE OFFICES OF:
GATEWAY BUILDING
204 EAST INNES STREET, SUITE 200
2ND FLOOR CONFERENCE ROOM
SALISBURY, NC 28144


02-22-2023
9:54 O'CLOCK A.M.
_____

Gretchen Wells
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 | (336) 992-1954 | (919) 649-4444

18

1    Q.  Did you qualify for retirement time with the
2  state retirement or the Local Government Retirement
3  System?
4    A.  Well, we gave them my account number that I
5  already had for my 401(k) and they were putting some
6  funds in that account.  So I guess there -- there -- I
7  don't know if that's considered, I guess, a 401(k)
8  benefit.
9    Q.  Okay.  So I guess my question, there's
10  401(k) benefits and then there's retirement benefits
11  that local government employees are entitled to under
12  the Local ---
13    A.  Uh-huh (yes).
14    Q.  --- Government Retirement System.
15    A.  Uh-huh (yes).
16    Q.  Did you qualify for that, do you know?
17    A.  I don't think I did, because I never
18  remember filling out information from the City or
19  getting information from the City.
20    Q.  Okay.
21    A.  They just paid into my state account I
22  already had set up that was -- I -- I carried it from
23  Wilson, North Carolina, where I was before I was here
24  in Salisbury.  So -- sorry, I'm not very up to date on
25  that.  I haven't looked at those records much lately.

19

1        MR. FLANAGAN:  I'm going to mark some
2  documents here as Exhibit 1.  And it's actually three
3  pages, but they all sort of work together.  But I have
4  -- I'm sorry.  That's for you.  I'm going to mark this
5  and give this to Ms. Hairgrove.
6        (DEFENDANT'S EXHIBIT
7         NUMBER 1 WAS MARKED
8         FOR IDENTIFICATION)
9    Q.  (Mr. Flanagan)  So showing you what I've
10  marked as Exhibit 1.  It's three pages, or three
11  separate pages, but I just want them marked right now
12  as one exhibit.
13        The first one is a document that appears to
14  be from you, dated June 23rd, 2020.  Do you recognize
15  that?
16    A.  I do.
17    Q.  All right.  Is that your resignation letter?
18    A.  It is.
19    Q.  The second page is a document from the City
20  of Salisbury, dated June 24th, 2020 per -- looks to be
21  signed by Lane Bailey, the city manager.  Do you
22  recognize that as a document that you received from
23  Mr. Bailey?
24    A.  I do.
25    Q.  And is that an acknowledgment of your

20

1  resignation letter?
2    A.  It is.
3    Q.  And then the third document is a personnel
4  action notice from the City of Salisbury and it
5  appears to be indicating your resignation effective
6  date of June 23rd, 2020 and your rate of pay.  Do you
7  see that?
8    A.  Uh-huh (yes).
9    Q.  Okay.  And your rate of pay upon your
10  resignation on June 23rd, 2020 was $80,167.63.  Is
11  that correct?
12    A.  That seems correct.  I've...
13    Q.  You note in your -- go back to your first
14  page.  That's all I have a question on on the
15  personnel action form.  But if you go back to the
16  first page, which is your resignation letter.
17    A.  Uh-huh (yes).
18    Q.  You indicate that -- it says, "This letter
19  is to notify you that I hereby resign from the
20  position of Downtown Development Director/Executive
21  Director for Downtown Salisbury, Inc., due to a
22  hostile work environment and work place harassment,
23  effective today, June 23rd, 2020."
24        Did I read that correctly?
25    A.  That's correct.

21

1    Q.  And the next doc -- the next page of Exhibit
2  1 is the June 24th, 2020 letter from the city manager.
3  And you see the second paragraph where he says, "You
4  also alleged in the letter that you were subject to a
5  hostile work environment and workplace harassment."
6        Do you see that?
7    A.  Yes.
8    Q.  And he goes on to ask you to provide
9  information about the hostile work environment and
10  workplace harassment to Ruth Kennerly, the human
11  resource director, in writing or schedule a meeting.
12        Do you see that?
13    A.  Yes.
14    Q.  Did you ever do that?
15    A.  At this point, I felt like I had documented
16  that thoroughly with my supervisors and I decided I
17  may need to seek counsel.  I know that Ms. Kennerly
18  and I did exchange some emails.  I probably have those
19  in my records.  Seems like we were trying to, if I'm
20  recalling correctly, set up something, but it -- maybe
21  she had been on vacation or at a conference or
22  something.
23        I can't remember the details, but there was
24  some communication with Ruth from me.  But it -- you
25  know, I can't remember exactly when we ended up, you

22

1  know, giving more specific details.
2      Q.  All right.  So my question's really very
3  specific.  In response to the June 24th letter from
4  Lane Bailey, where he asked you to -- he indicates,
5  "The City takes these allegations very seriously.  And
6  in order to promptly and thoroughly investigate these
7  allegations pursuant to City policy, please provide
8  Ruth Kennerly with specific details about your
9  allegations."
10         Did you ever provide Ruth Kennerly or
11  anybody else with the City after June 24th of 2020 any
12  details about this allegation that you made in your
13  June 23rd, 2020 resignation letter?
14      A.  Yes, but I don't know when exactly.
15      Q.  You would've done that by email?
16      A.  Most likely.
17      Q.  What is your email address, your personal
18  email address, that you would've used to communicate
19  those details?
20      A.  Send2rissa.  That's s-e-n-d, the Number 2,
21  r-i-s-s-a, @gmail.com.
22      Q.  And so it's your belief that you sent to
23  Ruth Kennerly, the HR director at the City of
24  Salisbury, specific details about your allegation that
25  you resigned due to a hostile work environment and

23

1  workplace harassment, from that email address to Ruth?
2      A.  I don't know if it came from that email
3  address or from my attorney, which I'm not sure ---
4      Q.  She can't answer it for you so ---
5      A.  Yeah, I'm ---
6      Q.  --- I'm just asking you.
7      A.  Right.  I'm not sure when exactly that
8  happened, but I feel like I did.
9      Q.  Okay.  So, again, if -- this isn't a memory
10  contest, all right?
11      A.  Yeah, I just ---
12      Q.  I'm not ---
13      A.  --- it's been a while.
14      Q.  No, I understand.  It would've been, you
15  know, maybe less than -- you know, between two and
16  three years ago, I suppose.  So your recollection is
17  that you sent detailed allegations about the hostile
18  work environment and workplace harassment either from
19  the send2rissa@gmailcom address or through your
20  attorney?
21      A.  I do believe that, after this letter.  But
22  there -- before this letter, there was a lot of
23  documentation.
24      Q.  And we're going to talk about that.  But
25  what I'm talking about right now is specifically in

24

1  response to Mr. Bailey's request to you ---
2      A.  Uh-huh (yes).
3      Q.  --- after you resigned.  Did you ever
4  contact Ruth Kennerly and send her specific details
5  about these allegations?
6      A.  I contacted her.  I don't know for sure -- I
7  cannot recall for sure without looking at my email
8  records what I sent her.
9      Q.  If you sent her something in your email
10  records, would you have produced that to the
11  Defendants in this lawsuit as part of the Discovery
12  process?
13      A.  If I still had it.
14      Q.  What do you mean?  Would you have deleted
15  it?
16      A.  I don't think I would have meaningfully
17  deleted it.  It's actually just something that has
18  occurred to me as we're talking through this.
19      Q.  Okay.  I'll represent to you that I haven't
20  seen anything, so...
21      A.  Uh-huh (yes).
22      Q.  And I'm not accusing you of deleting
23  anything, just -- just to be clear.
24      A.  Right.
25      Q.  But if you had sent that via email, then you

25

1  would have that in your sent box presumably somewhere?
2      A.  Right.
3      Q.  Okay.
4      A.  Or I don't know if it could've been a phone
5  call.  So, I mean, that's something I can look for.
6      Q.  Okay.
7          MS. BATEMAN:  Yeah.  We'd be happy to
8  look for it.
9          THE WITNESS:  Yeah ---
10      Q.  (Mr. Flanagan)  Sure.  Sure.  And I don't
11  know that we could look for a phone call, but you
12  might've -- it could've been an email or you may have
13  just called Ruth and told her -- talked to her about
14  it?
15      A.  Right.  So I -- I can look for that.  That's
16  no problem.
17      Q.  Okay.
18      A.  If it's there.
19      Q.  All right.
20      A.  I do want to just say I thought I was closer
21  to the 81,000 rate -- rate of pay for some reason.  It
22  may -- but that's just a, you know, $900 difference,
23  so it would have been -- I'm assuming that's what's on
24  record, that's true.
25          (DEFENDANT'S EXHIBIT

26

1         NUMBER 2 WAS MARKED
2         FOR IDENTIFICATION)
3   Q.  (Mr. Flanagan) I'll show you what I've
4 marked as Defendant's Exhibit 2. That is a letter --
5 depicted to be a letter, dated August 28th, 2020, from
6 Lane Bailey to you with the "Re: Requesting additional
7 information."
8     Do you see that?
9   **A.  Okay.**
10   Q.  Do you remember receiving this letter from
11 Mr. Bailey?
12   **A.  Let's see here. Just give me a moment ---**
13   Q.  Yeah, take all the time you need to review.
14 (Witness examines document)
15   **A.  Okay. So...**
16   Q.  Do you -- did you receive that letter is my
17 question.
18   **A.  I -- most likely. It's vaguely familiar. I**
19 **-- but, yeah, I -- believe I -- I did.**
20   Q.  And I'm not going to read that letter into
21 the record. I just -- already is in the record. But
22 Mr. Bailey indicates there that he requested specific
23 information related to your allegations related to
24 hostile work environment and workplace harassment,
25 that human resources called you to follow up and sent

27

1 an ---
2   **A.  Uh-huh (yes).**
3   Q.  --- email. And as of August 28th, 2020, Mr.
4 Bailey indicates that he has not heard from you since
5 that email and wanted to again make sure that he had
6 the relevant information. Does that ---
7   **A.  Uh-huh (yes).**
8   Q.  --- help your recollection of whether or not
9 you had actually given any details to Ruth via email
10 or phone call?
11   **A.  Well, it certainly shows that we probably**
12 **had a phone conversation. "Human resources followed**
13 **up on my request in the email dated" -- so there's an**
14 **email. I think she called me, followed up. And I do**
15 **believe we had a conversation.**
16     **So that -- it sounds like what I'm**
17 **remembering, so I would guess that I got this and I**
18 **probably sent it to an attorney.**
19   Q.  Yeah. So it says, "By email dated July 8th,
20 2020, you asked for a" ---
21   **A.  Uh-huh (yes).**
22   Q.  --- "asked about information in your
23 personnel file and indicated you would have -- you
24 would have or provide additional information after
25 speaking with your attorney" ---

28

1   **A.  Yes.**
2   Q.  Okay. But as of at least August 28th, it
3 sounds -- it appears that Mr. Bailey ---
4   **A.  Uh-huh (yes).**
5   Q.  --- nor anyone with the City had heard from
6 you since then.
7   **A.  Okay.**
8   Q.  Now, you indicated -- so are you aware of
9 any email, letter or documentation that came from you
10 -- I'm not talking about your attorney, but that came
11 from you, related to your allegations in your June
12 23rd letter of resignation?
13   **A.  After this date?**
14   Q.  Yes, ma'am.
15   **A.  I probably did not send them anything, on**
16 **the advice of my attorney.**
17   Q.  Okay. And I don't want to hear anything
18 about what you and your attorney ---
19   **A.  Okay.**
20   Q.  --- discussed or she advised you. But -- so
21 the answer to that question would be no?
22   **A.  I think so. I'm not sure, honestly.**
23   Q.  Okay. Now ---
24   **A.  I could look back and see, but...**
25   Q.  Well, again, when you say you'll look back

29

1 and see, what are you referring to that you're going
2 to look back and look at to refresh your memory?
3   **A.  Well, I have some copies of my emails and I**
4 **write notes.**
5   Q.  Okay. And those copies of your emails would
6 have been produced ---
7   **A.  Uh-huh (yes).**
8   Q.  --- in the Discovery process, correct?
9   **A.  Right. So if we don't have it, again, I can**
10 **go through and try to find things that I may have**
11 **overlooked or not given to my attorney, but...**
12   Q.  Well, I'd ask you to do that.
13   **A.  Yeah.**
14   Q.  If you would.
15   **A.  Sure.**
16   Q.  Now, you indicated that you had documented,
17 prior to your resignation, that you had -- you said
18 just a few minutes ago that you had documented the
19 hostile work environment and workplace harassment.
20     Tell me about ---
21   **A.  Uh-huh (yes).**
22   Q.  --- what documentation you have of that.
23   **A.  So I have letters that I sent to HR as well**
24 **as my direct supervisor at the time, Zack Kyle. And**
25 **Zack and I met weekly. And oftentimes, we met more**

30

1 than once. But we had -- you know, for different
2 meetings and we'd have discussions and talk about
3 issues that were going on.
4        But we met weekly and for -- specifically to
5 talk about how things are going, what progress is
6 being made. So I know that he kept a record. He
7 would write in his notebook, you know, notes on our
8 discussions.
9        I talked to HR more than one occasion about
10 how I felt like I was being treated differently and I
11 really felt like, you know, I was being harassed and
12 bullied. And we had conver -- that's -- should be in
13 my personnel file in the -- in the records that you
14 got. I don't know if they're complete. I don't think
15 we have complete information from the City.
16       Q. So let's talk about -- the first thing you
17 said is you had letters to HR, right? That's what you
18 just said?
19       A. Yes, at least -- and least one.
20       Q. And when you -- at least one letter?
21       A. Uh-huh (yes). Oh, and then I also had
22 comments on my disciplinary action reports, at least
23 one of those.
24       Q. Okay. Let's talk about the letter, the at
25 least one letter or maybe more to HR. First of all,

31

1 who would you have sent that letter to specifically in
2 HR?
3       A. I would have sent that, I believe, to
4 Brianna Kenny -- or Brianna -- she actually went by
5 Brianna Kenny, who's no longer with the City, but she
6 was one of my department HR representatives. That's
7 who I would -- either her or another representative,
8 rather than Ruth directly, who's the director. But
9 Ruth was in on some -- at least one conversation as
10 well.
11       Q. So I'd like to focus in on just letters.
12       A. Yeah.
13       Q. You said, "letters." We'll talk about
14 conversations with other people ---
15       A. Okay.
16       Q. --- including Zack, but I want to focus in
17 first on -- you said you had letters to the HR.
18       A. Uh-huh (yes).
19       Q. There was at least one to Brianna Kenny.
20 Can you remember any other -- well, let me ask you
21 that. The one to Brianna Kenny, do you know when that
22 letter was, what that was dated?
23       A. That was around sometime maybe in March of
24 2020 -- 2020.
25       Q. So March of 2020 ---

32

1       A. Uh-huh (yes).
2       Q. --- you sent a letter. Was that an actual
3 letter, like, on DSI letterhead or was that an email?
4 What was that?
5       A. I -- I emailed it, but it was on -- I had
6 some letterhead.
7       Q. And what was your complaint about in March
8 of 2020?
9       A. So HR asked me to respond -- HR and Zack,
10 about a -- an allegation that a few of the DSI board
11 members had submitted. And this was -- they submitted
12 it -- I can't remember if it was -- now the dates are
13 -- okay, maybe they submitted that in March and I --
14 and with COVID and such going on, there was some
15 delay. And it could've been I sent my response in
16 April.
17       Q. So COVID began in March of 2020 ---
18       A. Uh-huh (yes).
19       Q. --- and we all recall that, I think, as to
20 what was going on then ---
21       A. Uh-huh (yes). Yeah.
22       Q. And everything in the world was delayed,
23 but ---
24       A. That was ---
25       Q. So I completely understand that. So the

33

1 letter that you sent to HR, to Brianna Kenny, was in
2 March of 2020 and that was actually in response to
3 a ---
4       A. Uh-huh (yes).
5       Q. --- a complaint or an allegation made by the
6 DSI board about you, correct?
7       A. Yes.
8       Q. Okay ---
9       A. A few members.
10       Q. Yes, ma'am. And we'll talk about that as
11 well.
12       A. Uh-huh (yes).
13       Q. But -- all right. And so prior to your
14 letter to Brianna Kenny in March of 2020, had you sent
15 any letters to HR related to harassment, bullying or a
16 hostile work environment?
17       A. I do not believe so, if I recall correctly.
18 I -- I've had conversations in person. There may have
19 been some emails that -- but not a formal letter of
20 such that I remember. I had composed one and I never
21 sent it.
22       Q. Okay.
23       A. Earlier.
24       Q. So there might've been some emails to HR.
25 What were those -- what was the subject of those

**34**

1  emails?
2     A.  I think it would have been the fact that I
3  felt like I was being the scapegoat for a nonprofit
4  board who really didn't want to be in the contract
5  with the City.  There was a lot of minutia, tasks that
6  the executive director and department head of a city
7  shouldn't have to do or could delegate to, you know,
8  the staff of the department that I was head of and not
9  get flack back.
10        But I would get all kinds of flack about,
11  you know, small tasks that were on the board's -- it
12  was -- the board has a work plan.  And my job was to
13  assist with getting the whole overall plan done and
14  overall directing the development of the downtown.
15  You know, through building redevelopment -- from, you
16  know, that to making sure that the staff put on -- and
17  I would be at the events.
18        So there was a whole gamut that I was to be
19  -- to direct.
20     Q.  So you had a staff that you would delegate
21  some tasks to.  Is that right ---
22     A.  Yes.
23     Q.  And they might be at an event and that you
24  would be there, but you ---
25     A.  Uh-huh (yes).

**35**

1     Q.  --- weren't running the event necessarily,
2  you were overseeing it, so to speak, as the director?
3     A.  Correct, but I'd always work like a worker
4  bee.
5     Q.  Sure.  Understood.  Understood.  You got --
6  you did what you needed to do ---
7     A.  Yeah.
8     Q.  --- to get the job done, right ---
9     A.  That's right.  And handle the fires ---
10     Q.  Sure.
11     A.  --- put out the fires, things like that.
12     Q.  And did you feel like you at least should've
13  had the discretion to delegate some things that the
14  board wanted to make sure was getting done?
15     A.  Yes, of course.
16     Q.  All right.  So that was your email, sort of
17  complaints to HR that occurred prior to March of
18  2020, you think?
19     A.  I believe that sums up.
20     Q.  Okay.  You said you also talked to HR.
21     A.  Uh-huh (yes).
22     Q.  Would that have been Brianna or ---
23     A.  Uh-huh (yes).
24     Q.  --- Ruth or someone else?
25     A.  I talked to Brianna.  At times -- I don't

**36**

1  remember exactly what I talked about with Souwan, but
2  Souwan Kiengkham.  He is -- he was another HR person
3  that I was told at one point was my contact.  It
4  seemed to change.  And of course, you know, if someone
5  was out, then I would talk to someone else.
6        Ruth and I -- I can't remember if I had a
7  really good, maybe one sit-down, one-on-one talk with
8  her.  But then again, it -- it may not have been about
9  me.  It may have been about a staff person that I was
10  supervising.  I can't remember, but...
11     Q.  What I want to focus in on specifically is
12  you said that you had talks with HR.  And specifically
13  what I wrote down here is that you had felt you were
14  being treated differently and that you were being
15  harassed and bullied.  So ---
16     A.  Uh-huh (yes).
17     Q.  --- I want to focus in on that.
18     A.  Uh-huh (yes).
19     Q.  Do you remember who you had talks with at HR
20  specifically with regard to being treated differently
21  and being harassed and bullied?
22     A.  Brianna Kenny was definitely in some of
23  those conversations.
24     Q.  Okay.
25     A.  I think that she was my main contact.

**37**

1     Q.  All right.  Do you remember ever having any
2  of those conversations with Ruth Kennerly?
3     A.  Not -- I cannot recall that right now.  I
4  don't ---
5     Q.  Well, let's ---
6     A.  --- I'm not sure.
7     Q.  I'm sorry.  I didn't mean to interrupt you.
8        You don't recall any specific conversations
9  with Ruth about those topics?
10     A.  Yeah, I'm not certain about that.  I know I
11  talked about those topics with Zack, hoping he was
12  relaying that to Lane.  And our council liaison that
13  was on the DSI board, we talked about having too many
14  bosses and how he talked to Zack and/or Lane about
15  that fear himself.
16     Q.  Who's the council liaison?
17     A.  Brian Miller.
18     Q.  So I want to -- we'll get there.
19     A.  Uh-huh (yes).
20     Q.  But right now, I'm just talking about with
21  human resources.
22     A.  Uh-huh (yes).
23     Q.  So you're not sure whether you had a
24  conversation with Ruth.
25     A.  Uh-huh (yes).

