IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:21-cv-00814-CCE-LRW


LARISSA HARPER HAIRGROVE,       )
                                )
                Plaintiff,      )
                                )
     vs.                        )
                                )
CITY OF SALISBURY, DOWNTOWN     )
SALISBURY INC., and LANE        )
BAILEY, in his individual and   )
official capacity,              )
                                )
                Defendants.     )
                                )
--------------------------------


_____

DEPOSITION
OF
ZACK KYLE

_____


TAKEN AT THE SALISBURY, NC CITY HALL:
217 SOUTH MAIN STREET
SALISBURY, NC 28144



01-30-2023
1:53 O'CLOCK P.M.

_____

Gretchen Wells
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 | (336) 992-1954 | (919) 649-4444

**6**

1     PROCEEDINGS
2     (01:53 o'clock p.m.)
3         The witness, ZACK KYLE, being first duly
4   affirmed to state the truth, the whole truth, and
5   nothing but the truth, testifies as follows:
6         EXAMINATION
7   BY MS. BATEMAN:
8     Q.  Mr. Kyle?
9     **A.  Uh-huh (yes).**
10    Q.  I have trouble because you have two first
11  names.
12    **A.  Yes.**
13    Q.  So if I mess that up today, I apologize in
14  advance.  Mr. Kyle, I'm Valerie Bateman.  I am
15  Ms. Harper Hairgrove's attorney.  I'll be asking you
16  questions today.  Have you ever had your deposition
17  taken before?
18    **A.  I was telling Patrick I can't remember.**
19  **Usually they stay away from me because I'm on the HR**
20  **side, or I was.  I've been on the HR side in the past.**
21    Q.  Okay.
22    **A.  And so -- so I think I have, maybe once.**
23    Q.  You think you have?  Okay.
24    **A.  But only once.**
25

**7**

1     Q.  Okay.  But you've discussed with
2   Mr. Flanagan being prepared for your deposition today?
3     **A.  Yes.**
4     Q.  And -- and you're prepared?
5     **A.  Yes.**
6     Q.  Okay.  If there's any reason, any time you
7   need to take a break, you let me know.  If we're in
8   the middle of a question, the only thing I ask is that
9   you finish that question, and then you take the break.
10    **A.  Sure.**
11    Q.  Okay.  And I -- I will endeavor to ask you
12  very clear questions, to which you can give me equally
13  clear answers.  If my question is not clear, don't
14  hesitate to ask me to rephrase it.
15    **A.  Sure.**
16    Q.  The most important person in this room,
17  though, is the court reporter, because it's her job to
18  take down every word.  And so even though you might be
19  otherwise inclined to shake your head or nod your
20  head, if you do that or say, "uh-huh," or "huh-uh," it
21  would be great if you could, like, focus on, "yes,"
22  and, "no."
23    **A.  Sure.**
24    Q.  That would be great.  Okay.  So I'm going to
25  go ahead and start.  We took Mr. Bailey's deposition

**8**

1   this morning.  And we already marked some exhibits.
2   And so what I'm going to do, is I'm going to start out
3   with those exhibits and go through those with you.
4     **A.  Okay.**
5     Q.  All right.  So the first exhibit I had was
6   marked P1.  And it's a letter dated August 28th, 2017.
7   Can you just take a minute and look at this, and tell
8   me if you've ever seen it before?
9   (Witness examines document)
10    **A.  Yes.  It's the offer letter.**
11    Q.  Okay.  So number two on this list is a 5
12  percent increase in salary following successful
13  completion of six months of employment.
14        And then, number three is a 5 percent
15  increase in salary following completion of one year of
16  employment with successful performance evaluation.  Do
17  you know if Ms. Harper got the 5 percent increase in
18  salary after six months of employment?
19    **A.  No.  No, I don't.**
20    Q.  You don't know?
21    **A.  No.**
22    Q.  Okay.  And how about the 5 percent increase
23  in salary following completion of one year of
24  employment?
25    **A.  No, I would assume she did, but I don't**

**9**

1   **know ---**
2     Q.  Okay.  All right.
3     **A.  --- for sure.  I can't tell you for sure she**
4   **got that.**
5     Q.  Okay.  So this says in the second page of
6   this letter that, "We would like for you to begin
7   employment on Monday, October 9th, 2017."  Were you
8   aware that she came to work actually before that?
9     **A.  No.**
10    Q.  No?  Okay.  You don't know anything about
11  that?
12    **A.  No.**
13    Q.  Okay.  All right.  So that ---
14    **A.  Again, I mean, I couldn't tell you what the**
15  **date was.**
16    Q.  Okay.
17    **A.  You know, that she started.  So I couldn't**
18  **tell you if it was October 19th, or what the actual**
19  **date was.  No, I couldn't tell you that.**
20    Q.  Okay.  But you wouldn't expect an employee
21  to come to work before they're getting paid, would
22  you?
23    **A.  Not before they're getting paid.  But if**
24  **they're getting paid, sure.**
25    Q.  Okay.  All right.  I'm breezing through this

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 2 of 22

30

1 action?
2    A.  Have any discussion on what?
3    Q.  With her about the specific -- say, "I got a
4 complaint by a DSI board member on October 31st, or, I
5 got a complaint on such and such a day by a DSI member
6 who said she sent you, or he sent you, an email on
7 October 31st, and you didn't respond until November
8 12th."
9        Did you talk with her about that before ---
10    A.  Before this?
11    Q.  Yes?
12    A.  Of course.
13    Q.  So you -- you mentioned that specific event
14 before you issued this disciplinary action?
15    A.  Yes, I'm sure.
16    Q.  Okay.  And -- and do you recall what she
17 told you?
18    A.  No.
19    Q.  Okay.  Did you tell her, "You got a lot of
20 email in your email box that has not been opened or
21 responded to"?
22    A.  Again, that's something, you know, I don't
23 know that we had that discussion, or I would have -- I
24 would think we did.  But again, I don't -- I can't
25 tell you from now.

31

1    Q.  Okay.  What I'm trying to figure out is, if
2 Larissa ever told you, "Hey, I open an email and I
3 read it, and then I make it look like I've never read
4 it so that I remember to do something based on that
5 email."
6    A.  She never told me that.
7    Q.  Ever?
8    A.  No.
9    Q.  She never gave you any ---
10    A.  No.
11    Q.  --- response to this?
12    A.  No.
13    Q.  Okay.
14    A.  No.  Not -- nothing like that.
15    Q.  Okay.  And it says, "It's also been brought
16 to my attention that you have not been responsive to
17 our EDC director."
18    A.  Correct.
19    Q.  And who was the EDC director?
20    A.  Rod Crider.
21    Q.  Pardon me?
22    A.  Rod Crider.
23    Q.  And when you say, "our EDC director," who is
24 "our"?
25    A.  The city's.

32

1    Q.  So the city had its own independent EDC
2 director?
3    A.  I don't know if it's independent.  It works
4 with us and the county.  But they are -- they're a
5 separate entity, pretty much like DSI was before.
6    Q.  Is he a city employee?
7    A.  He's not a city employee.
8    Q.  Okay.  So what was Mr. Crider?
9    A.  Uh-huh (yes).
10    Q.  What was his concern?
11    A.  I have no idea with Larissa what the issue
12 was.
13    Q.  Okay.  And then you noted that she showed up
14 late on November 20th for a DSI meeting?
15    A.  Correct.
16    Q.  And it said, "After many discussions on the
17 need for you to be on time for meetings."  Who had
18 those discussions with her?
19    A.  I would have.
20    Q.  And on how many occasions was she late to
21 meetings?
22    A.  I would not -- I couldn't tell you that.
23    Q.  Well, did you document them?
24    A.  I'm sure at the time we did.
25    Q.  Okay.  So if there is documentation, that

33

1 ought to be in her personnel file, right?
2    A.  It would have been in my working papers.  I
3 don't know that it necessarily had to be in her
4 personnel file.
5    Q.  Okay.  So did you ever give her any of those
6 dates?
7    A.  I'm sure we had those discussions.
8    Q.  Okay.  And it says, "Finally, your lack of
9 responsiveness to the North Carolina Main Street
10 personnel prompted a call from them to the city
11 manager and myself, which has led to my asking the
12 marketing person in your department to lead our North
13 Carolina Main Street Conference Coordination."
14        So I have several questions about that.
15    A.  Sure.
16    Q.  Who was the Main Street personnel who
17 called?
18    A.  Again, I -- I'm not sure if it was Liz
19 Parham, or I was trying to think of the other lady
20 that was working with us, and I cannot think of her
21 name.  Because I -- I've looked over some of this
22 stuff.  And I was trying to think of -- but there was
23 another person that was involved.
24    Q.  And who do you -- which one do you think
25 called you?  Do you know?

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 3 of 22

26

1      A.   Yes.
2      Q.   Okay.  So I want to go back now to P3.  And
3  this is the disciplinary action that you issued in
4  December.
5      A.   Okay.
6      Q.   So you -- you refer back to the, "You were
7  advised to respond to phone calls and emails within
8  the same day or 24 hours."
9      A.   Right.  Correct.
10      Q.   And you can't recall whether everybody had
11  to do that, but you know you told Larissa she had to
12  do it.  Is that right?
13      A.   Again, I don't know what was required of
14  everybody else.  I mean ---
15      Q.   Well, what about the people that reported to
16  you?
17      A.   Again, whenever I had issues, we'd have
18  those discussions.
19      Q.   Okay.  So an email was sent -- you say this,
20  "An email was sent to you on October 31st by one of
21  the DSI board members, and you did not respond until
22  November 12th." So do you know what that email was
23  about?
24      A.   I couldn't tell you right now.
25      Q.   Okay.  Did you provide Larissa with a copy

27

1  of it at the time?
2      A.   I am not sure.  We had the discussion, and I
3  probably went over the details of the -- who it was or
4  what the concern was, sure.
5      Q.   Okay.  And then you say, "There are a number
6  of emails in your inbox that have not been opened or
7  responded to."
8      A.   Correct.
9      Q.   And how did you know that?
10      A.   I had someone from human resources looking
11  at emails.
12      Q.   Look at her emails.  And did you ever have
13  the occasion to do that to any other department head?
14      A.   I'm sure we've done it in the past, yes.
15      Q.   Do you recall who you did that with?
16      A.   I think that's a personnel matter.
17      Q.   Pardon me?
18      A.   I think that would probably be a personnel
19  matter.
20      Q.   Well, do you recall who it was, though?  Can
21  you, like, name that person by initials?
22      A.   I don't believe I need to do that.
23          MR. FLANAGAN:  Zack, I think you can
24  respond.  As long as you're not talking about the
25  specifics of any kind of investigation or personal

