```
                   IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
                   Civil Action No.: 1:21-cv-00814-CCE-LRW


LARISSA HARPER HAIRGROVE,           )
                                    )
              Plaintiff,             )
                                    )
     vs.                             )
                                    )
CITY OF SALISBURY, DOWNTOWN         )
SALISBURY INC., and LANE BAILEY,    )
in his individual and official      )
capacity,                           )
                                    )
              Defendants.            )
                                    )
  ------------------------------


                         _____

                                   DEPOSITION
                                      OF
                                  ROBIN CAGLE
                         _____



TAKEN AT THE OFFICES OF:
LEGAL AID OF NORTH CAROLINA
122 NORTH ELM STREET, SUITE 700
GREENSBORO, NC 27401



                                 01-31-2023
                              9:42 O'CLOCK A.M.
                         _____

                                Gretchen Wells
                                Court Reporter

                              Chaplin & Associates
                           132 Joe Knox Ave, Suite 100-G
                               Mooresville, NC 28117
                  (704) 606-1434 | (336) 992-1954 | (919) 649-4444
```

**Page 14**

1  A. We interviewed three people.
2  Q. And do you recall who you interviewed?
3  A. I do not. One was, I recall, not qualified
4  at all.
5  Q. Okay.
6  A. The other one -- we actually only interviewed
7  two people. The other one did not show up for the
8  interview.
9  Q. I'm sorry. The other one ---
10  A. The other one did not show up for the
11  interview.
12  Q. Okay.
13  A. The vice chair at the time sat in the
14  interviews with me.
15  Q. And who was that?
16  A. Greg Taylor.
17  Q. And so the upshot of those interviews was
18  that you offered Larissa the job?
19  A. I did.
20  Q. And how did she do?
21  A. How did she do when?
22  Q. After she was hired.
23  A. She did okay.
24  Q. All right. Did you ever have discussions
25  with her about assuming your position?

**Page 15**

1  A. I did.
2  Q. And tell me more about those discussions, if
3  you can.
4  A. It was my desire that someone work with me
5  for a good amount of time and be able to assume that
6  position. But I also discussed with her the fact that
7  that was not my decision to make.
8  Q. Got it. And I just want to go back for a
9  moment to the decision to even create that position. I
10  think what you said was that tourism had been down, and
11  you thought if you hired a person who focused on
12  marketing, it might be -- it might -- how can I say it?
13  Give it a jump start.
14  A. Correct.
15  Q. Is that right?
16  A. Uh-huh, that's pretty good assessment.
17  Q. So did Larissa have a probationary period?
18  A. She did.
19  Q. And how long was that?
20  A. Ninety days.
21  Q. How many?
22  A. Ninety.
23  Q. Ninety days?
24  A. Uh-huh (yes).
25  Q. Okay. And I'm going to show you a document,

**Page 16**

1  90 Day Probationary Evaluation.
2      MS. BATEMAN: We're going to mark that
3  29.
4      (PLAINTIFF'S EXHIBIT
5       NUMBER 29 WAS MARKED
6       FOR IDENTIFICATION)
7  Q. (Ms. Bateman) Does that look familiar to
8  you?
9  A. I think this is a little -- that looks a
10  little bit different than what I recall.
11  Q. Okay. And tell me how it looks different.
12  A. Because on it was a record of all of her --
13  of the time she had been late for work.
14  Q. Okay. And did you talk to her about that?
15  A. I did.
16  Q. Okay. And what did you say to her?
17  A. That -- just, I gave her all the times she
18  had been late for work, and that for me, that was
19  unacceptable.
20  Q. I'm sorry. For that ---
21  A. That was unacceptable.
22  Q. Okay.
23  A. And I would appreciate her -- she had a
24  problem with time management, and I would appreciate
25  her considering that. And we discussed it and she

