## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## Civil Action No. 1:21-cv-814

| | |
|---|---|
| **LARISSA HARPER HAIRGROVE,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CITY OF SALISBURY, DOWNTOWN** | ) |
| **SALISBURY, INC. and LANE BAILEY,** | ) |
| **in his individual and official capacity,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## DEFENDANT DOWNTOWN SALISBURY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Downtown Salisbury, Inc. ("DSI") hereby submits this Memorandum of Law in support of its Motion for Summary Judgment filed contemporaneously herewith.

### I.  INTRODUCTION

DSI is entitled to summary judgment on Plaintiff Larissa Hairgrove's two remaining claims against it.

First, Hairgrove cannot establish that her employment with the Lexington Tourism Authority ("LTA") was terminated because some unknown person at DSI retaliated against her by telling the LTA that she had filed EEOC charges against DSI and the City. Hairgrove's own evidence shows that Plaintiff – not DSI – told LTA that she "sued the City" and she admits that she has no evidence that anyone associated with DSI shared any

such information with LTA. This claim is based on nothing more than speculation and is without merit.

Second, Plaintiff's claim for overtime compensation under the North Carolina Wage and Hour Act ("NCWHA") fails because she was properly classified as a salaried exempt Executive employee who was not eligible for overtime. It is undisputed that Plaintiff was paid on a salary basis, and her job duties – as she described them in her resume, discovery responses and under oath in her deposition – fit squarely within the Executive overtime exemption. *See* N.C. Gen. Stat. §95-25.14(b)(4).

## II. STATEMENT OF FACTS

### A. Introduction and Hairgrove's Hiring

DSI is a quasi-governmental 501(c)(3) nonprofit organization formed in the early 1980's "[t]o promote, enhance and management the development of the central business district of Salisbury, … by improving and expanding the district to become the economic, governmental, social and cultural center of Rowan County." Hairgrove Dep. ("Pl. Dep.) Ex. 7 (Complaint) at ECF 1-4[1] (May 29, 2018 Main Street Manager Proposal) at p. 1. DSI is an accredited Main Street Program recognized by both the National and North Carolina Main Street Programs. *Id.* DSI is managed by full-time Director who oversees the progress and purpose of the organization. Pl. Dep. at 234, ECF 1-4. DSI has a 21-person Board of Directors. *Id.*

---

[1] Hereafter, all references to Exhibits to the Complaint will be identified by their ECF number only.

In May 2017, Plaintiff Larissa Hairgrove applied for the DSI Director position in response to a job posting. Pl. Dep. at 184-185, 193; Amd. Complaint (ECF 12) at ¶14 and ECF 1-1 at pp 1-3 (job posting). The City offered Hairgrove the position and she accepted on August 28, 2017. *Id.*; ECF 1-1 at pp. 4-6. Her offer letter described the position as "a salary/exempt position." *Id.* at p. 4 (Emphasis in original). Hairgrove's initial salary was $75,000.12 per year paid in bi-weekly installments of $2,884.62. *Id.* Plaintiff's City pay grade was 30. *See, e.g.* DSI MSJ Mem. of Law Ex. A ("Mem. Ex.")(2018 City Salary Ranges)[2]. Plaintiff's salary was $80,000 when she resigned in June 2020. Pl. Dep. at 185-186; Pl. Dep. Ex. 10[3] (resume). Plaintiff remained in her Director's position throughout her employment, she was never demoted, and her compensation and benefits were never reduced. *Id.* at 274-275.

On June 16, 2017, the City and DSI entered into a Memorandum of Understanding ("MOU") pursuant to which DSI would manage and operate the City's Main Street Program. *See* Mem. Ex. B (MOU). The DSI Director position was designated as a City Department Head level position reporting directly to the Assistant City Manager. *Id.* DSI was required to operate within the guidelines of the Main Street Model, including the establishment of four (4) specific committees devoted to Design, Economic Restructuring, Organization and Promotions. *Id.*

On October 11, 2017, Hairgrove signed a "Statement of Understanding" in which she acknowledged, *inter alia*, "I have been told the FLSA status of my position and I

---

[2] All Memorandum Exhibits were exchanged in discovery but were not marked as deposition exhibits.
[3] All references to "Dep. Ex." shall refer to exhibits to Plaintiff's deposition unless otherwise stated.

understand the overtime policy as it relates to me." Pl. Dep. at 186-188, 191-193; Dep. Ex. 8. *Id.* Hairgrove underlined this statement and understood she was not eligible for overtime. *Id.* at 192-193.

