# LARISSA HAIRGROVE

# DEPOSITION EXCERPTS

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:21-cv-814


LARISSA HARPER HAIRGROVE,          )
                                   )
                    Plaintiff,     )
                                   )
     vs.                           )
                                   )
CITY OF SALISBURY, DOWNTOWN        )
SALISBURY INC., and LANE           )
BAILEY, in his individual and      )
official capacity,                 )
                                   )
                    Defendants.    )
                                   )
--------------------------------


_____

DEPOSITION
OF
LARISSA HARPER HAIRGROVE
_____


TAKEN AT THE OFFICES OF:
GATEWAY BUILDING
204 EAST INNES STREET, SUITE 200
2ND FLOOR CONFERENCE ROOM
SALISBURY, NC 28144


02-22-2023
9:54 O'CLOCK A.M.
_____

Gretchen Wells
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 | (336) 992-1954 | (919) 649-4444

1   be even city staff or municipalities or directors of

2   those boards about issues they're having, specifically

3   downtown areas of their towns.  That's my speciality

4   is downtown development.

5          So we were talking about whether they needed

6   better pedestrian street access or if they needed a --

7   like, a board strategic planning session for, you

8   know, education either about the North Carolina Main

9   Street Program or if it was something to do with

10  planning for their downtown.

11         Just it's overall economic development of

12  downtowns, which could be, you know, putting vacant

13  buildings into hands of developers if they needed

14  maybe some list of developers they could reach out to.

15  It ---

16     Q.   Right.

17     A.   --- it's a broad spectrum.

18     Q.   Sure.  How did that benefit Sanford

19  Holshouser?

20     A.   So they had an economic development

21  speciality in -- in their law practice.  So instead --

22  not just doing, like, bonds or affordable housing.

23  This would help them to reach out and help with, for

24  instance, a -- a big, vacant building.

25         Let's say they needed to help a city.  A

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 3 of 112

1    city would hire them to look over the contracts and

2    make sure that the developers are giving the pro

3    formas and the information that the city needed.

4              And so they would evaluate those.  They

5    would talk about different financing options and help

6    us -- help to go to the state for the -- making sure

7    that all the T's were crossed and I's were dotted

8    where contracts -- with a city contract and a private

9    or public nonprofit was concerned.  Just making sure

10   everyone was covered.

11        Q.   How long did you work there?

12        A.   I worked there from October or November,

13   November of 2021 to April 2022.

14        Q.   Who hired you in November of '21, specific

15   person?

16        A.   That would be Bob Jessup and his partner,

17   whose name is escaping me right now.  He did more of

18   the affordable housing.  He is not -- he was in on the

19   interviews and had -- you know, gave his input.

20        Q.   What was your salary?

21        A.   Oh, goodness.  Let's see.  I -- I'm thinking

22   it was around 60,000.

23        Q.   Did you have benefits?

24        A.   No, but I had my husband's health insurance.

25        Q.   Understood.  Why did you leave there in

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 4 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1           MR. FLANAGAN:  I'm going to mark some

2    documents here as Exhibit 1.  And it's actually three

3    pages, but they all sort of work together.  But I have

4    -- I'm sorry.  That's for you.  I'm going to mark this

5    and give this to Ms. Hairgrove.

6                  (DEFENDANT'S EXHIBIT

7                  NUMBER 1 WAS MARKED

8                  FOR IDENTIFICATION)

9        Q.   (Mr. Flanagan)  So showing you what I've

10   marked as Exhibit 1.  It's three pages, or three

11   separate pages, but I just want them marked right now

12   as one exhibit.

13           The first one is a document that appears to

14   be from you, dated June 23rd, 2020.  Do you recognize

15   that?

16       A.   I do.

17       Q.   All right.  Is that your resignation letter?

18       A.   It is.

19       Q.   The second page is a document from the City

20   of Salisbury, dated June 24th, 2020 per -- looks to be

21   signed by Lane Bailey, the city manager.  Do you

22   recognize that as a document that you received from

23   Mr. Bailey?

24       A.   I do.

25       Q.   And is that an acknowledgment of your

1    emails?

2        A.    I think it would have been the fact that I

3    felt like I was being the scapegoat for a nonprofit

4    board who really didn't want to be in the contract

5    with the City.  There was a lot of minutia, tasks that

6    the executive director and department head of a city

7    shouldn't have to do or could delegate to, you know,

8    the staff of the department that I was head of and not

9    get flack back.

10            But I would get all kinds of flack about,

11   you know, small tasks that were on the board's -- it

12   was -- the board has a work plan.  And my job was to

13   assist with getting the whole overall plan done and

14   overall directing the development of the downtown.

15   You know, through building redevelopment -- from, you

16   know, that to making sure that the staff put on -- and

17   I would be at the events.

18            So there was a whole gamut that I was to be

19   -- to direct.

20       Q.    So you had a staff that you would delegate

21   some tasks to.  Is that right ---

22       A.    Yes.

23       Q.    And they might be at an event and that you

24   would be there, but you ---

25       A.    Uh-huh (yes).

Case 1:21-cv-00814-CCE-JLW  Document 42-7  Filed 04/04/23  Page 6 of 112

1      Q.    --- weren't running the event necessarily,

2   you were overseeing it, so to speak, as the director?

3      A.    **Correct, but I'd always work like a worker**

4   **bee.**

5      Q.    Sure.  Understood.  Understood.  You got --

6   you did what you needed to do ---

7      A.    **Yeah.**

8      Q.    --- to get the job done, right ---

9      A.    **That's right.  And handle the fires ---**

10     Q.    Sure.

11     A.    **--- put out the fires, things like that.**

12     Q.    And did you feel like you at least should've

13  had the discretion to delegate some things that the

14  board wanted to make sure was getting done?

15     A.    **Yes, of course.**

16     Q.    All right.  So that was your email, sort of

17  complaints to HR that occurred prior to March of

18  2020, you think?

19     A.    **I believe that sums up.**

20     Q.    Okay.  You said you also talked to HR.

21     A.    **Uh-huh (yes).**

22     Q.    Would that have been Brianna or ---

23     A.    **Uh-huh (yes).**

24     Q.    --- Ruth or someone else?

25     A.    **I talked to Brianna.  At times -- I don't**

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    Street organization, probably a couple of my friends,

2    and said, "You know, do your -- have your board

3    members ever done this, have they, you know, gone

4    around you to either city council or to city

5    management and, you know, not allowed you to be a part

6    of those conversations?"

7            And it was just like, "Oh, no, never, that

8    would never happen."

9            So I tried to explain that to Zack.  And he

10   said, "Nope, I'm going to meet with her and, I think,

11   Greg one more time."  This was probably pretty early

12   on.  "And then we'll talk about having conversations

13   with you in them."

14           So, you know, I -- I tried not to take this

15   personally.  And I always try to give people the

16   benefit of the doubt and I'm like, okay, we're going

17   to get through this, it's a rough patch, it's the

18   transition.  The more I help to lead and educate like

19   I should be doing, what I was hired to do, you know,

20   as to how this structure works, because I came from

21   that type of structure in another community, then

22   everything will -- will settle down.

23           And it seemed like just when you -- it

24   looked like it was going to get better, it would --

25   something would flare up and it would get worse.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 8 of 112

1          So just took a hard nose to wanting these,

2    you know, committee minutes.  Or anytime if -- if

3    Whitney missed a stakeholders meeting, she wanted me

4    to give her, you know, minutes or something written

5    about what happened.  Well, you know, that will come

6    out, but it may not be today.  And honestly, part of

7    being a stakeholder is coming to these meetings and

8    being present for what's going on.

9          So there were a lot of tasks such as that.

10   Or, oh, my goodness, in 2018, Greg and -- decided and

11   then he got Whitney on board, they were going to

12   change the logo.  So I just got there in October of

13   2017, and some of this structure -- some things had

14   been set up and going and planned for me before I even

15   started work without that transition of, "Hey, let's

16   get to know each other, let's -- this is how this

17   operates; it's going to be a little different."

18          Instead, I came in and it was like, "Okay,

19   you know, you've got to do this and you've got" --

20   coming from the board to me of, you know, smaller

21   tasks when the organization was a mess.

22          And I really had to clean up the whole

23   structure, put in systems in place that weren't in

24   place.  There was -- you know, I was hired to develop

25   a department, a City department, the way that I knew

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 9 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    how.  That's what I was hired to do, and to be the

2    executive director to this nonprofit partner arm.

3    It's supposed to be a partnership.

4            And in the contract, it even said they were

5    to work with the director.  And I felt from almost day

6    one, it was working against me, giving me more and

7    more to do, expecting it like this, going to city

8    council members or the mayor even, probably.  I -- I

9    have a feeling because of some emails that would come

10   around -- you know, there was some emails to Karen

11   Alexander from Whitney.  Seems like I saw that once

12   come around.

13           I don't know if I -- I don't even know if I

14   have that anymore.  But there were -- there was a lot

15   that needed to be done.  And I did a lot, even with

16   the impediments that I was given.

17           And I often told Zack, I probably told

18   Brianna and I'm pretty sure I told Diane and Whitney

19   and Greg that I felt like a punching bag.  I felt like

20   -- I would use two analogies, Stretch Armstrong and a

21   punching bag, and/or, depending on the day.

22           And so they -- I voiced this to all of them

23   quite often and tried to get Whitney and Diane to

24   understand because they were the ones that harped on

25   it the most, you know, that I could delegate to my

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 10 of 112


```
 1   staff.
 2              It didn't have to be me and -- you know,
 3   necessarily, you know, making this phone call to find
 4   out -- I don't know, I'm giving an example, a -- if
 5   there were back taxes owed on a -- you know, I --
 6   that's something I would've -- I would've called the
 7   tax office for.
 8              But I'm giving a bad example and I'm
 9   rambling.  So I get nervous.  But I want to make sure
10   -- and if I delay -- if I pause, it's because I'm
11   really trying to think because I know I'm under oath
12   and I want to be careful, you know, that I'm -- I'm
13   recalling exact events.  But I -- I -- it's just -- it
14   was a -- it was a bad time.
15              And, for instance, I think even Whitney, you
16   know, put my director's report at the end of the
17   agenda because she felt like that I -- I was taking
18   too much time.  Although, my time was to educate the
19   board on what, you know, was happening, like, at the
20   State, you know, with opportunity zones and with, you
21   know, grants that were possibly available and dates
22   that were coming up and trying to get them to
23   trainings.
24              Whitney did go to a couple of trainings, but
25   she couldn't quite grasp, still, this type of
```

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 11 of 112

1    your stuff short."

2          There was a actual organization committee

3    meeting -- there's four committees in the Main Street

4    Program.  So there's a four-point approach and each

5    approach has committees.  So -- and then Organization

6    Committee, which is like an executive committee.

7          Whitney totally derailed the agenda.  And

8    therefore, about -- it was something totally

9    different, not on the agenda.  And there were very

10   important dates and things I needed to go over with --

11   it's basically your board officers.  So it's committee

12   chairs and your chair, vice chair, treasurer,

13   secretary.

14         And it seems like as a result of that, there

15   was a follow-up email between Whitney and I later

16   about something that she didn't know about or didn't

17   -- I hadn't done or something and -- and I referred to

18   the fact that, well, the agenda got derailed and the

19   information -- you know, I tried to point it out.

20         There were just many times that, you know, I

21   wasn't given the direction to lead and guide like I

22   had been hired to do.

23     Q.   How often were the full -- these full board

24   meetings?

25     A.   The full board meetings were monthly.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 12 of 112

1      Q.   All right.  So once a month.  And then you

2  had these four committee meetings that you had, what,

3  also once a month ---

4      A.   Monthly.

5      Q.   All right.

6      A.   Yes.

7      Q.   And so then there were other meetings that

8  you would have with the City department head meetings

9  and things like that, right?

10     A.   Yes.

11     Q.   And all department heads were expected to be

12 at the City meetings.

13     A.   That would ---

14     Q.   Was that once week?

15     A.   --- happen at least once a week.

16     Q.   Right.

17     A.   Sometimes more than once.

18     Q.   And just to be clear.  The board meetings,

19 the DSI board meetings, the board members are all

20 volunteers, right?

21     A.   Uh-huh (yes).

22     Q.   All right.  They all have regular jobs or

23 other ---

24     A.   Uh-huh (yes).

25     Q.   --- things going on?

Case 1:21-cv-00814-CCE-JLW  Document 42-7  Filed 04/04/23  Page 13 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

```
 1        Q.   Sure.  Understood.

 2        A.   Uh-huh (yes).

 3        Q.   But there were -- there was a lot of things

 4   to go over in a limited amount of time.

 5        A.   Uh-huh (yes).

 6        Q.   Would that be accurate?

 7        A.   Sure.

 8        Q.   All right.  Let's talk about -- well, the

 9   other thing I wanted to ask you before we get to the

10   one spat that you referenced is you said that -- that

11   a lot of these things are -- they were going on behind

12   the scenes.

13        A.   Uh-huh (yes).

14        Q.   What do you mean by that?

15        A.   So I would find out from Zack sometimes.  I

16   guess that's who would typically inform me of the

17   meetings between the DSI officers and either Zack or

18   Lane or maybe Brian Miller, the council liaison.  I

19   don't know about other council members or the mayor.

20             But I -- I just felt like there was behind-

21   the-scenes talk or -- when I wasn't around, I guess I

22   should say specifically, about, you know, what I

23   should or should not be doing.  But they were coming

24   from an uneducated source, unrealistic and uneducated

25   position that I wasn't there and I couldn't clear up
```



1    office moved from this building we're actually in to

2    the City Hall building with the Parks & Rec and

3    communications staff.

4           Personally, that was the first mistake I see

5    as a educated executive director of, you know, this

6    type of structure.  But we were there.  I came in.

7    The event coordinator who was already in place who had

8    been the DSI intern and then -- and this is as I

9    understand it from her.  I believe she then took the

10   place of a staff person that left, who they actually

11   called them promotions directors, I believe.  It was a

12   promotions director.

13          But when I get -- for DSI.  That person

14   left.  This person was interning.  And then I believe,

15   as I understood it, she took that position.  The City

16   decided to hire her.  I don't know anything about that

17   interview process or anything, selection.  And she

18   became event coordinator for the downtown development

19   department, which actually at the time was still named

20   DSI.

21          I had to straighten that out.  There were

22   two -- people were confused as to whether DSI was

23   still a nonprofit entity of its own or a department

24   with the City.  So I -- that was another thing I had

25   to straighten out.  But at the time, when I came in,


1    the city department was called DSI rather than

2    downtown development department.