**Page 38**

1  Q.  But you know you had a conversation with
2  Brianna?
3  A.  Correct.
4  Q.  All right.  And specifically with regard to
5  being harassed and bullied, tell me what you told
6  Brianna as to who was harassing you or bullying you.
7  A.  Uh-huh (yes).  Well, without seeing my notes
8  or an email -- I remember there was an email from Zack
9  -- or it may have been a text; we did a lot of
10  texting, saying -- and I believe Brianna was copied on
11  that, saying, "Let's talk about, you know, what you
12  brought up to me yesterday," I think, is what the
13  email said.  It was from Zack to me and Brianna, I
14  believe.
15  And that's when Zack and I were talking in a
16  -- one of our many meetings.  It could've been our
17  weekly meeting.  That he said, well, he would take
18  that seriously.
19  Q.  Again, we'll get to conversations you had
20  with Zack and/or Brian Miller.  What I'm talking about
21  right now is you told me earlier that you had the one
22  email or letter to Brianna about the complaint that
23  the DSI board members had about you ---
24  A.  Uh-huh (yes).
25  Q.  --- to respond to that.  And then you had

**Page 39**

1  some emails to HR about feeling like you were the
2  scapegoat for the nonprofit and that the board didn't
3  like the fact that they had the contract and such.  So
4  we talked about that.
5  What I want to talk about right now is
6  specifically, again, your conversation or your talks
7  with Brianna as to being harassed and bullied.
8  A.  Uh-huh (yes).
9  Q.  So what do you remember about that
10  conversation with Brianna about being harassed and
11  bullied?
12  A.  One time in particular, I don't know if this
13  is the same time -- I don't think it is.  I think
14  there was a time I popped in her office.  I was in the
15  building, her building, different than where my office
16  was.  And I was so concerned, I stopped in there and I
17  just kind of released.
18  I said, "Brianna, you know, I feel like I'm
19  not being heard.  I have no idea if Lane knows what's
20  going on, but I feel like" -- and I -- and I'm -- and
21  I'm just trying to remember what I was telling her.
22  But I felt that, you know, I was talking to deaf ears
23  with Zack, try -- needing his help and support to
24  support City staff, you know, when they are being
25  pushed around, bullied.  And, you know, City staff

**Page 40**

1  should not be treated like that.
2  I think, as a matter of fact, now I'm
3  recalling a meeting with Lane and Ruth Kennerly.  This
4  was about the time -- I think it may have been the --
5  it was the Friday, June 2020.  It was June 20 -- I
6  don't know.  It could've been the 20th.  But it was a
7  Friday, he called me in to talk to me and gave -- I
8  believe that's when he gave me the pre-dismissal
9  letter, which I don't see here.
10  So there was a pre-dismissal letter on that
11  Friday in -- Ruth was in that meeting and I talked
12  about how, you know, I felt like no one was standing
13  up to -- for City staff and supporting them -- or
14  supporting me specifically with issues with bad
15  behaviors from people in the public.
16  Specifically in my situation, you know,
17  volunteer ad -- advisory, if you would even -- if
18  you'd call it that -- board members, which was the
19  minority that ended up swaying others.
20  So I did have a meeting with -- and stated
21  that I'm most positive if I am -- I want to be very
22  truthful here, because there was another meeting then
23  on Monday after that weekend and I think that's the
24  one Souwan was in from HR, Souwan Kiengkham.  And I
25  cannot remember how to smell his -- spell his last

**Page 41**

1  name, but I know his first name.
2  That's where I had to actually give my -- my
3  key card to Souwan.  That was -- I believe that was on
4  that Monday, the day before I sent the letter.  So
5  that would've been June 22nd of 2020.  So I can't
6  remember ex -- I think Ruth was in the Friday meeting
7  and Souwan was in the Monday meeting, but that
8  would've been talked about if I'm recalling correctly.
9  Q.  When you say, "that would've been talked
10  about," are you talking about that no one was standing
11  up to the City staff from bad behaviors with people
12  from the public, specifically a minority of the board
13  members, that -- that conversation ---
14  A.  Yes.
15  Q.  All right.
16  A.  Yes.
17  Q.  Let me jump back to where this started.  So
18  my question was about any conversations with
19  Brianna where you complained or talked about you being
20  harassed and bullied.  All right?
21  A.  Uh-huh (yes).
22  Q.  And so that sort of delved into this June.
23  So I think before ---
24  A.  Uh-huh (yes).
25  Q.  --- Friday, June 20th of 2020, did you have

**42**

1 a conversation with Brianna about harassment and
2 bullying?
3    A.  I believe I did.  I don't recall exactly
4 when or how many times, but I believe it was more than
5 once.
6    Q.  All right.  And the one time that you did
7 say that you'd stopped in and said you weren't being
8 heard, that you don't know if Lane knows what's going
9 on, that you feel like you were talking to deaf ears
10 with Zack and that you needed support with City staff
11 being pushed around and such, did you complain to
12 Brianna that you felt that you, Larissa, were being
13 bullied or harassed?
14    A.  I am not sure if I said those exact words in
15 that meeting with her.  It would've been that
16 sentiment, but I am, you know ---
17    Q.  Who did you feel was bullying you or
18 harassing you?
19    A.  So I felt that Whitney Williams was the main
20 person that was trying to make my job so hard because
21 she didn't understand exactly what my job was, even
22 though I had tried to tell her and tell the rest of
23 the board how this structure worked.  She still ex --
24 she refused to believe that I was -- she was not my
25 boss.

**43**

1       And there were others that couldn't seem to
2 understand it for -- either for a couple years.  There
3 was a past president who was president when I came in
4 that was having a hard time understanding the new
5 structure as well.  And at times, I feel like he was
6 understanding.  And at times, I felt like he would
7 just take -- he and Whitney had the same side.  And
8 that was Greg Shields.
9       They were bringing in others, Diane Young,
10 who became a board member, that were really expecting
11 me to do things such as give them a -- you know, a
12 call or an email or do something at a moment's notice.
13 And that's couldn't always happen because I had a lot
14 of meetings.  I would have three to four meetings a
15 day and sometimes not get back to my office until four
16 o'clock in order to, you know, look something up.
17       I would shoot them a text.  We texted as
18 soon as I could, you know, I would respond.  These are
19 just slight examples of -- not the -- the nitty-
20 gritty, I guess, examples ---
21    Q.  Do you have any belief -- belief, in your
22 own mind, do you have a theory or a belief as to why
23 Ms. Williams was doing these things, making your job
24 hard?
25    A.  Well, like I said, she did not understand

**44**

1 the new structure, but it went beyond that.  I don't
2 know for sure, but I had been told by -- and I don't
3 know remember who, just members of the public.  If I
4 remember who, I'd tell you.  But I -- I heard they
5 really wanted Diane Young to be the director of this
6 new structure.
7       And can you repeat that question?  Because I
8 just went down memory lane and I...
9    Q.  Sure.  No, I was just asking you why you
10 feel in your own mind, you know, what your opinion is
11 or what your thoughts are as to why Whitney Williams
12 -- Ms. Williams, she was the board chair at the time,
13 right?
14    A.  She was vice chair and then became ---
15    Q.  Right.
16    A.  --- chair during this time ---
17    Q.  Why she was doing these things that you've
18 just described to make your job too hard.
19    A.  So she would often go to City management and
20 talk about things and they would allow this.  So Zack,
21 I know, had several meetings, because we talked openly
22 about it.  And I asked him to, you know, "Let's all
23 meet together, please don't meet without me, because
24 that's just inappropriate."
25       And I had checked with another org -- Main

**45**

1 Street organization, probably a couple of my friends,
2 and said, "You know, do your -- have your board
3 members ever done this, have they, you know, gone
4 around you to either city council or to city
5 management and, you know, not allowed you to be a part
6 of those conversations?"
7       And it was just like, "Oh, no, never, that
8 would never happen."
9       So I tried to explain that to Zack.  And he
10 said, "Nope, I'm going to meet with her and, I think,
11 Greg one more time."  This was probably pretty early
12 on.  "And then we'll talk about having conversations
13 with you in them."
14       So, you know, I -- I tried not to take this
15 personally.  And I always try to give people the
16 benefit of the doubt and I'm like, okay, we're going
17 to get through this, it's a rough patch, it's the
18 transition.  The more I help to lead and educate like
19 I should be doing, what I was hired to do, you know,
20 as to how this structure works, because I came from
21 that type of structure in another community, then
22 everything will -- will settle down.
23       And it seemed like just when you -- it
24 looked like it was going to get better, it would --
25 something would flare up and it would get worse.

46

1  There was something more to do.  And alway -- seems
2  like Whitney and -- I don't know if there were others,
3  but she would want -- you know, she wanted to show,
4  while she was president, that DSI was doing this and
5  this and this and this.  She really wanted to give
6  that presence of "Look at what all we're doing."
7          And I think that came from the fact that DSI
8  had a poor reputation, a reputation of not really
9  being effective and -- and, you know, there's lots of
10  opinions out there because you're dealing with
11  business folks.  You know, you've got your small
12  retail business owners.  You have property owners.
13  Everybody has an opinion about what, you know, DSI or
14  the City should be doing.
15          So I'm trying to bring that bridge together
16  and show that we are working together to do overall
17  downtown economic development.  Whereas Whitney and
18  Diane both would harass me about minutes for, like,
19  committee meetings that even the state director said,
20  "You don't need minutes for your committee meetings,
21  you know, that's what the board is there for.  That's
22  why you have the board meeting and your committee
23  chairs or the director if the committee chair's not
24  there, someone assigned, you know, reports what that
25  committee did."

47

1          So just took a hard nose to wanting these,
2  you know, committee minutes.  Or anytime if -- if
3  Whitney missed a stakeholders meeting, she wanted me
4  to give her, you know, minutes or something written
5  about what happened.  Well, you know, that will come
6  out, but it may not be today.  And honestly, part of
7  being a stakeholder is coming to these meetings and
8  being present for what's going on.
9          So there were a lot of tasks such as that.
10  Or, oh, my goodness, in 2018, Greg and -- decided and
11  then he got Whitney on board, they were going to
12  change the logo.  So I just got there in October of
13  2017, and some of this structure -- some things had
14  been set up and going and planned for me before I even
15  started work without that transition of, "Hey, let's
16  get to know each other, let's -- this is how this
17  operates; it's going to be a little different."
18          Instead, I came in and it was like, "Okay,
19  you know, you've got to do this and you've got" --
20  coming from the board to me of, you know, smaller
21  tasks when the organization was a mess.
22          And I really had to clean up the whole
23  structure, put in systems in place that weren't in
24  place.  There was -- you know, I was hired to develop
25  a department, a City department, the way that I knew

48

1  how.  That's what I was hired to do, and to be the
2  executive director to this nonprofit partner arm.
3  It's supposed to be a partnership.
4          And in the contract, it even said they were
5  to work with the director.  And I felt from almost day
6  one, it was working against me, giving me more and
7  more to do, expecting it like this, going to city
8  council members or the mayor even, probably.  I -- I
9  have a feeling because of some emails that would come
10  around -- you know, there was some emails to Karen
11  Alexander from Whitney.  Seems like I saw that once
12  come around.
13          I don't know if I -- I don't even know if I
14  have that anymore.  But there were -- there was a lot
15  that needed to be done.  And I did a lot, even with
16  the impediments that I was given.
17          And I often told Zack, I probably told
18  Brianna and I'm pretty sure I told Diane and Whitney
19  and Greg that I felt like a punching bag.  I felt like
20  -- I would use two analogies, Stretch Armstrong and a
21  punching bag, and/or, depending on the day.
22          And so they -- I voiced this to all of them
23  quite often and tried to get Whitney and Diane to
24  understand because they were the ones that harped on
25  it the most, you know, that I could delegate to my

49

1  staff.
2          It didn't have to be me and -- you know,
3  necessarily, you know, making this phone call to find
4  out -- I don't know, I'm giving an example, a -- if
5  there were back taxes owed on a -- you know, I -- or
6  that's something I would've -- I would've called the
7  tax office for.
8          But I'm giving a bad example and I'm
9  rambling.  So I get nervous.  But I want to make sure
10  -- and if I delay -- if I pause, it's because I'm
11  really trying to think because I know I'm under oath
12  and I want to be careful, you know, that I'm -- I'm
13  recalling exact events.  But I -- I -- it's just -- it
14  was a -- it was a bad time.
15          And, for instance, I think even Whitney, you
16  know, put my director's report at the end of the
17  agenda because she felt like that I -- I was taking
18  too much time.  Although, my time was to educate the
19  board on what, you know, was happening, like, at the
20  State, you know, with opportunity zones and with, you
21  know, grants that were possibly available and dates
22  that were coming up and trying to get them to
23  trainings.
24          Whitney did go to a couple of trainings, but
25  she couldn't quite grasp, still, this type of

50

1 structure.
2    Q.  Who replaced you as the executive director
3 of DSI?
4    A.  Interim director was Latoya Price, who was
5 my events coordinator.  I called her events and
6 marketing coordinator, even though her official City
7 title was jut events coordinator.  She's -- Latoya was
8 interim and then they hired Sada, S-a-d-a, Troutman, I
9 think it is now.  Yes.
10    Q.  And she's been the executive director of DSI
11 since?
12    A.  Yes.  And I think that has only been maybe a
13 year.  I'm not quite sure.
14    Q.  So going back to where -- where this
15 started.  I was talking to you about your
16 conversations with Brianna Kenny in the HR office for
17 the City.  And did you just -- we were talking about
18 your conversation with Brianna specifically about
19 harassment and bullying.
20        And it sounds like who you believe was
21 harassing you and bullying you was the -- Whitney
22 Williams, who was the assistant board chair, and then
23 the board chair, Greg Shields perhaps, the past
24 president, and Diane Young.  And I think you said
25 first that you think that they wanted Diane Young to

51

1 be the director.  Is that right?
2    A.  Uh-huh (yes).
3    Q.  And then you talked about how they went to
4 Lane Bailey, the city manager and maybe the mayor and
5 some board members.
6    A.  Yeah ---
7    Q.  Let me ask you before we go farther than
8 that.  Do you think it's inappropriate for a city
9 council member or the mayor to talk to the city
10 manager about a department head such -- like the
11 police chief or the fire chief instead -- without that
12 fire chief or the police chief being present?
13    A.  No.
14    Q.  Okay.  But you didn't like it that the board
15 members, such as Ms. Williams or Ms. Young, would go
16 to the city manager to discuss things about DSI
17 without you present?
18    A.  When it was over -- yes, I did not believe
19 that that was -- that's not the same.
20    Q.  And as far as the harassment and the
21 bullying that you felt was going on were the things
22 that you just explained, that they wanted you to email
23 back right away or do -- make calls or things like
24 that nature as well as, you know, going to the -- to
25 Lane Bailey ---

52

1    A.  Well ---
2    Q.  --- and making complaints and such and
3 things like that?
4    A.  There was also an incident where Whitney and
5 I had a discussion.  I think it was after one of the
6 board meetings.  And she told me I needed to be more
7 like James Meacham, who is the CVB and TDA director.
8 And even said, "He wears nice suits."
9        And I'm thinking I -- I dress appropriately.
10 I think I was wearing a suit that day.  I wasn't -- I
11 was really upset that I felt like she was comparing me
12 to a man she felt like I needed to, you know, be more
13 like.
14        So that was -- and -- and she had some --
15 she's fiery.  And so she had -- it seems like she had
16 some fiery words in that instance.  And I don't
17 remember when that was exactly.
18    Q.  What is the CVB/TDA?
19    A.  Convention and Visitors Bureau is CVB.  And
20 Tourism Authority.
21    Q.  Okay.
22    A.  TDA, Tourism -- I can't remember what the D
23 stands for.  We're in the building.
24    Q.  Mr. Meacham is the executive director of
25 those organizations?

53

1    A.  Yeah.
2    Q.  And Ms. Wallace said to you at some point,
3 "Why can't you be more like him" or something to that
4 effect?
5    A.  Or I should be.
6    Q.  You should be more like him ---
7    A.  I should be more like him.
8    Q.  And did you complain about that?  Did you
9 tell Brianna or someone at HR about that?
10    A.  I told someone.  I don't know if I told HR
11 or if I told Zack.  And honestly, of course, you know,
12 this is hard for me to say, but at times, I felt like
13 Zack bullied me.
14        And that's hard for me to say because we had
15 a very close rapport because we were -- almost every
16 day, we were probably in meetings.  If not every day,
17 several times a week.  And sometimes about DSI things
18 and sometimes it was just department head city
19 management team stuff.  And, you know, he's likeable.
20        He, at one point, compared me to him and
21 said, you know, "You're probably like me."
22 (Off-record comments)
23        THE WITNESS:  And said, you know, "You
24 can laugh and joke and, you know, be friendly and
25 maybe that doesn't come off then as leadership," or

54
1 something like that.
2    Q.  (Mr. Flanagan)  When you went to either HR
3 or Zack and told them about this James Meacham
4 comment, what did they say?
5    A.  I don't really remember any comment.
6    Q.  Okay.  When you -- you said just a minute
7 ago -- and then I'm going to take a break here, but I
8 just don't want to leave this here.  You said that it
9 hurts you to say that Zack bullied you because you had
10 such a good relationship and you were together all the
11 time.
12       What did Zack do to bully you?  Tell me
13 specifically what you believe Zack did ---
14    A.  So in one instance -- and I believe this
15 could have been when we were going over a disciplinary
16 action review that he surprised me with.  And I'm
17 thinking either Brianna Kenny in HR or Kelly Baker was
18 in this meeting.  He didn't like the fact that I was,
19 you know, looking -- I believe we were looking over
20 this report.
21       It was something to do with, you know, my
22 performance review or disciplinary action report,
23 which, you know, I didn't feel was fair.  And so I
24 took time and wrote those comments.  I believe that's
25 the same time.  It may not have been.

55
1       But he was standing up and he had, like, his
2 hands on his hips and he said, "You know, I've
3 mellowed in my old age.  I used to be really" -- how
4 did he put it?  I'm just -- I'm -- I'm picturing right
5 now, you know, what -- he's standing up.  I'm sitting
6 down.  Brianna or Kelly, whoever, is there at the
7 table sitting down.
8       He's standing up and he has his -- he said,
9 "I -- I used to be -- I used to get really angry," I
10 think were his words, something like that, "So you're
11 lucky that I've mellowed," or something like that.
12       So here is a man that's typically affable
13 and we have a great relationship and we -- but I don't
14 know why -- if he was so frustrated by whatever was
15 going on in his world, but I feel like he -- he wasn't
16 listening to me.  I had the same -- I always came to
17 him with, "This is what I'm seeing going on.  This is
18 the problem I see."  And my story never changed.
19       And I don't remember the -- exactly, like I
20 said, what happened before that, but I feel like it
21 was one of those times when we were in his office and
22 there was a witness and it could've been Kelly Baker,
23 who I believe at the time was assistant to the city
24 manager, or it was Brianna Kenny in HR.
25       And from then on, it was like I never knew

56
1 which Zack I was going to get.  Was I going to come
2 into a meeting and it was going to be, you know,
3 affable, nice, "I'm your buddy, I'm there for you, I'm
4 going to support you" Zack, or if it was, "No, you
5 need to do, you know, whatever they say to do, plus
6 everything we ask you here at the City,"
7 non-supportive.
8       So it would -- there were times I just felt
9 like I didn't know who I was going to run into.
10    Q.  So this one instance where you felt that
11 Zack was bullying you was when you were receiving a
12 disciplinary action.  Is that ---
13    A.  I do believe so.
14    Q.  And speaking of that disciplinary action,
15 whichever one it was, and any of your other
16 disciplinary actions, did you ever grieve those
17 pursuant to the City of Salisbury's grievance policy?
18    A.  I wish I would have.  I wrote a letter and I
19 did not submit it, so no ---
20    Q.  Okay.  So no.
21    A.  --- I did not submit a grievance.
22    Q.  And did you ever submit a grievance with
23 regard to this instance, this one instance here where
24 you felt Zack was bullying you?  Did you make a
25 complaint ---

57
1    A.  No.
2    Q.  No?  All right.  And ---
3    A.  And -- and let me just amend that.
4    Q.  Sure.
5    A.  Unless it was one of -- the instance where I
6 popped into Brianna Kenny's office.  I don't know if
7 that was the same time or a different time when I sat
8 down and just talked to Brianna one on one about how I
9 was feeling and I wasn't being heard.
10    Q.  Right.  That's the one time you said you
11 talked to Brianna about not being heard, don't know if
12 Lane knows what's going on, you feel like you're
13 talking to deaf ears with Zack and that you needed
14 support with City staff being pushed around, right?
15    A.  Yes.
16    Q.  Okay.  So you may -- may, you're not sure,
17 but you may have talked to her about this instance
18 with Zack where he stood up and said, "I used to get
19 angry, but now I've mellowed"?
20    A.  I may have, but I am just not positive.
21    Q.  And when Zack stood up and said, "I used to
22 get angry, but now I've mellowed," did he say or do
23 anything else that you felt was bullying?
24    A.  Well, I kind of felt like that was enough.
25 I may have gotten upset.  I know I cried at least once

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 11 of 45

66

1  your stuff short."
2        There was a actual organization committee
3  meeting -- there's four committees in the Main Street
4  Program.  So there's a four-point approach and each
5  approach has committees.  So -- and then Organization
6  Committee, which is like an executive committee.
7        Whitney totally derailed the agenda.  And
8  therefore, about -- it was something totally
9  different, not on the agenda.  And there were very
10  important dates and things I needed to go over with --
11  it's basically your board officers.  So it's committee
12  chairs and your chair, vice chair, treasurer,
13  secretary.
14        And it seems like as a result of that, there
15  was a follow-up email between Whitney and I later
16  about something that she didn't know about or didn't
17  -- I hadn't done or something and -- and I referred to
18  the fact that, well, the agenda got derailed and the
19  information -- you know, I tried to point it out.
20        There were just many times that, you know, I
21  wasn't given the direction to lead and guide like I
22  had been hired to do.
23     Q.   How often were the full -- these full board
24  meetings?
25     A.   The full board meetings were monthly.

67

1     Q.   All right.  So once a month.  And then you
2  had these four committee meetings that you had, what,
3  also once a month ---
4     A.   Monthly.
5     Q.   All right.
6     A.   Yes.
7     Q.   And so then there were other meetings that
8  you would have with the City department head meetings
9  and things like that, right?
10     A.   Yes.
11     Q.   And all department heads were expected to be
12  at the City meetings.
13     A.   That would ---
14     Q.   Was that once week?
15     A.   --- happen at least once a week.
16     Q.   Right.
17     A.   Sometimes more than once.
18     Q.   And just to be clear.  The board meetings,
19  the DSI board meetings, the board members are all
20  volunteers, right?
21     A.   Uh-huh (yes).
22     Q.   All right.  They all have regular jobs or
23  other ---
24     A.   Uh-huh (yes).
25     Q.   --- things going on?

68

1     A.   Sure.
2     Q.   And how long would these board meetings
3  last?
4     A.   About an hour and 15 minutes.
5     Q.   Okay.  Would they be in the evening usually?
6     A.   No.  They were in the morning at 8 a -- they
7  were at 7:45.
8     Q.   Okay.
9     A.   They started and we would, you know, get our
10  coffee.  Sometimes, it would go an hour and a half.
11     Q.   Okay ---
12     A.   Because there was a lot of things going on
13  that we had ---
14     Q.   Right.
15     A.   --- to talk about.
16     Q.   And then people needed to get to work after
17  that, right ---
18     A.   Uh-huh (yes).
19     Q.   Okay.
20     A.   Uh-huh (yes).
21     Q.   So you had limited time in these board
22  meetings, would that be accurate, to go over things?
23     A.   Sure.  But, you know, if folks needed to --
24  if they could stay, you know, they could stay and talk
25  about more things if they needed to.