28

1  matter or the person.  But if there are other
2  employees who you have had reviewed their emails as
3  part of some complaint or something, then I think you
4  can discuss that, just not the specifics of any
5  disciplinary action or anything like that.
6          THE WITNESS:  I think that the ones
7  that probably that I would have done resulted in
8  disciplinary actions.
9          MR. FLANAGAN:  Okay.  Well, without
10  going into the names of the disciplinary actions, can
11  you describe the position and -- and what the
12  complaint was?  Do you know what I mean?  So without
13  going into any disciplinary action that was taken?
14          THE WITNESS:  All right.
15      Q.   (Ms. Bateman) I don't want -- I don't need
16  to know their name.  I just need to know what the
17  circumstances were.
18      A.   We've dealt with Fibrant directors.
19      Q.   Pardon me?
20      A.   Fibrant directors, people who are over our
21  Fibrant, our broadband.
22      Q.   Okay.  And what -- and what -- what were the
23  circumstances?
24      A.   Again, I think that's a personnel.
25      Q.   Well, can you tell me, did somebody make a

29

1  complaint?
2      A.   It was issues with work being done or
3  responses.
4      Q.   I'm sorry.  Say that again?
5      A.   Being responsive.  So I think it would
6  probably be -- would have been along those lines.
7      Q.   So how did you figure out they weren't being
8  responsive?
9      A.   We get complaints.
10      Q.   And so you got a complaint in this one case?
11      A.   It may have been ---
12          MR. FLANAGAN:  Object to form.  He
13  didn't say one, but ---
14      Q.   (Ms. Bateman) Pardon me?
15      A.   It may have been more than one case.
16  Again ---
17      Q.   Well, was there more ---
18      A.   --- it's going to take -- it's going to take
19  more than one case for us to start looking at your
20  emails, okay?
21      Q.   It's going to take?
22      A.   It's going to take more than one incidence
23  for us to start looking at people's emails.
24      Q.   Okay.  So did you have any discussion with
25  Larissa about this before you issued the disciplinary

22

1  A. I would have no idea.
2  Q. Okay. Are there any -- like, would you
3  create a document that would -- that would indicate
4  when you spoke with her about performance?
5  **A. Create a document?**
6  Q. Yeah? Like, would you document that you had
7  discussed with her, you know, her performance and how
8  you could assist her in making sure she's meeting the
9  requirements of her job?
10 **A. I took notes periodically, but I'm not sure**
11 **I would have every time we met.**
12 Q. Okay. Do you think you kept those notes?
13 **A. I doubt it.**
14 Q. Okay. Okay. So it says, "As we have
15 discussed, I have concerns with your being able to be
16 responsive to emails, calls and work related matters
17 that need your timely attention. We have also
18 discussed the need for you to utilize the staff
19 currently have to assure that the work of your
20 department is being done."
21 So in September 12th, 2018, what staff did
22 she have?
23 **A. Again, I probably -- she may have had a**
24 **receptionist of which I think, at that time, I -- come**
25 **to think of her name, Candice somebody. Candice**

23

1  Brown, maybe.
2  Q. Okay.
3  **A. You know, I'm not sure about the name, but**
4  **-- and I'm not sure if she had a marketing person at**
5  **that time or not.**
6  Q. Well, did she ever get a marketing person?
7  **A. Yes. She had a marketing person.**
8  Q. Okay. So in the third paragraph, "In the
9  next two months, I need for you to work closely with
10 Diane." Is that Diane Young?
11 **A. No. Diane would have been the city clerk.**
12 Q. Diane's the city clerk. What was that
13 Diane's last name?
14 **A. Gilmore.**
15 Q. Say it again?
16 **A. Gilmore.**
17 Q. Gilmore. And Atalie?
18 **A. Atalie would have been the -- she's the**
19 **receptionist upstairs here in the building.**
20 Q. Okay. For the whole city, the receptionist?
21 **A. No, just for the city mayor's office.**
22 Q. "To assure that she is providing you with
23 the assistance you need." Who is the "she"?
24 **A. I guess the "she" would have been "they."**
25 **That's probably a...**

24

1  Q. So Diane and Atalie were both supposed to be
2  helping Larissa?
3  **A. I asked her to work with them. Now again,**
4  **you know, I think it would have been up to her to**
5  **actually make sure she worked with them.**
6  Q. Okay. And then you say, "You will need to
7  work closely with whoever you hire to ensure they're
8  getting proper training and develop them in their new
9  role." Is that correct?
10 **A. Correct.**
11 Q. Okay. And was it expected that she would be
12 getting a position to hire?
13 **A. I assume so.**
14 Q. Okay. And then it says, "You must respond
15 to all emails and phone calls the same day within 24
16 hours."
17 **A. Uh-huh (yes).**
18 Q. Is that a standard routinely applied across
19 all departments?
20 **A. I couldn't tell you how it worked with all**
21 **departments.**
22 Q. Okay. How about just the departments you
23 supervised?
24 **A. The departments I supervised, yes. If we**
25 **have complaints, then definitely.**

25

1  Q. So you communicated to them, all of them?
2  **A. No, I didn't communicate with all of them.**
3  **I guess whenever I had issues, I would communicate**
4  **with them what the expectation was.**
5  Q. So but I'm just trying to find out ---
6  **A. Sure.**
7  Q. --- if it was an expectation ---
8  **A. Sure.**
9  Q. --- only of Larissa, or did everybody else
10 have to do that?
11 **A. Again, you know, it depends on circumstance**
12 **and situation, and what I'm dealing with.**
13 Q. Okay. Did you, yourself, always respond to
14 emails and phone calls within 24 hours?
15 **A. Yes.**
16 Q. Okay. So you said, "Please come prepared at
17 our weekly meeting to provide me with updates about
18 how you are meeting these expectations." Is that what
19 that says?
20 **A. Let me find it.**
21 Q. "Please come" -- one, two, three, fourth
22 paragraph down.
23 **A. Yes.**
24 Q. Okay. So you continued to have weekly
25 meetings?

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 5 of 22

18

1  you the exact date, because it was on my birthday.
2  June 17th.
3      Q.  Okay.
4      A.  2014.
5      Q.  And he was replaced by?
6      A.  It would have been Lane Bailey.  We had a
7  interim, but ---
8      Q.  And who was the interim?
9      A.  Interim was John Sofley.
10     Q.  Okay.  Can you spell his last name?
11     A.  S-o-f-l-e-y.
12     Q.  And then he was replaced by?
13     A.  Lane.
14     Q.  Lane.  And do you recall when Lane came?
15     A.  Maybe around 2015.  I'm not sure.
16     Q.  Okay.  All right.  So I'm just going to put
17  this there.  Okay.  I'm going to show you what we
18  previously marked P3 and ask you if you recall seeing
19  this before.
20     A.  Yes.
21     Q.  And can you tell me what it is?
22     A.  It's a disciplinary action.
23     Q.  And who issued it?
24     A.  I did.
25     Q.  And you issued it to who?

19

1      A.  Larissa.
2      Q.  All right.  And it's signed off by you
3  and ---
4      A.  Larissa.
5      Q.  And Larissa.  And who's the name at the
6  bottom?
7      A.  Kelly Baker.
8      Q.  Kelly Baker.  And she was there why?
9      A.  Witness.
10     Q.  Okay.  And this disciplinary action was
11  dated December 5th, 2018?
12     A.  Okay.
13     Q.  Is that right?
14     A.  Again, I -- you know...
15     Q.  Well, the date's right at the top if you
16  look at it.
17     A.  Yeah, December 5th.
18     Q.  Okay.  And where it says, "Description of
19  infraction" ---
20     A.  Okay.
21     Q.  --- it says, "In a September 12 memo, you
22  were advised to respond to phone calls and emails
23  within the same day or 24 hours.  An email was sent to
24  you on October 31st by one of the DSI board members
25  and you did not respond until November 12th."

20

1          So is that the kind of thing that, like, you
2  would normally immediately issue a disciplinary action
3  for?
4      A.  It would depend on, you know, how frequently
5  it was.  I mean ---
6      Q.  It would depend on ---
7      A.  --- it would depend on how frequently it
8  would happen.
9      Q.  Well, you only mentioned one in here.
10     A.  I'm sure there were probably more than one
11  occasion, but I had -- I gave a specific occasion.
12     Q.  Okay.  Had it happened prior to December
13  5th, 2018?
14     A.  I'm sure, probably.
15     Q.  Okay.  And let's just look at that September
16  12th memo.
17     A.  Okay.
18     Q.  Which it was -- has been marked P4.  Okay.
19  I'm sure you've seen this before, right?
20     A.  Uh-huh (yes).
21     Q.  And it's dated September 12th.
22     A.  Okay.
23     Q.  So that's three months prior to this -- this
24  disciplinary action.
25     A.  Right.

21

1      Q.  And it -- the subject of this memo is
2  "Performance Review and Future Expectations."  Is that
3  correct?
4      A.  Correct.
5      Q.  It says, "Recently we have met on several
6  occasions to discuss your performance and how we can
7  assist you to make sure you are meeting the
8  requirements of your job and the department."
9          Do you have any recollection of the several
10  occasions, when those were?
11     A.  No.  I couldn't tell you.
12     Q.  Okay.
13     A.  I don't know exact dates, no.
14     Q.  Did you have regular meetings?
15     A.  Yes.  Larissa and I met weekly.
16     Q.  Weekly meetings.  And would you -- is it
17  fair to say at every weekly meeting you discussed
18  with ---
19     A.  No.
20     Q.  No?
21     A.  I'm sure it wouldn't be every meeting, no.
22     Q.  Okay.
23     A.  It wasn't going to be weekly issues.
24     Q.  Well, how many times would you say "several"
25  is?