**Page 17**

1  agreed that she understood that, and she would work on
2  that.
3  Q. Okay. And did she?
4  A. Somewhat.
5  Q. Okay. So ---
6  A. We also discussed during that, that she had
7  such a desire to be perfect that she sometimes had
8  difficulty getting a job done.
9  Q. That's fair. So we have a saying at my
10  office, "Don't let the perfect be the enemy of the
11  good." Have you ever heard that?
12  A. That's a good one. No, I haven't, but that's
13  a good one.
14  Q. Okay. But perfectionism is hard to cure
15  people, isn't it?
16  A. It's what?
17  Q. Perfectionism and desire to be perfect is
18  hard to cure in people.
19      Okay. So the real reason I brought you here
20  today is to ---
21  A. I'm anxious to know what that is.
22  Q. --- is to ask you about the call you got at
23  some point from someone that -- to the effect of that
24  Larissa was suing the City of Salisbury. Do you recall
25  that?

**Page 18**

1  A. I didn't. Larissa told me she was suing the
2  City of Salisbury.
3  Q. Okay. And were those her words?
4  A. She did. She stood in the doorway of my
5  office and said, "I feel like I should tell you
6  something. I have a lawsuit against the City of
7  Salisbury."
8  Q. Okay. And did she describe it as a lawsuit
9  or a EEOC charge?
10  A. Well, she first said a lawsuit, and then she
11  said EEOG (sic) charge, or whatever you call that.
12  Q. But did you ever get a call from somebody
13  that discussed that with you?
14  A. Someone in the community mentioned it to me;
15  however, I disregard gossip.
16  Q. I'm sorry, you?
17  A. Gossip is just gossip to me.
18  Q. Okay. But did they mention it to you prior
19  to your talking to Larissa about it?
20  A. No.
21  Q. Okay. So it was after Larissa told you.
22  A. Yes.
23  Q. And did you tell her they told you that?
24  A. I did.
25  Q. And do you recall what you told her?

**Page 19**

1  A. I just said it's -- "Larissa, it's in the
2  community, in -- small town."
3  Q. Right. Who is this community member?
4  A. I would rather not say that.
5  Q. I know, but that's the whole reason I brought
6  you here today.
7  A. Rebecca McGee.
8  Q. I'm sorry?
9  A. Rebecca McGee.
10  Q. Rebecca?
11  A. McGee.
12  Q. McGee. M-c-G-e-e?
13  A. Uh-huh (yes).
14  Q. Okay. And who is she?
15  A. She was the former Main Street director.
16  Q. Okay. Of Lexington?
17  A. Yes.
18  Q. Okay. And how did she find out, if you know?
19  A. Well, just like the tourism community is a
20  small community, I imagine the Main Street community is
21  as well.
22  Q. Okay.
23  A. And Larissa had previously been part of that.
24  Q. Did Rebecca McGee tell you how she found out?
25  A. No, she just said, "You know, I've heard

**Page 20**

1  she's suing the city of Salisbury." And I said, "Well,
2  that's neither here nor there."
3  Q. Okay. And what was Rebecca McGee doing at
4  the time?
5  A. She was the -- she was working for another
6  city and, to be honest with you, I think it was
7  Asheboro, but I don't recall her actual position title.
8  Q. Okay. But she was still in Main---
9  A. It was something -- yes.
10  Q. She was still in the Main Street community?
11  A. Yes.
12  Q. So is -- the Lexington Tourism Authority,
13  it's not a Main Street entity?
14  A. No.
15  Q. Okay.
16  A. And wasn't really relevant to our agency.
17  Q. Okay. So at some point after Rebecca McGee
18  came to you, you told Larissa that word was out.
19  A. Uh-huh.
20  Q. And did you tell her you felt like you needed
21  to tell somebody else?
22  A. I did. My board chair.
23  Q. Your board chair?
24  A. Yes.
25  Q. And that was Cecil?