Hairgrove received a copy of and was given an orientation on the City's Employee Handbook on October 11, 2017. Pl. Dep. at 263 and Dep. Ex . 13 (receipt form); *See* Dep. Ex. 8 (handbook acknowledgment). Hairgrove understood its "Wage and Hour Policies" stating that exempt employees would not receive overtime compensation if they worked over 40 hours in a workweek. *Id.* at 264-265; Dep. Exh. 12 (Handbook Excerpts) at pp. 19-20. Pursuant to the "Recording Time" policy, Hairgrove was required to notify the City of any "pay discrepancies, unrecorded or misreported work hours, or any involuntary missed meal or break periods." *Id.*; Dep. Exh. 12 at p. 21. Hairgrove never used the City's Complaint form (attached to the Handbook) to report any such issues. *Id.* at 265-266, 273-274; Dep. Exh. 16 (Complaint Form).

In March 2019, Hairgrove received training on the Fair Labor Standards Act. Pl. Dep. at 267-272; Dep. Exs. 14 and 15. This training specifically addressed misclassification of employees, but Hairgrove never told her superiors she thought she was misclassified. *Id.*

Hairgrove completed weekly time sheets and reviewed them before they were submitted to the City. Pl. Dep. at 276-277; Dep. Ex. 18 (time sheets). Throughout her employment, Hairgrove's time sheets reflected that she worked 37.5 hours per week and she never disputed them. *Id.* at 252; *See* Dep. Ex. 18.

## B. Hairgrove's Description of Her DSI Director Job Duties

As the DSI Director, Hairgrove was a City Department Head in charge of DSI's daily operations. *See* Dep. Ex. 10. She consistently described those duties in her deposition testimony, resume and discovery responses. *See* Pl. Dep. at 195-225, 227-228; Dep. Exs. 10, 11 at pp. 6-7. *See also* Pl. Dep. at 237; ECF 1-4 at p. 4. Her responsibilities, accomplishments and future goals are memorialized in DSI Board meeting minutes, work plans, and goals/objectives worksheets she prepared. *See* Pl. Dep. at 229-231; ECF 1-5 (work plan), 16 (same), 19 (goals/objectives), 20 (same); *See generally* Mem. Ex. C (DSI Board and Committee Meeting Excerpts). Hairgrove described her duties as follows:

Hairgrove built a new department and merged economic development duties through a new quasi-governmental structure. Pl. Dep. at 196; Dep. Ex. 10. In her view, she "really had to clean up the whole structure, put . . . systems in place that weren't in place. . . I was hired to develop a department, a City department, the way I knew how. That's what I was hired to do, and to be the executive director to this nonprofit partner arm." *Id.* at 47-48.

Hairgrove was educated on the Main Street Program, and trained DSI Board members and staff on the proper way to run the DSI office through its new quasi-governmental structure. *See, e.g.*, Pl. Dep. at 45, 49, 69, 102-103, 112-113, 144-145, 239, 241-242, *See* ECF 1-5 at p.3 and Dep. Ex. 10. Hairgrove described herself as "a full time Executive Director who overs[aw] the progress and purpose of the organization." *Id.* at 234. Her job was "to assist with getting the whole overall [DSI work] plan done and . . .

5

directing the development of the downtown," including building redevelopment and ensuring that her staff was present at DSI events. *Id.* at 34-35.

Hairgrove responded to the City's request for proposal regarding future management of the Main Street Program. Pl. Dep. at 234-236; ECF 1-4 (Response to RFP). Winning this RFP was crucial to enabling DSI to continue to receive Municipal Service District ("MSD") funds to allocate for their programming. *Id.*

Hairgrove was responsible for enhancing the downtown municipal service district through business retention, recruitment, property development, marketing and memorable events, and North Carolina Main Street ("NCMS") reporting and assessment. *Id.* at 117, 211-212; Dep. Ex. 10. She "[w]orked extensively with the Planning & Community Development Department with consultants on a downtown parking study, market study, updating the Downtown Master Plan and other internal and external programs and projects." *Id.* at 212.

Hairgrove led monthly meetings of the DSI Board and its four committees. Pl. Dep. at 66-67, 213-214, 221; ECF 1-4 at p. 4; Dep. Ex. 10. Hairgrove presented her Director's Report at each DSI Board meeting. *Id.* at 220, 245-246; ECF 1-5, p. 5; *See* Mem. Ex. C. Hairgrove attended the committee meetings "because [she] was overseeing this" and they frequently needed her to make decisions or provide direction. *Id.* at 214. Hairgrove would report to the Board on the committees' activities. *Id.* at 235.