3            So Katelin was there, and Parks & Rec had an

4    event coordinator.  So Katelin liked to do her event

5    coordinating one way and the Parks & Rec event

6    coordinator liked to do hers another way and they

7    clashed.  They had -- it was a personality clash.  It

8    was a clash of, you know, what they were used to.  And

9    so there was already friction going on when I got

10   here.

11           And they really kind of didn't want to work

12   together and they were being forced to work together,

13   which I believe was the -- was a crux of the problem

14   for the whole Parks & Rec department working with us.

15   Because they had been put under contract to work with

16   DSI on running the events.  And I remember a meeting

17   with -- when I -- early on, I was just meeting Nick --

18   Nick, the Parks & Rec director, and Zack Kyle.

19           We sat down and there was still some

20   resistance because Nick was saying he didn't have

21   enough staff.  And Zack was -- he was being very -- I

22   don't want to say forceful, but he was re -- sternly

23   reminding him that there was a contract.

24           And I could tell that the Parks & Rec

25   director didn't feel like he should be in that

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 16 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    department head for probably half the time I was here,

2    and was actually -- became my supervisor when she

3    wasn't a department head for a while.  She was given

4    more power, I guess, over me and my staff than I.

5         Q.    Okay.  I understand ---

6         A.    So -- than me.

7         Q.    And Kelly is a female, obviously, right?

8         A.    Yes.

9         Q.    All right.  And then what about Lane?  Were

10   there specific instances where -- well, let me back up

11   just a second.  I'm sorry.

12             The other thing you mentioned about Zack was

13   that he stepped over boundaries that contributed to

14   demeaning your position and you said that happened one

15   time and maybe more.

16             Tell me about the one time that you remember

17   that that occurred, or have we talked about that

18   already?

19        A.    So I did not mention that.  I can mention

20   that now.

21        Q.    Let's talk about that ---

22        A.    So Zack, in this meeting with Latoya Price,

23   who was my event coordinator and marketing staff,

24   called her in.  And even though she had only been

25   there for maybe two months as my staff person or as

1    our department staff person, Zack put her in charge of

2    the Main Street Conference, the 2019 Main Street

3    Conference that was coming up.  Which she had never

4    been educated through the Main Street Program.

5              He then also asked Diane Young to be a part

6    of that leadership of the conference.  And, you know,

7    at first, because I had so much on my plate, I told

8    him, I said, "Well, you know, Zack, even though you

9    did this behind my back, you know, without my

10   knowledge and you're telling me, like, days later or

11   something," I said, "it actually makes sense for an

12   event, you know, person to -- to lead up some of the,

13   you know, activities,"

14             I was doing my part.  I was already -- I had

15   been working through the summer when I had no staff on

16   things that they needed for the conference the year

17   before.  So I was doing my part and I was overseeing.

18   So I felt like that maybe wasn't such a bad thing.

19             But then when I start hearing things, talk

20   from, you know, either DSI members or city staff that

21   would be -- it sounded like, well, you know, "Larissa

22   couldn't do this, so we had to put, you know, Latoya

23   and Diane in place."

24             Well, that's ---

25        Q.   Who told you that?

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 18 of 112

1    this is putting a lot of pressure on me and it's
2    something that's outside of downtown.  This is more
3    like something tourism would do."  And tourism didn't
4    want to do it, because I heard that from James Meacham
5    himself.  He didn't think it was worth it.  We had
6    that conversation.
7             So somebody's agenda -- I don't know who it
8    was, and Lane was enforcing this agenda to get this
9    CRC designation.  I was even threatened by Zack in a
10   letter, in an email, which you do have, that said if I
11   don't get it done by June of -- I can't remember if
12   that was 2019 or 2020 now -- well, I was still here,
13   so it was 2019.  Then I was going to be fired.
14            And I had to beg and plead and basically
15   say, "I have to say no.  I cannot not say no at this
16   point."  We had budget.  We had annual assessment due
17   for the Main Street program, which was a big
18   assessment.  I said, "However, I can get it done by
19   the due date on the application, which is July 30th."
20            I spoke and talked with the staff person at
21   the State who takes the applications.  He said, "Look,
22   I'm not going to give them to them until after August
23   1st.  So July 31st, August 1st, you just" -- and there
24   was -- I don't know why that -- I do know why.
25            It was because of budget or whatever.  But I

02-22-23          Hairgrove v. City of Salisbury          COPY

1          Q.    After you worked here at DSI in Salisbury,

2    you went to work for the Lexington -- tell me again,

3    Lexington ---

4          A.    **Tourism Authority.**

5          Q.    Tourism Authority.

6          A.    **Uh-huh (yes).**

7          Q.    So let's just call it LTA ---

8          A.    **LTA.  That'll be fine.**

9          Q.    And you worked there until August of '21.

10   Is that correct?

11         A.    **Correct.**

12         Q.    And as part of the claim in this case, you

13   have made a claim that you were retaliated against by

14   Salisbury, which led to your term -- led to the

15   termination of your employment at LTA.  Is that

16   accurate?

17         A.    **Yes.**

18         Q.    All right.  Who was your supervisor at LTA?

19         A.    **Robin Bivens.**

20         Q.    And in April of 2021, did you and Ms. Bivens

21   have a conversation about your claim against the City

22   of Salisbury and DSI?

23         A.    **I believe that was around April.**

24         Q.    Okay.  And in April of '21, did you tell

25   Ms. Bivens that you had filed a claim with the EOC in

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 20 of 112

1    August of 2020, claiming discrimination in the

2    workplace?

3        A.    Yes, I'm sure I did.

4        Q.    Why did you decide to tell Ms. Bivens about

5    that?

6        A.    Because when I came in from -- I think it

7    was, lunch, it was -- this was the day after returning

8    to work.  I took a day off the day before for our

9    media -- our first mediation in this case, with EEOC,

10   mediation.  I came back from lunch and the other staff

11   person wasn't there and Robin wanted to have a serious

12   conversation and she looked very worried and upset.

13   And she said she had received a phone call.  And she

14   would not tell me who.  She didn't remember when I

15   asked.  That I was suing the City of Salisbury.

16           Which, at that point, I said, "That's

17   misinformation because I haven't decided that yet.  We

18   simply had mediation."  She knew there was something,

19   I think, happening, but we really didn't -- we talked

20   -- we had, like, maybe one conversation about it and

21   she just really didn't want to know any more.  But

22   then when this call came in, it concerned her because

23   she said it came from another -- she told me a tourism

24   colleague.

25       Q.    Okay.  So let me back up just a second.  So

1    prior to this conversation in April that you had where

2    she said a tourism colleague had called, you had

3    already had some conversation with Ms. Bivens about

4    the char -- about the EEOC claim?

5        A.    Not really about what it was.

6        Q.    You made her aware that you had filed one?

7        A.    So I -- I do remember, you know -- I don't

8    know what day it was or when exactly it was, but I do

9    remember, you know, stepping to her office door and

10   saying, "You know, I feel like I need to tell you kind

11   of what's going on."  I didn't give her a lot of

12   details and -- and she didn't ask.  But then after

13   this phone call, it seemed like the sky was falling.

14       Q.    All right.  So prior to April of 20 -- just

15   to be clear.  Prior to April of 2021, you had had a

16   conversation with Ms. Bivens about the fact that you

17   had filed an EEOC charge.  But it wasn't until April

18   of 2021 that you had a conversation with her where she

19   said a fellow colleague ---

20       A.    Colleague ---

21       Q.    --- had told her of a lawsuit?  Did she say,

22   "lawsuit"?

23       A.    Yes.

24       Q.    Okay.  And you hadn't filed a lawsuit at

25   that point?

Case 1:21-cv-00814-CCE-JLW  Document 42-7  Filed 04/04/23  Page 22 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

```
1        A.    Huh-uh (no).

2        Q.    Correct?

3        A.    Correct.

4        Q.    Okay.

5        A.    That's what I recall.  And -- and I don't

6    know exactly when we had that first kind of short

7    conversation.

8        Q.    Did you tell Ms. Bivens that you were

9    looking to recover your loss of income between the

10   time that you resigned from the City of Salisbury

11   until you took the job at the Lexington -- at LTA?

12       A.    No, I don't think we had anything of that

13   detail.

14       Q.    What other conversation did you have with

15   her on that day?

16       A.    We had -- I explained to her what EEOC was

17   and what it did.  And seems like it was -- it was

18   mainly around that premise, I mean, other than work

19   that we were talking about.

20                     (DEFENDANT'S EXHIBIT

21                      NUMBER 3 WAS MARKED

22                      FOR IDENTIFICATION)

23       Q.    (Mr. Flanagan)  Let me -- have what's marked

24   Exhibit 3, I think.  I'm handing you --

25                     MR. FLANAGAN:  -- sorry, I'll stop
```

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 23 of 112

**Chaplin & Associates**
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

```
 1    talking for a minute.

 2         Q.   (Mr. Flanagan)  Let me hand you what's been

 3    marked Exhibit 3.

 4                   MR. FLANAGAN:  And I'm sorry, Valerie,

 5    I don't have another copy of this, but this is the

 6    letter, the hiring letter.

 7         Q.   (Mr. Flanagan)  All right.  And let me just

 8    ask you -- and I don't even have a copy for myself, is

 9    that the -- sorry.  Is that a letter dated October

10    22nd, 2020?

11         A.   Yes.

12         Q.   And it's a two-page document actually.  And

13    is that your signature on the second page ---

14         A.   Yes.

15         Q.   --- dated October 23rd, 2020.  Is that the

16    offer letter from LTA?

17         A.   It looks like it, yes.

18         Q.   All right.

19                        (DEFENDANT'S EXHIBIT

20                         NUMBER 4 WAS MARKED

21                         FOR IDENTIFICATION)

22         Q.   (Mr. Flanagan)  And let me hand you what's

23    been marked as Exhibit 4 and ask you if that is the

24    termination letter from LTA.

25         A.   Yes.
```

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1        Q.    And that was dated August 26th ---

2        A.    Uh-huh (yes).

3        Q.    --- 2021, correct?

4        A.    Correct.

5        Q.    And the -- prior to your termination in

6    August of 2021, LTA began the process of hiring a new

7    executive director, correct?

8        A.    Correct.

9        Q.    And Ms. Bivens was leaving?

10       A.    Yes.

11       Q.    All right.  And did they do an application

12   process for the executive director position?

13       A.    Yes.

14       Q.    And did you fill out an application and

15   apply for the position?

16       A.    Yes, I did.

17       Q.    And did you receive an interview for the

18   position?

19       A.    No, I did not.

20       Q.    And you did not receive the -- an offer for

21   that job.  Is that correct?

22       A.    That's correct.

23       Q.    And as part of the process in hiring a new

24   executive director, the LTA -- the LTA eliminated your

25   former position, correct?

1     A.    Yes.

2     Q.    And it was no longer funded.  Is that right?

3     A.    Correct.  I have one other work position I

4  can tell you about in between Kernersville and the

5  Lexington Chamber and getting back into real estate.

6          I worked for the Greensboro Convention &

7  Visitors Bureau.  And I was a national sales

8  representative and I traveled calling on educational

9  associations to come to Greensboro.  So I basically

10  sold Greensboro all the hotel spaces and such.  So I

11  was very familiar with that other than the tourism

12  that is involved with downtown development and

13  marketing.

14     Q.    I'm sorry.  Was that in between Kernersville

15  and Wilson or before Kernersville?

16     A.    That was right before Kernersville.

17     Q.    Okay.  And why did you leave Kernersville?

18     A.    Because the funding was cut.  They were

19  cutting across the board there at the Town.

20                    (DEFENDANT'S EXHIBIT

21                     NUMBER 5 WAS MARKED

22                     FOR IDENTIFICATION)

23     Q.    (Mr. Flanagan)  Let me show you what I've

24  marked as Exhibit 5.  And I'll represent that...

25  (Off-record comments)

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 26 of 112


1    things to do, that I had -- it was either two or

2    three.  I think it was three.

3            It was like, "Get the Empire Hotel done,"

4    which, you know, that's almost an impossible task

5    because I came into that contract without having

6    vetted the developer or anything.

7            But this is what he -- I reminded him, he

8    told me one of my very first days, "Get the Empire

9    deal done -- the Empire Hotel project redeveloped,

10   make the" -- I don't know if he said it exactly this

11   way, but, "Make the most voice -- vocal -- the most

12   vocal business owners happy."  And those are the two I

13   remember.  I don't remember what the third one was

14   right now.

15       Q.   All right.

16       A.   So I reminded him of that, and we talked

17   about the issues I'd been going through and how I felt

18   like I'd had no support.  And I'm pretty sure that

19   meeting was on Friday because I think I remember

20   seeing Ruth sitting there and taking this all in.

21           And I said, "You know, I have felt that city

22   management has not stood up and supported me.  They

23   have kind of allowed this to happen.  They've allowed

24   too much input from a volunteer board who are not

25   educated in the ways of this type of structure."

```
 1              Not even Diane Young, who had been a former
 2    nonprofit director for Main Street Programs, had never
 3    been a city staff person.  And she admitted that in
 4    one of our organization meetings.  So we went through
 5    all of the issues, and I, you know, probably voiced my
 6    disappointment.
 7         Q.   Those issues being some of the ones we've
 8    already talked about today ---
 9         A.   Uh-huh (yes).
10         Q.   --- correct?
11         A.   Right.
12         Q.   All right.  So you voice your
13    disappointment, Ruth was there.  Did Ruth say anything
14    during this meeting?
15         A.   I don't remember Ruth saying anything.
16         Q.   But did Lane say anything else to you, or
17    you say anything else to him, other than what you've
18    described that you recall?
19         A.   He said something about -- and I never
20    understood this.  And I hate that I didn't take the
21    time to ask.  Something about, "You can only -- you
22    can't control how people treat you.  You can only
23    control what -- how you react to how people treat
24    you," or something like that, which was very confusing
25    to me.
```

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 28 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1     A.   Uh-huh (yes).

2     Q.   All right.

3                    (DEPOSITION EXHIBIT

4                    NUMBER 6 WAS MARKED

5                    FOR IDENTIFICATION)

6     Q.   (Mr. Flanagan)  And I've handed you what's

7  been marked as Exhibit 6.

8     A.   6.

9     Q.   Did you receive this letter dated June 22nd,

10 2020 at that Monday meeting?

11    A.   Yes.

12    Q.   All right.  The last page is Page 3.  Is

13 that your signature there?