69

1     Q.   Sure.  Understood.
2     A.   Uh-huh (yes).
3     Q.   But there were -- there was a lot of things
4  to go over in a limited amount of time.
5     A.   Uh-huh (yes).
6     Q.   Would that be accurate?
7     A.   Sure.
8     Q.   All right.  Let's talk about -- well, the
9  other thing I wanted to ask you before we get to the
10  one spat that you referenced is you said that -- that
11  a lot of these things are -- they were going on behind
12  the scenes.
13     A.   Uh-huh (yes).
14     Q.   What do you mean by that?
15     A.   So I would find out from Zack sometimes.  I
16  guess that's who would typically inform me of the
17  meetings between the DSI officers and either Zack or
18  Lane or maybe Brian Miller, the council liaison.  I
19  don't know about other council members or the mayor.
20        But I -- I just felt like there was behind-
21  the-scenes talk or -- when I wasn't around, I guess I
22  should say specifically, about, you know, what I
23  should or should not be doing.  But they were coming
24  from an uneducated source, unrealistic and uneducated
25  position that I wasn't there and I couldn't clear up

**78**

1    Q.   All right.  So let's circle back.  You know,
2  originally some time ago, I asked you about
3  documentation of this hostile work environment and
4  workplace harassment that you referenced in your
5  resignation letter, which was Exhibit 1.
6    **A.   Uh-huh (yes).**
7    Q.   And you indicated that there -- the only
8  letter or email you remember about that is the March
9  2020 email that Zack asked you to -- or is a response
10  to the allegations by DSI that occurred in March of
11  2020.  And we're going to talk about that separately.
12        And there weren't any other, you know,
13  letter or complaints or grievances, but that you had
14  talked to Brianna the one time and perhaps more about
15  all the things we just talked about.  And we were
16  talking about harassment and bullying.
17        With regard to being treated differently,
18  tell me about that.  What did you talk to Brianna
19  about related to being treated differently?
20    **A.   I'm trying to remember if she was there**
21  **because she left the City and went to work in another**
22  **county.  So I'm not sure if it was Brianna, but key**
23  **scans -- I was shocked when Zack -- so I know I talked**
24  **to Zack.  I don't remember if Brianna was in this**
25  **meeting or another HR person.**

**79**

1        **But the fact that they were scanning my key**
2  **card into my office building when I use a -- I go to a**
3  **lot of different buildings.  And of course, just like**
4  **the board meeting, we have the 7:45 a.m. start time**
5  **and we have meeting -- committee meetings after hours.**
6        **I'm pretty sure I -- I asked -- at some**
7  **point, we have asked at least Zack, you know, "Why are**
8  **you showing my -- you know, why am I the only one that**
9  **you're scanning the keys?"**
10        **And I don't know if it was actually during**
11  **my employment or if it was after, now that it's been**
12  **two-and-a-half years.  But I felt like the fact that**
13  **he was scanning my key card into the one building of**
14  **multiple that I go into and he was giving me**
15  **disciplinary action reports saying I was to be in my**
16  **office from 8:30 to five, which is not my job at all.**
17  **It's not how my job works.  And, "You must answer**
18  **emails within 24 hours and phone calls."**
19        **Well, you know, who else -- I didn't feel**
20  **like they were doing that to the Parks & Rec director**
21  **who was in my building or the communications director**
22  **who was in my building that we're supposed to be**
23  **partners with in working on events and -- and our**
24  **website and such.  But I just felt like they did not**
25  **-- between scanning my key cards and looking through**

**80**

1  **my emails and assuming -- so they did a email audit**
2  **and assumed I didn't answer an email if it showed**
3  **unread.**
4        **And just like when we had conversations, the**
5  **men in the room would -- it seemed like, definitely**
6  **got more time.  Their -- their -- and they were --**
7  **their -- what they had to say was more important.  And**
8  **I often felt ignored.**
9        **And this could be in staff meetings, when we**
10  **had our team -- management team meetings or when I**
11  **went to Zack one on one and would talk with him and**
12  **try to talk through some of the issues that the Parks**
13  **& Rec department was having with my department staff**
14  **and I.  Because we really -- we had to work closely**
15  **together and he's the main comparator that I -- I can**
16  **think of is -- is the director of Parks & Rec.**
17        **It just feels like there were lots of**
18  **instances that I was not acknowledged by Lane or Zack.**
19  **And therefore, I felt like it was -- it was not -- it**
20  **was unfair treatment.  And I think a lot of the -- I**
21  **don't know that that was just me, unfair treatment of**
22  **women.**
23        **But I know that I felt like I had to stand**
24  **up and say something.  It was the principle.  I would**
25  **not do anything like this frivolously.**

**81**

1    Q.   So let's go back.  So the first thing you
2  said is that you felt the key card scanning into your
3  office was unfair and that you were being treated
4  differently because you were the only one being key
5  card scanned or audited, I guess ---
6    **A.   Well, when it went on my disciplinary action**
7  **report.**
8    Q.   So -- and you also said about the email
9  audit.
10    **A.   Uh-huh (yes).**
11    Q.   And you compared that -- yourself to the
12  communications director and the Parks & Rec director.
13  Who is the communications director that you're talking
14  about?
15    **A.   Linda Mc -- McElroy, McElroy, M-c ---**
16    Q.   Linda McElroy?
17    **A.   Uh-huh (yes).  E-l-r-o-y.**
18    Q.   And she was in your same building, right,
19  where you worked ---
20    **A.   Yes.**
21    Q.   All right.  And you -- so you were being
22  treated differently than Linda and then the Parks &
23  Rec director.  Who was that?
24    **A.   Nick Aceves, A-c-e-v-e-s.  A-c-e-v-e-s,**
25  **Aceves.**

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 13 of 45

82

1    Q.   Okay.  We'll just call them Nick and Linda.
2  How about that ---
3    **A.   Yeah.**
4    Q.   All right.  Okay.  So do you know whether
5  either Nick or Linda had ever had an email audit or
6  someone in management was looking at their key cards
7  and when they scanned in and out of the office?
8    **A.   I don't know.**
9    Q.   Do you know whether the -- Zack or Lane or
10 somebody else in management ever did an email audit or
11 did a key card scan audit of anybody else other than
12 -- well, anybody else other than you in the City?
13   **A.   I don't know.  I do know that I happened to**
14 **ask a planning department staff person right after I**
15 **had this disciplinary action for the number of emails**
16 **that they assumed I had not responded to.  I happened**
17 **to be talking with the planning department staff**
18 **person and somehow the -- it came up -- there was an**
19 **entrance and I asked her, you know, something about**
20 **the number of emails and she -- that, you know, I had**
21 **in my box or something and I may have told her I was**
22 **getting flack over it.  I don't know.**
23       **And she said that she had never emptied out**
24 **any of her emails since she had been there and she got**
25 **to the City, like, a -- probably a year and a half**

83

1  before I did.
2    Q.   Who was this?
3    **A.   Alyssa, A-l-y-s-s-a, Nelson.**
4    Q.   So you indicated to her that you had
5  undergone an email audit and had received, what,
6  disciplinary action about your ---
7    **A.   I don't know what I told her exactly in**
8  **that.  We were, I think, meeting for some other reason**
9  **and we were in her office one on one.  And it -- the**
10 **topic came up.**
11   Q.   Okay.  And so at least we know from your
12 apparent conversation with Alyssa Nelson that she
13 didn't empty out her inbox?
14   **A.   Uh-huh (yes).  Right.  So therefore, I would**
15 **feel, you know, like, well ---**
16   Q.   Do you ---
17   **A.   --- maybe this was just me.**
18   Q.   Yeah.  Do you know whether anybody ever
19 complained about Alyssa Nelson or Linda and ---
20   **A.   No.**
21   Q.   --- Nick, the communications director and
22 the Parks & Rec director, that they didn't either
23 respond to emails timely or that they were not in the
24 office on a regular basis or when they were supposed
25 to be?

84

1    **A.   I know of no -- not to my knowledge.  I**
2  **don't know of any complaints, but I don't know.**
3    Q.   And you said that you received a
4  disciplinary action for this or at least were told you
5  needed to answer your emails ---
6    **A.   Oh, I...**
7    Q.   --- and phone calls and be in the office on
8  a regular basis?
9    **A.   This -- this ---**
10   Q.   Yeah.
11   **A.   --- was in a disciplinary action report,**
12 **which is in the Discovery information.**
13   Q.   And you explained yourself in response to
14 those, correct?
15   **A.   I did on the -- that one, I believe, the**
16 **first -- I believe it was the first disciplinary**
17 **action report.  I wish I had done the same thing on**
18 **the other two.  But I was -- honestly, the first time**
19 **that I wrote -- I took time and I said, you know, "I**
20 **-- I have feelings about this.  I feel like I've**
21 **discussed with you, but I need to formally write this**
22 **down," I know that was with Zack.**
23       **And I'm trying to -- it may have been with**
24 **either Kelly Baker or -- I think it was with Kelly**
25 **Baker.  Because I felt like -- I felt the pressure as**

85

1  I was sitting there, writing.  They're, like, looking
2  at each other, kind of, like, rolling their eyes.  I
3  feel like -- you know, I'm looking up and -- because
4  I'm feeling this, like -- (sighs) like, is she done
5  already.  But ---
6    Q.   Who was in the room?  I'm sorry.
7    **A.   Kelly Baker.  She was, at the time,**
8  **assistant to the city manager.**
9    Q.   Okay.
10   **A.   And it may have been this same meeting**
11 **because her signature is on one of the disciplinary**
12 **action reports as a witness.  And it was either the**
13 **one time that I felt I had to, you know -- that I was**
14 **allowed time to write what I felt.  And it was either**
15 **that meeting or it was the meeting where I was**
16 **suspended.  And it could've been the same meeting.**
17       **And this would be the -- the meeting where**
18 **-- I believe it was the same meeting where Zack was**
19 **very -- seemed very irritated and was standing up and**
20 **put his hands on his hips.  And Kelly Baker told me to**
21 **just stop.  She just put a hand -- you know, I'm --**
22 **I'm trying to talk with Zack and talk through these**
23 **things and give him my perspective.**
24       **And she hands her hand out -- puts her hand**
25 **out and just says, "Just stop."  So I think that's**

**102**

1  office moved from this building we're actually in to
2  the City Hall building with the Parks & Rec and
3  communications staff.
4       Personally, that was the first mistake I see
5  as a educated executive director of, you know, this
6  type of structure. But we were there. I came in.
7  The event coordinator who was already in place who had
8  been the DSI intern and then -- and this is as I
9  understand it from her. I believe she then took the
10  place of a staff person that left, who they actually
11  called them promotions directors, I believe. It was a
12  promotions director.
13       But when I get -- for DSI. That person
14  left. This person was interning. And then I believe,
15  as I understood it, she took that position. The City
16  decided to hire her. I don't know anything about that
17  interview process or anything, selection. And she
18  became event coordinator for the downtown development
19  department, which actually at the time was still named
20  DSI.
21       I had to straighten that out. There were
22  two -- people were confused as to whether DSI was
23  still a nonprofit entity of its own or a department
24  with the City. So I -- that was another thing I had
25  to straighten out. But at the time, when I came in,

**103**

1  the city department was called DSI rather than
2  downtown development department.
3       So Katelin was there, and Parks & Rec had an
4  event coordinator. So Katelin liked to do her event
5  coordinating one way and the Parks & Rec event
6  coordinator liked to do hers another way and they
7  clashed. They had -- it was a personality clash. It
8  was a clash of, you know, what they were used to. And
9  so there was already friction going on when I got
10  here.
11       And they really kind of didn't want to work
12  together and they were being forced to work together,
13  which I believe was the -- was a crux of the problem
14  for the whole Parks & Rec department working with us.
15  Because they had been put under contract to work with
16  DSI on running the events. And I remember a meeting
17  with -- when I -- early on, I was just meeting Nick --
18  Nick, the Parks & Rec director, and Zack Kyle.
19       We sat down and there was still some
20  resistance because Nick was saying he didn't have
21  enough staff. And Zack was -- he was being very -- I
22  don't want to say forceful, but he was re -- sternly
23  reminding him that there was a contract.
24       And I could tell that the Parks & Rec
25  director didn't feel like he should be in that

**104**

1  contract. And I find out later from the parks
2  direction -- Parks & Rec director directly that he had
3  lost numerous staff members. And I -- I feel like he
4  told me this was a Zack decision. And he had lost,
5  like, 30 or so employees that went to other
6  departments from -- and so he was feeling way under --
7  way understaffed and there was just this unwillingness
8  for a while to work together.
9       Q. But Zack told him, "You have to work -- this
10  is part of your" ---
11       A. Yes.
12       Q. --- "mandate is you have to work with DSI
13  and help" ---
14       A. Yeah.
15       Q. --- "with these events," correct?
16       A. Yes.
17       Q. Sternly told him that, right ---
18       A. He did. I would say, you know ---
19       Q. Yeah. Okay.
20       A. --- I would say sternly.
21       Q. So the two event coordinators, Katelin and
22  the Parks & Rec -- your event coordinator,
23  Katelin ---
24       A. Uh-huh (yes).
25       Q. --- and the Parks & Rec coordinator -- what

**105**

1  was her name?
2       A. Vivian Koontz ---
3       Q. Vivian. Okay. And they clashed because
4  they had different styles or whatever, right?
5       A. They -- they worked on working together
6  better.
7       Q. Yeah.
8       A. And it did get a -- it got a little better.
9       Q. All right. And then the Parks & Rec
10  department head was understaffed and didn't feel like
11  he had the staff to do the events, but he was told he
12  had to do it?
13       A. Uh-huh (yes).
14       Q. And so what are the issues that the Parks &
15  Rec department head had with your staff specifically?
16       A. So as time went on, I think he understood,
17  you know, Katelin and Vivian were coming from two
18  different ways of doing things. So he -- I think he
19  and I worked together to try to get them to work
20  together.
21       Q. Uh-huh (yes).
22       A. Katelin leaves in May or June of 2018. So I
23  had only been there since October 2017. And I go five
24  months without help, without any staff. I think I may
25  have gotten the bookkeeper back temporarily that DSI

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 15 of 45

110

1   -- he -- Linda -- Linda, the communications director,
2   wanted Katelin to work with her and her staff in the
3   communications department.  I can't remember what the
4   project was.  You know, it may have been newsletters
5   or something.
6          Katelin complained to me that this was
7   taking away and -- you know, from her work, which was
8   making us both look bad, like we were behind on work.
9          So I did go to Zack and I said, "Katelin
10  cannot do this anymore.  She cannot help another
11  department anymore.  We are -- you know, there's only"
12  -- at that point, there was only two of us.  And we
13  needed -- for this size city, we needed a staff of
14  three or four.
15     Q.  Okay.  And Zack -- what was Zack's response
16  to that?
17     A.  He actually said, "Okay.  Katelin does not
18  have to work with communications anymore," thank
19  goodness.  So we -- we won that one.
20     Q.  Okay.  Is there one that you lost?
21     A.  Oh, let's see.  I feel like -- I don't know
22  if it was a loss, if it was a win or a loss, but I
23  feel like it didn't help.  One of the things that
24  happened to Katelin was that she was taken aside or
25  told to meet with Kelly Baker, who confronted her

111

1   about her tattoos.  And that, I think, was icing on
2   the cake.  Katelin was ready to get out at that point.
3   She did not feel like she was accepted as a City
4   employee.
5      Q.  Because of her tattoos?
6      A.  Yes.
7      Q.  And Ash -- Ashley -- Kelly Baker told her
8   that or ---
9      A.  Well ---
10     Q.  --- at least?
11     A.  --- I wasn't there for the, you know,
12  meeting between the two.  But from what Katelin told
13  me was that she needed to, you know, keep them covered
14  as much as she could.
15     Q.  Okay ---
16     A.  And this was, like, a small wrist tattoo or
17  something ---
18     Q.  What does that have to do with Zack and him
19  not acknowledging ---
20     A.  So -- so I feel like it -- at times, it
21  wasn't just me.  It was allowed -- for some reason,
22  Kelly Baker would have say over things.  Even how we
23  decorated our downtown offices, I had to go through
24  Kelly.
25         So Zack was allowing Kelly, who was not a

112

1   department head for probably half the time I was here,
2   and was actually -- became my supervisor when she
3   wasn't a department head for a while.  She was given
4   more power, I guess, over me and my staff than I.
5      Q.  Okay.  I understand ---
6      A.  So -- than me.
7      Q.  And Kelly is a female, obviously, right?
8      A.  Yes.
9      Q.  All right.  And then what about Lane?  Were
10  there specific instances where -- well, let me back up
11  just a second.  I'm sorry.
12         The other thing you mentioned about Zack was
13  that he stepped over boundaries that contributed to
14  demeaning your position and you said that happened one
15  time and maybe more.
16         Tell me about the one time that you remember
17  that that occurred, or have we talked about that
18  already?
19     A.  So I did not mention that.  I can mention
20  that now.
21     Q.  Let's talk about that ---
22     A.  So Zack, in this meeting with Latoya Price,
23  who was my event coordinator and marketing staff,
24  called her in.  And even though she had only been
25  there for maybe two months as my staff person or as

113

1   our department staff person, Zack put her in charge of
2   the Main Street Conference, the 2019 Main Street
3   Conference that was coming up.  Which she had never
4   been educated through the Main Street Program.
5          He then also asked Diane Young to be a part
6   of that leadership of the conference.  And, you know,
7   at first, because I had so much on my plate, I told
8   him, I said, "Well, you know, Zack, even though you
9   did this behind my back, you know, without my
10  knowledge and you're telling me, like, days later or
11  something," I said, "it actually makes sense for an
12  event, you know, person to -- to lead up some of the,
13  you know, activities,"
14         I was doing my part.  I was already -- I had
15  been working through the summer when I had no staff on
16  things that they needed for the conference the year
17  before.  So I was doing my part and I was overseeing.
18  So I felt like that maybe wasn't such a bad thing.
19         But then when I start hearing things, talk
20  from, you know, either DSI members or city staff that
21  would be -- it sounded like, well, you know, "Larissa
22  couldn't do this, so we had to put, you know, Latoya
23  and Diane in place."
24         Well, that's ---
25     Q.  Who told you that?

**114**

1     A.  So I -- I feel like that came from Zack.
2     Q.  Did he tell you, "I put Latoya in this
3  position" ---
4     A.  Oh, yeah.
5     Q.  --- "because I didn't think you could do
6  it"?
7     A.  I think he said that in a matter of words.
8     Q.  Okay.
9     A.  Yeah.
10    Q.  Said it to you?
11    A.  Yes.  But I feel like then it became somehow
12 -- however things happen in a small town, rumored that
13 that was a dig on me.  And that rumor, I'm sure, I
14 feel like it was surely rumored through the -- the
15 board membership.
16      And so, you know, that was a couple
17 instances.  There are more.  There are more.  But
18 that's all I can, like, recall right here on the spot.
19    Q.  Okay.  Well, let's just wrap this up and
20 we'll take a break.
21    A.  Uh-huh (yes).
22    Q.  I've got two more things I just need to
23 follow up on you.  You've mentioned that there were
24 instances where -- that you did -- you felt you were
25 not acknowledged by Lane -- by Zack and Lane, or Lane.

**115**

1  What -- can you tell me any that you felt you were not
2  acknowledged by Lane?  You mentioned that ---
3     A.  Yes.
4     Q.  --- the time you went to his office and he
5  said he couldn't deal with whatever the issue was
6  right then in May of 2020.
7     A.  Uh-huh (yes).
8     Q.  Are there other instances?
9     A.  Uh-huh (yes).
10    Q.  Tell me about that ---
11    A.  So in public at city council meeting, at
12 least one or two, seems like it was the second year
13 that we put on the Cheerwine Festival, there was no
14 mention of, you know, any of the work I did and
15 helped.  It was -- it's -- mainly was Nick and his
16 Parks & Rec staff is how I -- it's in the minutes.
17    Q.  Okay.  So the minutes would reflect what he
18 said?
19    A.  Right.  I think that was probably June of
20 2020, maybe 2019 as well.
21    Q.  Was Vivian, the Parks & Rec event
22 coordinator, involved in that?
23    A.  Yes.
24    Q.  All right.  What other instances?
25    A.  So there -- I'm trying to think with Lane.

**116**

1  I'm sorry, I just thought of something else.  I just
2  thought of something else.  That was Zack, though.
3       The commun -- certified retirement community
4  -- so this was something Lane forced me to do because
5  the planning department had not completed this task in
6  prior years.  Not only with all of this -- the
7  pressure of all these small and large things, big and
8  small, that I was asked to do personally, Kelly Baker
9  comes to me -- wasn't even Lane.
10      Kelly Baker said, "Lane wants you to apply
11 and head up this certified retirement program and you
12 have to have a meeting -- one meeting before you can
13 apply.  So you have to gather outside members from the
14 community, has to be certain partners, and have this
15 organization committee and go through this
16 application."
17      And I was -- I didn't understand.  When I
18 was looking at it, I said, "You know, this -- we're
19 looking at assets -- this is telling me to take asset
20 inventory of the whole county," you know, like Dan
21 Nicholas Park, you know, what attributes do we have to
22 become a state certified retirement community so that
23 then we can get advertisement.
24      And I questioned and I questioned Zack
25 multiple times.  I said, "You know, this is taking --

**117**

1  this is putting a lot of pressure on me and it's
2  something that's outside of downtown.  This is more
3  like something tourism would do."  And tourism didn't
4  want to do it, because I heard that from James Meacham
5  himself.  He didn't think it was worth it.  We had
6  that conversation.
7       So somebody's agenda -- I don't know who it
8  was, and Lane was enforcing this agenda to get this
9  CRC designation.  I was even threatened by Zack in a
10 letter, in an email, which you do have, that said if I
11 don't get it done by June of -- I can't remember if
12 that was 2019 or 2020 now -- well, I was still here,
13 so it was 2019.  Then I was going to be fired.
14      And I had to beg and plead and basically
15 say, "I have to say no.  I cannot not say no at this
16 point."  We had budget.  We had annual assessment due
17 for the Main Street program, which was a big
18 assessment.  I said, "However, I can get it done by
19 the due date on the application, which is July 30th."
20      I spoke and talked with the staff person at
21 the State who takes the applications.  He said, "Look,
22 I'm not going to give them to them until after August
23 1st.  So July 31st, August 1st, you just" -- and there
24 was -- I don't know why that -- I do know why.
25      It was because of budget or whatever.  But I

126

1    Q.   Yeah.  What about in Wilson?  What was your
2  -- who was your supervisor there?
3    A.   Kimberly Van Dyk.
4    Q.   And what was her position?
5    A.   She was the downtown manager, they called it
6  there.  But then she ended up -- we went from a
7  department within the City to becoming a part of the
8  planning department.  So now, she -- and they renamed
9  the planning department to a really long name, but
10  she's planning director.  It's, like, community
11  revitalization planning and downtown director.  She
12  kind of holds both those positions.
13    Q.   Were you a City of Wilson employee?
14    A.   Yes.
15    Q.   And from that, you became an -- the
16  executive director for DSI.  Is that right?
17    A.   Yes.
18    Q.   Why did you leave Wilson?
19    A.   Well, it was time to come closer to home.
20  My family was aging.  I had gone to some funerals that
21  I wish I had spent more time with my family over this,
22  you know, way.  And this opportunity was sent to me by
23  a coworker and so I thought it was a great fit.  It
24  was like the next step in my career and get me back
25  home.