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 6 of 22

14

1  the Main Street program was in any jeopardy prior to
2  going over to this quasi public-private partnership?
3  **A.  I'm not aware of it.  I'm not sure what**
4  **you're saying about funding, because the Main Street**
5  **program was funded through downtown municipal taxes.**
6  Q.  So had DSI done everything appropriately, as
7  far as you know, prior to this conversion to
8  public-private?
9  **A.  I don't know.  I wasn't aware of any issues**
10 **with DSI running the program.**
11 Q.  Okay.  Got it.  Okay.  So looking at this
12 org chart, on this org chart, it has the city manager
13 over community planning services.  Was community
14 planning services under you when you were here?
15 **A.  Yes.**
16 Q.  And how about engineering?
17 **A.  Yes.**
18 Q.  And how about parks & rec?
19 **A.  Yes.**
20 Q.  And public works?
21 **A.  Yes.**
22 Q.  And transit?
23 **A.  Yes.**
24 Q.  And then you also had, if you look over to
25 the right, downtown development, which is now under

15

1  the city manager?
2  **A.  Right.**
3  Q.  Okay.
4  **A.  And also has human resources.**
5  Q.  And human resources.  Okay.  When did human
6  resources go under the city manager?
7  **A.  Probably approximately two years ago, maybe.**
8  Q.  Okay.  Okay.  And then looking at the
9  department that reported directly to the city manager,
10 it looks like there's communications.  Was that the
11 same back then?
12 **A.  Yes.**
13 Q.  And finance?
14 **A.  Yes.**
15 Q.  And the police chief?
16 **A.  Yes.**
17 Q.  And utilities?
18 **A.  Yes.**
19 Q.  Fire?
20 **A.  Yes.**
21 Q.  And DEI, or was there a DEI back then?
22 **A.  No, there was no DEI department.  DEI**
23 **actually was a manager, and they reported to me.**
24 Q.  Okay.  So that was in -- within HR?
25 **A.  Well, no.**

16

1  Q.  No?
2  **A.  It was not within HR.  It was within**
3  **administration.**
4  Q.  Administration.  So why didn't it report to
5  Kelly Baker?
6  **A.  I assume because they were kind of**
7  **intertwined to a degree.  We separated at one point.**
8  **Human relations was under HR.**
9  Q.  Okay.
10 **A.  And there was a decision to hire a human**
11 **relations manager, that at that point, it actually**
12 **went under administration.**
13 Q.  Okay.  And do you recall when that was?
14 **A.  I'm getting old, no.**
15 Q.  I hear you.
16 **A.  Time is a challenge.  Oh, goodness.  It was**
17 **actually at the employment of -- actually when it**
18 **happened -- when we first hired the DEI, or when the**
19 **change took place?**
20 Q.  Either one.
21 **A.  When we hired the DEI person, it came under**
22 **me.  It moved probably -- I'm not sure when Lane left.**
23 **Lane left December of last year, probably, maybe**
24 **November of last year.  I think that was one of his**
25 **last actions was to make it a department.**

17

1  Q.  Okay.  So I understand you were talking
2  earlier about your HR experience.  Is that your
3  background?
4  **A.  I have a weird background, HR and planning.**
5  Q.  Okay.  And what did -- did you do both of
6  those in Radford?
7  **A.  Uh-huh (yes).**
8  Q.  And in Galax?
9  **A.  And in Galax.**
10 Q.  Okay.  Okay.  When you came to Salisbury,
11 though, you became the assistant city manager?
12 **A.  No.  I came in as HR director.**
13 Q.  Oh, you did?  Okay.
14 **A.  Yes.**
15 Q.  And that was February of 2009?
16 **A.  Uh-huh (yes).**
17 Q.  And when did you become assistant city
18 manager?
19 **A.  I think it was around April, maybe, of 2012.**
20 Q.  And who was the city manager then?
21 **A.  Doug Paris.**
22 Q.  Can you spell that last name for me?
23 **A.  P-a-r-i-s, Paris.**
24 Q.  And when did Doug Paris leave?
25 **A.  Probably around 2014.  Actually, I can give**

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 7 of 22

10

1 because -- because of the time.
2    A.   Sure.
3    Q.   Okay.  I'm going to show you what's now been
4 marked P2, and ask you not if you can identify this
5 document, because it's not truly relevant to our case.
6 It's the current board chart for the city.
7          But I asked Mr. Bailey a few questions about
8 it, and here's -- what I want to know is what you
9 recall about how things worked when you were there and
10 Ms. Harper Hairgrove was there and Mr. Bailey was
11 there.
12    A.   Okay.
13    Q.   So if you see the city manager position
14 right there, do you see that in the middle?
15    A.   Yes.
16    Q.   And the city attorney position off to the
17 right?
18    A.   Uh-huh (yes).
19    Q.   And then you see administrative services,
20 Kelly Baker?  Do you see her off to the right?
21    A.   Yes.
22    Q.   So it says she has a direct line to the city
23 manager.  Is she a department head, Kelly Baker?
24    A.   I would assume.  She's a department head
25 now, at the current time.

11

1    Q.   But she was not at the time?
2    A.   Again, I don't know when her role changed.
3 She was a assistant to the city manager.
4    Q.   Okay.  And what did that -- what did that
5 require?
6    A.   Again, I -- I don't know what the job
7 description was.  I know that she worked directly with
8 the city manager and with myself.
9    Q.   Do you know if she had any reports?
10    A.   At that time, I would -- possibly.  It could
11 have been the IT department.  I'm not sure.  Again,
12 time ---
13    Q.   Well, let me ask you ---
14    A.   --- time frame.
15    Q.   Go ahead.  Go ahead.  Time?
16    A.   Again, this time frame is -- you know, I'm
17 not sure when these changes took place ---
18    Q.   Okay.
19    A.   --- as far as promotions and so forth.
20    Q.   Let's narrow down your timeline.
21    A.   Sure.
22    Q.   When did you come?
23    A.   I came in 2009, February, 2009.
24    Q.   And you left?
25    A.   I just left December 31st.

12

1    Q.   Okay.  And do you have prior experience in
2 North Carolina local government?
3    A.   No, Virginia.
4    Q.   So was Salisbury the first community in
5 which you've worked with ---
6    A.   No, I've been in local government for -- I
7 was in local government for 42 years.
8    Q.   Was it the first community you've worked in
9 that had a Main Street program?
10    A.   No.
11    Q.   No?  Where else had a Main Street program?
12    A.   Radford, Virginia, and Galax, Virginia, both
13 had Main Street programs.
14    Q.   And what kind in Galax -- and what kind of
15 structure did they have?
16    A.   The Main Street program in Radford was not
17 under the city.  It was funded like a Chamber of
18 Commerce, or something like that.  But we did have
19 representation.
20    Q.   And then what about Galax?
21    A.   Galax was under the city.  And the
22 structure, I know there was a board.  And I'm not
23 quite sure who the direct report was to, you know, at
24 the time, because it did switch.  It went from an
25 independent board to a city function.

13

1    Q.   So was Galax just like Salisbury, or not?
2    A.   No, because it didn't -- there was not a
3 board and a city, I guess -- I don't know.  There was
4 not that relationship.
5    Q.   So what ---
6    A.   That position was under the city specific.
7    Q.   Was there an advisory board there?
8    A.   There was an advisory board, but it had no
9 authority basically.
10    Q.   In Radford, the city had no authority?
11    A.   No.  It was only representation.
12    Q.   So when you came to Salisbury, the Main
13 Street program was operating more like Radford than
14 Galax.
15    A.   Independently.
16    Q.   And what's your understanding of when or --
17 and why the city became involved?
18    A.   I think it was more or less to get more
19 qualified applicants.  They felt like that because it
20 was a city position for benefits and some things that
21 would attract more qualified applicants.
22    Q.   Did it have anything to do with almost
23 losing funding?
24    A.   I'm not aware of that.
25    Q.   Okay.  So you're not aware that at any time

46

1    A.  Correct.
2    Q.  And so they write P5, correct?
3    A.  Correct.
4    Q.  And then Larissa writes P6?
5    A.  Yes.
6    Q.  And then -- and then what happened?
7    A.  I don't know.
8    Q.  Okay.
9    A.  Again, that's a situation where I was less
10   involved.  And I do know that the HR department sent a
11   few emails to probably Lane and Graham that this had
12   been submitted.  But from there, I don't know.
13   Q.  Okay.  So at this -- in this letter, this
14   March 17th letter on Page 1, in the one, two, third
15   paragraph, it says, "At DSI's January 28th board
16   meeting, Whitney Wallace called for a closed session
17   which was openly intended to exclude all city
18   personnel and our city counsel liaison for the purpose
19   of promoting a candid discussion on how the nonprofit
20   board felt the partnership was going since it was
21   established two-and-a-half years ago."
22       Do you see that sentence?  Third
23   paragraph ---
24   A.  Okay.
25   Q.  --- first sentence.

47

1    A.  Okay.  Sure.
2    Q.  Do you see that?
3    A.  Uh-huh (yes).
4    Q.  Okay.  And then, it says they had another
5    meeting on February 25th, right?
6    A.  Uh-huh (yes).
7    Q.  Did Larissa ever discuss with you her
8    concerns about excluding people from these closed
9    session meetings?
10   A.  Yes.  She had concerns.  I had concerns.
11   Q.  And what were your concerns?
12   A.  Again, I -- you know, it's supposed to be a
13   partnership.
14   Q.  Right?
15   A.  And I didn't know that legally they could do
16   that.
17   Q.  All right.  So that's January and February.
18   And now this is March, okay?
19   A.  Okay.
20   Q.  And now we're in April?
21   A.  Okay.
22   Q.  Okay?  And we're also in the middle of the
23   pandemic now, right?  The beginning month of the
24   pandemic.  If you recall?
25   A.  I think so.

48

1    Q.  Okay.  Now, I'm just going to stop there for
2    a minute, and we're going to hold those thoughts.  And
3    I am going to go backwards in time.  So what I'm going
4    to show you now is P9.  Now, I'm assuming you've seen
5    this document before?
6    A.  Yes.
7    Q.  Okay.  And it's dated at the bottom of the
8    first page 11-13-19.  Is that right?
9    A.  Yes.  Correct.
10   Q.  Okay.  And then, on the very last page, it
11   looks like that's your signature.  It says, "I have
12   discussed this performance evaluation with the
13   employee."  Is that right?
14   A.  Yes.
15   Q.  Okay.  So here's what I want to do, is I
16   want to go through this with you.  Now, first I want
17   you to tell me if you recall what the HR people told
18   you to tell employees about getting a two?  Was a two
19   a bad thing?  Did employees think a two was a bad
20   thing?
21   A.  I don't think so.
22   Q.  Okay.  What is a two?
23   A.  Again, let me look here.  Satisfactory.
24   Q.  Satisfactory.  Okay.  And did they say you
25   could give out threes?