**Page 21**

1  A. Cecil.
2  Q. Okay. And what was his reaction?
3  A. You want to know exactly?
4  Q. I'm sorry?
5  A. You want to know exactly?
6  Q. I do.
7  A. "Oh, shit."
8  Q. Okay.
9  A. And then his question was, "Will that affect
10  us?"
11  Q. And what did you say?
12  A. "I don't have any idea."
13  Q. Okay. And do you recall when this was in
14  time, approximately?
15  A. I'm going to say April, May, possibly.
16  Q. Of '21?
17  A. Yes.
18  Q. Okay. And do you recall when Larissa first
19  mentioned it to you?
20  A. That's when Larissa mentioned it to me.
21  Q. Okay.
22  A. And that's when I told my -- I'd never said
23  anything to my board chairman until Larissa mentioned
24  it to me.
25  Q. Okay. And then after that, you heard from

**Page 22**

1  Rebecca McGee.
2     A.  Yes.
3     Q.  And when -- do you recall when you heard from
4  Rebecca McGee?
5     A.  It was all right around the same time,
6  actually.
7     Q.  Really?
8     A.  Yes.
9     Q.  Okay.  But Larissa definitely mentioned it
10 first.
11    A.  Yes.
12    Q.  Okay.
13    A.  Yes.  As I recall, yes.
14    Q.  Okay.  Did you ever discuss it with anybody
15 else?
16    A.  Terra Green.
17    Q.  Karen Green.
18    A.  Terra, T-e-r-r-a, Green, G-r-e-e-n, the city
19 manager, upon suggestions from Cecil.
20    Q.  Okay.  So Cecil said, "Tell Terra"?
21    A.  He said, "Discuss it with Sarah and see if --
22 Terra, to see if there -- she feels like if there is
23 any relevance to us."
24    Q.  Okay.  And did you do that?
25    A.  I did.

**Page 23**

1     Q.  And what did Terra tell you?
2     A.  She suggested that I speak to an attorney
3  that we have on retainer for -- and I did.  And she
4  said she felt like it was not of any relevance to us.
5     Q.  Okay.  And who was that attorney?
6     A.  She was from Raleigh.  Davis, maybe.  Robin
7  Da -- her name was Robin.  I remember that.
8     Q.  Okay.  And you think her last name might have
9  been Davis?
10    A.  I think it might have been Davis.
11    Q.  Okay.
12    A.  But we only had one conversation.
13    Q.  You only had one discussion?
14    A.  Uh-huh (yes).
15    Q.  Okay.  Did she give you any other advice?
16    A.  Just to -- if there were any issues or
17 concerns to please document them.
18    Q.  Okay.  And so did you report that back to
19 Terra?
20    A.  I don't recall that Terra and I really had
21 another conversation about it.  Cecil, I reported back
22 to Cecil.
23    Q.  Oh, you did?
24    A.  Yes.  As my ---
25    Q.  Okay.  And what did he say?

**Page 24**

1     A.  As my board chair.  He said, "Well, he felt
2  like we had done what we needed to do."
3     Q.  Okay.  So did you ever have any additional
4  discussion with Larissa about it?
5     A.  About the?
6     Q.  About the alleged suing of Salisbury?
7     A.  I did ask her to -- I did not want her to
8  tell me more than she needed to tell me or wanted to
9  tell me, I just needed to know if there was ever going
10 to be a time that I needed to protect her as an
11 employee -- as my employee.
12    Q.  Okay.  And what did she say?
13    A.  She told me about a conversation that she had
14 had.  We didn't -- after the initial time that she
15 talked to me about it, we didn't really talk about it
16 again.
17    Q.  Okay.  So did you follow the same hiring
18 process for the executive director that you did when
19 you hired Larissa?
20    A.  Hey, you know I did not hire the executive
21 director.
22    Q.  Okay.  Who hired the executive board?
23    A.  The board.
24    Q.  Okay.  So ---
25    A.  I had very little to do with that.