Each DSI committee had its own mission that complimented the various facets of Hairgrove's managerial duties. *Id.* at 66, 213-214, 234; ECF 1-4 at p. 4; Dep. Ex. 10. The Organization committee is DSI's executive committee, and consists of Hairgrove, DSI's

6

Board officers and committee chairs, and it manages personnel, budgetary and legal aspects of DSI. *Id.* at 66; *See* ECF 1-4 at p. 4. The Economic Vitality committee focuses on guiding the economic development of downtown, attracting businesses, and interacting with business owners. *Id.*; Pl. Dep. at 215-218. The Design committee sets goals and strategies that impact the design of downtown. *Id.* at 214 (she "ran" the committee with architect Pete Bogle); ECF 1-4 at p. 4. The Promotions committee plans and implements programs, activities, marketing projects and events designed to promote downtown Salisbury. *Id.*

Hairgrove attended weekly City Department Head meetings that included all City Department Heads, the City Manager, Assistant City Manager and the City Attorney. *Id.* at 66-67, 207-208. She also attended the City Council's bi-weekly meetings to provide updates on DSI's projects. *Id.* at 219-220. Hairgrove attended several other recurring meetings. Pl. Dep. at 232-233; ECF 1-3 (meetings).

Hairgrove submitted work plans and goals/objectives lists to the DSI Board and Assistant City Manager Zack Kyle. *See, e.g.,* Pl. Dep. at 238-247; *See* ECF 1-5; Kyle Dep. Exs 16, 19 and 20.

Given the nature of her position, Hairgrove was evaluated on execution of her managerial duties, including: development, direction and training of employees; business recruitment and property development; carrying out "duties expected of a Department Head;" "work[ing] with the Empire Hotel Development Team to secure executed contracts, coordinate with contractors, consultants, city staff, and City Council to implement the closing transaction;" and "[d]irect[ing] the overall economic development program of work for" DSI. *See* Bailey Dep. Exs. P8 and P9.

Hairgrove was required to prepare and submit annual reports to the North Carolina Main Street office describing DSI accomplishments and ongoing projects. Pl. Dep. at 242-243; ECF 1-5 at p. 3. She improved the reports by adding DSI accomplishments that had not been included in previous years. *Id.* at 243.

Hairgrove was the main point of contact between downtown business and property owners and DSI. She frequently met with these "stakeholders" to "find out what their needs are" because "it was part of the job." *Id.* at 216-217. Once she determined the stakeholders' needs, she would connect them with one of the DSI committees to provide further assistance. *Id.* Hairgrove's goal was to "build a relationship with each retailer and brainstorm ideas for growing their business." *Id.* at 241, ECF 1-5 at p. 2.

Hairgrove oversaw a $347,000 budget. *Id.* at 196; *See, Id.* at 244 (she was actually responsible for two budgets: one for DSI and one for the City). She had to ensure that the budget plan "align[ed] with the economic development plan and general operations of the MS organization." *Id.* at 241; ECF 1-5 (work plan) at p.2. Hairgrove was responsible for "staying within budget, cutting for efficiency and conservation of funds when needed." *Id.* at 212. She managed DSI's books and worked with CPA's on DSI audits. *Id.* at 244. Hairgrove prepared Form 990's as part of DSI's annual financial reporting. *Id.* at 246-247.

Hairgrove wrote and managed grants seeking funds to enable DSI to execute items in programming. Pl. Dep. at 49, 224-226, 245; ECF 1-5, p. 4; Dep. Ex. 10 at p.1. Hairgrove secured a $543,000 federal historic redevelopment grant and a $10,000 to $20,000 EPA/USDA Local Foods grant in 2020. *Id.* Plaintiff also applied for a $1,000,000 RISE grant for the redevelopment of the Empire Hotel. *Id.* at 224-226.

8

### C. Hairgrove's Hiring and Management of Two Full-Time Employees

Hairgrove managed two full-time employees: Events and Marketing Coordinator LaToya Price and the Administrative Specialist Candice Brown. *Id.* at 196-197. Price and Brown began their employment in October 2018. *Id.*; *See* Mem. Ex. D (September 2018 DSI Board Minutes) at p.1. Price was still employed when Hairgrove resigned, and Brown resigned in April 2020. *Id.* Price's pay grade was 18 and Brown's was 15. *See* Mem. Ex. A at p. 1. Plaintiff also supervised two interns, including Katelin Rice and Jordan Ferguson. *See* ECF 1-4 at p.4, and Pl. Dep. at 204.

Hairgrove was directly involved in the hiring of Price and Brown. *Id.* at 197-203. With the Administrative position, she received resumes and applications, reviewed them, narrowed the pool of applicants to interview, conducted interviews, and selected Brown for the position. *Id.* For the Events and Marketing Coordinator position, Hairgrove did all of the above, but she also created the job posting and advertised for the position. *Id.* Price was Hairgrove's first choice for her position. *Id.* at 203.