14    A.   Yes.

15    Q.   And it's dated June 22nd, 2020?

16    A.   Uh-huh (yes).

17    Q.   All right.  And looking at that last page,

18 it indicates that the pre-dismissal conference will be

19 held on June 24th, 2020 at 8:30 a.m. in the human

20 resources department, correct?

21    A.   Correct.

22    Q.   And other than handing you this letter, was

23 there any other -- was there any conversation between

24 you and Lane or Souwan?

25    A.   Trying to remember.  I don't remember

1    anything significant.  I remember turning in my badge,

2    having to turn my badge in right then.  I think -- I

3    mean, we -- I read it, and I don't remember any

4    details of what we talked about.

5         Q.   Okay.  When you say you turned in your

6    badge, what do you mean by that?

7         A.   So our Keyscan building badges.  I had to

8    give that to him, and I believe he said, "Don't go

9    back to your" -- yes.  He said that.  He did say that

10   because I didn't get a chance to pack up my office.

11   Somebody else did that for me.

12        Q.   At this point, did he place you on, like,

13   administrative suspension?

14        A.   Yes.

15        Q.   All right.  And with pay, right?

16        A.   That was with pay, yeah.

17        Q.   And you said you don't -- you don't remember

18   about -- about the conversation, if you had one, with

19   Lane?

20        A.   I mean, we were in the same room.  I'm sure

21   we did.  I don't ---

22        Q.   You just don't ---

23        A.   --- remember details.

24        Q.   That's fair.

25        A.   I'm sure I probably had questions.  I'm a

Case 1:21-cv-00814-CCE-JLW  Document 42-7  Filed 04/04/23  Page 30 of 112

1    questioner, so I may have -- you know, but I don't

2    remember anything significant.

3         Q.   Okay.  And then the next day, June 23rd,

4    2020, is when you sent in your resignation letter,

5    correct?

6         A.   I did.

7         Q.   All right.  And did you email that to Lane

8    and to Ruth?

9         A.   Yes, I believe so.  Let's see.  Yes.

10        Q.   On the -- on the letter, it just says, "City

11   Manager," and then it has his email address.  And same

12   for Ruth?

13        A.   Yes.  I'm pretty sure I emailed that,

14   though.

15        Q.   Did you have any discussions with anybody

16   between June 22nd and June 23rd regarding your

17   employment or any issues that were going on there?

18        A.   I'm sure I talked to my husband, my mother.

19        Q.   Yeah.  Let me -- let me clarify that a

20   little bit.  Did you have any conversations with

21   anybody at either DSI, meaning a board member, your

22   staff, or any employees of the City of Salisbury?

23        A.   I don't remember.

24        Q.   And -- but in any event, prior to the pre-

25   dismissal conference on June -- that was scheduled for

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 31 of 112



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    June 25th, you -- you sent in your resignation, so

2    that conference never occurred, right?

3        A.    Correct.  Because I felt like there was no

4    reason to go.  This -- the -- it was all out there on

5    the table, it seemed like.  It was -- I was not -- I

6    didn't feel I was going to get a fair review, even

7    though I do believe Lane said, maybe on that Monday

8    was a -- whenever I asked a question, maybe.

9              I don't -- in that discussion, he may have

10   said, you know, "This is your chance to go over

11   anything" -- well, no.  I don't know if he said that

12   or not.  I may be thinking about whenever I had a

13   discussion with my staff person a month earlier about

14   how -- a pre-dismissal hearing.

15             But he may have said, "It's your chance to,

16   you know, give your side of the -- you know, the

17   case," or whatever -- however he put it.  And I was

18   aware of that because like I said, I had just gone

19   through it, like, a month earlier with a staff person

20   that I supervised maybe a month or two -- month, two.

21       Q.    One of the allegations in your Complaint is

22   that on June 19th of 2020, which would have been the

23   day of the first -- that Friday meeting, that you made

24   a determination that you were -- you were going to ask

25   for family and medical leave in order to cope with the

1      A.    Uh-huh (yes).

2      Q.    --- B-o-g-l-e.  What information do you

3  believe he would have related to this -- your claims

4  in this lawsuit?

5      A.    Related to my claims?

6      Q.    Yeah.

7      A.    Well, he was -- Pete's a local architect who

8  has been a presenter at Main Street Conferences, and

9  he has worked with developers on redeveloping a lot of

10 downtown buildings.  He was on the board when I was

11 hired.  He had been a board member, I think, for quite

12 a while.

13            He may have had -- that may have -- I'm

14 thinking may have been his second term -- or stint.

15 There were three-year terms -- or three -- I'm going

16 back in my memory bank now.  Two-year terms, you could

17 have up to three.

18            So six, and then take a year off and come

19 back.  So he had knowledge before the new structure.

20 I don't know if he was part of the conversations when

21 the new structure was coming about.

22     Q.    Also in your Discovery, we had asked what

23 your reason for leaving Lexington Tourism and Visitor

24 Center, the LTA, I guess, is what we're calling it.

25     A.    Uh-huh (yes).

```
1        Q.    And you talked about the unknown source that
2   apparently called the director.  To this day, you
3   still don't know who that is, other than a colleague
4   in the -- a tourism colleague, right?
5        A.    Oh, no.  I know who it is now.
6        Q.    Oh, who is it?
7        A.    Rebekah McGee.
8        Q.    Rebekah McGee?
9        A.    Yes.  And that's ---
10       Q.    And who is -- who's Rebekah?
11       A.    --- R-e-b-e-k-a-h, McGee, M-c-G-e-e.  She
12   was, at the time that she called, former Uptown
13   Lexington director.  And at that time, I believe she
14   was the Asheboro downtown director.
15       Q.    Okay.  And how do you know it was Rebekah
16   McGee that called Ms. Bivens?
17       A.    I was there for Ms. Bivens's deposition,
18   where she named her.
19       Q.    That's the only way that you ---
20       A.    Yes.
21       Q.    --- became aware of it?  Okay.
22       A.    Yes.
23       Q.    And do you know how Ms. McGee became aware
24   of your EEOC claim -- or charge?
25       A.    I don't.
```

Case 1:21-cv-00814-CCE-JLW  Document 42-7  Filed 04/04/23  Page 34 of 112

1        A.    Yeah, there's more to that.

2        Q.    I just want to have a preliminary

3    understanding of your claim.  So let's look at the

4    Compliant and the Exhibit 1 point -- or 1-1.  You have

5    that in front of you?

6        A.    Yes.

7        Q.    And then the Complaint, it refers to this as

8    Exhibit A, but -- you know, it says ---

9        A.    Okay.

10       Q.    --- 1.1 down at the bottom, but that doesn't

11   matter.  So tell me -- the first three pages of this

12   appear to me to be a description of the Downtown

13   Development director position that you applied for.

14   Is that a fair statement?

15       A.    Correct.  Yes.

16       Q.    Okay.  And -- and then the fourth page is a

17   -- well, let me just -- is that the offer letter that

18   was sent to you by the City of Salisbury?

19       A.    Yes.

20       Q.    And that's dated August 28th, 2017?

21       A.    Yes.

22       Q.    Okay.  And you -- it looks like on the

23   second page of this, you signed it and dated it August

24   28, 2017?

25       A.    Yes.

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    Q.   Okay.  And above your signature, it said

2 that you accepted the terms of the employment offer

3 outlined above in the letter dated August 28, 2017?

4    A.   Yes.

5    Q.   Okay.  And so you read the offer letter

6 before you signed it?

7    A.   Uh-huh (yes).

8    Q.   Okay.  And did you see in the -- in the very

9 first introductory paragraph, before the numbered

10 paragraphs, that it says in the second line, "As we

11 discussed, I feel you would be an asset to the City of

12 Salisbury as a Downtown Development Director, which is

13 a salary/exempt position."

14        Have I read that correctly?

15    A.   Yes.

16    Q.   Was that your understanding when you

17 accepted the Downtown Development director position?

18    A.   Yes.

19    Q.   Okay.  And the -- in Item Number 1, it says

20 that you will be paid annually $75,000.12 per year.

21 Is that correct?

22    A.   Correct.

23    Q.   Okay.  And in the previous testimony, when

24 Mr. Flanagan was asking you questions, it sounds like

25 when you left the City, you were at about $80,000 a

1    year?

2         A.    In Wilson.

3         Q.    No -- no, in Salisbury.

4         A.    Oh, when I left here?

5         Q.    Yeah.

6         A.    Yes.

7         Q.    Okay.

8         A.    Yes.

9         Q.    So you did get some increases while you were

10   working for Salisbury?

11        A.    Yes.

12        Q.    Okay.  And let's see.  I'm trying to see if

13   there's anything else in this exhibit I want to ask

14   you about.  Okay.  So don't put this too far away

15   because I'm going to have some other questions for

16   you ---

17        A.    Okay.

18        Q.    --- but I want to show you another exhibit.

19                    (DEPOSITION EXHIBIT

20                    NUMBER 8 WAS MARKED

21                    FOR IDENTIFICATION)

22        Q.    (Mr. Adams)  Okay.  So I've handed you

23   what's been marked Exhibit 8, and at the top, there's

24   a letterhead that says, "City of Salisbury Statement

25   of Understanding."

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 37 of 112

1            Do you see that?

2       A.   Yes.

3       Q.   Do you recognize this document?

4       A.   **Yes, because I signed it.**

5       Q.   Okay.  And is this just -- is this a

6  document you received from the City of Salisbury upon

7  the commencement of your employment?

8       A.   Yes.

9       Q.   Okay.  And is that your signature that's at

10 the bottom of the page?

11      A.   Yes.

12      Q.   Okay.  And among the -- did you understand

13 that you were agreeing to each of the statements that

14 are listed in that document?

15      **A.   I was, and I believe that is my underline.**

16 **I underlined the FLSA status of my position and**

17 **overtime policy because I believe I may have needed**

18 **more information on what the FLSA status was.**

19      Q.   Okay.  So when you -- the -- the offer

20 letter that we just looked at a second ago that's on

21 the -- in the Complaint, it referred to your position

22 as a salaried/exempt ---

23      **A.   Yes.**

24      Q.   --- position.  You -- you signed that offer

25 letter.  At the time that you signed your offer

Case 1:21-cv-00814-CCE-JLW  Document 42-7  Filed 04/04/23  Page 38 of 112

1    letter, did you express to anyone that you did not

2    understand what that meant, that it was a

3    salaried/exempt position?

4        A.    The -- I understood what salary/exempt meant

5    according to how I was employed in Wilson, North

6    Carolina.   I assumed it's the same state.

7        Q.    Okay.  So when you worked in Wilson, you

8    received an annual salary, right?

9        A.    Yes.

10       Q.    And then -- and you, also in Wilson, did not

11   receive overtime pay if you worked more than 40 hours

12   in a workweek, correct?

13       A.    Right.  It was a very flexible schedule,

14   which I was promised here as well.

15       Q.    Okay.  Well, let me ask you this.   In

16   Wilson, did you ever work more than 40 hours in a

17   workweek?

18       A.    I -- I know I did sometimes.

19       Q.    Okay.  Did you ever request from the City of

20   Wilson that you be paid overtime for those hours?

21       A.    No, because my direct supervisor would allow

22   us to flex our time and have some time off.  They

23   couldn't, I guess, do -- they couldn't do overtime

24   pay, but we had that flexible schedule for when we

25   weren't in -- could have time off.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 39 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    one.  One hour to one hour, or whatever -- however

2    many hours.  But we really never -- we worked very

3    well and very closely together, and that was never

4    really an issue as I know in our whole department, and

5    we were part of the planning department.

6        Q.   And that -- just out of curiosity, the

7    employee who had some issue with the way that time was

8    being tracked is what I thought I heard you

9    referencing.  Did that employee bring a claim against

10   the City of Wilson for that ---

11       A.   No.

12       Q.   --- to your knowledge?  Okay.

13       A.   But I think she just stopped turning them

14   in, and she was able to keep her job.

15       Q.   Oh, okay.  Okay.

16       A.   She came from the private industry --

17   private sector.

18       Q.   Okay.  All right.  And so going back to

19   Exhibit 8, the Statement of Understanding.  So you --

20   you signed this document that said, "I have been told

21   the FLSA status of my position, and I understand the

22   overtime policy as it relates to me."

23            Is that correct?

24       A.   I signed that, and I thought I understood it

25   at the time.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 40 of 112



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    Q.   So at the time that you signed at document,

2  what was your understanding?

3    A.   Well, other than the, you know, statements

4  that are there, and I was salary and exempt, there was

5  a conversation with Zack about being able to flex

6  time, and that would not be a problem.

7         And if I, you know, worked over, I could,

8  you know, work it out with him, or I could, you know,

9  make up -- have that time off.  Unfortunately, I never

10  had time to have time off because there was just so

11  much required of me.

12    Q.   Who -- who is the person who gave you this

13  Statement of Understanding?  Was that Zack?

14    A.   I do not remember.  It could have been HR.

15  I don't know.

16    Q.   Was there -- when you first started your job

17  with Salisbury, did you sit down with someone from HR

18  who went over each of these items in this Statement of

19  Understanding before you signed it?

20    A.   I'm sure I did.  I'm sure it was someone in

21  the HR, and I don't know who it was.

22    Q.   And -- but ---

23    A.   I don't remember.

24    Q.   --- is it -- going back to that -- that item

25  that you underlined, at the time that you signed that

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 41 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    document, you understood that you would not be paid

2    overtime if you worked more than 40 hours in a week?

3         A.    Yes.

4         Q.    Okay.

5              MR. ADAMS:  So let's go to another

6    document.  Making sure I've got myself in order here.

7    Okay.

8                   (DEPOSITION EXHIBIT

9                    NUMBER 9 WAS MARKED

10                   FOR IDENTIFICATION)

11        Q.    (Mr. Adams)  All right.  So I've handed you

12   what's been marked as Exhibit Number 9, and do you

13   recognize that document?

14        A.    I sure do.

15        Q.    Okay.  And what is that?

16        A.    It's my resume that I created.

17        Q.    Okay.  And is this -- would this have been

18   the resume that you submitted to the City of Salisbury

19   when you applied for the position here, the ---

20        A.    Yes.

21        Q.    --- DSI director?

22        A.    Yes.

23        Q.    Okay.  All right.  And when you prepared

24   this resume, Exhibit Number 9, did you make sure that

25   you accurately described your previous work

Case 1:21-cv-00814-CCE-JLW  Document 42-7  Filed 04/04/23  Page 42 of 112

1    for DSI in the City of Salisbury?