127

1    Q.   After you worked here at DSI in Salisbury,
2  you went to work for the Lexington -- tell me again,
3  Lexington ---
4    A.   Tourism Authority.
5    Q.   Tourism Authority.
6    A.   Uh-huh (yes).
7    Q.   So let's just call it LTA ---
8    A.   LTA.  That'll be fine.
9    Q.   And you worked there until August of '21.
10  Is that correct?
11    A.   Correct.
12    Q.   And as part of the claim in this case, you
13  have made a claim that you were retaliated against by
14  Salisbury, which led to your term -- led to the
15  termination of your employment at LTA.  Is that
16  accurate?
17    A.   Yes.
18    Q.   All right.  Who was your supervisor at LTA?
19    A.   Robin Bivens.
20    Q.   And in April of 2021, did you and Ms. Bivens
21  have a conversation about your claim against the City
22  of Salisbury and DSI?
23    A.   I believe that was around April.
24    Q.   Okay.  And in April of '21, did you tell
25  Ms. Bivens that you had filed a claim with the EOC in

128

1  August of 2020, claiming discrimination in the
2  workplace?
3    A.   Yes, I'm sure I did.
4    Q.   Why did you decide to tell Ms. Bivens about
5  that?
6    A.   Because when I came in from -- I think it
7  was, lunch, it was -- this was the day after returning
8  to work.  I took a day off the day before for our
9  media -- our first mediation in this case, with EEOC,
10  mediation.  I came back from lunch and the other staff
11  person wasn't there and Robin wanted to have a serious
12  conversation and she looked very worried and upset.
13  And she said she had received a phone call.  And she
14  would not tell me who.  She didn't remember when I
15  asked.  That I was suing the City of Salisbury.
16        Which, at that point, I said, "That's
17  misinformation because I haven't decided that yet.  We
18  simply had mediation."  She knew there was something,
19  I think, happening, but we really didn't -- we talked
20  -- we had, like, maybe one conversation about it and
21  she just really didn't want to know any more.  But
22  then when this call came in, it concerned her because
23  she said it came from another -- she told me a tourism
24  colleague.
25    Q.   Okay.  So let me back up just a second.  So

129

1  prior to this conversation in April that you had where
2  she said a tourism colleague had called, you had
3  already had some conversation with Ms. Bivens about
4  the char -- about the EEOC claim?
5    A.   Not really about what it was.
6    Q.   You made her aware that you had filed one?
7    A.   So I -- I do remember, you know -- I don't
8  know what day it was or when exactly it was, but I do
9  remember, you know, stepping to her office door and
10  saying, "You know, I feel like I need to tell you kind
11  of what's going on."  I didn't give her a lot of
12  details and -- and she didn't ask.  But then after
13  this phone call, it seemed like the sky was falling.
14    Q.   All right.  So prior to April of 20 -- just
15  to be clear.  Prior to April of 2021, you had had a
16  conversation with Ms. Bivens about the fact that you
17  had filed an EEOC charge.  But it wasn't until April
18  of 2021 that you had a conversation with her where she
19  said a fellow colleague ---
20    A.   Colleague ---
21    Q.   --- had told her of a lawsuit?  Did she say,
22  "lawsuit"?
23    A.   Yes.
24    Q.   Okay.  And you hadn't filed a lawsuit at
25  that point?

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 18 of 45

130

1    A.  Huh-uh (no).
2    Q.  Correct?
3    A.  Correct.
4    Q.  Okay.
5    A.  That's what I recall.  And -- and I don't
6  know exactly when we had that first kind of short
7  conversation.
8    Q.  Did you tell Ms. Bivens that you were
9  looking to recover your loss of income between the
10  time that you resigned from the City of Salisbury
11  until you took the job at the Lexington -- at LTA?
12    A.  No, I don't think we had anything of that
13  detail.
14    Q.  What other conversation did you have with
15  her on that day?
16    A.  We had -- I explained to her what EEOC was
17  and what it did.  And seems like it was -- it was
18  mainly around that premise, I mean, other than work
19  that we were talking about.
20         (DEFENDANT'S EXHIBIT
21         NUMBER 3 WAS MARKED
22         FOR IDENTIFICATION)
23    Q.  (Mr. Flanagan)  Let me -- have what's marked
24  Exhibit 3, I think.  I'm handing you --
25         MR. FLANAGAN:  -- sorry, I'll stop

131

1  talking for a minute.
2    Q.  (Mr. Flanagan)  Let me hand you what's been
3  marked Exhibit 3.
4         MR. FLANAGAN:  And I'm sorry, Valerie,
5  I don't have another copy of this, but this is the
6  letter, the hiring letter.
7    Q.  (Mr. Flanagan)  All right.  And let me just
8  ask you -- and I don't even have a copy for myself, is
9  that the -- sorry.  Is that a letter dated October
10  22nd, 2020?
11    A.  Yes.
12    Q.  And it's a two-page document actually.  And
13  is that your signature on the second page ---
14    A.  Yes.
15    Q.  --- dated October 23rd, 2020.  Is that the
16  offer letter from LTA?
17    A.  It looks like it, yes.
18    Q.  All right.
19         (DEFENDANT'S EXHIBIT
20         NUMBER 4 WAS MARKED
21         FOR IDENTIFICATION)
22    Q.  (Mr. Flanagan)  And let me hand you what's
23  been marked as Exhibit 4 and ask you if that is the
24  termination letter from LTA.
25    A.  Yes.

132

1    Q.  And that was dated August 26th ---
2    A.  Uh-huh (yes).
3    Q.  --- 2021, correct?
4    A.  Correct.
5    Q.  And the -- prior to your termination in
6  August of 2021, LTA began the process of hiring a new
7  executive director, correct?
8    A.  Correct.
9    Q.  And Ms. Bivens was leaving?
10    A.  Yes.
11    Q.  All right.  And did they do an application
12  process for the executive director position?
13    A.  Yes.
14    Q.  And did you fill out an application and
15  apply for the position?
16    A.  Yes, I did.
17    Q.  And did you receive an interview for the
18  position?
19    A.  No, I did not.
20    Q.  And you did not receive the -- an offer for
21  that job.  Is that correct?
22    A.  That's correct.
23    Q.  And as part of the process in hiring a new
24  executive director, the LTA -- the LTA eliminated your
25  former position, correct?

133

1    A.  Yes.
2    Q.  And it was no longer funded.  Is that right?
3    A.  Correct.  I have one other work position I
4  can tell you about in between Kernersville and the
5  Lexington Chamber and getting back into real estate.
6         I worked for the Greensboro Convention &
7  Visitors Bureau.  And I was a national sales
8  representative and I traveled calling on educational
9  associations to come to Greensboro.  So I basically
10  sold Greensboro all the hotel spaces and such.  So I
11  was very familiar with that other than the tourism
12  that is involved with downtown development and
13  marketing.
14    Q.  I'm sorry.  Was that in between Kernersville
15  and Wilson or before Kernersville?
16    A.  That was right before Kernersville.
17    Q.  Okay.  And why did you leave Kernersville?
18    A.  Because the funding was cut.  They were
19  cutting across the board there at the Town.
20         (DEFENDANT'S EXHIBIT
21         NUMBER 5 WAS MARKED
22         FOR IDENTIFICATION)
23    Q.  (Mr. Flanagan)  Let me show you what I've
24  marked as Exhibit 5.  And I'll represent that...
25  (Off-record comments)

142

1     A.   --- Ruth, I believe ---
2     Q.   Sorry.  My bad.  On the 19th, the first
3  meeting, was you, Lane and Ruth, correct ---
4     A.   Correct.
5     Q.   Okay.  And at that meeting, you were not
6  given the June 22nd, 2020 notice of pre-dismissal
7  conference, correct?
8     A.   Let me look back.  No, I don't see it here.
9  But, no, I -- no.  I think it came on Monday and they
10  told me, "We'll have a conference" ---
11    Q.   Okay.
12    A.   --- a pre-dismissal conference on Wednesday.
13    Q.   So let's talk about the ---
14  (Witness coughing)
15         THE WITNESS:  Sorry.
16         MR. FLANAGAN:  Take your time.
17  (Off-record comments)
18  (Brief recess: 2:06 p.m. to 2:08 p.m.)
19    Q.   (Mr. Flanagan)  So we're talking about the
20  meeting -- the first meeting that occurred on Friday,
21  June 19th, 2020, and it was you, Lane and Ruth.  Tell
22  me what the discussion was between you and Lane in
23  that meeting.
24    A.   So I'm having a hard time remembering the
25  difference in the two meetings from Friday and Monday.

143

1  But if I'm remembering correctly, I believe that's
2  where Lane said that the board had lost confidence and
3  that they did not want me to be their director any
4  longer.  And he actually made a statement that he
5  wouldn't work under their direction either if it were
6  him.
7         And he showed me, I think at that meeting,
8  the performance evaluations that -- I believe it was,
9  like, 13 of the 21 board members submitted to him and
10  gave me just the -- didn't identify who, but the
11  scoring or -- and the comments from the individuals
12  that had either received and submitted or -- I don't
13  know if anyone else, the rest of the board, the other
14  members of the board, received that same evaluation or
15  not, but we got 13, I believe it was, about.
16    Q.   So he showed you the 13 -- the responses
17  from 13 of the board members that returned the
18  evaluation.  Did he give you a copy of that, or did he
19  just show it to you?
20    A.   He gave me a copy.
21    Q.   All right.  And any other conversation with
22  him, other than what you've just described?
23    A.   Sure.  I mean, we talked about, you know,
24  the issues I had been going through.  I think I
25  reminded him at that time that he told me I had three

144

1  things to do, that I had -- it was either two or
2  three.  I think it was three.
3         It was like, "Get the Empire Hotel done,"
4  which, you know, that's almost an impossible task
5  because I came into that contract without having
6  vetted the developer or anything.
7         But this is what he -- I reminded him, he
8  told me one of my very first days, "Get the Empire
9  deal done -- the Empire Hotel project redeveloped,
10  make the" -- I don't know if he said it exactly this
11  way, but, "Make the most voice -- vocal -- the most
12  vocal business owners happy."  And those are the two I
13  remember.  I don't remember what the third one was
14  right now.
15    Q.   All right.
16    A.   So I reminded him of that, and we talked
17  about the issues I'd been going through and how I felt
18  like I'd had no support.  And I'm pretty sure that
19  meeting was on Friday because I think I remember
20  seeing Ruth sitting there and taking this all in.
21         And I said, "You know, I have felt that city
22  management has not stood up and supported me.  They
23  have kind of allowed this to happen.  They've allowed
24  too much input from a volunteer board who are not
25  educated in the ways of this type of structure."

145

1         Not even Diane Young, who had been a former
2  nonprofit director for Main Street Programs, had never
3  been a city staff person.  And she admitted that in
4  one of our organization meetings.  So we went through
5  all of the issues, and I, you know, probably voiced my
6  disappointment.
7    Q.   Those issues being some of the ones we've
8  already talked about today ---
9    A.   Uh-huh (yes).
10   Q.   --- correct?
11   A.   Right.
12   Q.   All right.  So you voice your
13  disappointment, Ruth was there.  Did Ruth say anything
14  during this meeting?
15   A.   I don't remember Ruth saying anything.
16   Q.   But did Lane say anything else to you, or
17  you say anything else to him, other than what you've
18  described that you recall?
19   A.   He said something about -- and I never
20  understood this.  And I hate that I didn't take the
21  time to ask.  Something about, "You can only -- you
22  can't control how people treat you.  You can only
23  control what -- how you react to how people treat
24  you," or something like that, which was very confusing
25  to me.

146

1       And I did not know what he was referencing.
2   I wish I had asked.  But at this point, I was kind of
3   overwhelmed.
4       Q.  All right.  Anything else you recall from
5   that meeting?
6       **A.  Not really.**
7       Q.  At some point, he said, "All right.  Let's
8   -- we'll come back on Monday, we'll talk some more"?
9       **A.  Yeah.**
10      Q.  All right.  Did he set a time for you to
11  come back, or...
12      **A.  I don't -- I don't think so.  But I'm not**
13  **sure.  I can't remember that detail.  Seems like I**
14  **didn't have a time.  I was waiting just to hear**
15  **from ---**
16      Q.  Sure.
17      **A.  --- him on Monday sometime.**
18      Q.  So in any event, on Monday, you went back to
19  meet with him and ---
20      **A.  Uh-huh (yes).**
21      Q.  --- and it was Souwan that was in there,
22  correct?
23      **A.  Yes.  I believe that to be correct.**
24      Q.  And that was Monday afternoon sometime, the
25  22nd?

147

1       **A.  Uh-huh (yes).**
2       Q.  All right.
3           (DEPOSITION EXHIBIT
4           NUMBER 6 WAS MARKED
5           FOR IDENTIFICATION)
6       Q.  (Mr. Flanagan)  And I've handed you what's
7   been marked as Exhibit 6.
8       **A.  6.**
9       Q.  Did you receive this letter dated June 2nd,
10  2020 at that Monday meeting?
11      **A.  Yes.**
12      Q.  All right.  The last page is Page 3.  Is
13  that your signature there?
14      **A.  Yes.**
15      Q.  And it's dated June 22nd, 2020?
16      **A.  Uh-huh (yes).**
17      Q.  All right.  And looking at that last page,
18  it indicates that the pre-dismissal conference will be
19  held on June 24th, 2020 at 8:30 a.m. in the human
20  resources department, correct?
21      **A.  Correct.**
22      Q.  And other than handing you this letter, was
23  there any other -- was there any conversation between
24  you and Lane or Souwan?
25      **A.  Trying to remember.  I don't remember**

148

1   anything significant.  I remember turning in my badge,
2   having to turn my badge in right then.  I think -- I
3   mean, we -- I read it, and I don't remember any
4   details of what we talked about.
5       Q.  Okay.  When you say you turned in your
6   badge, what do you mean by that?
7       **A.  So our Keyscan building badges.  I had to**
8   **give that to him, and I believe he said, "Don't go**
9   **back to your" -- yes.  He said that.  He did say that**
10  **because I didn't get a chance to pack up my office.**
11  **Somebody else did that for me.**
12      Q.  At this point, did he place you on, like,
13  administrative suspension?
14      **A.  Yes.**
15      Q.  All right.  And with pay, right?
16      **A.  That was with pay, yeah.**
17      Q.  And you said you don't -- you don't remember
18  about -- about the conversation, if you had one, with
19  Lane?
20      **A.  I mean, we were in the same room.  I'm sure**
21  **we did.  I don't ---**
22      Q.  You just don't ---
23      **A.  --- remember details.**
24      Q.  That's fair.
25      **A.  I'm sure I probably had questions.  I'm a**

149

1   questioner, so I may have -- you know, but I don't
2   remember anything significant.
3       Q.  Okay.  And then the next day, June 23rd,
4   2020, is when you sent in your resignation letter,
5   correct?
6       **A.  I did.**
7       Q.  All right.  And did you email that to Lane
8   and to Ruth?
9       **A.  Yes, I believe so.  Let's see.  Yes.**
10      Q.  On the -- on the letter, it just says, "City
11  Manager," and then it has his email address.  And same
12  for Ruth?
13      **A.  Yes.  I'm pretty sure I emailed that,**
14  **though.**
15      Q.  Did you have any discussions with anybody
16  between June 22nd and June 23rd regarding your
17  employment or any issues that were going on there?
18      **A.  I'm sure I talked to my husband, my mother.**
19      Q.  Yeah.  Let me -- let me clarify that a
20  little bit.  Did you have any conversations with
21  anybody at either DSI, meaning a board member, your
22  staff, or any employees of the City of Salisbury?
23      **A.  I don't remember.**
24      Q.  And -- but in any event, prior to the pre-
25  dismissal conference on June -- that was scheduled for

150

1 June 25th, you -- you sent in your resignation, so
2 that conference never occurred, right?
3     A.  Correct.  Because I felt like there was no
4 reason to go.  This -- the -- it was all out there on
5 the table, it seemed like.  It was -- I was not -- I
6 didn't feel I was going to get a fair review, even
7 though I do believe Lane said, maybe on that Monday
8 was a -- whenever I asked a question, maybe.
9         I don't -- in that discussion, he may have
10 said, you know, "This is your chance to go over
11 anything" -- well, no.  I don't know if he said that
12 or not.  I may be thinking about whenever I had a
13 discussion with my staff person a month earlier about
14 how -- a pre-dismissal hearing.
15        But he may have said, "It's your chance to,
16 you know, give your side of the -- you know, the
17 case," or whatever -- however he put it.  And I was
18 aware of that because like I said, I had just gone
19 through it, like, a month earlier with a staff person
20 that I supervised maybe a month or two -- month, two.
21     Q.  One of the allegations in your Complaint is
22 that on June 19th of 2020, which would have been the
23 day of the first -- that Friday meeting, that you made
24 a determination that you were -- you were going to ask
25 for family and medical leave in order to cope with the

151

1 stress from dealing with the demands of the DSI board.
2         Did you ever discuss that with Lane or Ruth
3 or Souwan?
4     A.  I don't remember.  I had the paper in hand
5 with me, and I'm not sure if I said anything about
6 that to them.
7     Q.  Okay.  When you had the -- when you say you
8 had the paper with you, is that the leave -- the FMLA
9 leave documents?
10     A.  From my doctor.
11     Q.  Oh, sorry.
12     A.  My doctor's...
13     Q.  You had a doctor's note?
14     A.  Yeah.
15     Q.  Yeah.  So you didn't have -- you had not
16 filled out the leave forms that are required by the
17 City, correct?
18     A.  No.  I just had the -- from my physicians.
19     Q.  Yeah.  And what was your physician
20 recommending?
21     A.  I believe she was recommending maybe taking
22 a day or two a week, or every other week, or I think
23 we discussed an extended absence.  Something to give
24 me a mental and physical health break ---
25     Q.  Okay.

152

1     A.  --- if I'm recalling correctly.  But I
2 believe that's in the Discovery.
3     Q.  Yeah.  And I meant to ask you, I'm sorry,
4 but when you were talking about how Zack -- I think
5 you said sort of went around your back or went -- with
6 you knowing, went to Latoya and had her be in charge
7 of the -- what was it she was in charge of?
8     A.  It was the 2019 North Carolina Main Street
9 Conference we were having.
10     Q.  Right.  And so she was in charge of -- of
11 doing that.  You had been working on it, but she was
12 then ---
13     A.  Uh-huh (yes).
14     Q.  --- made in charge?  Do you know if it was
15 anybody other than Zack who made that decision to have
16 Latoya handle the -- handle that matter?
17     A.  I don't know.
18     Q.  Okay.  Do you know why he went to Latoya and
19 had her perform those duties?
20     A.  I'm not totally sure what was going on from
21 his perspective, but I feel like from my discussions
22 with him and having received a call from -- the state
23 director, Liz Parham, she called me first.
24        And she said, "Hey, you know, I'm -- I feel
25 like I need to call and talk to" -- I thought she was

153

1 going to talk to Lane.  She said, "I don't feel like
2 the City is taking this seriously."
3        And I said, "Liz, thank you very much."  At
4 this point, I thought it was going to help me to help
5 the other City departments.  When we say, "the City,"
6 I had been talking about this in staff meetings, you
7 know, asking for City department heads to all come
8 together, telling them about -- you know, this was a
9 really big deal.
10        It's, like, a 700-attendee conference, and
11 we needed some help, either monetarily or with, like,
12 donations of any items they may have for attendees and
13 gathering together volunteers to have for different
14 tours and -- and purposes.
15        So I talked to Liz about that, and I told
16 her, you know, I was having a hard time getting
17 traction.  And felt like if Lane and Zack could help
18 me, if they could give input and say, "Hey, you know,
19 this is a serious deal here."
20        And I felt like I needed them to help me
21 tell the others how -- the other departments how
22 serious this was, and we really needed to get on the
23 ball here.
24     Q.  All right.  And this is a conversation you
25 had with Liz Parham?

158

1  it was the strangest setup she had ever seen and that
2  she had talked with the City and given them some
3  direction, but they -- and the -- the strange part was
4  that it was set up with Parks & Rec.
5         She said it was -- "They're setting up to be
6  -- to partner closely or work together with the Parks
7  & Rec Department." So from the very get-go, it was
8  not set up as a typical Main Street Program of this
9  structure -- this would be set up because we are
10  economic development.
11        We would typically be closely working hand-
12  in-hand if not in the same department as in Wilson
13  with the planning department. So it showed us -- me,
14  I'm sure Liz as well, and we may have had this in our
15  conversation before I applied, that it was set up
16  because of the misunderstanding DSI was an event
17  organization. And so that was part of the strange
18  setup.
19     Q.  Well, you had an event coordinator within --
20  as a staff person for DSI, correct?
21     A.  I should have had a marketing or business
22  development specialist, but I was not allowed to
23  advertise for that. I had to advertise for event
24  coordinator.
25     Q.  All right. Well, okay. So, I mean, DSI ran

159

1  events, did they not?
2     A.  But that wasn't the totality of the work,
3  but ---
4     Q.  I understand. I understand. But that's
5  part of what you did?
6     A.  Part.
7     Q.  Yeah. And Parks & Rec were at least
8  supposed to, if they had the manpower, support you ---
9     A.  Uh-huh (yes).
10     Q.  --- in these -- with these events. Is that
11  right?
12     A.  Which would be a very good partnership.
13     Q.  Yeah. But Parks & Rec wasn't getting
14  involved in marketing and things like that, right,
15  for ---
16     A.  Somewhat.
17     Q.  Okay.
18     A.  They would help distribute posters to the
19  business owners.
20     Q.  Sure. All right. So they would help with
21  events in that ---
22     A.  Uh-huh (yes).
23     Q.  --- that manner? Okay. Some of the other
24  names you -- you listed were -- that we just -- we
25  haven't talked about yet is Pete Bogle ---

160

1     A.  Uh-huh (yes).
2     Q.  --- B-o-g-l-e. What information do you
3  believe he would have related to this -- your claims
4  in this lawsuit?
5     A.  Related to my claims?
6     Q.  Yeah.
7     A.  Well, he was -- Pete's a local architect who
8  has been a presenter at Main Street Conferences, and
9  he has worked with developers on redeveloping a lot of
10  downtown buildings. He was on the board when I was
11  hired. He had been a board member, I think, for quite
12  a while.
13        He may have had -- that may have -- I'm
14  thinking may have been his second term -- or stint.
15  There were three-year terms -- or three -- I'm going
16  back in my memory bank now. Two-year terms, you could
17  have up to three.
18        So six, and then take a year off and come
19  back. So he had knowledge before the new structure.
20  I don't know if he was part of the conversations when
21  the new structure was coming about.
22     Q.  Also in your Discovery, we had asked what
23  your reason for leaving Lexington Tourism and Visitor
24  Center, the LTA, I guess, is what we're calling it.
25     A.  Uh-huh (yes).