49

1    A.  Yes.
2    Q.  Okay.  And you can give out ones?
3    A.  Correct.
4    Q.  Okay.  So on -- let's go, they're not
5    marked, the pages, but if you turn to the second page?
6    A.  Okay.
7    Q.  Okay.  And we have a
8    Communication/Interpersonal, and you gave Larissa a
9    two.
10   A.  Okay.
11   Q.  And do you see your comment?  "Larissa has
12   gotten better at making her communications more
13   concise."
14   A.  Correct.
15   Q.  Okay.  Let's go to page number three.  On
16   attendance, you give her a one.  You say, "Larissa has
17   improved in this area the last four to six months."
18   Why didn't she get a two?
19   A.  She has improved, but I'm not sure if she
20   was exactly there for satisfactory.
21   Q.  Okay.  So you noted -- you wanted to note
22   that she'd improved?
23   A.  Right.
24   Q.  But you didn't want to give her a two to
25   say, "You're good."

42

1    A.   As far as Larissa needed to respond to -- I
2  think there were conversations between her and
3  Larissa, which I wasn't privy to.
4    Q.   Okay.  So this letter's dated April 12th,
5  right?
6    A.   Uh-huh.  Yes.
7    Q.   Why did she address it to you and Brianna
8  and not Lane, if Lane was her supervisor?
9    A.   I think because probably we were more
10  involved in it.  We were involved in the situation,
11  and she had had the conversations with myself and --
12  and Brianna about the -- the concern.  And I think
13  probably ---
14    Q.   And when you say, "the concern," you mean
15  the concerns expressed in ---
16    A.   Right.
17    Q.   --- P5?
18    A.   P5.
19    Q.   Okay.  Did you ever have any discussions
20  with any of the people who wrote P5?
21    A.   Yes.
22    Q.   And who did you talk with?
23    A.   Whitney Wallace.
24    Q.   And -- and what were -- what was the
25  substance of those discussions?

43

1    A.   The substance of those -- actually it was
2  prior to that, because I just made her aware that they
3  had left that information on the recording.
4    Q.   Okay.  So you told Whitney, "You left that
5  information on the recording."
6    A.   Correct.
7    Q.   And how did you find that out?
8    A.   With Larissa -- talking with Larissa.
9    Q.   Okay.  And what was the information that was
10  left on the recording?
11    A.   There was a closed session, I guess,
12  concerning the concerns they had with Larissa.
13    Q.   So it was about Larissa?
14    A.   Yes.
15    Q.   Okay.  And did you ever listen to it?
16    A.   No.  I don't think I ever listened to it.
17    Q.   You did not?
18    A.   I don't believe I did.  I'm trying to think.
19  This is such a long time ago.
20    Q.   Well, she got fired over it ---
21    A.   Right.
22    Q.   --- so it's kind of important.
23    A.   Yes, it is.
24         MR. FLANAGAN:  Object to form.  Go
25  ahead.

44

1         THE WITNESS:  It is.  But again, you
2  know I -- I do recall, I think Larissa maybe sent me
3  some excerpts of it.
4    Q.   (Ms. Bateman)  Okay.
5    A.   Of the conversation.
6    Q.   And how do you know she did?
7    A.   She sent it through email, I think.  Her --
8  or text.
9    Q.   So she told you she'd listened to it?
10    A.   Yes.
11    Q.   And so it was not a secret ---
12    A.   No.
13    Q.   --- that they had left it on there?
14    A.   No.
15    Q.   And it was not a secret that she had
16  listened to it?
17    A.   No.
18    Q.   She's not trying to cover that up?
19    A.   No.
20    Q.   Okay.  So what was the purpose of your going
21  to Whitney and telling her that Larissa had listened
22  to it?
23    A.   We had issue before with a similar situation
24  where actually some of that same conversation had
25  taken place.  I don't think it was in a closed -- what

45

1  they called it a closed session.  But there was a
2  meeting where, I think it was Whitney and Diane, had a
3  conversation that they didn't realize the tape was
4  still running.
5         And I believe Candice, maybe, had listened,
6  but she was doing the minutes, and had heard the
7  conversation.  And so I think we had discussion then
8  with DSI, you know, that this had occurred.  So I was
9  letting her know, again -- this has occurred again.
10    Q.   Right.
11    A.   You know.
12    Q.   And -- and you were telling them so that
13  they would do what?
14    A.   Be aware.  You know, I guess that here these
15  things are happening.
16    Q.   Right.  But were you blaming Larissa for it?
17    A.   No.  No.
18    Q.   Okay.  So whose fault was it that they left
19  the recording going?
20    A.   It was their fault.
21    Q.   And whose fault was it they didn't erase it
22  like they said they had?
23    A.   Theirs.
24    Q.   Okay.  So -- but clearly they're mad about
25  it from P5?

---

**38**

1   Q.   You were still her supervisor?
2   A.   Yes.
3   Q.   At what point did you stop becoming her
4 supervisor?
5   A.   It was right after this came out.
6   Q.   Okay.  And how did that come about?  How did
7 it -- how did it -- did Lane tell you, "I'm going to
8 supervise her now"?
9   A.   Yes.
10   Q.   Okay.  And so, if you were following your
11 24-hour response rule, you would have responded to
12 this within 24 hours?
13   A.   No, because I don't know necessarily that I
14 needed to respond to it.  It was information sent, but
15 not necessarily needed a response.
16   Q.   While I -- I appreciate that.  So I'm going
17 to ask you about that a little bit later.
18   A.   Sure.
19   Q.   Well, no.  Let me just go ahead and ask you
20 about it now.  So you used your discretion to
21 determine that this didn't need a response?
22   A.   Correct.
23   Q.   But Larissa's required to respond to every
24 single email she gets within 24 hours, whether she
25 decides it needs a response or not?

---

**39**

1   A.   She had to read them.
2   Q.   Right.  And if she read it and she decided
3 it didn't need a response, your directive to her says,
4 "You still have to respond to every single email you
5 get within 24 hours," correct?
6   A.   Not necessarily.  I mean, again, it would --
7 you get emails that don't necessarily require a
8 response.  We all get those.
9   Q.   Right.
10   A.   You know, so it does not necessarily mean
11 that she needed to respond to every single email.
12   Q.   Well, let's just go back and look at P4.
13 "You must respond to all emails and phone calls the
14 same day within 24 hours."
15   A.   Right.
16   Q.   That's what your memo says to her?
17   A.   Correct.
18   Q.   Okay.  So after this happened, you stopped
19 supervising Larissa?
20   A.   Yes.
21   Q.   And Lane started supervising her?
22   A.   Yes.
23   Q.   Okay.  And do you know whether any
24 investigation was ever done into the allegations made
25 in this letter?

---

**40**

1   A.   No.  Well, Larissa did respond to some
2 complaints.  And we provide it to our HR department.
3 And from there it stopped.
4   Q.   Okay.  So that brings us to P6.  Is this the
5 response you just referred to?
6       MR. FLANAGAN:  I'm sorry?
7       MS. BATEMAN:  P6?
8       MR. FLANAGAN:  The response from?
9       MS. BATEMAN:  Larissa, P6.
10       MR. FLANAGAN:  Okay.
11       THE WITNESS:  Oh, this is a response
12 from Larissa?
13   Q.   (Ms. Bateman)  Yes.  Let's go ahead and look
14 to the last, well ---
15   A.   Okay.
16   Q.   --- actually there is no signature page.
17 But if you just read a little bit of it, I think it's
18 pretty clear.  Because she's saying in the first
19 paragraph, "Thank you for allowing me time to compose
20 this message."
21   A.   Right.
22   Q.   Okay.
23   A.   So there was some communications with
24 Larissa and Brianna.
25   Q.   And who is Brianna?

---

**41**

1   A.   She was the HR liaison for DSI.
2   Q.   Okay.  And how -- and she reported to Ruth?
3   A.   Correct.
4   Q.   And why was Brianna assigned to this?
5   A.   Because she was -- we have -- we have
6 liaisons to departments.  And Brianna was liaison to
7 this department.
8   Q.   To her department?
9   A.   Yes.  To DSI.
10   Q.   Okay.  So was Brianna involved in previous
11 conversations?
12   A.   Brianna, yes.
13   Q.   And tell me about those.
14   A.   Again, I think they were discussions related
15 to the issue that -- in Exhibit 5.
16   Q.   I'm sorry?
17   A.   I guess Exhibit 5 is the exhibit that's
18 about the recording, correct?
19   Q.   Yes.  Did Brianna discuss that with Larissa?
20   A.   She would -- yeah.  She would have some
21 discussion there.
22   Q.   Okay.  With Larissa ---
23   A.   I think advising Larissa as to what to do.
24   Q.   Okay.  So was she advising Larissa, or was
25 she...

---

34

1    A.   No.
2    Q.   And did they call both of you on the same
3  call?
4    A.   No.
5    Q.   They called you separately?
6    A.   I'm sure it would have been separately.
7    Q.   And ---
8    A.   I don't remember having a joint call.
9    Q.   And do you recall what the concern was?
10    A.   It was -- Main Street Program was coming
11  here for their conference.  And they were having
12  issues with Larissa responding or taking care of
13  things.
14    Q.   Okay.  And did they say specifically what
15  things?
16    A.   At the time, you know...
17    Q.   Okay.  So you said, "I'm now going to ask
18  the marketing person in your department."  So you went
19  over her to her report and said, "I'm going to tell
20  you to lead our Main Street Conference."  Is that
21  right?
22    A.   Yes.
23    Q.   And who was that person?
24    A.   Latoya Price.
25    Q.   Okay.  And did Latoya Price thereafter lead

35

1  the entire Main Street Conference?
2    A.   I don't know if she led the entire Main
3  Street Conference.
4    Q.   Okay.
5    A.   But she did work on the Main Street
6  Conference.
7    Q.   Okay.  And did the conference occur?
8    A.   Yes.
9    Q.   And was it a success?
10    A.   I think so.
11    Q.   Okay.  Okay.  So that's P3, P4.  So I am
12  going to show you now what we marked P5 and ask you if
13  you recall this document.
14  (Witness examines document)
15    Q.   You let me know when you finish reading it.
16  And you don't have to read the whole thing.  All I
17  really wanted to know is if you've seen it before?
18    A.   I am not really sure I have.
19    Q.   Well, you see it's addressed to you at the
20  top?
21    A.   I see it's -- I see it is.
22    Q.   So it must have come into your email.
23    A.   Possibly.
24    Q.   Possibly?
25    A.   Yes.