**Page 25**

1     Q.  Okay, and tell me why.
2     A.  Because I work for the board and the board
3  hires the director.
4     Q.  Okay.  So you could hire a marketing
5  person ---
6     A.  Right.
7     Q.  But not your replacement?
8     A.  I could not.
9     Q.  Okay.  So did you have input into that
10 process?
11    A.  Actually, they chose not to have my input.
12    Q.  Okay.  And why is that?
13    A.  I can't really answer that question for you.
14 They interviewed me first.
15    Q.  They interviewed you first?
16    A.  They interviewed me first, all about -- it
17 was all about the job.
18    Q.  Okay.
19    A.  And then they set out looking for a director.
20    Q.  Okay.
21    A.  Yes.
22    Q.  Okay.
23    A.  The chairman appointed the vice chair to be -
24 - to head up a committee for hiring.
25    Q.  And remind me who that vice chair was again.

**Page 26**

1  A. Meetta Simpson.
2  Q. Can you spell that for me?
3  A. Meeta, M-e-e-t-t-a, Simpson.
4  Q. Simpson.
5  A. Uh-huh (yes).
6  Q. Was that a community -- what did Meeta do ---
7  A. She was a travel agent.
8  Q. Travel agent.
9  A. Which is why she served on the board.
10 Q. Okay. The vice chair.
11 A. Uh-huh (yes).
12 Q. And were you kept apprised of the process or
13 were you completely cut out of it?
14 A. I was completely cut out of it.
15 Q. And were you okay with that?
16 A. Yes, because I trusted the board members.
17 Q. Okay. And were you aware that Larissa
18 applied?
19 A. Yes, I encouraged her to.
20 Q. Okay. And you encouraged her to apply even
21 after you knew this information about the EEOC charge?
22 A. I didn't think it was relevant.
23 Q. Okay. And so do you recall when the
24 applications were submitted for the job?
25 A. Yes, in July.

**Page 27**

1  Q. In July.
2  A. I announced my retirement in June.
3  Q. In June.
4  A. At the June board meeting.
5  Q. And do you know how many applicants there
6  were?
7  A. I don't. I'm sorry.
8  Q. Okay.
9  A. As I said, I was not part of that.
10 Q. So no one specifically asked you to step away
11 from the hiring process, it just happened?
12 A. I -- yeah, it just happened.
13 Q. Did you ever have any discussions with
14 anybody about your being involved in the hiring
15 process?
16 A. No, not really. I trusted them.
17 Q. Okay. And do you know how many people were
18 interviewed?
19 A. I know -- I don't really know their process.
20 I was called to come to City Hall for an interview
21 process that I think was a second interview. They had
22 narrowed down, and the reason I was called is because
23 the applicants would enter through a locked door that
24 someone would have to man, and I was asked to man that
25 door. That was the first time I saw any of the

**Page 28**

1  applicants.
2  Q. And who was that applicant?
3  A. There were four of them that's -- on one day.
4  Q. There were four?
5  A. It was a -- yes, it was a day process.
6  Q. Okay. So you were there for the whole day?
7  A. Yes.
8  Q. So you saw each one of them come through?
9  A. Yes, I did.
10 Q. And were any of them Larissa?
11 A. No.
12 Q. So she was not interviewed for the position?
13 A. No.
14 Q. Did anybody ever tell you why?
15 A. No.
16 Q. Did you ever ask anybody why?
17 A. No, I didn't.
18 Q. Okay. Was it ever discussed with anybody?
19 A. No.
20 Q. So how many people were on the interview
21 team?
22 A. I think it was four.
23 Q. Okay. So Meeta Simpson?
24 A. Uh-huh (yes).
25 Q. And who else would have been?