Hairgrove supervised, verbally counseled, and disciplined her staff. *Id.* at 209-210. She completed and conducted performance evaluations for her staff. *Id.* at 207-208. She also delegated duties to her staff as she deemed necessary. *See, e.g.*, *Id.* at 34-35, 48, 236 (taking committee meeting minutes). Hairgrove also conducted a pre-dismissal hearing with a staff member. *Id.* at 150.

### D. Hairgrove's Resignation in June 2020

Throughout Hairgrove's employment, City Manager Lane Bailey, Assistant City Manager Zack Kyle and DSI Board members raised concerns regarding her job

performance. *See, e.g.* Bailey Dep. Exs. P3, P8-P11; *See* Kyle Dep. at 18-19, 31-34, 61, 73-75. Hairgrove's recurring problems were tardiness, failing to complete tasks, lack of organization and failing to respond to emails and phone calls in a timely manner. *Id.*

On February 25, 2020, the DSI Board conducted a closed session at the end of their regular monthly meeting to candidly discuss Hairgrove's job performance outside of her presence. *See* Pl. Dep. Ex. 5 at pp. 1-2. Hairgrove left a recording device in the closed session and then listened to it. *Id.* On March 17, 2020, the DSI Board sent Bailey a letter describing Hairgrove's misconduct. Pl. Dep. Ex. 5. On April 12, 2020, Hairgrove submitted a written response. ECF 1-9.

In conjunction with his evaluation of Hairgrove, City Manager Lane Bailey solicited the DSI Board's feedback regarding her job performance. *See* Dep. Ex. 6. Based upon the consistently negative feedback he received, Bailey prepared and delivered a pre-dismissal letter to Hairgrove on June 22, 2020. *Id.*; Pl. Dep. at 147-148. Bailey asked her to return to his office on June 24, 2020, but Hairgrove resigned on June 23, 2020. Pl. Dep. at 19, 149; Dep. Ex. 1.

### E.  Hairgrove's Employment at the Lexington Tourism Authority

On October 22, 2020, Hairgrove was hired as the LTA's Tourism Marketing Coordinator. Pl. Dep. at 127, 130-131; Dep. Ex. 3. Her supervisor was LTA Executive Director Robin Cagle. *Id.* This was a newly created, interim position intended to increase tourism revenues which fund the LTA. *Id.* at 10-11; Amd. Complaint, ¶¶ 72-75 (interim position).

10

Cagle considered Hairgrove's job performance "okay." Cagle Dep. at 14. Hairgrove had "unacceptable" tardiness and attendance issues. *Id.* at 16.

On November 19, 2020, Hairgrove filed EEOC charges of discrimination against the City and DSI. W. Williams Aff., ¶ 4. In April 2021, the City and Hairgrove participated in a mediation of the EEOC charges. *Id.* at ¶¶ 4, 6 (DSI had been dismissed).

On or before April 2021, Hairgrove told Robin Cagle that she was "suing" the City of Salisbury. Pl. Dep. at 127-130; Cagle Dep. at 17-18. Hairgrove then corrected herself and told Cagle that she had only filed EEOC charges. *Id.*

After Hairgrove volunteered this information to Cagle, Cagle received a phone call from Rebecca McGee, who was the former Main Street Director for the City of Lexington[4]. *Id.* at 18-19. McGee told Cagle that she had "heard [Plaintiff is] suing the city of Salisbury." *Id.* at 19-20; *See* Pl. Dep. at 161 (Hairgrove does not know how McGee became aware of her EEOC charge). Cagle considered this mere gossip and told McGee that "that's neither here nor there." *Id.* at 20. LTA considered this information to be irrelevant. *Id.* at 22-24.

In July 2021, LTA began seeking applicants to replace Cagle, who had announced her retirement. *Id.* at 26-27. Hairgrove applied for the position, but she was not interviewed. *Id.* at 26-28; Pl. Dep. at 132. Between July and September, Cagle told Hairgrove that LTA considered her marketing position to be a one-year position that was not likely to continue after the new Executive Director was hired. *Id.* at 32-33. On August 26, 2023, Morgan

---

[4] Plaintiff did not know who made the call until Cagle's deposition. Pl. Dep.at 160-161.

Brookshire was hired as the new Executive Director. *Id.* at 29, 36-38; Dep. Ex. 4 (position elimination letter). On that same day, Hairgrove was notified that her position was eliminated because LTA could not afford to fund both positions. *Id.;* Pl. Dep. at 132-133.