2        A.    Yes.

3        Q.    Okay.  And before you submitted that to the

4    City of Lexington, did you make sure that you had

5    accurately described your work for the City of

6    Salisbury?

7        A.    Yes.

8        Q.    Okay.

9              MR. ADAMS:  Let me hand you what I'm

10   going to mark as Exhibit 10.

11                    (DEPOSITION EXHIBIT

12                    NUMBER 10 WAS MARKED

13                    FOR IDENTIFICATION)

14       Q.    (Mr. Adams)  Okay.  I've handed you what's

15   been marked as Exhibit Number 10.  Do you recognize

16   that document?

17       A.    Yes, sir.

18       Q.    Okay.  And is that the resume that you

19   submitted to the City of Lexington?

20       A.    To the Lexington Tourism Authority, yes.

21       Q.    Okay.  All right.  And so looking at the

22   description of your position here in Salisbury, is

23   that an accurate description of what you did?

24       A.    I believe so.

25       Q.    Or of your job duties?  Okay.  And so the --

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 43 of 112

1   in the first item, "Salary," it references $80,000.

2   That would have been your salary, I guess, at the end

3   when you resigned?

4         A.    (Nods head up and down)

5         Q.    Okay.

6         A.    Right.

7         Q.    And then you were in charge of a budget of

8   $347,000.  Is that correct?

9         A.    Correct.

10        Q.    Okay.  And four items down, do you see the

11  word "built"?

12        A.    Yes.

13        Q.    Okay.  You "Built -- built new department

14  and merged economic development duties through new,

15  quasi-governmental structure"?

16        A.    Yes.

17        Q.    And is that accurate?

18        A.    Yes.

19        Q.    Okay.  And then the next item is that you

20  managed two full-time staff members, events and

21  marketing coordinator and admin, plus 21-member board.

22  Is that accurate?

23        A.    Yes.

24        Q.    The -- the two full-time staff members that

25  you supervised were Latoya -- Latoya Price was one of

1    them, right?

2        A.    Correct.

3        Q.    She was the events and marketing

4    coordinator?

5        A.    Yes.

6        Q.    And -- and who was the admin?

7        A.    Candice Brown.

8        Q.    Okay.  Okay.  And -- okay.  How long -- so

9    Candice Brown, how long -- do you remember what years

10   she worked there?

11       A.    Yes.

12       Q.    So what ---

13       A.    She came from another city department, from

14   the customer service department of the City, and

15   started with me October 2018.

16       Q.    Okay.

17       A.    And then April 2020, thereabouts, April or

18   May, she -- I think she ended up signing a -- a letter

19   of resignation.

20       Q.    Okay.  And then -- and did -- did you hire

21   Candice?

22       A.    Sort of.  I was given a pool of candidates I

23   was told to choose from.  And Candice was probably my

24   third or fourth choice, but the others either got

25   promotions within their own departments or found a job

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 45 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    outside the City.

2            And I felt like she had the personality for

3    everything that we needed her to do and then what

4    Kelly Baker wanted her to do, which was work the front

5    lobby of the -- of City Hall in addition.

6        Q.   Right.  And I remember you testifying ---

7        A.   Yes.

8        Q.   --- about that earlier.  So did you -- so

9    during the process of hiring her, did she -- did she

10   submit an application?

11       A.   You know, I know I got resumes, and we had

12   interviews.  I don't remember if there was any type of

13   application.

14       Q.   Okay.  And that's fine.  So -- but you do

15   recall seeing her resume?  You reviewed it?

16       A.   I think I did.  That was a long time.

17       Q.   Sure.

18       A.   And I -- I had something.  There was

19   something I was able to look at and evaluate ---

20       Q.   Right.

21       A.   --- between the candidates.

22       Q.   Okay.  And then you -- and then you said

23   that there were interviews that were -- you were

24   involved in the interview process?

25       A.   Yes.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 46 of 112

1       Q.    Okay.  And then was the process similar with

2  Latoya when she was brought on?

3       A.    With Latoya I actually did get to advertise

4  outside of the City, and advertise period.  And we

5  were able to get candidates, you know, by posting in

6  different LISTSERVs and associations.

7             The unfortunate thing there is that Zack

8  Kyle would not let me advertise for what I really

9  needed, which was a marketing person who -- marketing

10 PR, and that knew how to run events, not an event

11 coordinator that didn't know marketing.

12      Q.    Right.

13      A.    But he had -- he told me he had -- didn't

14 have any classifications in the City for that.  I

15 think I spoke -- either he told me or someone told me

16 later that he took a long time while he was first here

17 with the City or when was in HR.

18            He was the HR director before he was

19 assistant city manager.  And he -- I guess there were

20 a lot of classifications.  And he took, like, a whole

21 lot of time, and it was very important for him to

22 scale those classifications down.

23      Q.    And I'm sorry to interrupt, but by

24 classifications are you talking about, like, pay

25 grades ---

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 47 of 112

1       A.    Yes.

2       Q.    --- like, the numbered pay grades for

3    different positions?

4       A.    Yes.

5       Q.    Okay.

6       A.    And so I -- there was no marketing or PR ---

7       Q.    Right.

8       A.    --- person, you know, category ---

9       Q.    Right.

10      A.    --- of job.

11      Q.    So did you -- so did you prepare the posting

12   that was -- that went out to solicit applications?

13      A.    I did.  I think I was given some basic

14   information that I was able to tweak to add the

15   marketing in there.

16      Q.    Okay.  Do you -- do you recall, were the --

17   the interested potential applicants to contact you or

18   somebody else, or ---

19      A.    HR.

20      Q.    Okay.

21      A.    I'm -- I'm pretty sure they were told, yeah,

22   to contact HR.

23      Q.    Okay.  And so Latoya, when she was part of,

24   I guess, a prospective applicant pool, how -- how many

25   people were you all considering?

```
 1        A.    We had quite a few, like, maybe 20, if I'm
 2   remembering correctly, applications I think.  It was
 3   -- it was quite a few.  You know, some were not at all
 4   applicable.
 5        Q.    Right.
 6        A.    And then ---
 7        Q.    So you saw ---
 8        A.    --- we had interviews ---
 9        Q.    So you saw -- so let's just assume ---
10        A.    Yes.
11        Q.    --- if there were 20 applicants, you were
12   able to go through and -- and if -- like, if you saw
13   one that didn't have the requisite qualifications
14   you'd say, "Okay, this is not somebody that we're
15   going to pursue"?
16        A.    I'm pretty sure I got to see -- I think I
17   got to see all of them.
18        Q.    Okay.
19        A.    I'm pretty sure.  Yeah.  I had ---
20        Q.    And then did you -- what was the objective,
21   to come up with a -- like, a limited number -- like,
22   four people that might be good or -- or ---
23        A.    Yes.
24        Q.    Okay.
25        A.    And then conduct interviews.
```

1      Q.   Okay.  And you -- you agreed with the top

2   four, or whatever the number was, candidates that were

3   to be interviewed?

4      A.   Yes.

5      Q.   And then in the interview process, you --

6   you interviewed the candidates?

7      A.   Yes.

8      Q.   Okay.  And then -- and then how was Latoya

9   selected among that group?

10     A.   So we had a panel of interviewers, some DSI

11  board members and City staff.  We -- it seems like

12  there were a couple rounds of interviews, and there

13  were some tough choices at the, you know, top level.

14          But Latoya -- and I had mentioned this

15  earlier in this deposition, and I'm -- I'm not

16  discrediting, you know, her experience at all.  She

17  had a master's degree, and she was used to planning

18  events.

19          I felt like she had some social media skills

20  that could be partnered with other organizations we

21  were working with for marketing and a good personality

22  and kind of a go-getter ---

23     Q.   Right.

24     A.   --- type attitude.  But I did mention

25  earlier that I think what put her at the cream of the

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 50 of 112

1    crop for me in my eyes was that -- and maybe this is

2    not fair, but I couldn't go any longer without help.

3              I'd gone five months without any staff, and

4    she knew all the Parks & Rec staff members and had

5    gone to graduate school with the Parks & Rec director.

6    We were all in the same building.

7              Because of the struggles and troubles we had

8    had prior to my being hired with Parks & Rec wanting

9    to help DSI, I thought, "Well, this will be great.

10   This will solve that issue.  That'll solve that

11   problem because they actually already know each other

12   and they really like each other, and they're going to

13   work well together."

14        Q.    Right.

15        A.    "They're excited about working well

16   together."

17        Q.    So you -- so Latoya was your choice?  I

18   mean, she was your top choice for that position?

19        A.    Yes.

20        Q.    Who else was on that interview group?

21        A.    So Whitney Williams, Nick Aceves, who was

22   with Parks & Rec.  I believe maybe Vivian Koontz.

23   There may have been two or three Parks & Rec staff

24   people.  Goodness.  I'm sure there were some other

25   DSI.  Maybe -- maybe Greg Shields or -- there were

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 51 of 112

1    some other DSI, I think, folks besides Whitney.

2        Q.    Other than Latoya and Candice, did -- during

3    your tenure as the DSI director, did you hire other

4    staff too?

5        A.    Not hire.  We had volunteers.  We had

6    interns.

7        Q.    How were interns brought on?

8        A.    I was forced to take interns.  So because of

9    -- I don't know if it was HR or the Salisbury way --

10   sway, they call it, internal -- working with, you

11   know, the community.  I don't know why, but I was told

12   I needed to take an intern.

13       Q.    Okay.

14       A.    Even though I was -- the first intern was --

15   worked out perfectly because she did a lot for an

16   intern in between Katelin leaving in, like, May or

17   June of 2018 and me finally getting two full-time

18   staff people in October 2018.

19       Q.    So who was that intern?

20       A.    Jordan Ferguson.

21       Q.    Okay.

22       A.    I think it's with a U.

23       Q.    And -- and was -- was Jordan Ferguson

24   selected by HR of the City, and they would just say,

25   "This is your intern," or did you say, "Here's several

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 52 of 112

1   interns, I want Jordan Ferguson"?

2       A.   They came to me with -- I don't know if

3   there was more than just Jordan or if it was just

4   Jordan.  But they came to me and said, "We think

5   she'll be a good fit."

6            And then actually, my -- who is now my

7   husband, my fiancé at the time, knew her father, were

8   good friends of the family stuff.  So I feel like --

9   and she's just a wonderful young lady anyway, and she

10  was in a master's graduate ---

11      Q.   Right.

12      A.   --- program.  So not, like, a high school

13  intern.

14      Q.   Right.

15      A.   And she was in town for, like, the summer,

16  and so that worked out ---

17      Q.   So was that ---

18      A.   --- very well.

19      Q.   --- a summer internship?  Is that pretty

20  much what that was, or...

21      A.   A little bit -- it went into -- a little bit

22  into the fall.

23      Q.   Okay.

24      A.   Because I needed help and I was able to get

25  her college credit if she helped me with some reports

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 53 of 112


1    or something, that it worked for both of us.

2        Q.   And so after Jordan, were there other

3    interns during your employment?

4        A.   Yes.  I really didn't work with them much.

5    It was -- I don't remember if it was 2019 or 2020, but

6    Latoya and Candice were mainly working with them on

7    helping with, like, events.  I think they were high

8    school students.

9             And we had -- I said, "Look, I can't take

10   any more right now.  I mean, really.  We've got a lot,

11   and that would be an extra person to have to teach

12   things to."  Because, you know, there was a cycle

13   where Candice and Latoya had no idea, neither one of

14   them, about Main Street.  And that ---

15       Q.   Right.

16       A.   --- was something I was looking for in

17   Latoya's position, was someone with Main Street

18   education and experience along with the marketing PR

19   kind of business relations.  So we had one or two, I

20   think, but they were more -- shorter periods of time.

21       Q.   Right.  And were you involved in picking who

22   the interns were, or they were just available ---

23       A.   No.

24       Q.   Okay.  And then with -- with Latoya and

25   Candice, when they -- when they were first hired, you

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 54 of 112

1    had just mentioned that they, you know, weren't

2    familiar with this type of ---

3        A.    Yeah.

4        Q.    --- of structure.  So were you -- did you

5    train them so that they'd understand better how to do

6    their job?

7        A.    Oh, yes.

8        Q.    Okay.

9        A.    We sat down with manuals and website, and,

10   you know, I had to have them take some time to read

11   about what this is we really do, and then -- and then

12   they had a lot of hands-on training right away.

13       Q.    Sure.  Sure.  And so during the course of

14   their employment, did you -- did you do evaluations

15   for them?

16       A.    Yes.

17       Q.    Okay.  Were they written or verbal or both?

18       A.    Both, but we did have written evaluations

19   once we had an actual, official EPR tool that I

20   mentioned earlier, the employee performance review

21   tool.

22       Q.    Okay.

23       A.    That took months for management team to

24   decide upon because they were -- as soon as I came in,

25   they were -- it was like they started changing for

1   whatever reason.  I don't know if they had issues with

2   the last form, but it was multiple meetings for

3   several months just about the EPR tool.

4        Q.   Okay.

5        A.   So ---

6        Q.   And -- and when you refer to the management

7   team, who exactly is that?

8        A.   So that's all the department heads,

9   including HR director ---

10       Q.   Okay.

11       A.   --- Lane and Zack and Graham.

12       Q.   Okay.  And it's the department heads of all

13  departments in the City?

14       A.   Yes.

15       Q.   Okay.  Okay.  And then -- and you were there

16  as the head of the DSI?

17       A.   Well, yes.  In the beginning, it was called

18  DSI, and then I had to get permission, and Zack wanted

19  me to ask the planning director if it was okay with

20  her if I called it the Downtown Development

21  Department ---

22       Q.   Right.

23       A.   --- which is what it is, because it was very

24  confusing for the public.  And everyone, city staff,

25  DSI members, everyone asked who -- you know, what DSI

1    was.   Were they absorbed?

2             And I'm like, "No, they're not absorbed."

3    So we all had that education.   We had to say, "This

4    was -- you know, they still are a nonprofit, and we

5    work arm in arm as a public-private partnership with

6    the Downtown Development Department."

7         Q.   Okay.   Okay.

8         A.   Yeah.

9         Q.   And were you -- so you were -- you were

10   executive director of DSI.   And were you also the

11   Downtown Development director?

12        A.   Yes.

13        Q.   Okay.   Okay.   During the time that Latoya

14   and Candice were working for you, did you ever have to

15   discipline them or, like, verbally counsel them about

16   performance issues or conduct issues?

17        A.   I did have to verbally counsel, you know,

18   the evaluations.   I don't remember them always -- you

19   know, they didn't all get excellents.