161

1     Q.  And you talked about the unknown source that
2  apparently called the director. To this day, you
3  still don't know who that is, other than a colleague
4  in the -- a tourism colleague, right?
5     A.  Oh, no. I know who it is now.
6     Q.  Oh, who is it?
7     A.  Rebekah McGee.
8     Q.  Rebekah McGee?
9     A.  Yes. And that's ---
10     Q.  And who is -- who's Rebekah?
11     A.  --- R-e-b-e-k-a-h, McGee, M-c-G-e-e. She
12  was, at the time that she called, former Uptown
13  Lexington director. And at that time, I believe she
14  was the Asheboro downtown director.
15     Q.  Okay. And how do you know it was Rebekah
16  McGee that called Ms. Bivens?
17     A.  I was there for Ms. Bivens's deposition,
18  where she named her.
19     Q.  That's the only way that you ---
20     A.  Yes.
21     Q.  --- became aware of it? Okay.
22     A.  Yes.
23     Q.  And do you know how Ms. McGee became aware
24  of your EEOC claim -- or charge?
25     A.  I don't.

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 23 of 45

182

1  look at that exhibit.  This Complaint, Defendant's
2  Exhibit 7, do you recognize that document?
3      A.  Yes.
4      Q.  Is that the lawsuit that you filed against
5  the City of Salisbury, Downtown Salisbury, Inc, and
6  Lane Bailey?
7      A.  Yes.  It looks like it.
8      Q.  Okay.  And did you -- before the Complaint
9  was filed on your behalf, did you review it to make
10 sure it was accurate?
11     A.  Yes.
12     Q.  Okay.  Now, in this claim -- or in this
13 lawsuit, you understand that you have brought a claim
14 for wages?
15     A.  Yes.
16     Q.  Okay.  What I want to understand just as a
17 preliminary question is what -- this wage claim, under
18 the Fair Labor Standards Act and the North Carolina
19 Wage and Hour Act, what are you seeking as a result of
20 that claim?
21     A.  Well, I'm seeking to be made whole through
22 monetary means.  There could be other ways to resolve.
23 I think my ---
24     Q.  And I probably asked a bad question, so let
25 me start ---

183

1      A.  Okay.  Yeah.  So I may not understand.  You
2  may want to ---
3      Q.  Well ---
4      A.  --- say that again.
5      Q.  --- that was kind of a broad question, so
6  I'll -- I'll take the fall for that.  I guess what I'm
7  asking you is, in this -- this Wage and Hour Claim is
8  what I would call it, are you -- are you claiming that
9  there are hours that you worked for the City and DSI
10 for which you were not paid?
11     A.  Yes.  Okay.  That's what I thought you were
12 going to ask.
13     Q.  Okay.
14     A.  So yes.  I feel like I was working two jobs,
15 and it shouldn't have been like that ---
16     Q.  Okay.
17     A.  --- and I was.
18     Q.  And are you also claiming as a part of that
19 that there are overtime hours you worked on behalf of
20 DSI and the City that you were not paid?
21     A.  Yes.
22     Q.  Okay.  All right.  We'll get into that with
23 more detail ---
24     A.  Okay.
25     Q.  --- in a little bit.

184

1      A.  Yeah, there's more to that.
2      Q.  I just want to have a preliminary
3  understanding of your claim.  So let's look at the
4  Compliant and the Exhibit 1 point -- or 1-1.  You have
5  that in front of you?
6      A.  Yes.
7      Q.  And then the Complaint, it refers to this as
8  Exhibit A, but -- you know, it says ---
9      A.  Okay.
10     Q.  --- 1.1 down at the bottom, but that doesn't
11 matter.  So tell me -- the first three pages of this
12 appear to me to be a description of the Downtown
13 Development director position that you applied for.
14 Is that a fair statement?
15     A.  Correct.  Yes.
16     Q.  Okay.  And -- and then the fourth page is a
17 -- well, let me just -- is that the offer letter that
18 was sent to you by the City of Salisbury?
19     A.  Yes.
20     Q.  And that's dated August 28th, 2017?
21     A.  Yes.
22     Q.  Okay.  And you -- it looks like on the
23 second page of this, you signed it and dated it August
24 28, 2017?
25     A.  Yes.

185

1      Q.  Okay.  And above your signature, it said
2  that you accepted the terms of the employment offer
3  outlined above in the letter dated August 28, 2017?
4      A.  Yes.
5      Q.  Okay.  And so you read the offer letter
6  before you signed it?
7      A.  Uh-huh (yes).
8      Q.  Okay.  And did you see in the -- in the very
9  first introductory paragraph, before the numbered
10 paragraphs, that it says in the second line, "As we
11 discussed, I feel you would be an asset to the City of
12 Salisbury as a Downtown Development Director, which is
13 a salary/exempt position."
14         Have I read that correctly?
15     A.  Yes.
16     Q.  Was that your understanding when you
17 accepted the Downtown Development director position?
18     A.  Yes.
19     Q.  Okay.  And the -- in Item Number 1, it says
20 that you will be paid annually $75,000.12 per year.
21 Is that correct?
22     A.  Correct.
23     Q.  Okay.  And in the previous testimony, when
24 Mr. Flanagan was asking you questions, it sounds like
25 when you left the City, you were at about $80,000 a

186
1  year?
2  **A. In Wilson.**
3  Q. No -- no, in Salisbury.
4  **A. Oh, when I left here?**
5  Q. Yeah.
6  **A. Yes.**
7  Q. Okay.
8  **A. Yes.**
9  Q. So you did get some increases while you were
10 working for Salisbury?
11 **A. Yes.**
12 Q. Okay. And let's see. I'm trying to see if
13 there's anything else in this exhibit I want to ask
14 you about. Okay. So don't put this too far away
15 because I'm going to have some other questions for
16 you ---
17 **A. Okay.**
18 Q. --- but I want to show you another exhibit.
19           (DEPOSITION EXHIBIT
20           NUMBER 8 WAS MARKED
21           FOR IDENTIFICATION)
22 Q. (Mr. Adams) Okay. So I've handed you
23 what's been marked Exhibit 8, and at the top, there's
24 a letterhead that says, "City of Salisbury Statement
25 of Understanding."

187
1      Do you see that?
2  **A. Yes.**
3  Q. Do you recognize this document?
4  **A. Yes, because I signed it.**
5  Q. Okay. And is this just -- is this a
6  document you received from the City of Salisbury upon
7  the commencement of your employment?
8  **A. Yes.**
9  Q. Okay. And is that your signature that's at
10 the bottom of the page?
11 **A. Yes.**
12 Q. Okay. And among the -- did you understand
13 that you were agreeing to each of the statements that
14 are listed in that document?
15 **A. I was, and I believe that is my underline.**
16 **I underlined the FLSA status of my position and**
17 **overtime policy because I believe I may have needed**
18 **more information on what the FLSA status was.**
19 Q. Okay. So when you -- the -- the offer
20 letter that we just looked at a second ago that's on
21 the -- in the Complaint, it referred to your position
22 as a salaried/exempt ---
23 **A. Yes.**
24 Q. --- position. You -- you signed that offer
25 letter. At the time that you signed your offer

188
1  letter, did you express to anyone that you did not
2  understand what that meant, that it was a
3  salaried/exempt position?
4  **A. The -- I understood what salary/exempt meant**
5  **according to how I was employed in Wilson, North**
6  **Carolina. I assumed it's the same state.**
7  Q. Okay. So when you worked in Wilson, you
8  received an annual salary, right?
9  **A. Yes.**
10 Q. And then -- and you, also in Wilson, did not
11 receive overtime pay if you worked more than 40 hours
12 in a workweek, correct?
13 **A. Right. It was a very flexible schedule,**
14 **which I was promised here as well.**
15 Q. Okay. Well, let me ask you this. In
16 Wilson, did you ever work more than 40 hours in a
17 workweek?
18 **A. I -- I know I did sometimes.**
19 Q. Okay. Did you ever request from the City of
20 Wilson that you be paid overtime for those hours?
21 **A. No, because my direct supervisor would allow**
22 **us to flex our time and have some time off. They**
23 **couldn't, I guess, do -- they couldn't do overtime**
24 **pay, but we had that flexible schedule for when we**
25 **weren't in -- could have time off.**

189
1  Q. So how did you -- how did the City keep up
2  with the hours that you worked more than 40 in a
3  workweek?
4  **A. So that was between my director -- my direct**
5  **supervisor and I.**
6  Q. Okay. And so did you report to your direct
7  supervisor how many hours you had worked in a
8  particular workweek?
9  **A. Yes.**
10 Q. Did you -- so how did you do that?
11 **A. So we did fill out time sheets, but that was**
12 **a source of contention for another employee at the**
13 **City of Wilson who did not believe that that should be**
14 **an accurate reflection just because that's the way**
15 **they do it.**
16     **And so I think that was a question, but that**
17 **-- I followed what was supposed to be done, even**
18 **though -- because there was no getting around it. You**
19 **had submit a time sheet. And I don't remember there**
20 **if we actually stated that we worked 40 hours or if we**
21 **just put, like, our -- like, our vacation and**
22 **personal. I don't remember how that happened there.**
23 Q. So your -- your recollection is that you --
24 did you fill out a paper time sheet? Is that what it
25 was?

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 25 of 45

190

1    A.   It was probably a paper time sheet in Wilson
2  at that time.
3    Q.   Okay.  I mean, at any time, did they -- did
4  Wilson go to an electronic system where you'd clock in
5  and clock out?
6    A.   Oh, no.
7    Q.   Okay.  And there was no ---
8    A.   Not that I remember.
9    Q.   --- system in place, to your knowledge,
10  where they kept track of your, you know, like, key
11  card entries or something like that to track your
12  time?
13    A.   I was not aware of that happening.
14    Q.   Okay.  All right.  And so -- and so you
15  would turn in written time sheets each week to your
16  supervisor, and if you had hours more than 40 in a
17  workweek, then at some point, you would get flex
18  time ---
19    A.   Yes.
20    Q.   --- for that?  Okay.
21    A.   Correct.
22    Q.   Was there a limit on the amount of flex time
23  that you could receive in any given period?
24    A.   We never really had that issue.  I'm sure
25  it's equivalent to, you know, the actual -- one to

191

1  one.  One hour to one hour, or whatever -- however
2  many hours.  But we really never -- we worked very
3  well and very closely together, and that was never
4  really an issue as I know in our whole department, and
5  we were part of the planning department.
6    Q.   And that -- just out of curiosity, the
7  employee who had some issue with the way that time was
8  being tracked is what I thought I heard you
9  referencing.  Did that employee bring a claim against
10  the City of Wilson for that ---
11    A.   No.
12    Q.   --- to your knowledge?  Okay.
13    A.   But I think she just stopped turning them
14  in, and she was able to keep her job.
15    Q.   Oh, okay.  Okay.
16    A.   She came from the private industry --
17  private sector.
18    Q.   Okay.  All right.  And so going back to
19  Exhibit 8, the Statement of Understanding.  So you --
20  you signed this document that said, "I have been told
21  the FLSA status of my position, and I understand the
22  overtime policy as it relates to me."
23         Is that correct?
24    A.   I signed that, and I thought I understood it
25  at the time.

192

1    Q.   So at the time that you signed at document,
2  what was your understanding?
3    A.   Well, other than the, you know, statements
4  that are there, and I was salary and exempt, there was
5  a conversation with Zack about being able to flex
6  time, and that would not be a problem.
7         And if I, you know, worked over, I could,
8  you know, work it out with him, or I could, you know,
9  make up -- have that time off.  Unfortunately, I never
10  had time to have time off because there was just so
11  much required of me.
12    Q.   Who -- who is the person who gave you this
13  Statement of Understanding?  Was that Zack?
14    A.   I do not remember.  It could have been HR.
15  I don't know.
16    Q.   Was there -- when you first started your job
17  with Salisbury, did you sit down with someone from HR
18  who went over each of these items in this Statement of
19  Understanding before you signed it?
20    A.   I'm sure I did.  I'm sure it was someone in
21  the HR, and I don't know who it was.
22    Q.   And -- but ---
23    A.   I don't remember.
24    Q.   --- is it -- going back to that -- that item
25  that you underlined, at the time that you signed that

193

1  document, you understood that you would not be paid
2  overtime if you worked more than 40 hours in a week?
3    A.   Yes.
4    Q.   Okay.
5         MR. ADAMS:  So let's go to another
6  document.  Making sure I've got myself in order here.
7  Okay.
8            (DEPOSITION EXHIBIT
9            NUMBER 9 WAS MARKED
10            FOR IDENTIFICATION)
11    Q.   (Mr. Adams)  All right.  So I've handed you
12  what's been marked as Exhibit Number 9, and do you
13  recognize that document?
14    A.   I sure do.
15    Q.   Okay.  And what is that?
16    A.   It's my resume that I created.
17    Q.   Okay.  And is this -- would this have been
18  the resume that you submitted to the City of Salisbury
19  when you applied for the position here, the ---
20    A.   Yes.
21    Q.   --- DSI director?
22    A.   Yes.
23    Q.   Okay.  All right.  And when you prepared
24  this resume, Exhibit Number 9, did you make sure that
25  you accurately described your previous work

194

1  experience?
2  **A. Yes.**
3  Q. Okay. And the -- so with regard to the
4  description of the City of Wilson Planning and
5  Community Revitalization Department, all the items
6  that are listed under that position are accurate in
7  terms of your job duties and responsibilities?
8  **A. Yes.**
9  Q. Okay. And -- and you -- did you believe
10 that your experience working with the City of Wilson
11 from 2012 to 2017 made you qualified for the position
12 of the executive director in Salisbury?
13 **A. Absolutely.**
14 Q. Okay. Now, when you applied for your
15 position with the City of Lexington Tourism
16 Department, did you fill out an application?
17 **A. I submitted a resume, references, and I**
18 **don't remember if there was an actual application**
19 **form.**
20 Q. Okay.
21 **A. Maybe.**
22 Q. And -- and the resume that you submitted,
23 did you update Exhibit Number 9 ---
24 **A. Uh-huh (yes).**
25 Q. --- to include a description of what you did

195

1  for DSI in the City of Salisbury?
2  **A. Yes.**
3  Q. Okay. And before you submitted that to the
4  City of Lexington, did you make sure that you had
5  accurately described your work for the City of
6  Salisbury?
7  **A. Yes.**
8  Q. Okay.
9  MR. ADAMS: Let me hand you what I'm
10 going to mark as Exhibit 10.
11 (DEPOSITION EXHIBIT
12 NUMBER 10 WAS MARKED
13 FOR IDENTIFICATION)
14 Q. (Mr. Adams) Okay. I've handed you what's
15 been marked as Exhibit Number 10. Do you recognize
16 that document?
17 **A. Yes, sir.**
18 Q. Okay. And is that the resume that you
19 submitted to the City of Lexington?
20 **A. To the Lexington Tourism Authority, yes.**
21 Q. Okay. All right. And so looking at the
22 description of your position here in Salisbury, is
23 that an accurate description of what you did?
24 **A. I believe so.**
25 Q. Or of your job duties? Okay. And so the --

196

1  in the first item, "Salary," it references $80,000.
2  That would have been your salary, I guess, at the end
3  when you resigned?
4  **A. (Nods head up and down)**
5  Q. Okay.
6  **A. Right.**
7  Q. And then you were in charge of a budget of
8  $347,000. Is that correct?
9  **A. Correct.**
10 Q. Okay. And four items down, do you see the
11 word "built"?
12 **A. Yes.**
13 Q. Okay. You "Built -- built new department
14 and merged economic development duties through new,
15 quasi-governmental structure"?
16 **A. Yes.**
17 Q. And is that accurate?
18 **A. Yes.**
19 Q. Okay. And then the next item is that you
20 managed two full-time staff members, events and
21 marketing coordinator and admin, plus 21-member board.
22 Is that accurate?
23 **A. Yes.**
24 Q. The -- the two full-time staff members that
25 you supervised were Latoya -- Latoya Price was one of

197

1  them, right?
2  **A. Correct.**
3  Q. She was the events and marketing
4  coordinator?
5  **A. Yes.**
6  Q. And -- and who was the admin?
7  **A. Candice Brown.**
8  Q. Okay. Okay. And -- okay. How long -- so
9  Candice Brown, how long -- do you remember what years
10 she worked there?
11 **A. Yes.**
12 Q. So what ---
13 **A. She came from another city department, from**
14 **the customer service department of the City, and**
15 **started with me October 2018.**
16 Q. Okay.
17 **A. And then April 2020, thereabouts, April or**
18 **May, she -- I think she ended up signing a -- a letter**
19 **of resignation.**
20 Q. Okay. And then -- and did -- did you hire
21 Candice?
22 **A. Sort of. I was given a pool of candidates I**
23 **was told to choose from. And Candice was probably my**
24 **third or fourth choice, but the others either got**
25 **promotions within their own departments or found a job**

198
1  outside the City.
2       And I felt like she had the personality for
3  everything that we needed her to do and then what
4  Kelly Baker wanted her to do, which was work the front
5  lobby of the -- of City Hall in addition.
6     Q.  Right.  And I remember you testifying ---
7     A.  Yes.
8     Q.  --- about that earlier.  So did you -- so
9  during the process of hiring her, did she -- did she
10  submit an application?
11     A.  You know, I know I got resumes, and we had
12  interviews.  I don't remember if there was any type of
13  application.
14     Q.  Okay.  And that's fine.  So -- but you do
15  recall seeing her resume?  You reviewed it?
16     A.  I think I did.  That was a long time.
17     Q.  Sure.
18     A.  And I -- I had something.  There was
19  something I was able to look at and evaluate ---
20     Q.  Right.
21     A.  --- between the candidates.
22     Q.  Okay.  And then you -- and then you said
23  that there were interviews that were -- you were
24  involved in the interview process?
25     A.  Yes.

199
1     Q.  Okay.  And then was the process similar with
2  Latoya when she was brought on?
3     A.  With Latoya I actually did get to advertise
4  outside of the City, and advertise period.  And we
5  were able to get candidates, you know, by posting in
6  different LISTSERVs and associations.
7        The unfortunate thing there is that Zack
8  Kyle would not let me advertise for what I really
9  needed, which was a marketing person who -- marketing
10  PR, and that knew how to run events, not an event
11  coordinator that didn't know marketing.
12     Q.  Right.
13     A.  But he had -- he told me he had -- didn't
14  have any classifications in the City for that.  I
15  think I spoke -- either he told me or someone told me
16  later that he took a long time while he was first here
17  with the City or when was in HR.
18        He was the HR director before he was
19  assistant city manager.  And he -- I guess there were
20  a lot of classifications.  And he took, like, a whole
21  lot of time, and it was very important for him to
22  scale those classifications down.
23     Q.  And I'm sorry to interrupt, but by
24  classifications are you talking about, like, pay
25  grades ---

200
1     A.  Yes.
2     Q.  --- like, the numbered pay grades for
3  different positions?
4     A.  Yes.
5     Q.  Okay.
6     A.  And so I -- there was no marketing or PR ---
7     Q.  Right.
8     A.  --- person, you know, category ---
9     Q.  Right.
10     A.  --- of job.
11     Q.  So did you -- so did you prepare the posting
12  that was -- that went out to solicit applications?
13     A.  I did.  I think I was given some basic
14  information that I was able to tweak to add the
15  marketing in there.
16     Q.  Okay.  Do you -- do you recall, were the --
17  the interested potential applicants to contact you or
18  somebody else, or ---
19     A.  HR.
20     Q.  Okay.
21     A.  I'm -- I'm pretty sure they were told, yeah,
22  to contact HR.
23     Q.  Okay.  And so Latoya, when she was part of,
24  I guess, a prospective applicant pool, how -- how many
25  people were you all considering?

201
1     A.  We had quite a few, like, maybe 20, if I'm
2  remembering correctly, applications I think.  It was
3  -- it was quite a few.  You know, some were not at all
4  applicable.
5     Q.  Right.
6     A.  And then ---
7     Q.  So you saw ---
8     A.  --- we had interviews ---
9     Q.  So you saw -- so let's just assume ---
10     A.  Yes.
11     Q.  --- if there were 20 applicants, you were
12  able to go through and -- and if -- like, if you saw
13  one that didn't have the requisite qualifications
14  you'd say, "Okay, this is not somebody that we're
15  going to pursue"?
16     A.  I'm pretty sure I got to see -- I think I
17  got to see all of them.
18     Q.  Okay.
19     A.  I'm pretty sure.  Yeah.  I had ---
20     Q.  And then did you -- what was the objective,
21  to come up with a -- like, a limited number -- like,
22  four people that might be good or -- or ---
23     A.  Yes.
24     Q.  Okay.
25     A.  And then conduct interviews.