36

1    Q.   Okay.  So at the time this came in, and you
2  either got it or you didn't?
3    A.   Uh-huh.  Yes.
4    Q.   Were you made aware of it by anyone?
5    A.   I really don't remember being made aware of
6  it.  I ---
7    Q.   Okay.  So you never discussed it with
8  Mr. Bailey then?
9    A.   We discussed some issues with the recording,
10  but this was, like, immediately after it happened.
11  And I don't remember seeing anything from maybe --
12  this is from downtown Salisbury.
13    Q.   I'm sorry?
14    A.   This is from downtown Salisbury?
15    Q.   Yes.
16    A.   Okay.  I'm sorry.  So I think probably I did
17  see this.
18    Q.   Okay.
19    A.   I thought it was from Main Street, which I
20  didn't see anything from Main Street.
21    Q.   No.  This is from ---
22    A.   This is from DSI.
23    Q.   This is from DSI.
24    A.   Okay.  Yeah.  So ---
25    Q.   Yeah.  Let me just get you -- go to Page 8.

37

1    A.   Yeah.
2    Q.   It's signed by the DSI Organization
3  Committee.
4    A.   Okay.  Yeah, I'm sorry.  I guess I had in my
5  head it was Main Street, so...
6    Q.   Yeah.  No, not North Carolina Main Street.
7    A.   Right.
8    Q.   So this is from the DSI Organization
9  Committee.  So that clarifies your recollection?
10    A.   That clarifies my recollection.
11    Q.   So you believe you have -- you did get this?
12    A.   Yes.  Yes.
13    Q.   And you have seen it?
14    A.   Yes.
15    Q.   And you did discuss it with Mr. Bailey?
16    A.   We discussed -- yeah, the issues with
17  Mr. Bailey.  I did.
18    Q.   Okay.  Did you ever have a conversation with
19  Mr. Bailey and Mr. Corriher?
20    A.   Yes.
21    Q.   Okay.  About the allegations in this memo?
22    A.   Yes.
23    Q.   Okay.  And were you Larissa's supervisor at
24  this time?
25    A.   Yes.

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 12 of 22

30

1  action?

2     A.  Have any discussion on what?

3     Q.  With her about the specific -- say, "I got a

4  complaint by a DSI board member on October 31st, or, I

5  got a complaint on such and such a day by a DSI member

6  who said she sent you, or he sent you, an email on

7  October 31st, and you didn't respond until November

8  12th."

9        Did you talk with her about that before ---

10    A.  Before this?

11    Q.  Yes?

12    A.  Of course.

13    Q.  So you -- you mentioned that specific event

14  before you issued this disciplinary action?

15    A.  Yes, I'm sure.

16    Q.  Okay.  And -- and do you recall what she

17  told you?

18    A.  No.

19    Q.  Okay.  Did you tell her, "You got a lot of

20  email in your email box that has not been opened or

21  responded to"?

22    A.  Again, that's something, you know, I don't

23  know that we had that discussion, or I would have -- I

24  would think we did.  But again, I don't -- I can't

25  tell you from now.

31

1     Q.  Okay.  What I'm trying to figure out is, if

2  Larissa ever told you, "Hey, I open an email and I

3  read it, and then I make it look like I've never read

4  it so that I remember to do something based on that

5  email."

6     A.  She never told me that.

7     Q.  Ever?

8     A.  No.

9     Q.  She never gave you any ---

10    A.  No.

11    Q.  --- response to this?

12    A.  No.

13    Q.  Okay.

14    A.  No.  Not -- nothing like that.

15    Q.  Okay.  And it says, "It's also been brought

16  to my attention that you have not been responsive to

17  our EDC director."

18    A.  Correct.

19    Q.  And who was the EDC director?

20    A.  Rod Crider.

21    Q.  Pardon me?

22    A.  Rod Crider.

23    Q.  And when you say, "our EDC director," who is

24  "our"?

25    A.  The city's.

32

1     Q.  So the city had its own independent EDC

2  director?

3     A.  I don't know if it's independent.  It works

4  with us and the county.  But they are -- they're a

5  separate entity, pretty much like DSI was before.

6     Q.  Is he a city employee?

7     A.  He's not a city employee.

8     Q.  Okay.  So what was Mr. Crider?

9     A.  Uh-huh (yes).

10    Q.  What was his concern?

11    A.  I have no idea with Larissa what the issue

12  was.

13    Q.  Okay.  And then you noted that she showed up

14  late on November 20th for a DSI meeting?

15    A.  Correct.

16    Q.  And it said, "After many discussions on the

17  need for you to be on time for meetings."  Who had

18  those discussions with her?

19    A.  I would have.

20    Q.  And on how many occasions was she late to

21  meetings?

22    A.  I would not -- I couldn't tell you that.

23    Q.  Well, did you document them?

24    A.  I'm sure at the time we did.

25    Q.  Okay.  So if there is documentation, that

33

1  ought to be in her personnel file, right?

2     A.  It would have been in my working papers.  I

3  don't know that it necessarily had to be in her

4  personnel file.

5     Q.  Okay.  So did you ever give her any of those

6  dates?

7     A.  I'm sure we had those discussions.

8     Q.  Okay.  And it says, "Finally, your lack of

9  responsiveness to the North Carolina Main Street

10  personnel prompted a call from them to the city

11  manager and myself, which has led to my asking the

12  marketing person in your department to lead our North

13  Carolina Main Street Conference Coordination."

14        So I have several questions about that.

15    A.  Sure.

16    Q.  Who was the Main Street personnel who

17  called?

18    A.  Again, I -- I'm not sure if it was Liz

19  Parham, or I was trying to think of the other lady

20  that was working with us, and I cannot think of her

21  name.  Because I -- I've looked over some of this

22  stuff.  And I was trying to think of -- but there was

23  another person that was involved.

24    Q.  And who do you -- which one do you think

25  called you?  Do you know?

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 13 of 22

26

1    A.   Yes.
2    Q.   Okay.  So I want to go back now to P3.  And
3  this is the disciplinary action that you issued in
4  December.
5    A.   Okay.
6    Q.   So you -- you refer back to the, "You were
7  advised to respond to phone calls and emails within
8  the same day or 24 hours."
9    A.   Right.  Correct.
10   Q.   And you can't recall whether everybody had
11 to do that, but you know you told Larissa she had to
12 do it.  Is that right?
13   A.   Again, I don't know what was required of
14 everybody else.  I mean ---
15   Q.   Well, what about the people that reported to
16 you?
17   A.   Again, whenever I had issues, we'd have
18 those discussions.
19   Q.   Okay.  So an email was sent -- you say this,
20 "An email was sent to you on October 31st by one of
21 the DSI board members, and you did not respond until
22 November 12th."  So do you know what that email was
23 about?
24   A.   I couldn't tell you right now.
25   Q.   Okay.  Did you provide Larissa with a copy

27

1  of it at the time?
2    A.   I am not sure.  We had the discussion, and I
3  probably went over the details of the -- who it was or
4  what the concern was, sure.
5    Q.   Okay.  And then you say, "There are a number
6  of emails in your inbox that have not been opened or
7  responded to."
8    A.   Correct.
9    Q.   And how did you know that?
10   A.   I had someone from human resources looking
11 at emails.
12   Q.   Look at her emails.  And did you ever have
13 the occasion to do that to any other department head?
14   A.   I'm sure we've done it in the past, yes.
15   Q.   Do you recall who you did that with?
16   A.   I think that's a personnel matter.
17   Q.   Pardon me?
18   A.   I think that would probably be a personnel
19 matter.
20   Q.   Well, do you recall who it was, though?  Can
21 you, like, name that person by initials?
22   A.   I don't believe I need to do that.
23        MR. FLANAGAN:  Zack, I think you can
24 respond.  As long as you're not talking about the
25 specifics of any kind of investigation or personal

28

1  matter or the person.  But if there are other
2  employees who you have had reviewed their emails as
3  part of some complaint or something, then I think you
4  can discuss that, just not the specifics of any
5  disciplinary action or anything like that.
6        THE WITNESS:  I think that the ones
7  that probably that I would have done resulted in
8  disciplinary actions.
9        MR. FLANAGAN:  Okay.  Well, without
10 going into the names of the disciplinary actions, can
11 you describe the position and -- and what the
12 complaint was?  Do you know what I mean?  So without
13 going into any disciplinary action that was taken?
14       THE WITNESS:  All right.
15   Q.   (Ms. Bateman)  I don't want -- I don't need
16 to know their name.  I just need to know what the
17 circumstances were.
18   A.   We've dealt with Fibrant directors.
19   Q.   Pardon me?
20   A.   Fibrant directors, people who are over our
21 Fibrant, our broadband.
22   Q.   Okay.  And what -- and what -- what were the
23 circumstances?
24   A.   Again, I think that's a personnel.
25   Q.   Well, can you tell me, did somebody make a

29

1  complaint?
2    A.   It was issues with work being done or
3  responses.
4    Q.   I'm sorry.  Say that again?
5    A.   Being responsive.  So I think it would
6  probably be -- would have been along those lines.
7    Q.   So how did you figure out they weren't being
8  responsive?
9    A.   We get complaints.
10   Q.   And so you got a complaint in this one case?
11   A.   It may have been ---
12       MR. FLANAGAN:  Object to form.  He
13 didn't say one, but ---
14   Q.   (Ms. Bateman)  Pardon me?
15   A.   It may have been more than one case.
16 Again ---
17   Q.   Well, was there more ---
18   A.   --- it's going to take -- it's going to take
19 more than one case for us to start looking at your
20 emails, okay?
21   Q.   It's going to take?
22   A.   It's going to take more than one incidence
23 for us to start looking at people's emails.
24   Q.   Okay.  So did you have any discussion with
25 Larissa about this before you issued the disciplinary

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 14 of 22

22

1    A.  I would have no idea.
2    Q.  Okay.  Are there any -- like, would you
3  create a document that would -- that would indicate
4  when you spoke with her about performance?
5    **A.  Create a document?**
6    Q.  Yeah?  Like, would you document that you had
7  discussed with her, you know, her performance and how
8  you could assist her in making sure she's meeting the
9  requirements of her job?
10    **A.  I took notes periodically, but I'm not sure**
11  **I would have every time we met.**
12    Q.  Okay.  Do you think you kept those notes?
13    **A.  I doubt it.**
14    Q.  Okay.  Okay.  So it says, "As we have
15  discussed, I have concerns with your being able to be
16  responsive to emails, calls and work related matters
17  that need your timely attention.  We have also
18  discussed the need for you to utilize the staff
19  currently have to assure that the work of your
20  department is being done."
21        So in September 12th, 2018, what staff did
22  she have?
23    **A.  Again, I probably -- she may have had a**
24  **receptionist of which I think, at that time, I -- come**
25  **to think of her name, Candice somebody.  Candice**