**Page 29**

1  A. Jeannie Leonard.
2  Q. Say that one more time.
3  A. Jeanne Leonard.
4  Q. Jeanne?
5  A. Uh-huh (yes).
6  Q. J-e-a-n-n-i-e?
7  A. J-e-a-n-n-e.
8  Q. "E," okay.
9  A. Leonard. Maria -- gosh, I don't remember
10 Maria's last name. She was not on our board very long.
11 She was a hotelier; they kind of come and go.
12 Q. Do you remember what she did in the
13 community?
14 A. She was a hotelier. She worked for Quality
15 Inn. Maybe it was three. That's all I can recall, are
16 those three names.
17 Q. Okay. And do you remember the applicants?
18 A. The girl that was hired.
19 Q. And who was that?
20 A. Morgan Brookshire; she's now Brookshire-
21 Brinkle. And I remember one more.
22 Q. Okay. Who?
23 A. Stephanie Saintsing.
24 Q. Okay.
25 A. And that's it.

**Page 30**

1   Q. But there were four?
2   A. There were four.
3   Q. And at some point, were these candidates
4 discussed at the board meeting?
5   A. Not in my presence.
6   Q. Okay. Did they go into executive session to
7 do it?
8   A. Yes.
9   Q. Okay. So you were at a meeting, and then
10 they went into executive session to discuss the
11 applicants. And did they come out and announce
12 anything?
13   A. Not at that point. I don't -- they did not
14 announce anything at that point.
15   Q. Okay. And do you recall when that was?
16 After -- you said the interviews were in July -- no,
17 the position was posted in July?
18   A. Yes.
19   Q. And when did the interviews take place, if
20 you recall?
21   A. Sometime in August.
22   Q. Okay.
23   A. Best I can recall.
24   Q. And when, if you recall, was it announced who
25 had gotten the job?

**Page 31**

1   A. September. Sometime in September. I don't
2 recall dates, and I didn't have any of that
3 information. I didn't...
4   Q. So how did you find out they were going to
5 announce it?
6   A. In a board meeting. We had a -- they had
7 a ---
8   Q. Okay. And ---
9   A. They called a special meeting.
10   Q. Okay.
11   A. Special called board meeting.
12   Q. Was Larissa aware that they were interviewing
13 other people and not her?
14   A. Yes, she told me she did not -- she is the
15 one that told me she did not get an interview.
16   Q. Okay. And what did you say to her when you
17 heard that?
18   A. Well, I was -- I said, "Okay." What could I
19 say?
20   Q. Okay. And did she tell you before or after
21 you kind of manned the door for the interviews?
22   A. Before.
23   Q. Okay. So you knew that day she wasn't going
24 to be there ---
25   A. Yes.

**Page 32**

1   Q. --- because she told you she didn't get an
2 interview?
3   A. Yes.
4   Q. So was it pretty much a foregone conclusion
5 at that point she was not going to be hired?
6   A. I would say, if she did not get an interview.
7   Q. Okay.
8   A. I mean, in my mind. I don't know what they
9 were thinking.
10   Q. Right. So do you think they should have
11 interviewed her?
12   A. I would have.
13   Q. Okay. And why is that?
14   A. Just the courtesy if nothing else.
15   Q. Okay. So you knew and she knew that she
16 wasn't going to be hired.
17   A. Correct.
18   Q. Was there ever a time at which you ended up
19 having a formal conversation with her about it?
20   A. I don't recall us really having a formal
21 conversation about it, except that she asked me what
22 was going to happen to that marketing position.
23   Q. And what did you say?
24   A. I said that it was a -- you know, the board
25 considered the funds for that for a one-year position

**Page 33**

1 and I didn't imagine that it would continue; that would
2 be up to the new director, the direction she wanted to
3 go with that.
4   Q. And do you recall when that conversation was?
5   A. It would have been sometime between July and
6 the September hiring.
7   Q. Okay.
8   A. In fact, we had several conversations about
9 it.
10   Q. Okay. Can you tell me more about those? Was
11 it the same conversation ---
12   A. Just the same conversation every time.
13   Q. Okay.
14   A. What's going to happen to the marketing
15 position if -- when the new director comes on.
16   Q. Okay. And you said it will be up ---
17   A. Yes.
18   Q. --- to the board?
19   A. To the board, yes.
20   Q. Okay.
21   A. Correct.
22   Q. And so at some time, did you tell Larissa who
23 got the job?
24   A. I don't recall doing that.
25   Q. Okay.