## III.   ARGUMENT

### A.   Standard of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015)) (internal quotation marks omitted). However, the Court must also abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial.'" *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's

12

favor. *Id.* "To create a genuine issue for trial, 'the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540. "Instead, the nonmoving party must establish that a material fact is genuinely disputed by, inter alia, 'citing to particular parts of the materials of record.'" *United States v. 8.929 Acres of Land in Arlington Cnty., Va.*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(c)(1)(A)).

### B.  Title VII Post-Termination Retaliation Claim

Plaintiff alleges a claim for post-employment retaliation pursuant to Title VII. Plaintiff claims that her LTA interim position was eliminated and her Executive Director application was "rejected" because "an unknown person working in either the state or local government economic development field [shared] confidential information about Plaintiff's pending EEOC charge, including the allegation that Plaintiff was going to sue her former employer, the City of Salisbury." Amd. Complaint, ¶¶74-75. A former employee may bring a retaliation claim under Title VII for a former employer's post-employment conduct.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)).

Hairgrove must show that retaliation was a "but-for cause" of the adverse employment action, i.e. that it would not have happened had she not engaged in the alleged protected activity. *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 352, 133 S.Ct. 2517, 186 L. Ed. 2d 503 (2013); *Guessous v. Fairview Prop. Invests., LLC*, 828 F.3d 208, 216-17 (4th Cir. 2016). This causation standard "requires proof that the unlawful retaliation

would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. "Naked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." *Huckelba v. Peering,* 2016 U.S. Dist. LEXIS 143198, at *7 (E.D.N.C. Oct. 17, 2016).

In order to establish a *prima facie* case of post-employment retaliation, Hairgrove must establish three elements: (1) she engaged in protected activity; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between plaintiff's participation in the protected activity and the adverse employment action." *Meadows v. Blue Ridge Cmty. Coll.*, 2020 U.S. Dist. LEXIS 92838, at *10-11 (W.D.N.C. May 5, 2020). Hairgrove cannot establish a *prima facie* for the reasons explained herein.

### 1. Protected Activity

Hairgrove describes her protected activity as "complaining about sex discrimination and a hostile work environment due to sex." *See* Amd. Complaint, p. 16 ("Count Four" title). Presumably she is referring to the November 19, 2020 filing of her EEOC charges and the April 22, 2021 mediation. Assuming this is protected activity, Hairgrove cannot establish the remaining elements of her claim for post-employment retaliation.

### 2. Adverse Employment Action

The alleged adverse employment action is that DSI was somehow involved in informing LTA that Hairgrove filed EEOC charges against DSI and the City, and this led to the termination of her LTA employment. Amd. Complaint, ¶¶72-75. Fundamental to a

14

post-employment retaliation claim is that the former employer <u>actually did something</u> that resulted in harm to the Plaintiff. For example, employers have been held liable under this theory of retaliation for intentionally providing false job references for a former employee. *See Robinson*, 519 U.S. at 339. Similarly, widespread public disclosure of information regarding litigation may provide a basis for a post-employment Title VII retaliation claim. *See Greengrass v. Int'l Monetary Sys., Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015)(referring to employee's "meritless" lawsuit in public SEC filings). Hairgrove cannot even articulate what DSI supposedly did, other than to speculate that it must have had something to do with it. She has provided no forecast of evidence – testimonial, documentary, or otherwise – establishing DSI's involvement in disclosing the EEOC information to LTA or the cessation of her LTA employment. The previously "unknown" person who made the call to LTA is not connected to DSI. Pl. Dep. at 160-161; Williams Aff., ¶¶7-10. Most significantly, to advance this claim Plaintiff must ignore her own admission under oath that <u>she</u> is the person who first informed LTA about her EEOC charges.

### 3. Causation

Hairgrove cannot prove that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action" of DSI. *Nassar*, 570 U.S. at 360. Indeed, Hairgrove has no proof of any wrongful actions by DSI that are connected to her LTA employment. All she has is a threadbare allegation of her own creation. *See Guessous*, 828 F.3d at 217. Such "[n]aked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a

15

plausible Title VII claim." _Huckelba_, 2016 U.S. Dist. LEXIS 143198, 2016 WL 6082032, at *3. Timing and the absence of evidence doom this claim.