20        Q.   Right.

21        A.   There were things that we can all improve

22   on ---

23        Q.   Right.

24        A.   --- you know, and that's to help us so we

25   don't get lackadaisical, you know ---

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 57 of 112

```
 1        Q.   Sure.

 2        A.   --- and know there's still more things we

 3   can learn and do.

 4                  MR. FLANAGAN:  Can I ---

 5                  THE WITNESS:  But not often.

 6                  MR. FLANAGAN:  Can I just interrupt you

 7   all and Valerie as well?  Just so we're not all

 8   violating 168-168, let's -- can we agree that this --

 9   anything discussing other folk's personnel matters are

10   deemed confidential for our purposes?

11                  MS. BATEMAN:  Yeah.  We have a

12   protective order in place.

13                  MR. FLANAGAN:  Do we?  Okay.

14                  MS. BATEMAN:  I feel like we do.

15                  MR. FLANAGAN:  I don't think we do.

16                  MS. BATEMAN:  Do we not?

17                  MR. FLANAGAN:  I don't think so.

18                  MR. ADAMS:  I don't remember.  We asked

19   for one.

20                  MR. FLANAGAN:  I don't think we do, but

21   in any event, let's agree among ourselves.

22                  MS. BATEMAN:  Okay.

23                  MR. ADAMS:  Yeah.

24                  MS. BATEMAN:  Yes.

25                  MR. FLANAGAN:  Otherwise -- I don't
```

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 58 of 112

1    want ---

2                    MR. ADAMS:  Yeah.

3                    MR. FLANAGAN:  --- Ms. Hairgrove

4    violating statutes.

5                    THE WITNESS:  No, please.

6                    MR. ADAMS:  Yeah.

7                    THE WITNESS:  But it was not often, and

8    it was not -- we had a good -- very good working

9    relationship.

10       Q.   (Mr. Adams)  Okay.  So going back to the --

11   Exhibit 10, the resume, the -- under the "Managed two

12   full-time staff members," it has, "Overall duties the

13   same as listed for my roles in the communities of

14   Kernersville and Wilson."

15              And then you list to "enhance the downtown

16   municipal service district through business retention,

17   recruitment, property development, marketing and

18   memorable events; Responsible for NCMS

19   Reporting/Assessments."

20              What is NCMS?

21       A.   North Carolina Main Street.

22       Q.   Okay.

23       A.   I just abbreviated.

24       Q.   Got you.  Okay.  And then "Award" -- and

25   then "Awards."  So those were things -- those were, I

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 59 of 112

1    guess, main duties that you performed at DSI and in

2    Kernersville and in Wilson?

3        A.    Yes.

4        Q.    Okay.  And then next item is "City

5    Management Team Member Duties/Accomplishments."  And

6    then these are things, I guess, that you did during

7    your employment here ---

8        A.    Uh-huh (yes).

9        Q.    --- correct?  Okay.  And the first little

10   arrow is "Department Head/Management Team Member

11   responsible for overseeing planning and development in

12   MSD," and that's municipal service district?

13       A.    Correct.

14       Q.    Okay.  "Staying within budget, cutting for

15   efficiency and conservation of funds when needed."

16             And that's something you were responsible

17   for?

18       A.    Yes.

19       Q.    And then, "Worked extensively with the

20   Planning & Community Development Department with

21   consultants on a downtown parking study, market study,

22   updating the Downtown Master Plan and other internal

23   and external programs and projects."

24             Have I read the correctly?

25       A.    Yes.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 60 of 112

1          Q.    When it refers to "market study," what is

2     that referring to?

3          A.    So we -- trying to think if we -- I know we

4     did a big parking study with consultants, and the

5     market study could have been something similar with

6     the consultants, or it could have been multiple

7     studies for, like, information that we got from the

8     North Carolina Main Street after, you know, talking

9     with them about what we needed for marketability, you

10    know, and leakage gaps.  Those types of studies.

11         Q.    So you would get information from the North

12    Carolina Main Street group and then you'd take that

13    and determine changes that needed to be made here ---

14         A.    Yes.

15         Q.    --- in Salisbury?

16         A.    Yes.  Not only that, but, you know, calling.

17    I would call Realtors ---

18         Q.    Okay.

19         A.    --- and property owners, and you know, find

20    out, you know, "What are you leasing this for, and how

21    many square feet, and do you need -- you know, what do

22    you feel like we need?"  And talking with the Economic

23    Vitality Committee members about, you know, this

24    information and, you know ---

25         Q.    So part of your -- I understand that there

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 61 of 112

```
 1   were four committees ---
 2        A.   Yes.
 3        Q.   --- under DSI: the organizational, economic
 4   vitality, promotions and ---
 5        A.   Design.
 6        Q.   Design?
 7        A.   Yeah.
 8        Q.   And so -- and you -- as the executive
 9   director of DSI, you attended all of those committee
10   meetings, right?
11        A.   I attended when I had to, needed to, could.
12   Yes.  I like to have -- because I was overseeing all
13   of this.  And although I had staff such as Katelin
14   Rice -- Latoya Price continued Katelin's work with the
15   promotions committee.
16             And I would go when I was needed or I needed
17   to make a decision or, you know, they needed my
18   direction.  But -- and then there were all kinds of
19   subcommittees for events ---
20        Q.   Yeah.
21        A.   --- and such.  But then yeah, I would go --
22   I would pretty much run the design committee with Pete
23   Bogle, and then it became Cheryl Goins.  I was usually
24   at the Economic Vitality Committee, and of course the
25   org and the board.
```

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 62 of 112

1        Q.    And so those committees would meet whether

2   you were there or not, and they would, you know, make

3   -- like, economic vitality would discuss things like

4   office space that was open downtown, that there may be

5   somebody that is interested in that space, and they'd

6   feed that information back to you?

7        A.    Yes.   We would ---

8        Q.    Okay.

9        A.    --- yes, discuss things like that ---

10       Q.    And then what would you do -- what would you

11  do with that?  Would you just, like, factor that into

12  -- okay, add it to your to-do list to follow up with

13  that potential, lessor or ---

14       A.    Sometimes if the volunteers didn't volunteer

15  to ---

16       Q.    Right.

17       A.    --- you know, get more information about it

18  because maybe they knew them better ---

19       Q.    Right.

20       A.    --- than I did or -- but yeah, we would put

21  it on a list and then we started putting it on the

22  website once we had a new website.

23       Q.    Right.  And in going through, like, looking

24  at a lot of the minutes from, like, the board minutes

25  and those committee minutes, it sounds like you spent

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 63 of 112

1    a lot of time, you know, downtown, meeting with

2    business owners ---

3        A.    Uh-huh (yes).

4        Q.    --- and property owners?  What was ---

5        A.    Yes.

6        Q.    What was the purpose of that in terms of

7    your kind of overall job duties?

8        A.    Well, that was part of what -- you know, it

9    was part of the job.  So you get to know the property

10   owners and the business owners, find out what their

11   needs are.

12       Q.    Right.

13       A.    And then we can decide, you know, do they

14   need education, which could come from one of our --

15   like, the Economic Vitality Committee?  Whitney helped

16   -- you know, very much so, put in a educational

17   session series.  So it just depended on what their

18   needs were, or if they needed help with their Facebook

19   page ---

20       Q.    Right.

21       A.    --- we'd try to get someone to help them, or

22   we would help them -- you know, we would help them ---

23       Q.    Right.

24       A.    --- ourselves.

25       Q.    And, like, just business owners, property

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 64 of 112

1   owners, are those the stakeholders ---

2        A.    Yes.

3        Q.    --- that I see referred to in the -- okay.

4        A.    Yes.

5        Q.    Okay.

6        A.    Now, stakeholders can also be partner

7   organizations ---

8        Q.    Okay.  Got it.

9        A.    --- your TDA your CBB.  Anybody that, you

10  know, has a business or a link to downtown and that is

11  an interest.

12       Q.    Okay.  I got you.

13       A.    Yeah.

14       Q.    And then following in that same section,

15  "Empire Hotel Mixed-Use Project gained momentum and

16  relations improved with developer."

17             And I know that's something that you spent a

18  lot of time on.  What was the -- what was kind of the

19  end goal for that project?

20       A.    It was to be a mixed-use, residential and

21  commercial project.  It's 100,000 square feet,

22  multiple buildings, historic, and so it was going to

23  be residential -- I would say upper-end housing, I

24  guess, is how I'm going to put it.  There was some

25  talk about having some affordable options as well.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 65 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1        Q.    So was that something that was -- when you

2    came here that was somewhat dormant and you kind of

3    kick-started it again, or...

4        A.    So that developer had been chosen, I guess,

5    by the DSI board and the director before me.  The

6    director before that actually, I guess, worked with

7    the board to purchase or somehow obtain the buildings.

8    So I came in to contracts that had already signed, and

9    I had to review them and work within those contracts

10   and get to know those developers.

11       Q.    Who were the developers?

12       A.    It was -- I want to say, like, Blackstone.

13   So there were two gentlemen.  I cannot remember the

14   first lead.  He ended up going back to California.

15   And then the gentleman that lives in Charlotte was our

16   main go-to, Brett Weaver -- Britt, with an I.

17       Q.    Okay.

18       A.    B-r-i-t-t, Britt Weaver.

19       Q.    Okay.  And was there an architect that was

20   involved in that project?

21       A.    That may have been before my time, or ---

22       Q.    Okay.

23       A.    --- if it was on the developer side -- I

24   don't -- I mean, Pete Bogle, a local architect, knew

25   everything about that building, and I would -- that's

1    -- I would get information from him or others that had

2    been around a long time and city staff, and he would

3    graciously help to, you know, walk folks through when

4    we had tours.

5         Q.   Right.

6         A.   And those -- there were tours set up before

7    I got here too.  There were a lot of meetings set up

8    before I was even hired that I had to jump right in

9    and get on board with.

10        Q.   Right.

11        A.   And the several series of tours of the

12   Empire was one of them.

13        Q.   Right.  And then the next item, "Attended

14   City Council every first and third Tuesday," as I

15   understand from looking at the minutes, you would go

16   to those meetings and you would present the director's

17   report.  That's -- that was what you did?

18        A.   At city council?

19        Q.   Yes.

20        A.   Not every meeting.  I was on the agenda ---

21        Q.   Okay.

22        A.   --- every ---

23        Q.   Okay.

24        A.   --- meeting.  We would have some items ---

25        Q.   Okay.  So if you had something to report to

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 67 of 112

```
 1    the city council, what -- what would it be, typically?

 2    I'm sure it would vary, but I mean, what kind of

 3    things would you report?

 4         A.    Some things we would submit that were just

 5    events, and then other things were -- let's see.  I

 6    did a Cheerwine presentation with Parks & Rec one

 7    time.  And we would -- if -- there was DSI annual

 8    reporting that we did to city council to give them an

 9    update, show them what we've been doing, and you know,

10    "Please allow us -- allow DSI, that organization, to

11    continue using those funds" ---

12         Q.    Right.

13         A.    --- "for our programs."

14         Q.    And you -- and you attended -- the reason

15    that you were the one attending those city council

16    meetings is that you were the -- the executive

17    director of DSI?

18         A.    Yes.

19         Q.    Right?  Okay.  And I think that when I first

20    asked that question, I think the director's report,

21    that's something you would do in the DSI board

22    meetings, right?

23         A.    Yes.

24         Q.    Okay.  Okay.

25         A.    Yes.
```

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 68 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1        Q.    That was my confusion.   The next heading on

2    here, "Nonprofit Organization Operation

3    Duties/Accomplishments."

4            So how is this different than the bullet

5    point above?   This is referring specifically to DSI?

6        A.    Yes.

7        Q.    Okay.  All right.   And then under this one,

8    it says, "Led board meetings, multiple committee

9    meetings," and those would be the four committees we

10   talked about a second ago?

11       A.    Yes.

12       Q.    "Oversight of budget, operational

13   documents."   What would "operational documents" refer

14   to?

15       A.    So the bylaws, the contracts with the

16   insurance agents for, like, D&O, insurance on the

17   Empire or any maintenance.   I also managed

18   maintenance, which I did that by reporting first to,

19   you know, the DSI organization committee because, you

20   know, DSI owned the building.

21       Q.    Okay.

22       A.    So things like that.

23       Q.    And as I understand it -- so you were

24   involved in maybe rewriting or amending the bylaws at

25   some point?

1        A.    Whitney and I worked on that together, as

2    well as instituting -- what I always said, if I was a

3    director and I became a director of a board that

4    needed it we would have forms for, like, an

5    application, and it would be very transparent.

6             And that's something that Whitney believed

7    in too, and she did some good work and reached out to

8    another community, got some -- a copy of their, you

9    know, conflict of interest.

10            And also, the one that I really believe we

11   needed to use and probably still didn't utilize was,

12   you know, that -- that contract saying, "Look, I am --

13   I know I'm a volunteer, but I'm willing to give my

14   time.  I have it to give, and I need to be at, like,

15   at least two events a year."  And so that type of,

16   "This is a promise."

17        Q.    And that's something that was instituted or

18   was not?

19        A.    Yes.

20        Q.    Okay.

21        A.    Yes.

22        Q.    Okay.  And then you had mentioned insurance.

23   I think at some point you were involved in switching

24   insurance carriers as well?

25        A.    Probably so.  I -- probably.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 70 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1          Q.    Okay.

2          A.    I didn't make that decision myself.

3          Q.    Okay.  And then the third one down,

4    "Establish productive Quarterly Downtown Stakeholders

5    Meetings that increase participation -- increased in

6    participation."

7                So that -- what -- what did you do in that

8    regard as far as establishing these quarterly

9    meetings?

10         A.    So I talked to different business owners

11   that had a larger, you know, open type of building,

12   where we could house 20 or 30 people, because that's

13   what were hoping for.

14         Q.    Right.

15         A.    We may have ten.  We didn't know.  But this

16   was something that hadn't been done in a long time.

17   And the business owners were, I think, disgruntled

18   because they felt like they weren't being listened to,

19   and that's very important.

20                So we -- I talked to them, got places to

21   meet, times.  We set up the agenda to make sure that

22   we had some type of, maybe, educational piece, and we

23   would update the business owners about what's coming

24   up, what they could be a part of, not only

25   promotional-wise, but, like, what's going to happen

1    with the street, when they're going to repave that.

2           So some of that type of planning, and

3    allowing them time to give feedback and network and

4    talk to each other about how they could cross-promote.

5        Q.   Okay.  And then -- let's see.  And then --

6    let's see.  That last bullet point, "Grant Writing and

7    Awards."  So I assume that means that you would be

8    involved in writing grants for funds for DSI, right,

9    for different projects or -- or events?