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 28 of 45

202

1    Q.  Okay.  And you -- you agreed with the top
2  four, or whatever the number was, candidates that were
3  to be interviewed?
4    **A.  Yes.**
5    Q.  And then in the interview process, you --
6  you interviewed the candidates?
7    **A.  Yes.**
8    Q.  Okay.  And then -- and then how was Latoya
9  selected among that group?
10   **A.  So we had a panel of interviewers, some DSI**
11  **board members and City staff.  We -- it seems like**
12  **there were a couple rounds of interviews, and there**
13  **were some tough choices at the, you know, top level.**
14  **But Latoya -- and I had mentioned this**
15  **earlier in this deposition, and I'm -- I'm not**
16  **discrediting, you know, her experience at all.  She**
17  **had a master's degree, and she was used to planning**
18  **events.**
19  **I felt like she had some social media skills**
20  **that could be partnered with other organizations we**
21  **were working with for marketing and a good personality**
22  **and kind of a go-getter ---**
23    Q.  Right.
24   **A.  --- type attitude.  But I did mention**
25  **earlier that I think what put her at the cream of the**

203

1  **crop for me in my eyes was that -- and maybe this is**
2  **not fair, but I couldn't go any longer without help.**
3  **I'd gone five months without any staff, and**
4  **she knew all the Parks & Rec staff members and had**
5  **gone to graduate school with the Parks & Rec director.**
6  **We were all in the same building.**
7  **Because of the struggles and troubles we had**
8  **had prior to my being hired with Parks & Rec wanting**
9  **to help DSI, I thought, "Well, this will be great.**
10  **This will solve that issue.  That'll solve that**
11  **problem because they actually already know each other**
12  **and they really like each other, and they're going to**
13  **work well together."**
14    Q.  Right.
15   **A.  "They're excited about working well**
16  **together."**
17    Q.  So you -- so Latoya was your choice?  I
18  mean, she was your top choice for that position?
19   **A.  Yes.**
20    Q.  Who else was on that interview group?
21   **A.  So Whitney Williams, Nick Aceves, who was**
22  **with Parks & Rec.  I believe maybe Vivian Koontz.**
23  **There may have been two or three Parks & Rec staff**
24  **people.  Goodness.  I'm sure there were some other**
25  **DSI.  Maybe -- maybe Greg Shields or -- there were**

204

1  **some other DSI, I think, folks besides Whitney.**
2    Q.  Other than Latoya and Candice, did -- during
3  your tenure as the DSI director, did you hire other
4  staff too?
5    **A.  Not hire.  We had volunteers.  We had**
6  **interns.**
7    Q.  How were interns brought on?
8    **A.  I was forced to take interns.  So because of**
9  **-- I don't know if it was HR or the Salisbury way --**
10  **sway, they call it, internal -- working with, you**
11  **know, the community.  I don't know why, but I was told**
12  **I needed to take an intern.**
13    Q.  Okay.
14   **A.  Even though I was -- the first intern was --**
15  **worked out perfectly because she did a lot for an**
16  **intern in between Katelin leaving in, like, May or**
17  **June of 2018 and me finally getting two full-time**
18  **staff people in October 2018.**
19    Q.  So who was that intern?
20   **A.  Jordan Ferguson.**
21    Q.  Okay.
22   **A.  I think it's with a U.**
23    Q.  And -- and was -- was Jordan Ferguson
24  selected by HR of the City, and they would just say,
25  "This is your intern," or did you say, "Here's several

205

1  interns, I want Jordan Ferguson"?
2    **A.  They came to me with -- I don't know if**
3  **there was more than just Jordan or if it was just**
4  **Jordan.  But they came to me and said, "We think**
5  **she'll be a good fit."**
6  **And then actually, my -- who is now my**
7  **husband, my fiancé at the time, knew her father, were**
8  **good friends of the family stuff.  So I feel like --**
9  **and she's just a wonderful young lady anyway, and she**
10  **was in a master's graduate ---**
11    Q.  Right.
12   **A.  --- program.  So not, like, a high school**
13  **intern.**
14    Q.  Right.
15   **A.  And she was in town for, like, the summer,**
16  **and so that worked out ---**
17    Q.  So was that ---
18   **A.  --- very well.**
19    Q.  --- a summer internship?  Is that pretty
20  much what that was, or...
21   **A.  A little bit -- it went into -- a little bit**
22  **into the fall.**
23    Q.  Okay.
24   **A.  Because I needed help and I was able to get**
25  **her college credit if she helped me with some reports**

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 29 of 45

206

1 or something, that it worked for both of us.
2     Q.   And so after Jordan, were there other
3 interns during your employment?
4     A.   Yes.  I really didn't work with them much.
5 It was -- I don't remember if it was 2019 or 2020, but
6 Latoya and Candice were mainly working with them on
7 helping with, like, events.  I think they were high
8 school students.
9         And we had -- I said, "Look, I can't take
10 any more right now.  I mean, really.  We've got a lot,
11 and that would be an extra person to have to teach
12 things to."  Because, you know, there was a cycle
13 where Candice and Latoya had no idea, neither one of
14 them, about Main Street.  And that ---
15     Q.   Right.
16     A.   --- was something I was looking for in
17 Latoya's position, was someone with Main Street
18 education and experience along with the marketing PR
19 kind of business relations.  So we had one or two, I
20 think, but they were more -- shorter periods of time.
21     Q.   Right.  And were you involved in picking who
22 the interns were, or they were just available ---
23     A.   No.
24     Q.   Okay.  And then with -- with Latoya and
25 Candice, when they -- when they were first hired, you

207

1 had just mentioned that they, you know, weren't
2 familiar with this type of ---
3     A.   Yeah.
4     Q.   --- of structure.  So were you -- did you
5 train them so that they'd understand better how to do
6 their job?
7     A.   Oh, yes.
8     Q.   Okay.
9     A.   We sat down with manuals and website, and,
10 you know, I had to have them take some time to read
11 about what this is we really do, and then -- and then
12 they had a lot of hands-on training right away.
13     Q.   Sure.  Sure.  And so during the course of
14 their employment, did you -- did you do evaluations
15 for them?
16     A.   Yes.
17     Q.   Okay.  Were they written or verbal or both?
18     A.   Both, but we did have written evaluations
19 once we had an actual, official EPR tool that I
20 mentioned earlier, the employee performance review
21 tool.
22     Q.   Okay.
23     A.   That took months for management team to
24 decide upon because they were -- as soon as I came in,
25 they were -- it was like they started changing for

208

1 whatever reason.  I don't know if they had issues with
2 the last form, but it was multiple meetings for
3 several months just about the EPR tool.
4     Q.   Okay.
5     A.   So ---
6     Q.   And -- and when you refer to the management
7 team, who exactly is that?
8     A.   So that's all the department heads,
9 including HR director ---
10     Q.   Okay.
11     A.   --- Lane and Zack and Graham.
12     Q.   Okay.  And it's the department heads of all
13 departments in the City?
14     A.   Yes.
15     Q.   Okay.  Okay.  And then -- and you were there
16 as the head of the DSI?
17     A.   Well, yes.  In the beginning, it was called
18 DSI, and then I had to get permission, and Zack wanted
19 me to ask the planning director if it was okay with
20 her if I called it the Downtown Development
21 Department ---
22     Q.   Right.
23     A.   --- which is what it is, because it was very
24 confusing for the public.  And everyone, city staff,
25 DSI members, everyone asked who -- you know, what DSI

209

1 was.  Were they absorbed?
2         And I'm like, "No, they're not absorbed."
3 So we all had that education.  We had to say, "This
4 was -- you know, they still are a nonprofit, and we
5 work arm in arm as a public-private partnership with
6 the Downtown Development Department."
7     Q.   Okay.  Okay.
8     A.   Yeah.
9     Q.   And were you -- so you were -- you were
10 executive director of DSI.  And were you also the
11 Downtown Development director?
12     A.   Yes.
13     Q.   Okay.  Okay.  During the time that Latoya
14 and Candice were working for you, did you ever have to
15 discipline them or, like, verbally counsel them about
16 performance issues or conduct issues?
17     A.   I did have to verbally counsel, you know,
18 the evaluations.  I don't remember them always -- you
19 know, they didn't all get excellents.
20     Q.   Right.
21     A.   There were things that we can all improve
22 on ---
23     Q.   Right.
24     A.   --- you know, and that's to help us so we
25 don't get lackadaisical, you know ---

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 30 of 45

210

1    Q.  Sure.
2    A.  --- and know there's still more things we
3  can learn and do.
4        MR. FLANAGAN:  Can I ---
5        THE WITNESS:  But not often.
6        MR. FLANAGAN:  Can I just interrupt you
7  all and Valerie as well?  Just so we're not all
8  violating 168-168, let's -- can we agree that this --
9  anything discussing other folk's personnel matters are
10  deemed confidential for our purposes?
11        MS. BATEMAN:  Yeah.  We have a
12  protective order in place.
13        MR. FLANAGAN:  Do we?  Okay.
14        MS. BATEMAN:  I feel like we do.
15        MR. FLANAGAN:  I don't think we do.
16        MS. BATEMAN:  Do we not?
17        MR. FLANAGAN:  I don't think so.
18        MR. ADAMS:  I don't remember.  We asked
19  for one.
20        MR. FLANAGAN:  I don't think we do, but
21  in any event, let's agree among ourselves.
22        MS. BATEMAN:  Okay.
23        MR. ADAMS:  Yeah.
24        MS. BATEMAN:  Yes.
25        MR. FLANAGAN:  Otherwise -- I don't

211

1  want ---
2        MR. ADAMS:  Yeah.
3        MR. FLANAGAN:  --- Ms. Hairgrove
4  violating statutes.
5        THE WITNESS:  No, please.
6        MR. ADAMS:  Yeah.
7        THE WITNESS:  But it was not often, and
8  it was not -- we had a good -- very good working
9  relationship.
10    Q.  (Mr. Adams)  Okay.  So going back to the --
11  Exhibit 10, the resume, the -- under the "Managed two
12  full-time staff members," it has, "Overall duties the
13  same as listed for my roles in the communities of
14  Kernersville and Wilson."
15        And then you list to "enhance the downtown
16  municipal service district through business retention,
17  recruitment, property development, marketing and
18  memorable events; Responsible for NCMS
19  Reporting/Assessments."
20        What is NCMS?
21    A.  North Carolina Main Street.
22    Q.  Okay.
23    A.  I just abbreviated.
24    Q.  Got you.  Okay.  And then "Award" -- and
25  then "Awards."  So those were things -- those were, I

212

1  guess, main duties that you performed at DSI and in
2  Kernersville and in Wilson?
3    A.  Yes.
4    Q.  Okay.  And then next item is "City
5  Management Team Member Duties/Accomplishments."  And
6  then these are things, I guess, that you did during
7  your employment here ---
8    A.  Uh-huh (yes).
9    Q.  --- correct?  Okay.  And the first little
10  arrow is "Department Head/Management Team Member
11  responsible for overseeing planning and development in
12  MSD," and that's municipal service district?
13    A.  Correct.
14    Q.  Okay.  "Staying within budget, cutting for
15  efficiency and conservation of funds when needed."
16        And that's something you were responsible
17  for?
18    A.  Yes.
19    Q.  And then, "Worked extensively with the
20  Planning & Community Development Department with
21  consultants on a downtown parking study, market study,
22  updating the Downtown Master Plan and other internal
23  and external programs and projects."
24        Have I read the correctly?
25    A.  Yes.

213

1    Q.  When it refers to "market study," what is
2  that referring to?
3    A.  So we -- trying to think if we -- I know we
4  did a big parking study with consultants, and the
5  market study could have been something similar with
6  the consultants, or it could have been multiple
7  studies for, like, information that we got from the
8  North Carolina Main Street after, you know, talking
9  with them about what we needed for marketability, you
10  know, and leakage gaps.  Those types of studies.
11    Q.  So you would get information from the North
12  Carolina Main Street group and then you'd take that
13  and determine changes that needed to be made here ---
14    A.  Yes.
15    Q.  --- in Salisbury?
16    A.  Yes.  Not only that, but, you know, calling.
17  I would call Realtors ---
18    Q.  Okay.
19    A.  --- and property owners, and you know, find
20  out, you know, "What are you leasing this for, and how
21  many square feet, and do you need -- you know, what do
22  you feel like we need?"  And talking with the Economic
23  Vitality Committee members about, you know, this
24  information and, you know ---
25    Q.  So part of your -- I understand that there

214

1  were four committees ---
2  **A. Yes.**
3  Q. --- under DSI: the organizational, economic
4  vitality, promotions and ---
5  **A. Design.**
6  Q. Design?
7  **A. Yeah.**
8  Q. And so -- and you -- as the executive
9  director of DSI, you attended all of those committee
10  meetings, right?
11  **A. I attended when I had to, needed to, could.**
12  **Yes. I like to have -- because I was overseeing all**
13  **of this. And although I had staff such as Katelin**
14  **Rice -- Latoya Price continued Katelin's work with the**
15  **promotions committee.**
16  **And I would go when I was needed or I needed**
17  **to make a decision or, you know, they needed my**
18  **direction. But -- and then there all kinds of**
19  **subcommittees for events ---**
20  Q. Yeah.
21  **A. --- and such. But then yeah, I would go --**
22  **I would pretty much run the design committee with Pete**
23  **Bogle, and then it became Cheryl Goins. I was usually**
24  **at the Economic Vitality Committee, and of course the**
25  **org and the board.**

215

1  Q. And so those committees would meet whether
2  you were there or not, and they would, you know, make
3  -- like, economic vitality would discuss things like
4  office space that was open downtown, that there may be
5  somebody that is interested in that space, and they'd
6  feed that information back to you?
7  **A. Yes. We would ---**
8  Q. Okay.
9  **A. --- yes, discuss things like that ---**
10  Q. And then what would you do -- what would you
11  do with that? Would you just, like, factor that into
12  -- okay, add it to your to-do list to follow up with
13  that potential, lessor or ---
14  **A. Sometimes if the volunteers didn't volunteer**
15  **to ---**
16  Q. Right.
17  **A. --- you know, get more information about it**
18  **because maybe they knew them better ---**
19  Q. Right.
20  **A. --- than I did or -- but yeah, we would put**
21  **it on a list and then we started putting it on the**
22  **website once we had a new website.**
23  Q. Right. And in going through, like, looking
24  at a lot of the minutes from, like, the board minutes
25  and those committee minutes, it sounds like you spent

216

1  a lot of time, you know, downtown, meeting with
2  business owners ---
3  **A. Uh-huh (yes).**
4  Q. --- and property owners? What was ---
5  **A. Yes.**
6  Q. What was the purpose of that in terms of
7  your kind of overall job duties?
8  **A. Well, that was part of what -- you know, it**
9  **was part of the job. So you get to know the property**
10  **owners and the business owners, find out what their**
11  **needs are.**
12  Q. Right.
13  **A. And then we can decide, you know, do they**
14  **need education, which could come from one of our --**
15  **like, the Economic Vitality Committee? Whitney helped**
16  **-- you know, very much so, put in a educational**
17  **session series. So it just depended on what their**
18  **needs were, or if they needed help with their Facebook**
19  **page ---**
20  Q. Right.
21  **A. --- we'd try to get someone to help them, or**
22  **we would help them -- you know, we would help them ---**
23  Q. Right.
24  **A. --- ourselves.**
25  Q. And, like, just business owners, property

217

1  owners, are those the stakeholders ---
2  **A. Yes.**
3  Q. --- that I see referred to in the -- okay.
4  **A. Yes.**
5  Q. Okay.
6  **A. Now, stakeholders can also be partner**
7  **organizations ---**
8  Q. Okay. Got it.
9  **A. --- your TDA your CBB. Anybody that, you**
10  **know, has a business or a link to downtown and that is**
11  **an interest.**
12  Q. Okay. I got you.
13  **A. Yeah.**
14  Q. And then following in that same section,
15  "Empire Hotel Mixed-Use Project gained momentum and
16  relations improved with developer."
17  And I know that's something that you spent a
18  lot of time on. What was the -- what was kind of the
19  end goal for that project?
20  **A. It was to be a mixed-use, residential and**
21  **commercial project. It's 100,000 square feet,**
22  **multiple buildings, historic, and so it was going to**
23  **be residential -- I would say upper-end housing, I**
24  **guess, is how I'm going to put it. There was some**
25  **talk about having some affordable options as well.**

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 32 of 45

218

1    Q.  So was that something that was -- when you
2  came here that was somewhat dormant and you kind of
3  kick-started it again, or...
4    A.  So that developer had been chosen, I guess,
5  by the DSI board and the director before me.  The
6  director before that actually, I guess, worked with
7  the board to purchase or somehow obtain the buildings.
8  So I came in to contracts that had already signed, and
9  I had to review them and work within those contracts
10  and get to know those developers.
11    Q.  Who were the developers?
12    A.  It was -- I want to say, like, Blackstone.
13  So there were two gentlemen.  I cannot remember the
14  first lead.  He ended up going back to California.
15  And then the gentleman that lives in Charlotte was our
16  main go-to, Brett Weaver -- Britt, with an I.
17    Q.  Okay.
18    A.  B-r-i-t-t, Britt Weaver.
19    Q.  Okay.  And was there an architect that was
20  involved in that project?
21    A.  That may have been before my time, or ---
22    Q.  Okay.
23    A.  --- if it was on the developer side -- I
24  don't -- I mean, Pete Bogle, a local architect, knew
25  everything about that building, and I would -- that's

219

1  -- I would get information from him or others that had
2  been around a long time and city staff, and he would
3  graciously help to, you know, walk folks through when
4  we had tours.
5    Q.  Right.
6    A.  And those -- there were tours set up before
7  I got here too.  There were a lot of meetings set up
8  before I was even hired that I had to jump right in
9  and get on board with.
10    Q.  Right.
11    A.  And the several series of tours of the
12  Empire was one of them.
13    Q.  Right.  And then the next item, "Attended
14  City Council every first and third Tuesday," as I
15  understand from looking at the minutes, you would go
16  to those meetings and you would present the director's
17  report.  That's -- that was what you did?
18    A.  At city council?
19    Q.  Yes.
20    A.  Not every meeting.  I was on the agenda ---
21    Q.  Okay.
22    A.  --- every ---
23    Q.  Okay.
24    A.  --- meeting.  We would have some items ---
25    Q.  Okay.  So if you had something to report to

220

1  the city council, what -- what would it be, typically?
2  I'm sure it would vary, but I mean, what kind of
3  things would you report?
4    A.  Some things we would submit that were just
5  events, and then other things were -- let's see.  I
6  did a Cheerwine presentation with Parks & Rec one
7  time.  And we would -- if -- there was DSI annual
8  reporting that we did to city council to give them an
9  update, show them what we've been doing, and you know,
10  "Please allow us -- allow DSI, that organization, to
11  continue using those funds" ---
12    Q.  Right.
13    A.  --- "for our programs."
14    Q.  And you -- and you attended -- the reason
15  that you were the one attending those city council
16  meetings is that you were the -- the executive
17  director of DSI?
18    A.  Yes.
19    Q.  Right?  Okay.  And I think that when I first
20  asked that question, I think the director's report,
21  that's something you would do in the DSI board
22  meetings, right?
23    A.  Yes.
24    Q.  Okay.  Okay.
25    A.  Yes.

221

1    Q.  That was my confusion.  The next heading on
2  here, "Nonprofit Organization Operation
3  Duties/Accomplishments."
4         So how is this different than the bullet
5  point above?  This is referring specifically to DSI?
6    A.  Yes.
7    Q.  Okay.  All right.  And then under this one,
8  it says, "Led board meetings, multiple committee
9  meetings," and those would be the four committees we
10  talked about a second ago?
11    A.  Yes.
12    Q.  "Oversight of budget, operational
13  documents."  What would "operational documents" refer
14  to?
15    A.  So the bylaws, the contracts with the
16  insurance agents for, like, D&O, insurance on the
17  Empire or any maintenance.  I also managed
18  maintenance, which I did that by reporting first to,
19  you know, the DSI organization committee because, you
20  know, DSI owned the building.
21    Q.  Okay.
22    A.  So things like that.
23    Q.  And as I understand it -- so you were
24  involved in maybe rewriting or amending the bylaws at
25  some point?

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 33 of 45

222

1     A.   Whitney and I worked on that together, as
2   well as instituting -- what I always said, if I was a
3   director and I became a director of a board that
4   needed it we would have forms for, like, an
5   application, and it would be very transparent.
6          And that's something that Whitney believed
7   in too, and she did some good work and reached out to
8   another community, got some -- a copy of their, you
9   know, conflict of interest.
10         And also, the one that I really believe we
11  needed to use and probably still didn't utilize was,
12  you know, that -- that contract saying, "Look, I am --
13  I know I'm a volunteer, but I'm willing to give my
14  time.  I have it to give, and I need to be at, like,
15  at least two events a year."  And so that type of,
16  "This is a promise."
17    Q.   And that's something that was instituted or
18  was not?
19    A.   Yes.
20    Q.   Okay.
21    A.   Yes.
22    Q.   Okay.  And then you had mentioned insurance.
23  I think at some point you were involved in switching
24  insurance carriers as well?
25    A.   Probably so.  I -- probably.

223

1     Q.   Okay.
2     A.   I didn't make that decision myself.
3     Q.   Okay.  And then the third one down,
4   "Establish productive Quarterly Downtown Stakeholders
5   Meetings that increase participation -- increased in
6   participation."
7          So that -- what -- what did you do in that
8   regard as far as establishing these quarterly
9   meetings?
10    A.   So I talked to different business owners
11  that had a larger, you know, open type of building,
12  where we could house 20 or 30 people, because that's
13  what were hoping for.
14    Q.   Right.
15    A.   We may have ten.  We didn't know.  But this
16  was something that hadn't been done in a long time.
17  And the business owners were, I think, disgruntled
18  because they felt like they weren't being listened to,
19  and that's very important.
20         So we -- I talked to them, got places to
21  meet, times.  We set up the agenda to make sure that
22  we had some type of, maybe, educational piece, and we
23  would update the business owners about what's coming
24  up, what they could be a part of, not only
25  promotional-wise, but, like, what's going to happen

224

1   with the street, when they're going to repave that.
2          So some of that type of planning, and
3   allowing them time to give feedback and network and
4   talk to each other about how they could cross-promote.
5     Q.   Okay.  And then -- let's see.  And then --
6   let's see.  That last bullet point, "Grant Writing and
7   Awards."  So I assume that means that you would be
8   involved in writing grants for funds for DSI, right,
9   for different projects or -- or events?
10    A.   So this was -- would be combined-win effort
11  for the City and DSI.  Someone had to bring it
12  forward, either being a municipality or a nonprofit.
13  And I worked with city staff on these things and was
14  able to -- now, the RISE grant for the Empire Hotel --
15  excuse me -- that took the board members helping kind
16  of get our -- get our information out there.
17         I don't want to say politicking, and I don't
18  want to -- because, you know, you've got to be careful
19  when you're a nonprofit.
20    Q.   Right.
21    A.   But anyway, we had friends who talked to
22  friends who may have been elected officials to kind of
23  talk about why this would be a good thing.  I think it
24  was on that one.
25         It may have been another one because

225

1   actually, that RISE grant, I think Liz Parham just
2   emailed me and said, "Sorry for the late notice, but
3   by two o'clock today," and I think this was at ten
4   o'clock, "you need to give me all your projects."
5   Because they were trying to get it into the governor's
6   budget.
7     Q.   Okay.
8     A.   So I don't know if that was -- but we had
9   other issues that the members were helping with.
10    Q.   So these were -- these were -- so the three
11  items that are listed here, the $543,000 grant, that
12  was one that was awarded August 2020 ---
13    A.   Yes.
14    A.   --- and you had -- you had worked on it
15  before you left in June, right?
16    A.   Yes.
17    Q.   Okay.  And then the next one is a ten to
18  $20,000 "EPA/USDA Local Foods, Local Grant for
19  technical assistance," and that was -- that was one
20  that you worked on that was awarded in April 2020?
21    A.   Yes.
22    Q.   And then the $1 million RISE grant for the
23  Empire Hotel, I guess it was submitted, but it was not
24  -- not awarded?
25    A.   The governor put it in his budget, so it

226

1 was.
2    Q. Oh, okay.
3    **A. But then it was cut.**
4    Q. Okay.
5    **A. It never got to the house and the ---**
6    Q. I got you. I got you.
7    **A. --- senate.**
8    Q. Okay. And ---
9    **A. I did that one on my own.**
10    Q. You what?
11    **A. I did that one on my own in, like ---**
12    Q. Okay.
13    **A. --- I don't know, two hours. It was all**
14 **this information they needed.**
15    Q. When you were at the City -- or Town of
16 Kernersville, did you ever -- did you ever challenge
17 your salary/exempt status?
18    **A. No. And -- yeah, it wasn't hourly. So no.**
19    Q. Okay. And what about -- what about -- same
20 question for the City of Wilson.
21    **A. No.**
22    Q. Okay. All right. Let me shift gears here.
23 Look at --
24      MR. ADAMS: -- and let me -- go off the
25 record for a just a second.