23

1  Brown, maybe.
2    Q.  Okay.
3    **A.  You know, I'm not sure about the name, but**
4  **-- and I'm not sure if she had a marketing person at**
5  **that time or not.**
6    Q.  Well, did she ever get a marketing person?
7    **A.  Yes.  She had a marketing person.**
8    Q.  Okay.  So in the third paragraph, "In the
9  next two months, I need for you to work closely with
10  Diane."  Is that Diane Young?
11    **A.  No.  Diane would have been the city clerk.**
12    Q.  Diane's the city clerk.  What was that
13  Diane's last name?
14    **A.  Gilmore.**
15    Q.  Say it again?
16    **A.  Gilmore.**
17    Q.  Gilmore.  And Atalie?
18    **A.  Atalie would have been the -- she's the**
19  **receptionist upstairs here in the building.**
20    Q.  Okay.  For the whole city, the receptionist?
21    **A.  No, just for the city mayor's office.**
22    Q.  "To assure that she is providing you with
23  the assistance you need."  Who is the "she"?
24    **A.  I guess the "she" would have been "they."**
25  **That's probably a...**

24

1    Q.  So Diane and Atalie were both supposed to be
2  helping Larissa?
3    **A.  I asked her to work with them.  Now again,**
4  **you know, I think it would have been up to her to**
5  **actually make sure she worked with them.**
6    Q.  Okay.  And then you say, "You will need to
7  work closely with whoever you hire to ensure they're
8  getting proper training and develop them in their new
9  role."  Is that correct?
10    **A.  Correct.**
11    Q.  Okay.  And was it expected that she would be
12  getting a position to hire?
13    **A.  I assume so.**
14    Q.  Okay.  And then it says, "You must respond
15  to all emails and phone calls the same day within 24
16  hours."
17    **A.  Uh-huh (yes).**
18    Q.  Is that a standard routinely applied across
19  all departments?
20    **A.  I couldn't tell you how it worked with all**
21  **departments.**
22    Q.  Okay.  How about just the departments you
23  supervised?
24    **A.  The departments I supervised, yes.  If we**
25  **have complaints, then definitely.**

25

1    Q.  So you communicated to them, all of them?
2    **A.  No, I didn't communicate with all of them.**
3  **I guess whenever I had issues, I would communicate**
4  **with them what the expectation was.**
5    Q.  So but I'm just trying to find out ---
6    **A.  Sure.**
7    Q.  --- if it was an expectation ---
8    **A.  Sure.**
9    Q.  --- only of Larissa, or did everybody else
10  have to do that?
11    **A.  Again, you know, it depends on circumstance**
12  **and situation, and what I'm dealing with.**
13    Q.  Okay.  Did you, yourself, always respond to
14  emails and phone calls within 24 hours?
15    **A.  Yes.**
16    Q.  Okay.  So you said, "Please come prepared at
17  our weekly meeting to provide me with updates about
18  how you are meeting these expectations."  Is that what
19  that says?
20    **A.  Let me find it.**
21    Q.  "Please come" -- one, two, three, fourth
22  paragraph down.
23    **A.  Yes.**
24    Q.  Okay.  So you continued to have weekly
25  meetings?

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 15 of 22

18

1  you the exact date, because it was on my birthday.
2  June 17th.
3     Q.  Okay.
4     A.  2014.
5     Q.  And he was replaced by?
6     A.  It would have been Lane Bailey.  We had a
7  interim, but ---
8     Q.  And who was the interim?
9     A.  Interim was John Sofley.
10    Q.  Okay.  Can you spell his last name?
11    A.  S-o-f-l-e-y.
12    Q.  And then he was replaced by?
13    A.  Lane.
14    Q.  Lane.  And do you recall when Lane came?
15    A.  Maybe around 2015.  I'm not sure.
16    Q.  Okay.  All right.  So I'm just going to put
17 this there.  Okay.  I'm going to show you what we
18 previously marked P3 and ask you if you recall seeing
19 this before.
20    A.  Yes.
21    Q.  And can you tell me what it is?
22    A.  It's a disciplinary action.
23    Q.  And who issued it?
24    A.  I did.
25    Q.  And you issued it to who?

19

1     A.  Larissa.
2     Q.  All right.  And it's signed off by you
3  and ---
4     A.  Larissa.
5     Q.  And Larissa.  And who's the name at the
6  bottom?
7     A.  Kelly Baker.
8     Q.  Kelly Baker.  And she was there why?
9     A.  Witness.
10    Q.  Okay.  And this disciplinary action was
11 dated December 5th, 2018?
12    A.  Okay.
13    Q.  Is that right?
14    A.  Again, I -- you know...
15    Q.  Well, the date's right at the top if you
16 look at it.
17    A.  Yeah, December 5th.
18    Q.  Okay.  And where it says, "Description of
19 infraction" ---
20    A.  Okay.
21    Q.  -- it says, "In a September 12 memo, you
22 were advised to respond to phone calls and emails
23 within the same day or 24 hours.  An email was sent to
24 you on October 31st by one of the DSI board members
25 and you did not respond until November 12th."

20

1        So is that the kind of thing that, like, you
2  would normally immediately issue a disciplinary action
3  for?
4     A.  It would depend on, you know, how frequently
5  it was.  I mean ---
6     Q.  It would depend on ---
7     A.  --- it would depend on how frequently it
8  would happen.
9     Q.  Okay.  Well, you only mentioned one in here.
10    A.  I'm sure there were probably more than one
11 occasion, but I had -- I gave a specific occasion.
12    Q.  Okay.  Had it happened prior to December
13 5th, 2018?
14    A.  I'm sure, probably.
15    Q.  Okay.  And let's just look at that September
16 12th memo.
17    A.  Okay.
18    Q.  Which it was -- has been marked P4.  Okay.
19 I'm sure you've seen this before, right?
20    A.  Uh-huh (yes).
21    Q.  And it's dated September 12th.
22    A.  Okay.
23    Q.  So that's three months prior to this -- this
24 disciplinary action.
25    A.  Right.

21

1     Q.  And it -- the subject of this memo is
2  "Performance Review and Future Expectations."  Is that
3  correct?
4     A.  Correct.
5     Q.  It says, "Recently we have met on several
6  occasions to discuss your performance and how we can
7  assist you to make sure you are meeting the
8  requirements of your job and the department."
9        Do you have any recollection of the several
10 occasions, when those were?
11    A.  No.  I couldn't tell you.
12    Q.  Okay.
13    A.  I don't know exact dates, no.
14    Q.  Did you have regular meetings?
15    A.  Yes.  Larissa and I met weekly.
16    Q.  Weekly meetings.  And would you -- is it
17 fair to say at every weekly meeting you discussed
18 with ---
19    A.  No.
20    Q.  No?
21    A.  I'm sure it wouldn't be every meeting, no.
22    Q.  Okay.
23    A.  It wasn't going to be weekly issues.
24    Q.  Well, how many times would you say "several"
25 is?

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 16 of 22

14

1  the Main Street program was in any jeopardy prior to
2  going over to this quasi public-private partnership?
3      **A.  I'm not aware of it.  I'm not sure what**
4  **you're saying about funding, because the Main Street**
5  **program was funded through downtown municipal taxes.**
6      Q.  So had DSI done everything appropriately, as
7  far as you know, prior to this conversion to
8  public-private?
9      **A.  I don't know.  I wasn't aware of any issues**
10  **with DSI running the program.**
11      Q.  Okay.  Got it.  Okay.  So looking at this
12  org chart, on this org chart, it has the city manager
13  over community planning services.  Was community
14  planning services under you when you were here?
15      **A.  Yes.**
16      Q.  And how about engineering?
17      **A.  Yes.**
18      Q.  And how about parks & rec?
19      **A.  Yes.**
20      Q.  And public works?
21      **A.  Yes.**
22      Q.  And transit?
23      **A.  Yes.**
24      Q.  And then you also had, if you look over to
25  the right, downtown development, which is now under

15

1  the city manager?
2      **A.  Right.**
3      Q.  Okay.
4      **A.  And also has human resources.**
5      Q.  And human resources.  Okay.  When did human
6  resources go under the city manager?
7      **A.  Probably approximately two years ago, maybe.**
8      Q.  Okay.  Okay.  And then looking at the
9  department that reported directly to the city manager,
10  it looks like there's communications.  Was that the
11  same back then?
12      **A.  Yes.**
13      Q.  And finance?
14      **A.  Yes.**
15      Q.  And the police chief?
16      **A.  Yes.**
17      Q.  And utilities?
18      **A.  Yes.**
19      Q.  Fire?
20      **A.  Yes.**
21      Q.  And DEI, or was there a DEI back then?
22      **A.  No, there was no DEI department.  DEI**
23  **actually was a manager, and they reported to me.**
24      Q.  Okay.  So that was in -- within HR?
25      **A.  Well, no.**

16

1      Q.  No?
2      **A.  It was not within HR.  It was within**
3  **administration.**
4      Q.  Administration.  So why didn't it report to
5  Kelly Baker?
6      **A.  I assume because they were kind of**
7  **intertwined to a degree.  We separated at one point.**
8  **Human relations was under HR.**
9      Q.  Okay.
10      **A.  And there was a decision to hire a human**
11  **relations manager, that at that point, it actually**
12  **went under administration.**
13      Q.  Okay.  And do you recall when that was?
14      **A.  I'm getting old, no.**
15      Q.  I hear you.
16      **A.  Time is a challenge.  Oh, goodness.  It was**
17  **actually at the employment of -- actually when it**
18  **happened -- when we first hired the DEI, or when the**
19  **change took place?**
20      Q.  Either one.
21      **A.  When we hired the DEI person, it came under**
22  **me.  It moved probably -- I'm not sure when Lane left.**
23  **Lane left December of last year, probably, maybe**
24  **November of last year.  I think that was one of his**
25  **last actions was to make it a department.**