01-31-23     Hairgrove v. City of Salisbury, et al.     COPY

Case 1:21-cv-00814-CCE-JLW    Document 38-15    Filed 04/03/23    Page 6 of 8

## Page 34

1    A.  No, I -- yes.
2    Q.  Yes?
3    A.  I think I told -- when the board held the
4  meeting to determine they were going to hire this
5  position, I may have told her then, but I don't really
6  recall.
7    Q.  Okay.  Do you recall being in a meeting with
8  her and Angel Lineberry ---
9    A.  I do.
10   Q.  --- City Clerk?  Okay.
11   A.  And that's when I think perhaps I told her
12 who was going to be hired.
13   Q.  Okay.  Does the city clerk take minutes at
14 the meetings, the board meetings?
15   A.  Yes.
16   Q.  Okay.
17   A.  Actually, I take the minutes.
18   Q.  Oh, you take the minutes?
19   A.  And the city clerk approves them.
20   Q.  Okay.
21   A.  It's is not the city clerk, the board
22 secretary.
23   Q.  The board secretary?
24   A.  Yes.
25   Q.  And who was that?

## Page 35

1    A.  Angel Lineberry.
2    Q.  Okay.  So is she a board member or is she ---
3    A.  She is.
4    Q.  She's a board member.  And what's her ---
5    A.  That is the other -- that is one of the other
6  positions.  The city manager -- either the city manager
7  or their designee has to serve on the board.  The city
8  Manager appointed Angel.
9    Q.  Oh, okay.  So that's seven.
10   A.  That's seven, yeah.
11   Q.  Okay.
12   A.  We'll keep thinking and I'll come up ---
13   Q.  Okay, that's good.  That's good.
14 Congratulations.  Okay.  So the city manager appointed
15 Angel Lineberry?
16   A.  Yes.
17   Q.  So what was -- was her job as the city clerk?
18   A.  Yes.
19   Q.  Okay.
20   A.  No, no, no, no, no, no.  She was not.  She
21 was the administrative secretary to the city manager.
22   Q.  Okay.
23   A.  That was her job.  And the mayor, actually.
24   Q.  I'm sorry?
25   A.  And the mayor.

## Page 36

1    Q.  And the mayor?
2    A.  Yes.  Small town.  Everybody has more than
3  one job.
4    Q.  Okay.  All right.  So did they give a reason
5  why they selected, don't tell me, Morgan Brookshire?
6    A.  They felt she was very qualified for the job,
7  for the position.
8    Q.  And what was her background, if you know?
9    A.  She actually studied marketing and tourism.
10   Q.  Okay.  In school?
11   A.  Yes.
12   Q.  Had she had any marketing and tourism jobs?
13   A.  She worked for Childress Vineyards in
14 Marketing.
15   Q.  Okay.
16   A.  And she had worked at Biltmore in marketing.
17   Q.  So when was the decision made to stop funding
18 her position, Larissa's position?
19   A.  The same day.
20   Q.  The same day?
21   A.  The same day that they determined to -- they
22 voted to hire the new marketing director.
23   Q.  So in the same meeting that they hired Morgan
24 Brookshire, they said, "And we're not going to fund the
25 marketing position anymore."