### a.  Absence of Temporal Proximity

There is a complete absence of temporal proximity between the alleged protected activity and the adverse employment action.  The Fourth Circuit has consistently held that a period of three to four months between the protected activity in question and the subsequent adverse employment action is too long to establish causation by temporal proximity alone. _See Roberts v. Glenn Indus. Grp., Inc._, 998 F.3d 111, 127 (4th Cir. 2021). There is a 9 to10 month gap between the filing of her November 2020 EEOC charge and the August 2021 elimination of her LTA position.   This significant lapse of time "negates any inference that a causal connection exists between the two."   _Dowe v. Total Action Against Poverty in Roanoke Valley_, 145 F.3d 653, 657 (4th Cir. 1998), _abrogated on other grounds by Burlington N. and Santa Fe Ry. v. White_, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); _Pascual v. Lowe's Home Ctrs., Inc._, 193 F.App'x 229, 233 (4th Cir. 2006)(3-4 months).  Similarly, the April 2021 mediation was 4-5 months before Plaintiff's LTA position was eliminated, which is too long to establish causation. _See_ Pl. Dep. at 128; Amd. Complaint, ¶¶ 72-75; _See_, _e.g. Roberts_, 998 F.3d at 127.

### b.  There is No Connection to DSI

Hairgrove has no evidence that DSI had any involvement in the elimination of her LTA position and not being hired as LTA's Executive Director.  The following facts are undisputed: Hairgrove first told Cagle about the EEOC charges in April 2021.  _See_ Pl. Dep. at 127-130; Cagle Dep. at 17-18, 22-24. After Hairgrove's disclosure, Rebecca McGee

shared the gossip with Cagle that Hairgrove had "sued" the City of Salisbury. Cagle Dep. at 18-20. Hairgrove admitted under oath that she does not know how McGee knew about her EEOC charges. Pl. Dep. at 161. McGee worked for the city of Asheboro - not LTA - when this occurred and thus had no influence over LTA's employment-related decision-making. Cagle Dep. at 20. There is no evidence that anyone at DSI knew McGee or asked her to call Cagle. Pl. Dep. at 161; Williams Aff., ¶¶ 7-10. There is no evidence that anyone at DSI called LTA directly about Plaintiff's EEOC charges. *Id.* McGee has no connection to DSI or the City and Hairgrove has not advanced any. *Id.* McGee's information was old news because Hairgrove had already informed Cagle. Cagle Dep. at 17-18, 22-24. There is no evidence that this "gossip" had any bearing on LTA's decision making regarding Hairgrove. *Id.* at 20, 22-24.

### c. Non-Retaliatory Reasons for LTA's Decisions

LTA's personnel decisions regarding Hairgrove were wholly unrelated to her EEOC charges. Hairgrove knew she had an "interim" position and, months before its elimination, Cagle reminded her that LTA could not fund both her position and the new Executive Director. *See* Amd. Complaint, ¶¶ 72-75; Cagle Dep. at 32-33. While Cagle would have interviewed Hairgrove for the Executive Director position "out of courtesy," there is no evidence that Plaintiff, whose performance was viewed as merely "okay," would have been hired or that LTA did not simply choose to interview those candidates it believed were most qualified for the position. Cagle Dep. at 14-16, 24-26, 32.

17

### d. **Plaintiff's Claim is Pure Conjecture**

Hairgrove's claim ignores the most fundamental and undisputed fact: if LTA eliminated her position or decided not to hire her because she had filed an EEOC charge against the City and DSI (which is denied), it was because Hairgrove – not DSI or the City – volunteered this information. She alleges no facts making it plausible that DSI retaliated against her by interfering with her LTA employment. Williams Aff., ¶¶7-10. Hairgrove's claim amounts to a series of weak speculative assumptions that cannot raise a genuine issue of material fact to avoid summary judgment.

In *Jones v. Bloomingdale's*, 2018 U.S. Dist. LEXIS 38572, *12-13 (S.D.N.Y March 8, 2018), the Court dismissed a negative reference retaliation claim under Title VII, noting that, like Plaintiff's claim in this case, it was nothing but pure conjecture:

> Plaintiff must allege facts making it plausible that the company's allegedly negative references "were made for retaliatory reasons" . . . [citations omitted]. He has failed to do so. He has not, for example, alleged any facts about who at Bloomingdale's provided the allegedly negative references or what they said. Nor has he alleged any facts supporting his contention that the speaker or speakers providing the references, whoever they were, expressed negative views of Jones . . . for retaliatory reasons. The Court thus "has no reason to draw an inference of causation between the allegedly negative references and the protected activity" or between the references and discriminatory animus. . . . Jones's negative-reference allegations are little more than "speculation premised on . . . [his] alleged inability to find a job" and his assumptions that his prospective employers called Bloomingdale's for a reference and were provided negative ones due to discrimination or retaliation.

*Id.*

### C. **Plaintiff Was Properly Classified as a Salaried Exempt Employee**

Hairgrove claims that she was misclassified as a salaried exempt employee and is therefore entitled to overtime compensation for hours worked in excess of 40 hours in a

18

workweek. This claim is without merit because Plaintiff satisfies the executive exemption under the N.C. Wage and Hour Act.