10       A.   So this was -- would be combined-win effort

11   for the City and DSI.  Someone had to bring it

12   forward, either being a municipality or a nonprofit.

13   And I worked with city staff on these things and was

14   able to -- now, the RISE grant for the Empire Hotel --

15   excuse me -- that took the board members helping kind

16   of get our -- get our information out there.

17          I don't want to say politicking, and I don't

18   want to -- because, you know, you've got to be careful

19   when you're a nonprofit.

20       Q.   Right.

21       A.   But anyway, we had friends who talked to

22   friends who may have been elected officials to kind of

23   talk about why this would be a good thing.  I think it

24   was on that one.

25          It may have been another one because

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 72 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    actually, that RISE grant, I think Liz Parham just

2    emailed me and said, "Sorry for the late notice, but

3    by two o'clock today," and I think this was at ten

4    o'clock, "you need to give me all your projects."

5    Because they were trying to get it into the governor's

6    budget.

7         Q.    Okay.

8         A.    So I don't know if that was -- but we had

9    other issues that the members were helping with.

10        Q.    So these were -- these were -- so the three

11   items that are listed here, the $543,000 grant, that

12   was one that was awarded August 2020 ---

13        A.    Yes.

14        A.    --- and you had -- you had worked on it

15   before you left in June, right?

16        A.    Yes.

17        Q.    Okay.  And then the next one is a ten to

18   $20,000 "EPA/USDA Local Foods, Local Grant for

19   technical assistance," and that was -- that was one

20   that you worked on that was awarded in April 2020?

21        A.    Yes.

22        Q.    And then the $1 million RISE grant for the

23   Empire Hotel, I guess it was submitted, but it was not

24   -- not awarded?

25        A.    The governor put it in his budget, so it

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 73 of 112

1    was.

2         Q.   Oh, okay.

3         A.   But then it was cut.

4         Q.   Okay.

5         A.   It never got to the house and the ---

6         Q.   I got you.  I got you.

7         A.   --- senate.

8         Q.   Okay.  And ---

9         A.   I did that one on my own.

10        Q.   You what?

11        A.   I did that one on my own in, like ---

12        Q.   Okay.

13        A.   --- I don't know, two hours.  It was all

14   this information they needed.

15        Q.   When you were at the City -- or Town of

16   Kernersville, did you ever -- did you ever challenge

17   your salary/exempt status?

18        A.   No.  And -- yeah, it wasn't hourly.  So no.

19        Q.   Okay.  And what about -- what about -- same

20   question for the City of Wilson.

21        A.   No.

22        Q.   Okay.  All right.  Let me shift gears here.

23   Look at --

24             MR. ADAMS:  -- and let me -- go off the

25   record for a just a second.

```
 1    (Brief recess: 4:01 p.m. to 4:05 p.m.)
 2        Q.    (Mr. Adams)  I'm going to hand you what
 3    we're going to mark as Exhibit 11.
 4                    (DEPOSITION EXHIBIT
 5                    NUMBER 11 WAS MARKED
 6                    FOR IDENTIFICATION)
 7        Q.    (Mr. Adams)  And I'll represent to you that
 8    those are your written responses to the Discovery
 9    request that we submitted in this case, just asking a
10    bunch of questions.  You provided responses.
11            Did you -- before these were served on us,
12    did you review these to make sure that they were
13    accurate?
14        A.    Yes.
15        Q.    Okay.  Flip over to Page 6.  And if -- if
16    you look on that page, this is an interrogatory, just
17    asking you about employment history.  And so you
18    provided -- if you look on the page before, you're
19    describing your job at Lexington, and then next, you
20    know, job going backwards would be DSI and the City of
21    Salisbury.
22            So it looks to me, if you look at Exhibit
23    Number 10 that we just finished looking at, the resume
24    that you submitted to ---
25        A.    Yes.
```

1       Q.    --- Lexington, your description of the DSI

2   position in the resume, Exhibit 10, and in these

3   Discovery responses look pretty much identical.  Would

4   you agree with that?

5       A.    Pretty much, yeah.  I agree.

6       Q.    Yeah.  I mean, is there any, like, error in

7   either one of them or glaring -- you know, a

8   difference that you're seeing?

9       A.    I don't see any glaring ---

10      Q.    Okay.

11      A.    --- mistakes.

12      Q.    Okay.  And then let me ask you a question,

13  just kind of -- kind of going in a different

14  direction.  I'd asked you about the -- so the DSI

15  board, how frequently did they meet?

16      A.    Every -- well, most months, we met.

17      Q.    Okay.

18      A.    Now, we would combine November and December,

19  typically, into one because of the way they hit ---

20      Q.    The holidays and stuff.

21      A.    --- on the holidays.

22      Q.    Yeah.

23      A.    So we would -- we would meet the -- and

24  exceed the threshold of three-fourths of the year.

25      Q.    Okay.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 76 of 112

```
 1        A.   And we would meet almost every month except
 2   when we may have combined.
 3        Q.   Okay.  And when you refer to a threshold, is
 4   that something that Main Street -- that, like, North
 5   Carolina Main Street sets ---
 6        A.   Yes.
 7        Q.   Okay.
 8        A.   Regulation, yes.
 9        Q.   Okay.  And so you would have a meeting, and
10   in that meeting, would -- at the beginning of the
11   meeting, would you approve the minutes from the
12   previous board meetings?
13        A.   Typically.  There was a spot for that, and
14   if there was a month that there -- you know, those
15   minutes weren't available for some reason, we would
16   double up the next month.  But yes, there was always a
17   spot for that.
18        Q.   Okay.  And so before each board meeting,
19   would the minutes -- the draft of the minutes from the
20   previous board meetings be circulated to everyone that
21   was in the board meeting?
22        A.   Yes.
23        Q.   Okay.
24        A.   Typically.  If we had them, then we
25   circulated them there as well as electronically.
```

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

```
1        Q.    Who prepared ---

2        A.    Or emailed.

3        Q.    --- the typed minutes?

4        A.    Well, I did a lot of the typing of the

5   minutes.  Candice Brown, I would have -- I think she

6   would do the minutes.  I would always go back over

7   them, and before her, I think Katelin Rice did it when

8   she was with the organization.

9        Q.    So generally, DSI staff would prepare the

10  minutes?

11       A.    Or Downtown ---

12       Q.    Okay.

13       A.    --- Developments.

14       Q.    All right.  And so -- so you would have --

15  you personally would have a chance to look at the

16  previous meeting's minutes to make sure they

17  accurately reflected what was ---

18       A.    Yes.

19       Q.    --- said in the meeting?  And would you have

20  an opportunity -- if something was inaccurate, would

21  you have an opportunity to correct it?

22       A.    Uh-huh (yes).

23       Q.    Okay.

24       A.    Yes.

25       Q.    Would you just do that before the meeting
```


```
 1   and then bring that up when the minutes were to be
 2   approved, or...
 3        A.   So I wouldn't -- if a board member, during a
 4   meeting, brought up a correction, you know, we would
 5   correct it and bring it back.  But if there were
 6   misspellings, of course, I corrected.
 7             I would try to catch those as much as I
 8   could, but if I couldn't -- you know, it depended on
 9   my workload.  I would -- I'm trying to think -- so we
10   would send -- sometimes, we would have them and have
11   enough time to get them done before the org meeting,
12   and org -- the executive committee ---
13        Q.   Right.
14        A.   --- organization committee would be able to
15   review those.  I would say a lot of the times, though,
16   it was -- they got them prior to or at the board
17   meeting.  And everyone was given time.
18        Q.   Okay.
19        A.   But yeah, small errors or ---
20        Q.   Sure.
21        A.   --- such as spelling and such, I would ---
22        Q.   Okay.
23        A.   --- I would fix that.  I would -- if I
24   caught it.
25        Q.   Got you.  Okay.  Look back at the Complaint,
```

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 79 of 112

```
 1    if you would.  And there is a -- it's going to be

 2    Document 1-3, and again, these -- I don't really have

 3    page numbers that I can refer to, but it's -- it's ---

 4         A.    Uh-huh (yes).

 5         Q.    That page.

 6         A.    Oh.

 7         Q.    If you're looking at the bottom, it says,

 8    "Document 1-3."

 9         A.    Okay.

10         Q.    Okay.  And so that -- as I understand it,

11    these are recurring meetings that you would have to

12    attend as ---

13         A.    Yes.

14         Q.    --- the DSI executive director?

15         A.    Yes.

16         Q.    Okay.  And was this -- was that the case

17    throughout your employment?

18         A.    Yes.  This is very similar to what --

19    because we would have, like, 12 events, and we always

20    had pre- and post-council management team meetings the

21    day before or the day of city council.

22               Then we would have city council that would

23    go late at night, and then we would have post-council

24    to talk about what happened in council, plus

25    management team meetings that were not a part of
```


1    preparing for council.  Yes.  And then I had -- there
2    were spots for me and for the DSI director for the
3    chamber -- on the chamber board and some others.
4         Q.   Okay.
5         A.   Yeah.
6         Q.   And then if you flip the page.  This is
7    referred to in the Complaint as Exhibit D, but it's
8    Document 1-4 at the bottom.  It looks like it's nine
9    pages.  And this -- I think this is a letter that you
10   signed.  Yeah.
11        A.   Yes.
12        Q.   To Janet -- is it Gapen or Gapen?
13        A.   Gapen.  Gapen.  Uh-huh (yes).
14        Q.   Gapen?  So what was the purpose of this
15   letter?
16        A.   So this was a requirement to respond to the
17   City's request for proposal.  It was -- it's state
18   statute that the City has to put out an RFP to
19   organizations.  It may not be the same organization
20   every time.
21        Q.   Right.
22        A.   But they have to put it out there, and it
23   usually falls to -- in this case, in this city, DSI
24   because they're that partner arm.  So I had to respond
25   to the city RFP with reasons why DSI should continue

1    getting the MSD funds to allocate ---

2         Q.   Okay.  I got you.

3         A.   --- for programming.

4         Q.   And so if you look at the first page of the

5    letter and the third paragraph, kind of at the -- it

6    says, "We're an accredited Main Street Program,

7    recognized by both the National and North Carolina

8    Main Street Programs.

9              "DSI is managed by a 21 person Board of

10   Directors, representing downtown stakeholders and a

11   full time Executive Director who oversees the progress

12   and purpose of the organization."

13             And that full-time executive director,

14   that's referring to you, right?

15        A.   Yes.

16        Q.   Okay.  And then in the next paragraph, in

17   the middle, it says, "Our four main -- main committees

18   are Economic Vitality, Organization, Design/Master

19   Plan and Promotions/Marketing."

20             And those are the committees that we've

21   discussed previously, correct?

22        A.   Correct.

23        Q.   And -- and would the -- I don't know if I

24   asked this specifically, but would the process of

25   preparing and approving minutes for those committee

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 82 of 112

1  meetings be the same as what you discussed for the DSI

2  board?

3      A.   You really don't -- you didn't have to have

4  committee meeting minutes.  That's what the board

5  meeting was for, was for the chairs or myself or

6  someone who's on the board and at the -- or at the

7  committee meeting reporting.  And that's the official

8  minutes.

9      Q.   Right.

10     A.   How Salisbury had always done it, I guess,

11 is that they typed up everything.  And they typed --

12 and even Liz Parham, state director, said, "You do not

13 need to type them up.  You can hand jot down, even,

14 you know, or you don't have to have committee minutes

15 because" ---

16     Q.   Right.

17     A.   --- "the -- what the committees are doing is

18 reported in the board meeting."

19     Q.   Right.  But they did ---

20     A.   Yes.

21     Q.   I mean, here, they did do minutes for all

22 those committee meetings, and so there would be an

23 approval process for those like with the DSI board

24 meetings?

25     A.   I don't know if they actually approved those

1   meetings or they just -- we read them, or they got

2   them, and this is what happened.  But -- so I don't

3   know if there was actual -- they didn't say, "Oh, we

4   approve those committee minutes."

5        Q.   Right.  I mean, would you -- since you

6   oversaw those four committees, did you get copies of

7   those minutes?

8        A.   Usually, if I wasn't taking them myself ---

9        Q.   Okay.

10       A.   --- or delegating to a staff ---

11       Q.   Right.  Okay.

12       A.   --- person.

13       Q.   And then if you look at the second page, if

14  you look at the last paragraph, it says, "On behalf of

15  the Board of Directors, and as an authorized signature

16  and submittal source for this document, I thank you

17  for the opportunity to respond, da, da, da, da," and

18  then your signature is below there.

19            Is that correct?

20       A.   That's correct.

21       Q.   And you -- you, as the executive director of

22  DSI, were the authorized signature that's referred to

23  in that paragraph?

24       A.   Yes.

25       Q.   Okay.  And then if you look at -- let's see

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 84 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1   here, Page 4 of 9.  If you look down in the kind of

2   bottom right-hand corner, you'll see "Page 4 of 9."

3        A.   Uh-huh (yes).

4        Q.   So on this page, it looks like you're

5   describing the -- you know, general terms, the duties

6   of different individuals who were involved with DSI?

7        A.   Yes.

8        Q.   Okay.  And you've described your, I guess,

9   qualifications as executive director and then kind of

10  a summary of your role as the executive director.  Is

11  that right?

12       A.   Yes.

13       Q.   Okay.  And it looks like those duties are

14  the same ones that were in your resume and in the

15  Discovery response.  Would you agree with that?

16       A.   Yes.

17       Q.   Just in shorter form?

18       A.   Yes.

19       Q.   Okay.  And then let's see.  The next exhibit

20  on here I want to ask you about is -- let's see.  Hang

21  on a second.  Let me find this.  Okay the -- the --

22  there's an exhibit, Document 1-5.  It's referred to as

23  Exhibit E in the Complaint, but if you flip -- this is

24  the MS & RP ---

25       A.   Yes.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 85 of 112

1    Q.   --- Main Street Director's Roles and

2    Responsibilities.  So in the Complaint, it says, "In

3    June," and this would be 2018, "Plaintiff submitted

4    her Main Street Director's Work Plan for 2018-2019,"

5    and it says "Exhibit E."

6         So is that what this is?

7    A.   It must be.

8    Q.   Okay.

9    A.   Yes.  I mean, that corresponds.

10   Q.   And -- okay.  So what would be the purpose

11   of this work plan, and who are you submitting it to?

12   A.   So I submitted this to Zack and Greg and

13   Whitney, Greg Shields and Whitney Williams, in a

14   meeting.  It's a template that I had created -- I got

15   a template from Liz Parham, from the State.