227

1 (Brief recess: 4:01 p.m. to 4:05 p.m.)
2    Q. (Mr. Adams) I'm going to hand you what
3 we're going to mark as Exhibit 11.
4      (DEPOSITION EXHIBIT
5        NUMBER 11 WAS MARKED
6        FOR IDENTIFICATION)
7    Q. (Mr. Adams) And I'll represent to you that
8 those are your written responses to the Discovery
9 request that we submitted in this case, just asking a
10 bunch of questions. You provided responses.
11      Did you -- before these were served on us,
12 did you review these to make sure that they were
13 accurate?
14    **A. Yes.**
15    Q. Okay. Flip over to Page 6. And if -- if
16 you look on that page, this is an interrogatory, just
17 asking you about employment history. And so you
18 provided -- if you look on the page before, you're
19 describing your job at Lexington, and then next, you
20 know, job going backwards would be DSI and the City of
21 Salisbury.
22      So it looks to me, if you look at Exhibit
23 Number 10 that we just finished looking at, the resume
24 that you submitted to ---
25    **A. Yes.**

228

1    Q. --- Lexington, your description of the DSI
2 position in the resume, Exhibit 10, and in these
3 Discovery responses look pretty much identical. Would
4 you agree with that?
5    **A. Pretty much, yeah. I agree.**
6    Q. Yeah. I mean, is there any, like, error in
7 either one of them or glaring -- you know, a
8 difference that you're seeing?
9    **A. I don't see any glaring ---**
10    Q. Okay.
11    **A. --- mistakes.**
12    Q. Okay. And then let me ask you a question,
13 just kind of -- kind of going in a different
14 direction. I'd asked you about the -- so the DSI
15 board, how frequently did they meet?
16    **A. Every -- well, most months, we met.**
17    Q. Okay.
18    **A. Now, we would combine November and December,**
19 **typically, into one because of the way they hit ---**
20    Q. The holidays and stuff.
21    **A. --- on the holidays.**
22    Q. Yeah.
23    **A. So we would -- we would meet the -- and**
24 **exceed the threshold of three-fourths of the year.**
25    Q. Okay.

229

1    **A. And we would meet almost every month except**
2 **when we may have combined.**
3    Q. Okay. And when you refer to a threshold, is
4 that something that Main Street -- that, like, North
5 Carolina Main Street sets ---
6    **A. Yes.**
7    Q. Okay.
8    **A. Regulation, yes.**
9    Q. Okay. And so you would have a meeting, and
10 in that meeting, would -- at the beginning of the
11 meeting, would you approve the minutes from the
12 previous board meetings?
13    **A. Typically. There was a spot for that, and**
14 **if there was a month that there -- you know, those**
15 **minutes weren't available for some reason, we would**
16 **double up the next month. But yes, there was always a**
17 **spot for that.**
18    Q. Okay. And so before each board meeting,
19 would the minutes -- the draft of the minutes from the
20 previous board meetings be circulated to everyone that
21 was in the board meeting?
22    **A. Yes.**
23    Q. Okay.
24    **A. Typically. If we had them, then we**
25 **circulated them there as well as electronically.**

230

1    Q.  Who prepared ---
2    **A.  Or emailed.**
3    Q.  --- the typed minutes?
4    **A.  Well, I did a lot of the typing of the**
5    **minutes.  Candice Brown, I would have -- I think she**
6    **would do the minutes.  I would always go back over**
7    **them, and before her, I think Katelin Rice did it when**
8    **she was with the organization.**
9    Q.  So generally, DSI staff would prepare the
10   minutes?
11   **A.  Or Downtown ---**
12   Q.  Okay.
13   **A.  --- Developments.**
14   Q.  All right.  And so -- so you would have --
15   you personally would have a chance to look at the
16   previous meeting's minutes to make sure they
17   accurately reflected what was ---
18   **A.  Yes.**
19   Q.  --- said in the meeting?  And would you have
20   an opportunity -- if something was inaccurate, would
21   you have an opportunity to correct it?
22   **A.  Uh-huh (yes).**
23   Q.  Okay.
24   **A.  Yes.**
25   Q.  Would you just do that before the meeting

231

1    and then bring that up when the minutes were to be
2    approved, or...
3    **A.  So I wouldn't -- if a board member, during a**
4    **meeting, brought up a correction, you know, we would**
5    **correct it and bring it back.  But if there were**
6    **misspellings, of course, I corrected.**
7         **I would try to catch those as much as I**
8    **could, but if I couldn't -- you know, it depended on**
9    **my workload.  I would -- I'm trying to think -- so we**
10   **would send -- sometimes, we would have them and have**
11   **enough time to get them done before the org meeting,**
12   **and org -- the executive committee ---**
13   Q.  Right.
14   **A.  --- organization committee would be able to**
15   **review those.  I would say a lot of the times, though,**
16   **it was -- they got them prior to or at the board**
17   **meeting.  And everyone was given time.**
18   Q.  Okay.
19   **A.  But yeah, small errors or ---**
20   Q.  Sure.
21   **A.  --- such as spelling and such, I would ---**
22   Q.  Okay.
23   **A.  --- I would fix that.  I would -- if I**
24   caught it.
25   Q.  Got you.  Okay.  Look back at the Complaint,

232

1    if you would.  And there is a -- it's going to be
2    Document 1-3, and again, these -- I don't really have
3    page numbers that I can refer to, but it's -- it's ---
4    **A.  Uh-huh (yes).**
5    Q.  That page.
6    **A.  Oh.**
7    Q.  If you're looking at the bottom, it says,
8    "Document 1-3."
9    **A.  Okay.**
10   Q.  Okay.  And so that -- as I understand it,
11   these are recurring meetings that you would have to
12   attend as ---
13   **A.  Yes.**
14   Q.  --- the DSI executive director?
15   **A.  Yes.**
16   Q.  Okay.  And was this -- was that the case
17   throughout your employment?
18   **A.  Yes.  This is very similar to what --**
19   **because we would have, like, 12 events, and we always**
20   **had pre- and post-council management team meetings the**
21   **day before or the day of city council.**
22        **Then we would have city council that would**
23   **go late at night, and then we would have post-council**
24   **to talk about what happened in council, plus**
25   **management team meetings that were not a part of**

233

1    **preparing for council.  Yes.  And then I had -- there**
2    **were spots for me and for the DSI director for the**
3    **chamber -- on the chamber board and some others.**
4    Q.  Okay.
5    **A.  Yeah.**
6    Q.  And then if you flip the page.  This is
7    referred to in the Complaint as Exhibit D, but it's
8    Document 1-4 at the bottom.  It looks like it's nine
9    pages.  And this -- I think this is a letter that you
10   signed.  Yeah.
11   **A.  Yes.**
12   Q.  To Janet -- is it Gapen or Gapen?
13   **A.  Gapen.  Gapen.  Uh-huh (yes).**
14   Q.  Gapen?  So what was the purpose of this
15   letter?
16   **A.  So this was a requirement to respond to the**
17   **City's request for proposal.  It was -- it's state**
18   **statute that the City has to put out an RFP to**
19   **organizations.  It may not be the same organization**
20   **every time.**
21   Q.  Right.
22   **A.  But they have to put it out there, and it**
23   **usually falls to -- in this case, in this city, DSI**
24   **because they're that partner arm.  So I had to respond**
25   **to the city RFP with reasons why DSI should continue**

234

1  getting the MSD funds to allocate ---
2      Q.  Okay.  I got you.
3      A.  --- for programming.
4      Q.  And so if you look at the first page of the
5  letter and the third paragraph, kind of at the -- it
6  says, "We're an accredited Main Street Program,
7  recognized by both the National and North Carolina
8  Main Street Programs.
9          "DSI is managed by a 21 person Board of
10  Directors, representing downtown stakeholders and a
11  full time Executive Director who oversees the progress
12  and purpose of the organization."
13          And that full-time executive director,
14  that's referring to you, right?
15      A.  Yes.
16      Q.  Okay.  And then in the next paragraph, in
17  the middle, it says, "Our four main -- main committees
18  are Economic Vitality, Organization, Design/Master
19  Plan and Promotions/Marketing."
20          And those are the committees that we've
21  discussed previously, correct?
22      A.  Correct.
23      Q.  And -- and would the -- I don't know if I
24  asked this specifically, but would the process of
25  preparing and approving minutes for those committee

235

1  meetings be the same as what you discussed for the DSI
2  board?
3      A.  You really don't -- you didn't have to have
4  committee meeting minutes.  That's what the board
5  meeting was for, was for the chairs or myself or
6  someone who's on the board and at the -- or at the
7  committee meeting reporting.  And that's the official
8  minutes.
9      Q.  Right.
10      A.  How Salisbury had always done it, I guess,
11  is that they typed up everything.  And they typed --
12  and even Liz Parham, state director, said, "You do not
13  need to type them up.  You can hand jot down, even,
14  you know, or you don't have to have committee minutes
15  because" ---
16      Q.  Right.
17      A.  --- "the -- what the committees are doing is
18  reported in the board meeting."
19      Q.  Right.  But they did ---
20      A.  Yes.
21      Q.  I mean, here, they did do minutes for all
22  those committee meetings, and so there would be an
23  approval process for those like with the DSI board
24  meetings?
25      A.  I don't know if they actually approved those

236

1  meetings or they just -- we read them, or they got
2  them, and this is what happened.  But -- so I don't
3  know if there was actual -- they didn't say, "Oh, we
4  approve those committee minutes."
5      Q.  Right.  I mean, would you -- since you
6  oversaw those four committees, did you get copies of
7  those minutes?
8      A.  Usually, if I wasn't taking them myself ---
9      Q.  Okay.
10      A.  --- or delegating to a staff ---
11      Q.  Right.  Okay.
12      A.  --- person.
13      Q.  And then if you look at the second page, if
14  you look at the last paragraph, it says, "On behalf of
15  the Board of Directors, and as an authorized signature
16  and submittal source for this document, I thank you
17  for the opportunity to respond, da, da, da, da," and
18  then your signature is below there.
19          Is that correct?
20      A.  That's correct.
21      Q.  And you -- you, as the executive director of
22  DSI, were the authorized signature that's referred to
23  in that paragraph?
24      A.  Yes.
25      Q.  Okay.  And then if you look at -- let's see

237

1  here, Page 4 of 9.  If you look down in the kind of
2  bottom right-hand corner, you'll see "Page 4 of 9."
3      A.  Uh-huh (yes).
4      Q.  So on this page, it looks like you're
5  describing the -- you know, general terms, the duties
6  of different individuals who were involved with DSI?
7      A.  Yes.
8      Q.  Okay.  And you've described your, I guess,
9  qualifications as executive director and then kind of
10  a summary of your role as the executive director.  Is
11  that right?
12      A.  Yes.
13      Q.  Okay.  And it looks like those duties are
14  the same ones that were in your resume and in the
15  Discovery response.  Would you agree with that?
16      A.  Yes.
17      Q.  Just in shorter form?
18      A.  Yes.
19      Q.  Okay.  And then let's see.  The next exhibit
20  on here I want to ask you about is -- let's see.  Hang
21  on a second.  Let me find this.  Okay the -- the --
22  there's an exhibit, Document 1-5.  It's referred to as
23  Exhibit E in the Complaint, but if you flip -- this is
24  the MS & RP ---
25      A.  Yes.

238

1    Q.   --- Main Street Director's Roles and
2  Responsibilities.  So in the Complaint, it says, "In
3  June," and this would be 2018, "Plaintiff submitted
4  her Main Street Director's Work Plan for 2018-2019,"
5  and it says "Exhibit E."
6        So is that what this is?
7    **A.  It must be.**
8    Q.  Okay.
9    **A.  Yes.  I mean, that corresponds.**
10   Q.  And -- okay.  So what would be the purpose
11 of this work plan, and who are you submitting it to?
12   **A.  So I submitted this to Zack and Greg and**
13 **Whitney, Greg Shields and Whitney Williams, in a**
14 **meeting.  It's a template that I had created -- I got**
15 **a template from Liz Parham, from the State.**
16   Q.  Okay.
17   **A.  Okay?  And then I put in the dates of these**
18 **different Main Street meetings that I, as director --**
19 **you know, we're required to attend.  And so I had to**
20 **edit it to put in what, you know, we were doing here**
21 **in the city and to show Greg and Zack and Whitney, you**
22 **know, "This is a Main Street director's roles and**
23 **responsibilities."**
24       **At this point, I do not believe I had any**
25 **employees.  I did not.  So, of course, I think either**

239

1  I alluded to that in here or I told them, "You know,
2  some of this could be delegated once I have employees
3  again."
4    Q.  Right.
5    **A.  And yeah, this is one of several that I**
6  **tried to use to educate city staff and DSI board and**
7  **officers -- board members and/or officers of what it**
8  **was I was to do.**
9    Q.  Okay.
10   **A.  Yeah.**
11   Q.  And then -- and then over the course of the
12 year in the DSI board meetings, and I guess the city
13 council meetings, whenever you'd present, would you
14 provide them updates on things that are in this
15 template that you had accomplished along the way?
16   **A.  That -- when we met with city council, it**
17 **was more about what the organization does ---**
18   Q.  Got it.
19   **A.  --- and not me.  So we had a similar plan**
20 **that looked like this, and it was color coded, that we**
21 **would use internally at -- within the board and the**
22 **committees to keep up with our work plan.  That was**
23 **supposed to be planned work for a year or a year and a**
24 **half, just what was there ---**
25   Q.  Right.

240

1    **A.  --- not constantly adding to it.  But we may**
2  **have presented that at -- if not our annual meeting**
3  **with city council, the official meeting, possibly at a**
4  **city council board retreat.  I'm pretty sure at one**
5  **point, we did.  If not, we used this as our internal**
6  **board working document.**
7    Q.  Okay.  And so -- at the top of this
8  template, it has -- under the -- the title, "Main
9  Street Director's Roles and Responsibilities," it
10 says, "Main Street Director's Role."  And Main Street
11 Director, that's you, right?
12   **A.  Yes.**
13   Q.  And it says, "Is charged with day-to-day
14 operations of the local Main Street Program and in
15 assisting the Main Street board and committee with the
16 implementation of the Downtown Economic Development
17 Implementation plan."
18       What's the Downtown Economic Development
19 Implementation plan?
20   **A.  So I don't know if that was part of the**
21 **wording of the template or if that was something we**
22 **were already starting to work on with the City.  DSI**
23 **had a Downtown Master Plan, and then we were able to**
24 **get the City and planning staff onboard to help to**
25 **update that plan.  But they called it the Downtown**

241

1  Master Plan.  That may have been template ---
2    Q.  Okay.  All right.
3    **A.  --- verbiage.**
4    Q.  And then if you flip to the second page of
5  the same exhibit on the -- in the left-hand column,
6  three little dots down, it says, "Develop a budget
7  plan that aligns with the economic development plan
8  and general operations of the MS organization."
9        Do you see that?
10   **A.  Yes.**
11   Q.  And that -- I think you referred earlier to
12 your involvement in developing and following a budget?
13   **A.  Uh-huh (yes).**
14   Q.  And then a column over, "Retail Sales
15 Activities, build a relationship with each retailer
16 and brainstorm ideas for growing their business."
17       That's the meetings with the downtown
18 business owners ---
19   **A.  Yes.**
20   Q.  --- and the property owners?
21   **A.  Yes.**
22   Q.  Okay.  And then if you flip the page, at the
23 top of the left-hand column, "Train new board and
24 committee members at the start of the new fiscal
25 year."

242

1    A.  Uh-huh (yes).
2    Q.  So that was something that you did when, I
3  guess -- what, when new board members would come on or
4  new committee members, they -- they would need to be
5  trained?
6    A.  Right.  They would need a orientation.
7    Q.  Okay.  The next one down, "Draft, establish
8  and manage best practices with the local MS
9  organization."
10       What -- what is that referring to?
11   A.  Oh.  That's one of two annual reports that
12  we had to send in to the North Carolina Main Street
13  office, which is part of the Department of Commerce.
14   Q.  Okay.
15   A.  And so on that assessment was things like,
16  "List all of your partner organizations."  And there
17  would be -- you had to get, like -- you know, you
18  needed three out of four of these to, you know, keep
19  your accreditation.
20       The State would then take that assessment,
21  and I mean, it was thick, and then recommend a city or
22  a town for designation through the National Main
23  Street America program.  So you would -- it was -- so
24  this was a document that we had to do every year.
25       And I -- and basically, we were putting all

243

1  the things we were doing on there.  And I did have to
2  -- I think I improved it, and I was able to list
3  things that were not on past years.
4    Q.  And so you knew -- I mean, you -- from
5  working in Kernersville and Wilson, you were familiar
6  with, I guess, like, the standards that you had to ---
7    A.  Yes.
8    Q.  --- comply with, and you -- this thick
9  report, you'd make sure it was in compliance and
10  then ---
11   A.  Oh, yes.
12   Q.  --- you all would submit it annually or ---
13   A.  Yes.
14   Q.  --- twice a year?  Okay.
15   A.  There were two reports annually.
16   Q.  Okay.
17   A.  One in July, and one was always due, like,
18  January 3rd.
19   Q.  What was your fiscal year?
20   A.  July to June.
21   Q.  Okay.
22   A.  And then the next point down on that same
23  column, "Write drafts, manage, update and file, as
24  needed, all nonprofit paperwork and documentation,
25  including bylaws, solicitation license, annual

244

1  insurance agreements."
2        So I think we already touched on this.
3  These were -- you had mentioned working on the bylaws
4  and insurance, things of that nature?
5    A.  Correct.
6    Q.  Okay.  And let's see.
7    A.  And there were two budgets, so I worked with
8  a bookkeeper, an accountant here.
9    Q.  Okay.
10   A.  We had books and a budget for DSI as well as
11  my budget for the City, but we would have to cut
12  checks for events to pay, like ---
13   Q.  Okay.
14   A.  --- you know ---
15   Q.  And I've seen reference in some of the -- I
16  guess it was in some of the minutes to audits that
17  were done.  So you were involved ---
18   A.  Oh, yeah.
19   Q.  Would you meet with CPAs who were ---
20   A.  Uh-huh (yes).
21   Q.  --- doing the audits and -- okay.
22   A.  Yes.
23   Q.  Okay.  If you flip to Page 4 of 8, in the
24  second column over on the left, there's a heading,
25  "Marketing."  And would this -- this heading here,

245

1  would this describe, you know, some of the marketing
2  you had to be involved in for DSI?
3    A.  Yes.
4    Q.  Okay.  And lets see.  And then the next
5  column over, down at the bottom, the last bullet point
6  refers to "Write and manage grants."  I think that's
7  kind of what we were talking about earlier?
8    A.  Yes.
9    Q.  And then the next page on the left column,
10  top bullet point, "Write a director's monthly activity
11  report and present it to the Board of Directors at
12  their monthly meeting."
13       So that's something that -- is that
14  something you did?
15   A.  I did not do that at first.  That wasn't in
16  -- I mean, that's something some directors write, and
17  some directors just give a verbal.  And I was used to
18  giving verbal, and I assume the last director was, and
19  -- but somewhere -- at some point in time, I was
20  required to write a director's monthly activity report
21  and present that at the board.
22   Q.  Okay.  And what would be in that report?
23   A.  I think that's in some of the Discovery
24  documents.  So it ---
25   Q.  Okay.

246

1    A.    --- would be any business owners or building
2  owners I had met with.  It would be updates on, you
3  know, any -- most of the big highlights of my work.
4    Q.    Right.  And that would be highlights during
5  the last month between board meetings?
6    A.    Yes.
7    Q.    And then you'd present that at the meeting?
8    A.    Yes.
9    Q.    Okay.
10    A.    Meetings I went to and initiatives we were
11  trying to, you know, start or updates on programs or
12  initiatives.
13    Q.    Okay.  And then look at the -- it's at Page
14  6 of 8 in the -- in the left column.
15    A.    Yeah.
16    Q.    Second bullet point is, "Manage the books of
17  the organization through QuickBooks or other
18  appropriate accounting program as needed."
19        And that was something that you did?
20    A.    That was something that Sheila Ezzo did, who
21  was the part-time DSI office manager and bookkeeper
22  before I was hired.  And she also worked with the
23  bookkeeper who I eventually worked with.
24    Q.    Okay.
25    A.    She mainly did that, but then Zack told her

247

1  she could leave whenever the interim director left.
2  And she didn't even get to talk to Zack about it.  So
3  I lost my office manager and bookkeeper about, I don't
4  know, two weeks after I arrived.  And so then I had to
5  do it myself, with Katelin's help at first.
6    Q.    Okay.  Okay.  And then the next bullet point
7  is, "Facilitate audits as needed," and I think we
8  talked about that, your work with CPAs, that you were
9  doing the audits?
10    A.    Yes.
11    Q.    The next one says, "Complete 990's."  What
12  is that?
13    A.    So if there was something -- oh, that is
14  part of the annual financial reporting.
15    Q.    Oh, okay.
16    A.    Yeah.
17    Q.    And who -- is that submitted -- again, is
18  that something that's submitted to the state Main
19  Street organization?
20    A.    No.  This is for compliance with accounting
21  standards.
22    Q.    Okay.
23    A.    Yeah.
24    Q.    I got you.  And then let's look at -- let me
25  try to figure out which -- I'm not sure what the --

248

1  hang on a second.  Okay.  Exhibit -- it's Document 1-
2  7.  It's referred to in the Complaint as Exhibit G.
3  Let me look and see.
4    A.    Yeah, my calendar.
5    Q.    So in the Complaint, it says, "Beginning in
6  January 2019, Plaintiff began keeping a calendar of
7  the extra hours that she was required to work outside
8  of regular business hours unlike any of the male
9  department heads."
10        And it refers to Exhibit G.  So this is --
11  this document, 1-7, which is 19 pages, purports to be
12  this calendar.  Is that what this is?
13    A.    Yes.
14    Q.    Okay.  Now, a couple questions about this.
15  The -- why did you start keeping this calendar in
16  January 2019?
17    A.    Because I felt there was a need for me to
18  have evidence or proof.  I don't -- that's not really
19  what I was thinking in my head at the time.  I was
20  just thinking, "I need to document my hours so I can
21  show it to Zack, my supervisor.  I can, you know,
22  share it with the board if possible," which Zack would
23  not let me do.
24        I just -- I had to account for my hours
25  because I was -- I felt like I was getting beat up on,

249

1  "What is it you're doing?"  Well, you know, I ---
2    Q.    Okay.  And so ---
3    A.    --- I just felt that way.
4    Q.    Sorry.
5    A.    I'm sorry.
6    Q.    I didn't mean to interrupt you.
7    A.    I interrupted you.  I'm sorry.
8    Q.    So let me ask you just a few questions about
9  this.  So if you look at the first entry from Monday,
10  January 7th, 2019, and at the top, it says, "12 a.m.
11  to Tuesday, the 8th, 12 a.m. Doodle Poll -- Stat
12  Report."
13        Now, an entry like that, I'm assuming that
14  that doesn't mean that you actually started working at
15  12 a.m. through 12 a.m. the following day on this
16  status report.  That's just a placeholder, I'm
17  guessing.
18    A.    Right.
19    Q.    Okay.
20    A.    It had to go out, I guess, that day, or...
21    Q.    Okay.  And -- and would it be true that, you
22  know -- I mean, I keep a calendar too and try to do my
23  best of to kind of keep up with everything I've got on
24  my calendar, but sometimes, I don't get to certain
25  things.