17

1      Q.  Okay.  So I understand you were talking
2  earlier about your HR experience.  Is that your
3  background?
4      **A.  I have a weird background, HR and planning.**
5      Q.  Okay.  And what did -- did you do both of
6  those in Radford?
7      **A.  Uh-huh (yes).**
8      Q.  And in Galax?
9      **A.  And in Galax.**
10      Q.  Okay.  Okay.  When you came to Salisbury,
11  though, you became the assistant city manager?
12      **A.  No.  I came in as HR director.**
13      Q.  Oh, you did?  Okay.
14      **A.  Yes.**
15      Q.  And that was February of 2009?
16      **A.  Uh-huh (yes).**
17      Q.  And when did you become assistant city
18  manager?
19      **A.  I think it was around April, maybe, of 2012.**
20      Q.  And who was the city manager then?
21      **A.  Doug Paris.**
22      Q.  Can you spell that last name for me?
23      **A.  P-a-r-i-s, Paris.**
24      Q.  And when did Doug Paris leave?
25      **A.  Probably around 2014.  Actually, I can give**

58

1    A.   Well, it -- oh, I'm sorry.
2    Q.   Yeah.
3    A.   Did I think the act was?
4    Q.   What was the act they were accusing of?  Was
5  that conduct or was that performance?
6    A.   That would be conduct.
7    Q.   That's what I wanted you to say.
8    A.   Okay.  But whether or not I agree with
9  it ---
10   Q.   No.
11   A.   Okay.
12   Q.   And did you agree with it?
13   A.   No.
14   Q.   Okay.  So that is -- back to P5.  I'm making
15  a mess of these exhibits.  We talked about her
16  evaluation, which just occurred four months before
17  that, but apparently it's been simmering because they
18  talk about the January and February meetings where
19  something happened with recording, right?
20   A.   Yes.
21   Q.   So -- so now, this is an evaluation done in
22  November.  But I want you to look at P8 now, which is
23  somewhere here.
24        MS. BATEMAN:  P6.
25        THE COURT REPORTER:  Here.

59

1        MS. BATEMAN:  P8, thank you.
2    Q.   (Ms. Bateman) P8.
3    A.   Okay.
4    Q.   What's the date on this evaluation at the
5  bottom on the first page?
6    A.   1-18-19.
7    Q.   Okay.  Why would you get an evaluation both
8  in January and in November?
9    A.   I'm not sure if the six month may have been
10  -- I don't know.  I'm not sure.
11   Q.   Okay.  I mean, was there something going on
12  with the city's performance evaluation process that
13  she couldn't get one, you know, in the previous
14  November?  Like, was the city developing?  I seem to
15  recall hearing that the city was developing some sort
16  of evaluation tool?
17   A.   We were working on an evaluation tool, yes.
18  And so, I'm not quite sure.
19   Q.   Okay.  Well, if you go through this one, and
20  you look at the next to the last page, it's like .03
21  less than the next one she gets, right?
22   A.   Right.
23   Q.   Right under two?
24   A.   Right.
25   Q.   Right?

60

1    A.   Yes.
2    Q.   And Larissa has a comment here.  You don't
3  have any comment, right?
4    A.   Right.
5    Q.   But she has a comment saying, "I don't think
6  this is bad," right?
7    A.   Right.
8    Q.   And then she -- and then she tells you why.
9  And she, at this point in January of 2019, has been
10  with the city since October of 2017, right?
11   A.   Again ---
12   Q.   You don't recall.  But if I told you that
13  was true, you wouldn't have any reason to doubt me?
14   A.   I don't have any reason to doubt it, no.
15   Q.   Okay.  So -- so she gets this rating in
16  January.  And then six months later, she gets this
17  P10.  And you've seen this before, I'm guessing?
18   A.   Yes.
19   Q.   Okay.  Now, do you consider this to be a
20  written warning and a suspension?
21   A.   It was a suspension.
22   Q.   But what about the second written warning?
23  Doesn't there have to be a second written warning ---
24   A.   No.
25   Q.   --- before you get a suspension?

61

1    A.   No.
2    Q.   And why not?
3    A.   I don't think we follow that progression ---
4    Q.   Okay.
5    A.   --- necessarily.
6    Q.   All right.  So you can go right to
7  suspension?
8    A.   Yes.
9    Q.   Okay.  So you go through that in the
10  beginning, first paragraph, right?  You say you
11  already got this, written warning for being untimely
12  with email and phone call responses, being late to
13  meetings, right?
14   A.   Yes.
15   Q.   And then it says, "After being notified that
16  an email on certified retirement communities had not
17  been responded to from June 5th" -- okay, "it was
18  necessary to audit your emails."
19        And you say, "It was found that over 1,600
20  emails are currently in your inbox and a lot of those
21  emails had not been opened and read."
22        And it's your testimony today that she never
23  told you that she leaves -- reads them and leaves them
24  open in order to remember to go back to them?
25   A.   No.  Not that I ---

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 18 of 22

70

1  that question.
2      Q.  Okay.  But anyway, this had nothing to do
3  with downtown Salisbury, and it got assigned to
4  Larissa.  And Kelly Baker sent an email, and Larissa
5  used her discretion and hadn't responded to it yet.
6          And I believe Larissa told you, "I've been
7  in two meetings with her since she sent that email,
8  and she hasn't said a word to me about it."
9          Do you recall that?
10         MR. FLANAGAN:  Object to form.  You can
11 answer the question.
12     Q.  (Ms. Bateman)  You don't recall Larissa
13 telling you that?
14     A.  I -- again, I don't know.
15     Q.  Okay.
16     A.  That's something that's so far ---
17     Q.  And you're supposed to notify your
18 supervisor if you're going to be more than 30 minutes
19 late to work?
20     A.  Yes.
21     Q.  But again, if she's at a meeting, which is
22 on her calendar, can't you see that she's at this
23 meeting?
24     A.  If she shared her calendar.
25     Q.  Right.  Do you recall that she shared her

71

1  calendar?
2      A.  I didn't have access to it.
3      Q.  You did not have access to her calendar?
4      A.  No.  No.
5      Q.  Okay.  So if she's at work, though, is that
6  considered late to work?
7      A.  No.
8      Q.  Okay.  So is she routinely late to work
9  because of personal matters?
10     A.  Again, I could not tell you what the -- the
11 issue was.
12     Q.  Okay.  Did she -- did she take any leave for
13 personal matters?
14     A.  That's been so far back.  I don't -- I don't
15 know.
16     Q.  You don't recall?
17     A.  I have no idea.
18     Q.  Okay.  All right.  Well, that's -- that's
19 June.  We talked about the performance evaluation in
20 January.  Then, we talk about this disciplinary action
21 in June ---
22     A.  Okay.
23     Q.  --- which is the suspension.  Then, we talk
24 about the performance evaluation in November where you
25 said, "All is good now," right?  You fixed ---

72

1      A.  Pretty much.
2      Q.  --- all these issues?  Yeah.
3      A.  Well, pretty much.  Not totally.
4      Q.  Well, pretty much.  I just want to see --
5  "Larissa was suspended on June 3rd for three days and
6  was given a plan for improvement and has done well
7  with meeting the requirements of the plan."
8      A.  Uh-huh.  Yes.
9      Q.  Okay.  All right.  So that's 8,9 and 10.  So
10 now I want you to look at P11.
11         MR. FLANAGAN:  Valerie, before we get
12 started on this one, since you're sort of on a new
13 topic, can we just take a five-minute comfort break?
14         MS. BATEMAN:  Sure.  Sure.
15         THE COURT REPORTER:  Off the record at
16 3:03 p.m.
17 (Brief recess: 3:03 p.m. to 3:08 p.m.)
18         THE COURT REPORTER:  We're back.
19     Q.  (Ms. Bateman)  I think we were talking about
20 P11.
21     A.  Okay.
22     Q.  And this is dated in February of 2019.
23     A.  Okay.
24     Q.  So you've got the evaluation, P8, which
25 happens January 18th.

73

1      A.  Okay.
2      Q.  And then February 25th, this email goes to
3  you from Greg Shields ---
4      A.  Okay.
5      Q.  --- with a cc to Whitney Wallace, Tim Proper
6  and Lane.
7      A.  Okay.
8      Q.  Do you see that?
9      A.  Oh, yes.  Okay.
10 (Witness examines document)
11     A.  Okay.
12     Q.  Okay.  So at the bottom of this email, it's
13 an email from you.
14     A.  Uh-huh (yes).
15     Q.  And it says, "Good afternoon
16 Greg/Whitney/Tim, thank you for meeting with me on
17 Friday to express your concerns related to Larissa's
18 performance.  I am working toward preparing
19 documentation concerning her performance, and I need
20 your assistance in providing me with specifics related
21 to her performance that warranted your decision to
22 request termination."
23         So it sounds like, at some point, you had a
24 meeting with them and they said, "We want you to fire
25 her."

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 19 of 22

74

1    A.  Okay.
2    Q.  Is that right?  I mean, this is your email.
3    A.  Yeah, it's my email.  Again ---
4    Q.  Right.  And did they request that she be
5 terminated?
6    A.  I'm sure they did.
7    Q.  Okay.  And you said, "Okay.  I need your
8 help doing that," right?
9    A.  Right.
10    Q.  So he responds and says, "Emails to Larissa
11 are routinely unanswered even after repeated attempts
12 to contact her."
13        Did you ever ask him to provide you with
14 examples?
15    A.  I'm not sure.  We could have had
16 conversation ---
17    Q.  I mean, that's kind of a broad statement?
18    A.  Yes, it is.  Yes.
19    Q.  Okay.  "For most meetings she is late and
20 rarely prepared."  Did you ask him to give you any
21 examples?
22    A.  I'm sure I did at the time.
23    Q.  Okay.  "In many cases when she has asked to
24 take care of something, she says she is far too busy
25 and delegates it to Candice or Latoya."