## Page 37

1    A.  Correct.
2    Q.  And did they tell you to communicate that?
3    A.  Yes.
4    Q.  And who told you?
5    A.  The board chair.
6    Q.  Okay.  And that was Cecil.
7    A.  Cecil.
8    Q.  And so you met with her?
9    A.  I did.
10   Q.  And is that the same meeting with Angel
11 Lineberry?
12   A.  Yes, it is.
13   Q.  Okay.  And what did you say?
14   A.  I -- there was a preprepared letter that I
15 was to share with her, and I just shared that that day
16 the job had been -- the board had discussed and voted
17 to eliminate the position, effective immediately, upon
18 hiring the new director.
19   Q.  All right.
20       MS. BATEMAN:  We're going to mark that
21 20 -- no, 30.
22       (PLAINTIFF'S EXHIBIT
23       NUMBER 30 WAS MARKED
24       FOR IDENTIFICATION)
25   Q.  (Ms. Bateman) I'm going to show you that

01-31-23              Hairgrove v. City of Salisbury, et al.              COPY

Case 1:21-cv-00814-CCE-JLW   Document 38-15   Filed 04/03/23   Page 7 of 8

**Page 38**

1 letter, and ask you if that looks like the letter?
2  **A. Yes, that looks like the letter.**
3  Q. Okay.
4      MR. ADAMS: Do you have other copies?
5      MS. BATEMAN: I don't, but I'm going to
6  get you some.
7      MR. ADAMS: Okay.
8  Q. (Ms. Bateman) And so that was her last day
9  of employment?
10 **A. Correct.**
11 Q. She signed that letter?
12 **A. She did.**
13 Q. And went home?
14 **A. She did.**
15 Q. And took her stuff?
16 **A. She did.**
17 Q. And that was it?
18 **A. Yes.**
19 Q. Okay. I mean, did you ever talk to her after
20 that?
21 **A. Maybe emailed.**
22 Q. Okay. All right. I mean, do you have any
23 regrets about how all that went down?
24 **A. I was just working under the advisement of**
25 **the board.**

**Page 39**

1  Q. Right, I get that, but that's not the same as
2  do you have any regrets? I understand why it went
3  down. It wasn't your choice. Would you have done it
4  differently? Let me ask it that way.
5  **A. I would have given her an interview.**
6  Q. Okay, that's fair. All right.
7      MS. BATEMAN: I don't have any
8  questions. If either of you all have questions.
9      MR. ADAMS: I do not.
10     MS. MCDANIEL: I do not believe I have
11 any questions either.
12
13     WHEREUPON, at 10:22 o'clock a.m., the
14 deposition was adjourned.

**Page 40**

CERTIFICATION

I, Gretchen Wells, Notary Public in and for the County of Iredell, State of North Carolina at Large, do hereby certify:

That said witness was affirmed by me to state the truth, the whole truth, and nothing but the truth, in said cause and appeared before me at the time and place herein aforementioned and the foregoing consecutively numbered pages are a complete and accurate record of all the testimony given by said witness;

That the undersigned is not of kin, nor in anywise associated with any of the parties to said cause of action, nor their counsel, and not interested in the event(s) thereof.

Reading and signing of the testimony was requested.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of February, 2023.

_Gretchen Lynn Wells_
CHAPLIN & ASSOCIATES
Notary No. 202110400230

**Page 41**

WITNESS CERTIFICATION

I, ROBIN CAGLE, do hereby certify,

That I have read and examined the contents of the foregoing pages of record of testimony as given by me at the times and place herein aforementioned;

And that to the best of my knowledge and belief, the foregoing pages are a complete and accurate record of all the testimony given by me at said time, except as noted on the attached here (Addendum A).

I have ____ / have not ____ made changes/corrections to be attached.

_____
(WITNESS SIGNATURE)

I, _____, Notary Public for the County of _____, State of _____, do hereby certify:

That the herein-above named personally appeared before me this the _____ day of _____, 20____;

And that I personally witnessed the execution of this document for the intents and purposes herein above described.

_____
NOTARY PUBLIC
My Commission Expires:            (SEAL)

01-31-23        Hairgrove v. City of Salisbury, et al.        COPY

Case 1:21-cv-00814-CCE-JLW   Document 38-15   Filed 04/03/23   Page 8 of 8