Plaintiff was "employed in a bona fide executive capacity" under N.C. Gen. Stat. §95-25.14(b)(4) (and 29 U.S.C. § 213(a)(1)); *See Powell v. P2Enterprises, LLC*, 786 S.E.2d 798, 800 (N.C. Ct. App. 2016)([i]n interpreting the [Wage and Hour Act], North Carolina courts look to the FLSA for guidance."). The executive exemption covers employees:

> (1) Compensated on a salary basis . . . at a rate of not less than $684 per week . . . exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a); *Ducharme v. Madewell Concrete*, LLC, 2021 U.S. Dist. LEXIS 99721, *15 (D. S.C. May 26, 2021).

### 1. Plaintiff Was Paid on a Salary Basis

An employee is paid on a "salary basis" if she "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a) The employee must be compensated at a rate of not less than $684 per week. 29 C.F.R. § 541.600(a). It

is undisputed that Plaintiff was paid on a salary basis exceeding $684 per week, as her salary ranged from $75,000.12 to $80,000 and her starting bi-weekly paychecks were $2,884.62, or $1,442.31 per week. *See* Pl. Dep. at 184-186; ECF 1-1 at pp. 4-6.

### 2.     Primary Duty of Management

The second element of the executive exemption requires the employee's primary duty to be management.

### a.  Management

Management includes activities such as interviewing, selecting, and training of employees; directing the work of employees; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; apportioning the work among employees; planning and controlling the budget; and monitoring or implementing legal compliance measures. 29 C.F.R. § 541.102; *Pang v. Adult Day Health, Inc.*, 2022 U.S. Dist. LEXIS 130440, *17-19 (D. Md. July 21, 2022).

Plaintiff was a City Department Head in charge of DSI operations, and in that capacity she "built a new department and merged economic duties through a new quasi-governmental structure." *See* Dep. Ex. 10. She "develop[ed] . . . a City department." Pl. Dep. at 48.  Every aspect of her job duties related to management of DSI.  She was responsible for responding to the City's RFP to ensure that DSI continued to be funded (234-236)[5]; she prepared grant submissions for DSI projects (224-226, 245); she managed

---

[5] All parenthetical page number references herein are to Plaintiff's deposition.

the budget and the books and oversaw audits (196, 212-241, 244); she updated DSI's by-laws (221-222); she prepared the DSI annual work plan and submitted it to the City (238 and ECF 1-5); she evaluated its insurance needs and changed policies (221-222), and she prepared and submitted NCMS annual assessments (211, 242). She was engaged in marketing DSI and downtown Salisbury. ECF 1-5 at p. 4. She led DSI Board meetings and oversaw its 4 committees (66-67, 221). She attended City Department Head meetings because of her position. *Id.* Plaintiff was the main point of contact between downtown stakeholders and DSI (216-217). She "guid[ed] the economic development of downtown." ECF 1-4 at p.4. She interviewed, hired, trained and evaluated LaToya Price and Candice Brown (197-203, 207, 209-210). She trained the DSI Board and incoming Board members on the quasi-governmental structure (112-113, 144-145). She delegated work to her staff and ensured that they attended DSI events (34-35, 48, 236).

### b. **Primary Duty**

"Primary duty" means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). This determination must focus on the "employee's job as a whole." *Id.* Relevant factors include the relative importance of the exempt duties compared to other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* No single factor is dispositive. *Kreiner v. Dolgencorp, Inc.*, 841 F.Supp.2d 897, 904 (D. Md. 2012).

21

Hairgrove's own testimony establishes that she functioned as the executive director/manager of the DSI and the managerial duties she performed were her most important, essential duties that she effectively spent all of her time performing. While Hairgrove claims she was "micromanaged," this alone is insufficient to undermine her testimony that she was in charge of running DSI. *See* Amd. Complaint, ¶19; *See also Thomas v. Dolgencorp, Inc.*, 2012 U.S. Dist. LEXIS 46667, at *17 (D. S.C. April 3, 2012)(the exemption does not demand complete freedom from supervision); *Smith v. Autozone, Inc.,* 2016 U.S. Dist. LEXIS 63900, at *38-39 (W.D. Va. May 13, 2016)(a manager's exempt status is not diminished by the need to obey corporate policies and corporate superiors, or the need to seek preapproval for certain decisions). The fact that Hairgrove received praise or blame for whatever happened at DSI is evidence of the critical importance of her management duties to the proper functioning of DSI. *Smith*, 2016 U.S. Dist. LEXIS 63900, at *30. It is evident from Hairgrove's testimony, resume and work plans that she spent well over 50% of her time performing those managerial tasks. The final factor weighs heavily in favor of DSI, as Plaintiff's pay grade was 30, while her two staff were 18 and 15, and their positions were classified as "non-essential" while Plaintiff's was "essential." *See* Mem. Ex. A at p. 1.