16   Q.   Okay.

17   A.   Okay?  And then I put in the dates of these

18   different Main Street meetings that I, as director --

19   you know, we're required to attend.  And so I had to

20   edit it to put in what, you know, we were doing here

21   in the city and to show Greg and Zack and Whitney, you

22   know, "This is a Main Street director's roles and

23   responsibilities."

24        At this point, I do not believe I had any

25   employees.  I did not.  So, of course, I think either

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    I alluded to that in here or I told them, "You know,

2    some of this could be delegated once I have employees

3    again."

4         Q.   Right.

5         A.   And yeah, this is one of several that I

6    tried to use to educate city staff and DSI board and

7    officers -- board members and/or officers of what it

8    was I was to do.

9         Q.   Okay.

10        A.   Yeah.

11        Q.   And then -- and then over the course of the

12   year in the DSI board meetings, and I guess the city

13   council meetings, whenever you'd present, would you

14   provide them updates on things that are in this

15   template that you had accomplished along the way?

16        A.   That -- when we met with city council, it

17   was more about what the organization does ---

18        Q.   Got it.

19        A.   --- and not me.  So we had a similar plan

20   that looked like this, and it was color coded, that we

21   would use internally at -- within the board and the

22   committees to keep up with our work plan.  That was

23   supposed to be planned work for a year or a year and a

24   half, just what was there ---

25        Q.   Right.

1      A.   --- not constantly adding to it.  But we may

2  have presented that at -- if not our annual meeting

3  with city council, the official meeting, possibly at a

4  city council board retreat.  I'm pretty sure at one

5  point, we did.  If not, we used this as our internal

6  board working document.

7      Q.   Okay.  And so -- at the top of this

8  template, it has -- under the -- the title, "Main

9  Street Director's Roles and Responsibilities," it

10 says, "Main Street Director's Role."  And Main Street

11 Director, that's you, right?

12     A.   Yes.

13     Q.   And it says, "Is charged with day-to-day

14 operations of the local Main Street Program and in

15 assisting the Main Street board and committee with the

16 implementation of the Downtown Economic Development

17 Implementation plan."

18          What's the Downtown Economic Development

19 Implementation plan?

20     A.   So I don't know if that was part of the

21 wording of the template or if that was something we

22 were already starting to work on with the City.  DSI

23 had a Downtown Master Plan, and then we were able to

24 get the City and planning staff onboard to help to

25 update that plan.  But they called it the Downtown

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 88 of 112

1    Master Plan.  That may have been template ---

2         Q.   Okay.  All right.

3         A.   --- verbiage.

4         Q.   And then if you flip to the second page of

5    the same exhibit on the -- in the left-hand column,

6    three little dots down, it says, "Develop a budget

7    plan that aligns with the economic development plan

8    and general operations of the MS organization."

9              Do you see that?

10        A.   Yes.

11        Q.   And that -- I think you referred earlier to

12   your involvement in developing and following a budget?

13        A.   Uh-huh (yes).

14        Q.   And then a column over, "Retail Sales

15   Activities, build a relationship with each retailer

16   and brainstorm ideas for growing their business."

17             That's the meetings with the downtown

18   business owners ---

19        A.   Yes.

20        Q.   --- and the property owners?

21        A.   Yes.

22        Q.   Okay.  And then if you flip the page, at the

23   top of the left-hand column, "Train new board and

24   committee members at the start of the new fiscal

25   year."



1      A.   Uh-huh (yes).

2      Q.   So that was something that you did when, I

3   guess -- what, when new board members would come on or

4   new committee members, they -- they would need to be

5   trained?

6      A.   Right.   They would need a orientation.

7      Q.   Okay.   The next one down, "Draft, establish

8   and manage best practices with the local MS

9   organization."

10        What -- what is that referring to?

11      A.   Oh.   That's one of two annual reports that

12   we had to send in to the North Carolina Main Street

13   office, which is part of the Department of Commerce.

14      Q.   Okay.

15      A.   And so on that assessment was things like,

16   "List all of your partner organizations."   And there

17   would be -- you had to get, like -- you know, you

18   needed three out of four of these to, you know, keep

19   your accreditation.

20        The State would then take that assessment,

21   and I mean, it was thick, and then recommend a city or

22   a town for designation through the National Main

23   Street America program.   So you would -- it was -- so

24   this was a document that we had to do every year.

25        And I -- and basically, we were putting all

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 90 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434|336-992-1954|919-649-4444

1    the things we were doing on there.  And I did have to

2    -- I think I improved it, and I was able to list

3    things that were not on past years.

4        Q.    And so you knew -- I mean, you -- from

5    working in Kernersville and Wilson, you were familiar

6    with, I guess, like, the standards that you had to ---

7        A.    Yes.

8        Q.    --- comply with, and you -- this thick

9    report, you'd make sure it was in compliance and

10   then ---

11       A.    Oh, yes.

12       Q.    --- you all would submit it annually or ---

13       A.    Yes.

14       Q.    --- twice a year?  Okay.

15       A.    There were two reports annually.

16       Q.    Okay.

17       A.    One in July, and one was always due, like,

18   January 3rd.

19       Q.    What was your fiscal year?

20       A.    July to June.

21       Q.    Okay.  Okay.

22       A.    And then the next point down on that same

23   column, "Write drafts, manage, update and file, as

24   needed, all nonprofit paperwork and documentation,

25   including bylaws, solicitation license, annual

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

```
1    insurance agreements."
2              So I think we already touched on this.
3    These were -- you had mentioned working on the bylaws
4    and insurance, things of that nature?
5         A.    Correct.
6         Q.    Okay.  And let's see.
7         A.    And there were two budgets, so I worked with
8    a bookkeeper, an accountant here.
9         Q.    Okay.
10        A.    We had books and a budget for DSI as well as
11   my budget for the City, but we would have to cut
12   checks for events to pay, like ---
13        Q.    Okay.
14        A.    --- you know ---
15        Q.    And I've seen reference in some of the -- I
16   guess it was in some of the minutes to audits that
17   were done.  So you were involved ---
18        A.    Oh, yeah.
19        Q.    Would you meet with CPAs who were ---
20        A.    Uh-huh (yes).
21        Q.    --- doing the audits and -- okay.
22        A.    Yes.
23        Q.    Okay.  If you flip to Page 4 of 8, in the
24   second column over on the left, there's a heading,
25   "Marketing."  And would this -- this heading here,
```

1    would this describe, you know, some of the marketing

2    you had to be involved in for DSI?

3        A.    Yes.

4        Q.    Okay.  And lets see.  And then the next

5    column over, down at the bottom, the last bullet point

6    refers to "Write and manage grants."  I think that's

7    kind of what we were talking about earlier?

8        A.    Yes.

9        Q.    And then the next page on the left column,

10   top bullet point, "Write a director's monthly activity

11   report and present it to the Board of Directors at

12   their monthly meeting."

13            So that's something that -- is that

14   something you did?

15       A.    I did not do that at first.  That wasn't in

16   -- I mean, that's something some directors write, and

17   some directors just give a verbal.  And I was used to

18   giving verbal, and I assume the last director was, and

19   -- but somewhere -- at some point in time, I was

20   required to write a director's monthly activity report

21   and present that at the board.

22       Q.    Okay.  And what would be in that report?

23       A.    I think that's in some of the Discovery

24   documents.  So it ---

25       Q.    Okay.

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 93 of 112

1      A.    --- would be any business owners or building

2    owners I had met with.  It would be updates on, you

3    know, any -- most of the big highlights of my work.

4      Q.    Right.  And that would be highlights during

5    the last month between board meetings?

6      A.    Yes.

7      Q.    And then you'd present that at the meeting?

8      A.    Yes.

9      Q.    Okay.

10      A.    Meetings I went to and initiatives we were

11    trying to, you know, start or updates on programs or

12    initiatives.

13      Q.    Okay.  And then look at the -- it's at Page

14    6 of 8 in the -- in the left column.

15      A.    Yeah.

16      Q.    Second bullet point is, "Manage the books of

17    the organization through QuickBooks or other

18    appropriate accounting program as needed."

19          And that was something that you did?

20      A.    That was something that Sheila Ezzo did, who

21    was the part-time DSI office manager and bookkeeper

22    before I was hired.  And she also worked with the

23    bookkeeper who I eventually worked with.

24      Q.    Okay.

25      A.    She mainly did that, but then Zack told her

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 94 of 112



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

```
 1   she could leave whenever the interim director left.
 2   And she didn't even get to talk to Zack about it.  So
 3   I lost my office manager and bookkeeper about, I don't
 4   know, two weeks after I arrived.  And so then I had to
 5   do it myself, with Katelin's help at first.
 6        Q.   Okay.  Okay.  And then the next bullet point
 7   is, "Facilitate audits as needed," and I think we
 8   talked about that, your work with CPAs, that you were
 9   doing the audits?
10        A.   Yes.
11        Q.   The next one says, "Complete 990's."  What
12   is that?
13        A.   So if there was something -- oh, that is
14   part of the annual financial reporting.
15        Q.   Oh, okay.
16        A.   Yeah.
17        Q.   And who -- is that submitted -- again, is
18   that something that's submitted to the state Main
19   Street organization?
20        A.   No.  This is for compliance with accounting
21   standards.
22        Q.   Okay.
23        A.   Yeah.
24        Q.   I got you.  And then let's look at -- let me
25   try to figure out which -- I'm not sure what the --
```



Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1      A.   But what's not on here are times that I

2   worked evenings or nights ---

3      Q.   Okay.

4      A.   --- or weekends on organizational things or

5   minutes or -- you know, typically, it seemed like it

6   was minutes, but it was sometimes other work.

7      Q.   Right.  So a couple questions.  So the

8   Google calendars that you kept here from January 2019

9   to June 2019, did you keep -- contemporaneously with

10  these Outlook calendars, did you keep any other record

11  of the hours that you worked during that time frame?

12     A.   I had -- I was trying to find different ways

13  to easily print out calendars.  So, like, I tried --

14  here's one like this, but it didn't show my hours as

15  well as this did.  Time sheets, we had to submit time

16  sheets to the City, and I was told a couple different

17  ways to fill those out.

18          It started at first, saying that I worked 37

19  and a half hours each week, and then I was told not to

20  do it that way, to do it the way Lane does his, which

21  is just put your sick leave and your personal time.

22  And I think those were the ways I mainly kept my ---

23     Q.   Okay.  So you have ---

24     A.   These were more accurate.

25     Q.   --- this set of calendar -- so you have this

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1    or -- yes.

2        Q.   And then, when it was updated, this copy

3    here has a date of February 2020, and it -- do you

4    recall getting an updated version of that?

5        A.   I don't.

6        Q.   Okay.  All right.

7                 MR. ADAMS:  Let me show you what I'm

8    going to mark as Exhibit 13.

9                      (DEPOSITION EXHIBIT

10                      NUMBER 13 WAS MARKED

11                      FOR IDENTIFICATION)

12       Q.   (Mr. Adams)  Exhibit -- Exhibit 13, is that

13   the handbook acknowledgment ---

14       A.   Yes.

15       Q.   --- receipt document you signed when you

16   started your employment?

17       A.   Yes.

18       Q.   Okay.  And -- and when you signed that

19   document, you had reviewed the employee handbook and

20   acknowledged that you understood those policies?

21       A.   Yes.  I think we had an orientation where we

22   went through certain sections.  I'm not saying I read

23   it word for word, page for page, but I'm -- you know,

24   we went through it well enough I felt like it was --

25   well enough to sign this.

02-22-23          Hairgrove v. City of Salisbury          COPY

1      Q.    Okay.  And if you look at Exhibit Number 12,

2  if you flip over to the second page, it has,

3  "Wage and Hour Policies, 4.0."

4         Do you see that?

5      A.    Yes.

6      Q.    And under the two headings down or three

7  headings down, it says, "Exempt Employees."

8         Do you see that?

9      A.    Yes.

10     Q.    Okay.  So did you understand that there was

11 various classifications of employees who were exempt

12 from receiving overtime if they worked more than 40

13 hours in a week?

14     A.    I knew there was exempt and non-exempt.

15     Q.    Okay.  Do you understand that that term

16 "exempt" meant exempt from being eligible for overtime

17 pay if you worked more than 40 hours in a workweek?

18     A.    I mean, it's the term I guess cities use and

19 there's a description.  So yeah.  If I, you know, I

20 read that and that's what an exempt employee should

21 be.

22     Q.    Okay.  Look over at what's marked as -- at

23 the bottom, Page 21.  And you see "4.5, Recording

24 Time"?

25     A.    Uh-huh (yes).

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

1      Q.   Okay.  And it says, "If a" -- the bottom

2  line there, "Employees are required to notify the City

3  of any pay discrepancies, unrecorded or misreported

4  work hours, or any involuntary missed meal or break

5  periods."

6           Have I read that correctly?

7      A.   Uh-huh (yes).

8      Q.   Did you ever notify the City of any pay

9  discrepancies?

10     A.   I asked Zack to give me pay for the three

11  days of suspension that he put me on in 2019.  And it

12  seems like there may have been one other time that he

13  made me take my leave when we were supposed to be

14  flexing hours.

15     Q.   Uh-huh.  But other than those two instances,

16  you did not notify the City of any other pay

17  discrepancies?

18     A.   I don't think in those words, no.  We talked

19  a lot about how much I was working, when I was

20  working.  Zack would -- he usually knew because lots

21  of times he was CC'd on emails.

22     Q.   Did -- were you paid by direct deposit or

23  did you actually get a physical paycheck?

24     A.   Direct deposit.

25     Q.   Okay.  And did you ever notify the City or

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 99 of 112

Chaplin & Associates
transcripts@chaplinandassociates.com
704-606-1434 | 336-992-1954 | 919-649-4444

```
1    DSI that the amount that you were being paid on the
2    direct deposit stub was inaccurate?
3         A.   I don't remember having a conversation like
4    that.
5         Q.   Okay.
6              MS. BATEMAN:  Wait.  I just want to
7    stop.
8              MR. ADAMS:  Yeah.
9              MS. BATEMAN:  I can find them in here.
10   They're all in here.  They're all in here ---
11             THE WITNESS:  I thought so.
12             MS. BATEMAN:  --- it's 215 to 226,
13   although I just created a new document and almost
14   emailed it to you.
15             MR. ADAMS:  It's 215 to 226?
16             MS. BATEMAN:  Yeah.
17             MR. ADAMS:  All right.
18             MS. BATEMAN:  214.
19             MR. ADAMS:  Okay.
20             MS. BATEMAN:  It starts on 214.
21             MR. ADAMS:  Okay.  All right.
22        Q.   (Mr. Adams)  Did -- at any time during your
23   employment with DSI, did you file a complaint with the
24   Department of Labor for unpaid wages or overtime?
25        A.   When I was employed with the City, I did not
```

1   file anything ---

2       Q.   Okay.

3       A.   --- such as that.

4       Q.   All right.

5       A.   I was just trying to please everyone as best

6   I could.

7       Q.   All right.

8            MR. ADAMS:  And -- is it 13?

9            THE COURT REPORTER:  You're on 14.

10           MR. ADAMS:  14.  All right.  I'm going

11  to hand you another document.