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 40 of 45

258

1  kept.  Because like I said, at some point, I felt like
2  I was on the hot seat, and I was being unfairly put on
3  the hot seat and I needed to justify my work.  Because
4  I kept hearing from a couple DSI board officers, you
5  know, "What are you doing?  What is -- what are you
6  doing?"
7         And, you know, I offered to share my
8  calendar early on and Zack told me, "No."  I guess
9  that was probably out of protocol.  I'm -- you know,
10 I'm sure that was something that maybe the Parks & Rec
11 director didn't have to share with his planning -- or
12 his Parks & Rec board or the planning, you know,
13 director had to share with her planning board.  So ---
14    Q.   When was it you offered to show Zack your
15 calendar?
16    A.   I offered to show Greg and Whitney.
17    Q.   Oh, okay.
18    A.   This -- I mean, it was early on because Greg
19 was chairman at the time, and so probably I was hired
20 in October of 2017.  He was probably asking to share
21 it within the next -- within the next two months,
22 probably.  I mean, it was pretty early on.  And I was
23 actually willing to share so that, you know, there
24 would be an understanding and education, not -- and
25 transparency.

259

1    Q.   Right.
2    A.   But I could not.
3    Q.   So what -- what I want to understand is what
4  -- what documents, be it hard copy documents or
5  electronic documents, did you look at to reconstruct
6  these hours that you claim that you're owed?
7    A.   So emails that you have -- I mean, I think
8  everything is in Discovery, the email -- except for
9  maybe -- except for my personal texts to my, you know,
10 husband, my mother, who were usually checking up -- of
11 me before and after ---
12    Q.   And you also did not have access to your
13 Outlook calendar from June -- the end of June 2019
14 through June 23rd of 2020, correct?
15
16    A.   Now, wait a minute.  Those dates don't sound
17 right.
18    Q.   The -- the exhibit that we just looked at on
19 the Complaint ends, like, June 22nd of 2019.  And then
20 almost exactly a year later is when you resigned, June
21 23rd, 2020.
22         So you did not -- when you were recreating
23 this log of hours that you say you weren't paid for,
24 you did not have access to those Outlook calendars
25 during that time frame I just mentioned, right?

260

1    A.   Right.
2    Q.   Okay.  And so ---
3    A.   I think I heard that right.  I'm sorry.  I'm
4  waning.  I'm starting to wane.  You all are probably
5  too, but...
6    Q.   You didn't have Outlook -- access to Outlook
7  calendars for the last year of your employment when
8  you created that log of hours you say you're due?
9    A.   After I was constructively discharged, I did
10 not have access.
11    Q.   Okay.  So you ---
12    A.   Only whenever I worked for Salisbury did I
13 have access.
14    Q.   Okay.  So what I understand you're saying is
15 that you used emails and text messages to create that
16 log?
17    A.   To -- yeah, identify the times I was ---
18    Q.   Okay.  And you created that on your own
19 computer ---
20    A.   Yeah.
21    Q.   --- at home?
22    A.   Uh-huh (yes).
23    Q.   And it was a Word document?
24    A.   Yes.
25    Q.   Okay.  And you say that you start -- so when

261

1  did you start preparing this?  Would it have been June
2  of 2020?
3    A.   I am not sure when it was.  I don't know if
4  it was -- it was probably not June because I went on
5  vacation, and -- I'm not sure.  It could be in the --
6  sometime in the fall.  I don't think I started it the
7  year before when I was suspended.  I know I was
8  thinking at that point, that's kind of I think what
9  really triggered, I need to document my true hours.
10        But I -- I think it was probably after June
11 of 2020.  I don't know when it ---
12    Q.   And if you did it in a Word document, I
13 would assume that a digital copy of that, the
14 properties ---
15    A.   Yeah.
16    Q.   --- on that document would show when you
17 started working on it ---
18    A.   Yeah.  Sure.
19    Q.   Now, do you -- when was the first time that
20 you considered yourself to be misclassified as a
21 salary/exempt employee?
22    A.   The first time?  Probably when -- possibly
23 when Kelly Baker became my supervisor, and yet she was
24 not a department head.  And that would have been in,
25 like, maybe November, December of 2017, I think that

262

1  was. So I hadn't been here but a couple months, and I
2  was under Zack's supervision.
3      And I thought I was doing a favor for Kelly,
4  in actual -- I don't know if I realized it right then.
5  I take that back. I don't think it was that early.
6  But due to several things happening like that, the
7  next -- it wasn't long before I started feeling like
8  and thinking, "This is -- I am not treated -- I'm not
9  being treated the way I'm classified."
10     Q. Okay. And so did you do anything about
11 that?
12     A. No. Not officially with the City.
13     Q. Okay. Let me show you some other documents.
14         MR. ADAMS: Okay. 12?
15         THE COURT REPORTER: Yes.
16         (DEPOSITION EXHIBIT
17          NUMBER 12 WAS MARKED
18          FOR IDENTIFICATION)
19     Q. (Mr. Adams) And I'll represent to you this
20 is not the entire employee manual, these are excerpts.
21     A. Uh-huh, yes.
22     Q. But do you recall, at the commencement of
23 your employment, receiving an employee manual from the
24 City of Salisbury?
25     A. I think I got it in orientation. Something

263

1  or -- yes.
2      Q. And then, when it was updated, this copy
3  here has a date of February 2020, and it -- do you
4  recall getting an updated version of that?
5      A. I don't.
6      Q. Okay. All right.
7          MR. ADAMS: Let me show you what I'm
8  going to mark as Exhibit 13.
9          (DEPOSITION EXHIBIT
10          NUMBER 13 WAS MARKED
11          FOR IDENTIFICATION)
12     Q. (Mr. Adams) Exhibit -- Exhibit 13, is that
13 the handbook acknowledgment ---
14     A. Yes.
15     Q. --- receipt document you signed when you
16 started your employment?
17     A. Yes.
18     Q. Okay. And -- and when you signed that
19 document, you had reviewed the employee handbook and
20 acknowledged that you understood those policies?
21     A. Yes. I think we had an orientation where we
22 went through certain sections. I'm not saying I read
23 it word for word, page for page, but I'm -- you know,
24 we went through it well enough I felt like it was --
25 well enough to sign this.

264

1      Q. Okay. And if you look at Exhibit Number 12,
2  if you flip over to the second page, it has,
3  "Wage and Hour Policies, 4.0."
4      Do you see that?
5      A. Yes.
6      Q. And under the two headings down or three
7  headings down, it says, "Exempt Employees."
8      Do you see that?
9      A. Yes.
10     Q. Okay. So did you understand that there was
11 various classifications of employees who were exempt
12 from receiving overtime if they worked more than 40
13 hours in a week?
14     A. I knew there was exempt and non-exempt.
15     Q. Okay. Do you understand that that term
16 "exempt" meant exempt from being eligible for overtime
17 pay if you worked more than 40 hours in a workweek?
18     A. I mean, it's the term I guess cities use and
19 there's a description. So yeah. If I, you know, I
20 read that and that's what an exempt employee should
21 be.
22     Q. Okay. Look over at what's marked as -- at
23 the bottom, Page 21. And you see "4.5, Recording
24 Time"?
25     A. Uh-huh (yes).

265

1      Q. Okay. And it says, "If a" -- the bottom
2  line there, "Employees are required to notify the City
3  of any pay discrepancies, unrecorded or misreported
4  work hours, or any involuntary missed meal or break
5  periods."
6      Have I read that correctly?
7      A. Uh-huh (yes).
8      Q. Did you ever notify the City of any pay
9  discrepancies?
10     A. I asked Zack to give me pay for the three
11 days of suspension that he put me on in 2019. And it
12 seems like there may have been one other time that he
13 made me take my leave when we were supposed to be
14 flexing hours.
15     Q. Uh-huh. But other than those two instances,
16 you did not notify the City of any other pay
17 discrepancies?
18     A. I don't think in those words, no. We talked
19 a lot about how much I was working, when I was
20 working. Zack would -- he usually knew because lots
21 of times he was CC'd on emails.
22     Q. Did -- were you paid by direct deposit or
23 did you actually get a physical paycheck?
24     A. Direct deposit.
25     Q. Okay. And did you ever notify the City or

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 42 of 45

266

1  DSI that the amount that you were being paid on the
2  direct deposit stub was inaccurate?
3      **A.  I don't remember having a conversation like**
4  **that.**
5      Q.  Okay.
6          MS. BATEMAN:  Wait.  I just want to
7  stop.
8          MR. ADAMS:  Yeah.
9          MS. BATEMAN:  I can find them in here.
10  They're all in here.  They're all in here ---
11          **THE WITNESS:  I thought so.**
12          MS. BATEMAN:  --- it's 215 to 226,
13  although I just created a new document and almost
14  emailed it to you.
15          MR. ADAMS:  It's 215 to 226?
16          MS. BATEMAN:  Yeah.
17          MR. ADAMS:  All right.
18          MS. BATEMAN:  214.
19          MR. ADAMS:  Okay.
20          MS. BATEMAN:  It starts on 214.
21          MR. ADAMS:  Okay.  All right.
22      Q.  (Mr. Adams)  Did -- at any time during your
23  employment with DSI, did you file a complaint with the
24  Department of Labor for unpaid wages or overtime?
25      **A.  When I was employed with the City, I did not**

267

1  file anything ---
2      Q.  Okay.
3      **A.  --- such as that.**
4      Q.  All right.
5      **A.  I was just trying to please everyone as best**
6  **I could.**
7      Q.  All right.
8          MR. ADAMS:  And -- is it 13?
9          THE COURT REPORTER:  You're on 14.
10          MR. ADAMS:  14.  All right.  I'm going
11  to hand you another document.
12          (DEPOSITION EXHIBIT
13              NUMBER 14 WAS MARKED
14              FOR IDENTIFICATION)
15      Q.  (Mr. Adams)  And do you recognize that
16  document?
17      **A.  Yes.**
18      Q.  Okay.  This is an acknowledgment, sign-off
19  sheet I guess, that you received some training on the
20  Fair Labor Standards Act in March of 2019?
21      **A.  Yes.**
22      Q.  Okay.  And do you know why you received that
23  training?
24      **A.  All I know is it was required by I -- I**
25  **don't know if it was just directors or department**

268

1  hands or it was everyone.  I feel like it was a large
2  -- I think all employees were required to do that.  It
3  was one of many, you know, things like that.
4      Q.  Okay.  All right.
5          MR. ADAMS:  I'm going to hand you what
6  I'm going to mark as 15.
7          (DEPOSITION EXHIBIT
8              NUMBER 15 WAS MARKED
9              FOR IDENTIFICATION)
10      Q.  (Mr. Adams)  Okay.  I'm handing you a
11  document marked as Exhibit 15.  Take a look at that
12  and tell me if that appears to be the PowerPoint
13  presentation on Fair Labor Standards Act Wage and Hour
14  Training that you received in March of 2019?
15      **A.  Well, the date is on here as March 7th,**
16  **2019.  So this very well could be what I saw -- what I**
17  **sat through.**
18      Q.  Okay.  And after -- so is it fair to say
19  that in this PowerPoint presentation you were given
20  training on the difference between exempt and non-
21  exempt employees?
22      **A.  If it's in there.**
23      Q.  Okay.  Look at Page 3, if you would, and at
24  the bottom it says, "FLSA Overtime Claims May
25  Involve," do you see that one?

269

1      **A.  Uh-huh (yes).**
2      Q.  And you see three different types of
3  overtime claims.  The first one is, "Employers
4  mistakenly treating employees as 'exempt' from the
5  FLSA overtime requirements."
6          Do you see that one?
7      **A.  Uh-huh (yes).**
8      Q.  And then, "Employers failing to identify,
9  record or compensate 'off-the-clock' hours spent by
10  employees performing compensable, job-related
11  activities."
12          Do you see that?
13      **A.  Yes.**
14      Q.  Okay.  Now, when you went through this
15  training and you saw that slide of this PowerPoint
16  presentation, did that not prompt you to go to your
17  supervisors and complain that you were not being paid
18  for all of the hours that you were working?
19      **A.  I didn't feel I had that luxury.  I remember**
20  **-- I think we were -- I think I remember this session**
21  **in the -- that big gym building.  I can't think of**
22  **what it's called.  I think I remember sitting in a**
23  **session, and you know, seeing these and thinking,**
24  **"Well, that's interesting."**
25          **But I didn't feel that -- if I were to go**

270

1  and complain for any reason, I would have been fired.
2  And I really didn't start thinking, I think, of myself
3  as, "Hey, I'm being treated differently than an exempt
4  employee should be," until I think I was probably
5  suspended in maybe June of 2019.
6      Q.  Okay.  If you flip over ---
7      A.  I'm not quite sure.
8      Q.  I'm sorry.  On Page 4 of the PowerPoint,
9  "Three Basic Requirements Of The Fair Labor Standards
10  Act," and Number 3 says, "An accurate record of hours
11  worked."
12          Do you see that?
13      A.  Uh-huh (yes).
14      Q.  So at this point, did this not prompt you to
15  start keeping a record of the hours that you worked?
16      A.  It could have.  I don't remember back then.
17      Q.  But as I understand it, you didn't start
18  keeping a log of hours you think you were not paid for
19  until after you resigned, right?
20      A.  Well, no.  I mean, I was keeping these in
21  2019.
22      Q.  The Outlook calendars?
23      A.  The Outlook calendars because I would have,
24  like, you know, 13 hours and -- but I don't see here,
25  like, the totals.  Usually I would total, like, at the

271

1  end of the week.  But I don't see that on -- that
2  reflected here because either I wasn't keeping it like
3  that then or this format didn't...
4      Q.  Okay.  Flip over to Page 29, if you would,
5  of the PowerPoint.
6      A.  Okay.
7      Q.  And the slide at the bottom says,
8  "Retaliation (Whistleblower)"?
9      A.  Yeah.
10      Q.  And this one says, "Unlawful to retaliate
11  for filing a complaint or testifying."
12          Do you see that?
13      A.  Yeah.
14      Q.  "Threat to file action may be sufficient."
15          Do you see that?
16      A.  Uh-huh (yes).
17      Q.  "Any adverse employment action is
18  prohibited."
19          Do you see that?
20      A.  Uh-huh (yes).
21      Q.  So you knew at least from this slide that
22  the City was prohibited from retaliating against you,
23  in fact, it would have been unlawful for making a
24  complaint about wages, right?
25      A.  Yes.

272

1      Q.  Okay.  But yet you didn't make a complaint?
2      A.  Well, because that -- this is what employers
3  should do and that's not always what happens, as we
4  know.
5      Q.  Do you -- are you aware of any City employee
6  who complained about their wages and was fired as a
7  result of that complaint?
8      A.  I do not.
9      Q.  So what -- what was your fear of retaliation
10  based on?
11      A.  The fact that it was a -- this was mentioned
12  earlier.  In some of our management team meetings,
13  when we had anonymous surveys or such that we needed
14  employees to respond to.  And there were concerns from
15  the department heads that employees felt like if they
16  gave their honest opinion, they would have, you know,
17  retaliation.
18          And I don't know if that was coming from
19  prior practices before I got here, but that was a true
20  fear.  And, you know, the way I was being -- what I
21  felt like being retaliated against, being suspended in
22  2019 especially -- do you all need a sidebar?
23      Q.  No, we're good.
24          MR. FLANAGAN:  No.
25          THE WITNESS:  So the way I was starting

273

1  to feel over the years, it was getting worse and
2  worse.  I felt like, well, maybe this is a true
3  concern and not just a -- you know, something that is
4  made up or...
5          (DEPOSITION EXHIBIT
6          NUMBER 16 WAS MARKED
7          FOR IDENTIFICATION)
8      Q.  (Mr. Adams)  Okay.  Let me show you another
9  document.  This is 16.  And then we'll take a break
10  after I ask you about this one.
11          MS. BATEMAN:  Oh my gosh, take a break?
12  We should be done.  It's 5:06.  You've got 23 minutes.
13          MR. ADAMS:  Actually, it's seven hours
14  each party, so we're good.
15          MS. BATEMAN:  Not on the same day.
16          THE WITNESS:  Yeah.  Fourteen-hour day.
17          MS. BATEMAN:  Not on the same day ---
18          THE WITNESS:  That -- hey, I think it
19  says right here I have worked...
20      Q.  (Mr. Adams)  So do you recognize that
21  document, Exhibit 16?
22      A.  I recognize it because I looked it up when I
23  was suspended in 2019 to figure out how to file a
24  grievance.
25      Q.  Okay.  And you never, as I understand it,

274

1  you never submitted one of these complaint forms,
2  correct?
3      A.  Correct.
4      MR. ADAMS:  Okay.  All right.  Why
5  don't we take a break?
6          THE WITNESS:  Okay.
7  (Brief recess: 5:07 p.m. to 5:18 p.m.)
8      Q.  (Mr. Adams)  Okay.  So I don't have that
9  much, but we're almost done.  Okay.  Just a couple
10  things.  As I understand it, you were never demoted
11  during your employment, correct?
12      A.  I was not demoted, but I did have to prove
13  why I deserved a 5 percent raise that was in my letter
14  of employment.  I think that was at the six-month
15  period, which we didn't have that I think for nine
16  months actually.
17          So I think I had my six-month review at nine
18  months, had to write out all that I had done to prove
19  why I deserved that.  Never got the second 5 percent
20  raise that was in the letter of employment.  I only
21  got a cost of living increase, which every employee
22  got that year.
23      Q.  Okay.  I don't understand -- so you're
24  talking -- so the 5 percent raise that you thought you
25  were entitled to that you wrote something out

275

1  explaining why you should get it.  You got that one,
2  right?
3      A.  I did, but I got it, like, nine months
4  later, and there's a four-month gap that I never got.
5  And I ---
6      Q.  Okay.
7      A.  --- think I brought that up once, but then I
8  was afraid to keep asking about.  And I hate to say
9  that I was afraid to do that, but I was.
10      Q.  But your -- at no time during your
11  employment was your compensation reduced, right?
12      A.  Correct.
13      Q.  And your benefits weren't cut or reduced,
14  right ---
15      A.  Correct.
16      Q.  And you remained executive director of DSI
17  throughout your employment?
18      A.  Correct.
19      Q.  Okay.
20          MR. ADAMS:  Let me show you a couple
21  random things I have in here.  it, is that...
22          (DEPOSITION EXHIBIT
23              NUMBER 17 WAS MARKED
24              FOR IDENTIFICATION)
25      Q.  (Mr. Adams)  I'm going to hand you what I've

276

1  marked as Exhibit 17.  And I will represent to you
2  that this was a document that was in Discovery.  It
3  was a -- in Candice Brown's file folder or her folder.
4  Do you recognize this?  It looks like an org chart of
5  some sort.
6      A.  No.  I don't recognize that.
7      Q.  Would -- would that accurately reflect if
8  you were to do an org chart that included City of
9  Salisbury DSI, you, Latoya and Candice, that would be
10  accurate, wouldn't it?
11      A.  No.  I don't believe so.
12      Q.  Well, what -- what would be inaccurate about
13  it?
14      A.  I think that it would be City of Salisbury,
15  and then there would be me, DSI board of directors
16  here and my employees over there.
17      Q.  Okay.  All right.  Let me show you another
18  document.  This is a big one that I'm not going to go
19  over in detail per se.
20      A.  Are we done with this Exhibit 7 (sic)?
21      Q.  Yeah.  Yeah, you can just put it in here.
22  All right.  Here you go.
23          (DEPOSITION EXHIBIT
24              NUMBER 18 WAS MARKED
25              FOR IDENTIFICATION)

277

1      Q.  (Mr. Adams)  So I'm handing you what has
2  been marked as Exhibit 18.  It's a compound exhibit,
3  and I will represent to you that these are the City
4  time sheets for you during your employment.
5          Is that what it looks like to you?
6      A.  Yes.  It looks like these should be the time
7  sheets I submitted ---
8      Q.  Okay.  So these would be -- and would you --
9  would you see these on a weekly basis?
10      A.  Yes.
11      Q.  Okay.
12      A.  I would have to fill them out.
13      Q.  Okay.
14      A.  And review -- make sure downtown department
15  staff had theirs done, and reviewed and signed theirs.
16      Q.  Okay.  All right.  And then, look at -- look
17  back at Exhibit 11, which are the Discovery responses.
18      A.  Uh-huh (yes).
19      Q.  Okay.  Look at Page 25, if you would.  Okay.
20  If you see kind of in the middle of the page there,
21  there's an Interrogatory Number 16, where we asked for
22  you to, "Identify with particularity all damages the
23  Plaintiff contends she has suffered as a result of
24  DSI's conduct as alleged in the Complaint, identifying
25  in your response the amount, nature, components, and

Case 1:21-cv-00814-CCE-JLW   Document 38-1   Filed 04/03/23   Page 45 of 45