75

1        That's actually a good thing if she's not
2 utilizing her staff properly, right?
3    A.  Yes.  Correct.
4    Q.  So he's -- damned if you do, damned if you
5 don't, right?
6        MR. FLANAGAN:  Object to form.
7    Q.  (Ms. Bateman)  I'm just saying, how does she
8 win, right?  You say, "You're not delegating," and he
9 says, "Oh my God, she's delegating.  She's too busy."
10        So I don't -- I mean, I think that's an
11 example of, it was going to be hard to please both
12 people ---
13    A.  Sure.
14    Q.  --- wouldn't you agree?
15    A.  Yes.
16    Q.  Okay.  "It feels like there's a lot of
17 activity but very little progress made."  Did you ask
18 him to give you specific examples?
19    A.  I'm sure they did.
20    Q.  Okay.  "A very specific instance of this was
21 new board member orientation.  It was disorganized.
22 Larissa was late.  We spent a lot of the orientation
23 adding pages to our binders that were not in them to
24 begin with."
25        Did you ever ask Larissa about that specific

76

1 event to get her side of the story?
2    A.  Again, I -- I'm sure we had discussions.  I
3 -- that specific one, I don't know.
4    Q.  Okay.  It says, "As I understand it, the two
5 biggest issues which have gotten us to this point are
6 the lack of follow through on the Main Street
7 conference and the City Council retreat."
8        Do you see that?
9    A.  Yes.
10    Q.  Now, the Main Street conference is coming up
11 in March, right?
12    A.  Correct.
13    Q.  And you already dinged her for that last
14 December, right, in that written warning.
15    A.  Yes.
16    Q.  And you said, "I'm going to give this to
17 Latoya to work on," right?
18    A.  Yes.
19    Q.  And you told me Latoya worked on it.
20    A.  Yes.
21    Q.  And did Larissa also work on it?
22    A.  I'm sure she did.
23    Q.  Okay.  What was your understanding of how
24 much work Larissa was supposed to do, versus how much
25 work volunteers for DSI were supposed to do?

77

1    A.  Again, I'm not into that, I guess,
2 micro-management of staff, to know exactly what each
3 role or responsibility is.
4    Q.  Okay.  That's fair.  I'm going to fast
5 forward you, though, back to the February, after her
6 evaluation in November of 2019.
7    A.  Okay.
8    Q.  They've had a DSI board meeting in January,
9 which something happened that was mentioned in the
10 March 17th letter.  They've had -- well, let's just
11 get you to look at that, P12.  Have you seen this
12 before?
13    A.  Yes.  Yes.
14    Q.  Okay.  So let's go to Page 3.  So on Friday,
15 January 31st, Whitney sends an email to you and
16 Larissa.  Do you see that?
17    A.  Yes.
18    Q.  "Hope you had a great retreat.  Know you
19 must be exhausted.  I developed the below list of
20 take-aways from our wonderful, helpful discussion
21 yesterday."
22        I am assuming that on Thursday, January
23 30th, you, Larissa, Whitney and Liz Parham, based on
24 this email, at least got together.  Do you recall a
25 meeting ---

102

1    Q.  Right.  But Larissa had -- had Candice.
2    **A.  And Latoya.**
3    Q.  I'm sorry?
4    **A.  Candice and Latoya.**
5    Q.  Well, they didn't come at the same time,
6  though, did they?
7    **A.  Well, you had -- I can't think of the young**
8  **lady actually works for Fibrant now that was a**
9  **marketing person that had left.  Caitlin.**
10   Q.  Right.  But Caitlin -- did Caitlin --
11 Caitlin was there when Larissa got there, right?
12   **A.  Yes.**
13   Q.  And her title was Events Coordinator?
14   **A.  Right.**
15   Q.  And at some point, Larissa was told she
16 could hire somebody after Caitlin left, right?
17   **A.  Yes, correct.**
18   Q.  And she wanted to hire -- she wanted to post
19 a position for a marketing position.  Do you recall
20 that?
21   **A.  I don't.**
22   Q.  Okay.  So ---
23   **A.  I can't say that I do.**
24   Q.  Right.  Latoya Price got hired for the job
25 that Larissa needed to do marketing.  Do you recall

103

1  that?
2    **A.  Correct.**
3    Q.  And was Latoya Price an external hire or did
4  she come from within the city?
5    **A.  I think she was an external.**
6    Q.  Okay.  How about Candice Brown?
7    **A.  Candice was a transfer.**
8    Q.  So she transferred from?
9    **A.  Customer service.**
10   Q.  Okay.  And for that position, Larissa was
11 told she could not advertise it externally?
12   **A.  I do not know.**
13   Q.  You don't recall?
14   **A.  No.**
15   Q.  She had her choice of internal people who
16 were being relocated from customer service?
17   **A.  I don't know.  Again, that's one I'm not**
18 **sure of timing as to -- there was --- looking at**
19 **downsizing the customer service.  I don't know.  But**
20 **that occurs and sometimes we did do that, ask for**
21 **folks to allow for a transfer rather than losing the**
22 **position.**
23   Q.  Okay.  So now he goes to a history of
24 performance concerns.  And he -- and he goes back to
25 September 18th.  And I think he's referring to what we

104

1  marked as P4, which was September 12th.
2    **A.  Okay.**
3    Q.  And he calls this, "A memo from your
4  supervisor expressing concerns about your performance,
5  especially -- no, specifically your responsiveness to
6  emails, telephone calls and work related matters."
7    **A.  Okay.**
8    Q.  Now, around this same time -- okay.  That's
9  dated September, correct?
10   **A.  Yes.  September 12th.**
11   Q.  Okay.  Prior to that in June, do you recall
12 Larissa having to create a plan of work for herself
13 for 2018, 2019?
14   **A.  I don't ---**
15   Q.  It would look like this.
16   **A.  Yes, they do those.  DSI does that.**
17   Q.  I'm sorry?
18   **A.  Main Street programs do that.  Main Street**
19 **programs do that.**
20   Q.  So she was required to do this as part of
21 the Main Street program, right?
22   **A.  Yes.**
23   Q.  And they, in fact, provide the template.
24   **A.  Right.**
25   Q.  And I'm going to mark this P16.

105

1    MS. BATEMAN:  Dang.  I have the
2  stickers on already.  Sorry.  Actually, I'm going to
3  stick it right on there.  Okay.  P16 --
4    (DEPOSITION EXHIBIT
5    NUMBER P16 WAS MARKED
6    FOR IDENTIFICATION)
7    Q.  (Ms. Bateman) -- And let you look at that
8  one.
9    **A.  Okay.**
10   Q.  And then -- so she prepared this, and I'm
11 assuming at some point you reviewed it?
12   **A.  Yes.  The DSI board did.**
13   Q.  Okay.  So that's June.  And in September,
14 you -- I think she comes to you, or you go to her, or
15 somehow this document gets generated.
16   **A.  Okay.**
17   MS. BATEMAN:  P17.
18   (DEPOSITION EXHIBIT
19   NUMBER P17 WAS MARKED
20   FOR IDENTIFICATION)
21   **THE WITNESS:  Yes.**
22   Q.  (Ms. Bateman)  Do you recall this document?
23   **A.  Yes.**
24   Q.  Okay.  And it's dated September 19th, right?
25   **A.  Right.**

110

1    And so she says, "This is why I should get
2  the 5 percent increase in salary that I'm supposed to
3  get after a year."
4    A. Okay.
5    Q. Do you remember if she got that increase?
6    A. I don't remember.
7    Q. You don't know. Okay. So normally if she's
8  been there now a year, she started in October and it's
9  now November, so she's been there a year.
10    A. Okay.
11    Q. She'd get an evaluation?
12    A. Okay.
13    Q. But she didn't get it, because it didn't
14  happen until January. We know that from that exhibit.
15  Do you recall asking her at some point to evaluate, do
16  an individual goals and objectives worksheet?
17    A. Yes. All departments do that that work for
18  me.
19    Q. Okay. I am going to show you what we're
20  going to mark...
21    THE COURT REPORTER: 19.
22    MS. BATEMAN: 19, thank you. 19 and
23  20.
24    (DEPOSITION EXHIBITS
25    NUMBER P19 AND P20 WERE

111

1    MARKED FOR IDENTIFICATION)
2    Q. (Ms. Bateman) Okay. Here is 19, and
3  here is 20. Okay. Let me tell you which one is
4  which.
5    A. Okay.
6    Q. 19 is City of Salisbury Individual Goals and
7  Objectives Worksheet. Do you see that?
8    A. Yes.
9    Q. Okay. And then 20 is Goals and Objectives
10  Worksheet for Larissa Harper, Downtown Director,
11  October 19, 2017, to October 9th, 2018.
12    A. Sure.
13    Q. Okay. And you asked her to do these
14  documents and she created them, right?
15    A. No.
16    Q. Well, okay. She filled them out.
17    A. Right.
18    Q. Okay. And what is the difference between
19  these two documents, if you know?
20    A. I think the second one's more specific.
21    Q. And the second one -- by that one you mean
22  the 20 -- Exhibit 20?
23    A. Well, they look similar now that I look at
24  them. There's not a lot of difference in the two.
25    Q. Now, maybe ---

112

1    A. I think ---
2    Q. --- 19 was given to her and 20, because she
3  says at the bottom, "I have read and understand my
4  goals on the attached sheets."
5    They're generic, right?
6    A. Uh-huh (yes).
7    Q. And then, here is what she says she's done
8  with timelines next to it. Does that make sense?
9    A. Yes.
10    Q. She comes back, and revises it and says,
11  "Yes."
12    A. Yes.
13    Q. Okay. And did you use these documents to do
14  her evaluation in January? I mean, what was the
15  purpose of these?
16    A. They are. That's part of the evaluation
17  process.
18    Q. Okay. All right. And when you reviewed
19  this, did you have any reason to believe that anything
20  on it wasn't accurate?
21    A. No.
22    Q. Okay. And on -- on Exhibit Number 20, on
23  the one, two, third page, it says, "Larissa's Year-End
24  Comments." Do you see that? It looks like that?
25    A. Is it the 20?

113

1    Q. It's Exhibit 20, and it's starts at the
2  top ---
3    A. Okay. I got it.
4    Q. You got it? Larissa's Year-End Comments.
5  Okay. She talks about challenges in the first
6  paragraph.
7    A. Okay.
8    Q. Then she says, "I've seen improvement in the
9  willingness to allow me to lead as I was hired to do."
10  In the second paragraph, she talks about improvements
11  in support, right?
12    A. Right.
13    Q. And in the third paragraph, she says, "Still
14  needs improvement in education/communication that
15  Downtown Department is an actual City Department,"
16  right?
17    A. Right.
18    Q. "Over the last year, especially the five
19  months, I've seen improvement in relationships with
20  downtown businesses."
21    A. Okay.
22    Q. And the next paragraph, it says, "I've seen
23  an improvement in board, committee members and
24  business owners, public statements and
25  communications." Do you see that?

Case 1:21-cv-00814-CCE-JLW   Document 38-8   Filed 04/03/23   Page 22 of 22