### 3. Customarily and Regularly Directed the Work of Two or More Employees

Hairgrove must have customarily and regularly directed the work of two or more employees. *See* 29 C.F.R. § 541.701. In her own words, Hairgrove "Managed 2 Full-Time Staff members (Events & Marketing Coordinator and Admin.)." Dep. Ex. 10. She

delegated tasks to them, trained them, counseled them and evaluated their job performance. Pl. Dep. at 34-35, 48, 196-203, 206-210, 236; *See* ECF 1-5 at p. 5 ("Manage MS Staff and conduct staff evaluations as needed – Ongoing throughout year"). This included "measur[ing] the impact of coordinated marketing efforts" for which Price was responsible. ECF 1-5 at p. 4. She approved intern Jordan Ferguson's timesheets. *See* Mem. Ex. E; *See Pang*, 2022 U.S. Dist. LEXIS 130440, *20-21 (these facts were sufficient to establish this element of the exemption). Taken together, these activities constitute direction of at least two other employees. *See Grace v. Family Dollar Stores, Inc.* 637 F.3d 508, 513-14 (4th Cir. 2011)(employee met this requirement where she trained and managed employees and "engaged the employees in counseling and coaching to make sure that they performed their tasks as necessary").

### 4. Hiring and Firing Employees

Finally, either Hairgrove must have had the authority to hire or fire other employees, or particular weight must have been given to her recommendations in personnel matters. 29 C.F.R. § 541.105; *Pang*, 2022 U.S. Dist. LEXIS 130440, at *20-23. It is undisputed that Hairgrove was involved in every aspect of hiring both Price and Brown, from posting the job (for Price's position), evaluating applications and selecting applicants to interview, interviewing and hiring. Pl. Dep. at 197-203. Price was Hairgrove's first choice for the Marketing and Events Coordinator position and she hired her. *Id.* at 203; *See* Mem. Ex. D. Hairgrove also testified that she conducted a pre-dismissal conference during her employment, but even without this information she satisfies this element because it only requires her to be involved in hiring <u>or</u> firing. *Id.* at 150; *See* 29 C.F.R. § 541.105; *See also*

*Pang*, 2022 U.S. Dist. LEXIS 130440, at \*20-23 (Pang satisfied this element even though he did not himself hire, fire, or discipline other employees because his job responsibilities interviewing applicants and making hiring recommendations).

## IV.    CONCLUSION

For the reasons set forth herein, DSI respectfully moves the Court to grant summary judgment in its favor.

## CERTIFICATION OF WORD COUNT

The undersigned counsel hereby certifies that this Memorandum of Law does not exceed 6,250 words in accordance with MDNC Local Rule 7.3(d)(1).

This the 4th day of April, 2023.

> *s/G. Bryan Adams, III*
> G. Bryan Adams, III (N.C. Bar No. 17307)
> VAN HOY, REUTLINGER, ADAMS & PIERCE, PLLC
> 737 East Boulevard
> Charlotte, North Carolina 28203
> Telephone:  704-375-6022
> Fax:  704-375-6024
> Email:  bryan.adams@vraplaw.com
>
> **ATTORNEYS FOR DEFENDANT DOWNTOWN SALISBURY, INC.**

24

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that this MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record for the Plaintiff as follows:

> Valerie Bateman
> June Allison
> NEW SOUTH LAW FIRM
> 209 Lloyd Street, Ste. 350
> Carrboro, NC  27510
> Email:  valerie@newsouthlawfirm.com
>            june@newsouthlawfirm.com

and to counsel for Defendants City of Salisbury and Lane Bailey as follows:

> Patrick Flanagan
> Cranfill Sumner LLP
> 2907 Providence Road, Suite 200
> Charlotte, NC  28211
> Email:  phf@cshlaw.com

This 4th  day of April, 2023.

> *s/G. Bryan Adams, III*
> G. Bryan Adams, III
> N.C. Bar No. 17307
> VAN HOY, REUTLINGER, ADAMS & PIERCE, PLLC
> 737 East Boulevard
> Charlotte, North Carolina  28203
> Telephone:  704-375-6022
> Fax:  704-375-6024
> Email:  bryan.adams@vraplaw.com

> **ATTORNEYS FOR DEFENDANT DOWNTOWN SALISBURY, INC.**