12                (DEPOSITION EXHIBIT

13                NUMBER 14 WAS MARKED

14                FOR IDENTIFICATION)

15      Q.   (Mr. Adams)  And do you recognize that

16  document?

17      A.   Yes.

18      Q.   Okay.  This is an acknowledgment, sign-off

19  sheet I guess, that you received some training on the

20  Fair Labor Standards Act in March of 2019?

21      A.   Yes.

22      Q.   Okay.  And do you know why you received that

23  training?

24      A.   All I know is it was required by I -- I

25  don't know if it was just directors or department

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 101 of 112



```
1   hands or it was everyone.  I feel like it was a large
2   -- I think all employees were required to do that.  It
3   was one of many, you know, things like that.
4        Q.   Okay.  All right.
5             MR. ADAMS:  I'm going to hand you what
6   I'm going to mark as 15.
7             (DEPOSITION EXHIBIT
8              NUMBER 15 WAS MARKED
9              FOR IDENTIFICATION)
10       Q.   (Mr. Adams)  Okay.  I'm handing you a
11  document marked as Exhibit 15.  Take a look at that
12  and tell me if that appears to be the PowerPoint
13  presentation on Fair Labor Standards Act Wage and Hour
14  Training that you received in March of 2019?
15       A.   Well, the date is on here as March 7th,
16  2019.  So this very well could be what I saw -- what I
17  sat through.
18       Q.   Okay.  And after -- so is it fair to say
19  that in this PowerPoint presentation you were given
20  training on the difference between exempt and non-
21  exempt employees?
22       A.   If it's in there.
23       Q.   Okay.  Look at Page 3, if you would, and at
24  the bottom it says, "FLSA Overtime Claims May
25  Involve," do you see that one?
```

1        A.    Uh-huh (yes).

2        Q.    And you see three different types of

3   overtime claims.  The first one is, "Employers

4   mistakenly treating employees as 'exempt' from the

5   FLSA overtime requirements."

6            Do you see that one?

7        A.    Uh-huh (yes).

8        Q.    And then, "Employers failing to identify,

9   record or compensate 'off-the-clock' hours spent by

10   employees performing compensable, job-related

11   activities."

12            Do you see that?

13        A.    Yes.

14        Q.    Okay.  Now, when you went through this

15   training and you saw that slide of this PowerPoint

16   presentation, did that not prompt you to go to your

17   supervisors and complain that you were not being paid

18   for all of the hours that you were working?

19        A.    I didn't feel I had that luxury.  I remember

20   -- I think we were -- I think I remember this session

21   in the -- that big gym building.  I can't think of

22   what it's called.  I think I remember sitting in a

23   session, and you know, seeing these and thinking,

24   "Well, that's interesting."

25            But I didn't feel that -- if I were to go

1    and complain for any reason, I would have been fired.

2    And I really didn't start thinking, I think, of myself

3    as, "Hey, I'm being treated differently than an exempt

4    employee should be," until I think I was probably

5    suspended in maybe June of 2019.

6         Q.    Okay.  If you flip over ---

7         A.    I'm not quite sure.

8         Q.    I'm sorry.  On Page 4 of the PowerPoint,

9    "Three Basic Requirements Of The Fair Labor Standards

10   Act," and Number 3 says, "An accurate record of hours

11   worked."

12         Do you see that?

13         A.    Uh-huh (yes).

14         Q.    So at this point, did this not prompt you to

15   start keeping a record of the hours that you worked?

16         A.    It could have.  I don't remember back then.

17         Q.    But as I understand it, you didn't start

18   keeping a log of hours you think you were not paid for

19   until after you resigned, right?

20         A.    Well, no.  I mean, I was keeping these in

21   2019.

22         Q.    The Outlook calendars?

23         A.    The Outlook calendars because I would have,

24   like, you know, 13 hours and -- but I don't see here,

25   like, the totals.  Usually I would total, like, at the


```
 1   end of the week.  But I don't see that on -- that

 2   reflected here because either I wasn't keeping it like

 3   that then or this format didn't...

 4        Q.    Okay.  Flip over to Page 29, if you would,

 5   of the PowerPoint.

 6        A.    Okay.

 7        Q.    And the slide at the bottom says,

 8   "Retaliation (Whistleblower)"?

 9        A.    Yeah.

10        Q.    And this one says, "Unlawful to retaliate

11   for filing a complaint or testifying."

12              Do you see that?

13        A.    Yeah.

14        Q.    "Threat to file action may be sufficient."

15              Do you see that?

16        A.    Uh-huh (yes).

17        Q.    "Any adverse employment action is

18   prohibited."

19              Do you see that?

20        A.    Uh-huh (yes).

21        Q.    So you knew at least from this slide that

22   the City was prohibited from retaliating against you,

23   in fact, it would have been unlawful for making a

24   complaint about wages, right?

25        A.    Yes.
```

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 105 of 112

1       Q.    Okay.  But yet you didn't make a complaint?

2       A.    Well, because that -- this is what employers

3    should do and that's not always what happens, as we

4    know.

5       Q.    Do you -- are you aware of any City employee

6    who complained about their wages and was fired as a

7    result of that complaint?

8       A.    I do not.

9       Q.    So what -- what was your fear of retaliation

10   based on?

11      A.    The fact that it was a -- this was mentioned

12   earlier.  In some of our management team meetings,

13   when we had anonymous surveys or such that we needed

14   employees to respond to.  And there were concerns from

15   the department heads that employees felt like if they

16   gave their honest opinion, they would have, you know,

17   retaliation.

18            And I don't know if that was coming from

19   prior practices before I got here, but that was a true

20   fear.  And, you know, the way I was being -- what I

21   felt like being retaliated against, being suspended in

22   2019 especially -- do you all need a sidebar?

23      Q.    No, we're good.

24            MR. FLANAGAN:  No.

25            THE WITNESS:  So the way I was starting

1    to feel over the years, it was getting worse and

2    worse.  I felt like, well, maybe this is a true

3    concern and not just a -- you know, something that is

4    made up or...

5                    (DEPOSITION EXHIBIT

6                    NUMBER 16 WAS MARKED

7                    FOR IDENTIFICATION)

8        Q.   (Mr. Adams)  Okay.  Let me show you another

9    document.  This is 16.  And then we'll take a break

10   after I ask you about this one.

11                MS. BATEMAN:  Oh my gosh, take a break?

12   We should be done.  It's 5:06.  You've got 23 minutes.

13                MR. ADAMS:  Actually, it's seven hours

14   each party, so we're good.

15                MS. BATEMAN:  Not on the same day.

16                THE WITNESS:  Yeah.  Fourteen-hour day.

17                MS. BATEMAN:  Not on the same day ---

18                THE WITNESS:  That -- hey, I think it

19   says right here I have worked...

20       Q.   (Mr. Adams)  So do you recognize that

21   document, Exhibit 16?

22       A.   I recognize it because I looked it up when I

23   was suspended in 2019 to figure out how to file a

24   grievance.

25       Q.   Okay.  And you never, as I understand it,

Case 1:21-cv-00814-CCE-JLW   Document 42-7   Filed 04/04/23   Page 107 of 112

1    you never submitted one of these complaint forms,

2    correct?

3        A.    Correct.

4                    MR. ADAMS:  Okay.  All right.  Why

5    don't we take a break?

6                    THE WITNESS:  Okay.

7    (Brief recess: 5:07 p.m. to 5:18 p.m.)

8        Q.    (Mr. Adams)  Okay.  So I don't have that

9    much, but we're almost done.  Okay.  Just a couple

10   things.  As I understand it, you were never demoted

11   during your employment, correct?

12       A.    I was not demoted, but I did have to prove

13   why I deserved a 5 percent raise that was in my letter

14   of employment.  I think that was at the six-month

15   period, which we didn't have that I think for nine

16   months actually.

17               So I think I had my six-month review at nine

18   months, had to write out all that I had done to prove

19   why I deserved that.  Never got the second 5 percent

20   raise that was in the letter of employment.  I only

21   got a cost of living increase, which every employee

22   got that year.

23       Q.    Okay.  I don't understand -- so you're

24   talking -- so the 5 percent raise that you thought you

25   were entitled to that you wrote something out

1  explaining why you should get it.  You got that one,

2  right?

3       A.   I did, but I got it, like, nine months

4  later, and there's a four-month gap that I never got.

5  And I ---

6       Q.   Okay.

7       A.   --- think I brought that up once, but then I

8  was afraid to keep asking about.  And I hate to say

9  that I was afraid to do that, but I was.

10      Q.   But your -- at no time during your

11  employment was your compensation reduced, right?

12      A.   Correct.

13      Q.   And your benefits weren't cut or reduced,

14  right ---

15      A.   Correct.

16      Q.   And you remained executive director of DSI

17  throughout your employment?

18      A.   Correct.

19      Q.   Okay.

20           MR. ADAMS:  Let me show you a couple

21  random things I had in here.  17, is that...

22               (DEPOSITION EXHIBIT

23               NUMBER 17 WAS MARKED

24               FOR IDENTIFICATION)

25      Q.   (Mr. Adams)  I'm going to hand you what I've

1   marked as Exhibit 17.  And I will represent to you

2   that this was a document that was in Discovery.  It

3   was a -- in Candice Brown's file folder or her folder.

4   Do you recognize this?  It looks like an org chart of

5   some sort.

6        A.   No.  I don't recognize that.

7        Q.   Would -- would that accurately reflect if

8   you were to do an org chart that included City of

9   Salisbury DSI, you, Latoya and Candice, that would be

10  accurate, wouldn't it?

11       A.   No.  I don't believe so.

12       Q.   Well, what -- what would be inaccurate about

13  it?

14       A.   I think that it would be City of Salisbury,

15  and then there would be me, DSI board of directors

16  here and my employees over there.

17       Q.   Okay.  All right.  Let me show you another

18  document.  This is a big one that I'm not going to go

19  over in detail per se.

20       A.   Are we done with this Exhibit 7 (sic)?

21       Q.   Yeah.  Yeah, you can just put it in here.

22  All right.  Here you go.

23                 (DEPOSITION EXHIBIT

24                 NUMBER 18 WAS MARKED

25                 FOR IDENTIFICATION)

 1        Q.    (Mr. Adams)  So I'm handing you what has

 2   been marked as Exhibit 18.  It's a compound exhibit,

 3   and I will represent to you that these are the City

 4   time sheets for you during your employment.

 5            Is that what it looks like to you?

 6        A.    Yes.  It looks like these should be the time

 7   sheets I submitted ---

 8        Q.    Okay.  So these would be -- and would you --

 9   would you see these on a weekly basis?

10        A.    Yes.

11        Q.    Okay.

12        A.    I would have to fill them out.

13        Q.    Okay.

14        A.    And review -- make sure downtown department

15   staff had theirs done, and reviewed and signed theirs.

16        Q.    Okay.  All right.  And then, look at -- look

17   back at Exhibit 11, which are the Discovery responses.

18        A.    Uh-huh (yes).

19        Q.    Okay.  Look at Page 25, if you would.  Okay.

20   If you see kind of in the middle of the page there,

21   there's an Interrogatory Number 16, where we asked for

22   you to, "Identify with particularity all damages the

23   Plaintiff contends she has suffered as a result of

24   DSI's conduct as alleged in the Complaint, identifying

25   in your response the amount, nature, components, and



# REGENCY

User: cbrooks
Ship To: Charlotte
Cost Center:
Order By: Sara Brady
Order Status: Confirmed

Order Number: WO-201735136
Date: 3/10/2023
P O Number:
Shopcart Name:
Total Lines: 6

| Product | Description | Manf | Qty | Price | UOM | Ct | Msg | Budget/Project | Ext |
|---------|-------------|------|-----|-------|-----|----|----|----------------|-----|
| 475248 300 | Office Depot Brand Plain Dividers With Tabs And Labels, White, 5-Tab, Pack Of 25 Sets | OFFICE DEPOT | 1 | $46.99 | PK | | | | $46.99 |
| 287154 300 | Bankers Box Stor/File Standard-Duty Storage Boxes With Lift-Off Lids And Built-In Handles, Letter/Legal Size, 10&ldquo; x 12" x 15", 60% Recycled, White/Blue, Pack Of 10 | FELLOWES INC. | 2 | $36.99 | PK | | | | $73.98 |
| 7733355 300 | TOPS Docket Letr-Trim Legal Rule Canary Legal Pads - 50 Sheets - Double Stitched - 0.34" Ruled - 16 lb Basis Weight - 8 1/2" x 11 3/4" - Canary Paper - Marble Green Binder - Perforated, | TOPS BUSINESS FORMS | 1 | $68.49 | PK | | | | $68.49 |
| 409557 300 | Pilot Precise V7 Liquid Ink Rollerball Pens, Fine Point, 0.7 mm, Blue Barrel, Blue Ink, Pack Of 12 | PILOT CORPORATION OF AMERICA | 1 | $19.79 | DZ | | | | $19.79 |
| 4714792 300 | Business Source Straight Tab Cut Letter Recycled File Pocket - 8 1/2" x 11" - 5 1/4" Expansion - Redrope - Redrope - 30% Recycled - 10 / Box | SP RICHARDS | 1 | $15.83 | BX | | | | $15.83 |
| 329026 300 | Redi-Tag See Notes, 1 3/4" x 15/32", Assorted Neon Colors, Pad Of 250 Flags | REDI-TAG CORPORATION | 2 | $7.09 | EA | | | | $14.18 |

LineTotal: $239.26
Tax: $17.33
Surcharge: $0.00
Total: $256.59

**Ship To Address :**
Customer Name: Van Hoy Reutlinger Adams & Pierce
Contact Name: Sara Brady
ShipTo Name: Van Hoy, Reutlinger, Adams & Pierce
737 East Blvd.
Charlotte NC 28203
**Delivery Instructions:**

**InHouse Comments:**