

EXHIBIT

7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No.: 1:21-cv-814

| | |
|---|---|
| LARISSA HARPER HAIRGROVE, ) | |
| ) | |
| Plaintiff, ) | **COMPLAINT** |
| ) | **JURY TRIAL DEMANDED** |
| v. ) | **CLASS ACTION** |
| ) | |
| CITY OF SALISBURY, DOWNTOWN ) | |
| SALISBURY INC., and LANE BAILEY, ) | |
| in his individual and official capacity, ) | |
| ) | |
| Defendant. | |

Plaintiff, by and through her undersigned attorneys, hereby make this
Complaint against Defendant, and alleges, as follows:

### PRELIMINARY STATEMENT

1.      This is an action brought by Plaintiff against Defendants for violation of
42 U.S.C. § 2000e-1 et seq (Title VII) for damages resulting adverse actions and a
hostile work environment based on her sex and retaliation for complaining about the
same.

2.      This is also an action brought under 29 U.S.C. § 201 et seq (the Fair
Labor Standards Act) and N.C. Gen. Stat. § 95-25.1 et seq. (the N.C. Wage and Hour
Act) against Defendants for violations of federal and state wage and hour laws.

3.      This is also an action brought under 42 U.S.C. § 1983 (Section 1983) for
violation of Plaintiff's rights to equal protection under the United States Constitution,

1

for violations by Defendant Lane Bailey in his individual capacity for implementing a specific practice of employing Plaintiff on behalf of the City of Salisbury jointly with the Downtown Salisbury Inc. and requiring Plaintiff to work two full time positions with two full-time supervisors in knowing violation of wage and hour laws and Plaintiff's right to be treated equally to other similarly situated City employees and not differently because of her sex.

4.     This is also an action under State common law articulated in *Corum v. University of North Carolina* against Lane Bailey in his official capacity seeking to vindicate Plaintiff's rights to equal protection and the fruits of her labor under Sections 1 and 19 (*Corum* claims).

5.     Plaintiff seeks compensatory and punitive damages, attorney's fees and costs, and all other equitable relief to which she may be entitled.

## JURISDICTION

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under Title VII, the FLSA, and Section 1983.

7.     The Court may exercise supplemental jurisdiction over Plaintiff's State law claims under 28 U.S.C. § 1367.

8.     Plaintiff has exhausted her administrative remedies and is filing this Complaint within 90 days of her receipt of the Right to Sue Notice issued by the EEOC against Defendant DSI and Defendant City of Salisbury.

## VENUE

9.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that Plaintiff resides in this district and the Defendants either live or have their principal place of business in this district and under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

10.    Plaintiff is a resident of Davidson, County, and was formerly jointly employed by the Defendant City of Salisbury and Defendant Downtown Salisbury Inc.

11.    Lane Bailey is the City Manager of the City of Salisbury and upon information and belief resides in Rowan County, North Carolina.

12.    The City of Salisbury is a municipal corporation organized under the laws of this State with the powers and duties conferred by law. N.C. Gen. Stat. § 160A-1(2).  By law, the City's powers are to be broadly construed under N.C. Gen. Stat. § 160A-4, except that "the exercise of such additional or supplementary powers shall not be contrary to State or federal law or to the public policy of this State."

13.    Downtown Salisbury Inc. is a nonprofit corporation organized under the laws of the State of North Carolina with its principal offices located in Rowan County, North Carolina.

## FACTS

14.    Plaintiff became employed as the Downtown Development Director for

the City after she applied for a position advertised by the City. She received and signed an offer letter on August 28, 2017, with a proposed start date of October 9, 2017. **Exhibit A.**

15.     In fact, Plaintiff was "strongly urged" to actually come to work on October 5, 2017, without pay in order to be present for an after work-hours events which was a tour of the Empire Hotel with the developers and a public open house. Plaintiff did attend the event, but was not paid for her attendance.

16.     Plaintiff learned soon after she became employed as Downtown Development Director with the City, that she was also required to be employed as full-time 40 hours/week paid professional Main Street Manager pursuant to an agreement between the City and DSI pursuant to a contract between the City and DSI. **Exhibit B, Appendix A.** Plaintiff also learned that Lane Bailey had told the City Council at the May 16, 2017 City Council meeting that the budget he was recommending for the City "incorporates Downtown Salisbury, Inc. (DSI) into the City organization."

17.     Plaintiff learned after was hired that the City and DSI had been at risk for losing the ability to administer Main Street funds they had collected because they had not followed proper procedure in requesting and using the funds and the City had failed to follow State mandated procedures by adverting a request for quotes in the proper manner to partner with DSI.

18.     As a result of this joint employment between the City and DSI, Plaintiff

routinely worked well in excess of forty hours a week in order to attempt to fulfill the expectations of Lane Bailey, City Manager, for her duties as Downtown Development Director, along with the expectations of the various members of the Board of the DSI, for her to work 40 hours a week as the DSI Main Street Manager.

19.     While Plaintiff was theoretically employed as an exempt department head, in reality her hours and duties were under significant daily scrutiny by Lane Bailey, and the Assistant City Manager Zack Kyle, and during some portion of her employment, she was also told she was being supervised by Bailey's administrative support person.  This was in contrast to the other department heads, mostly male, who were not micromanaged and required to account for all of their time.

20.     Plaintiff kept both Lane Bailey and his assistant fully apprised of the conflicting instructions she was getting from them and from the DSI board and the impossibility of being able to make both the City and the DSI board happy given that both of them wanted her working for them 40 hours a week.  Plaintiff was forced to attending meetings prior to the regularly scheduled work day and after the regularly scheduled work day and if she was not in her office, the City manager or his assistant questioned her whereabouts.  When she was not at the offices of DSI, the DSI board members questioned her whereabouts.

21.     Plaintiff knew that none of the other male department heads were being treated the way she was and Bailey was unresponsive to Plaintiff's complaints that her workload was not sustainable.

5

22. The DSI board also scrutinized Plaintiff's daily hours and duties and complained regularly to the City that Plaintiff was not responsive to their needs and did not promptly return emails, phone calls, and other messages.

23. In fact, as she learned, she was actually expected to work two full-times jobs, with only two weeks of orientation with an interim director who worked primarily as an administrative assistant for the DSI board members, and had not been required to function as a full-time City department head with the requirement to attend meetings which were required of department heads.

24. As examples of her unequal treatment as compared to male department managers, after Plaintiff was hired in 2017, the Parks & Recreation staff of the City resented Plaintiff's involvement in events which they had previously been in charge of. As a result, Plaintiff found it difficult to get their cooperation in carrying out tasks that were assigned to her department by both the City and by DSI such as a College Night event. The Parks & Recreation department head was male and when Plaintiff needed cooperation from the department, Bailey and his assistant routinely supported the male department head and not Plaintiff when conflicts arose.

25. In late December 2017, early January 2018, assistant manager Kyle admonished Plaintiff for failing to have Main Street Award recipients ready to announce in March 2018. In fact, Plaintiff was hired after the award applications were due and the applications had not been prepared by the previous interim director.

26. In March 2018 after six months in the position, Plaintiff presented to

6

both City management and the DSI board a list of the number and type of meetings she was being expected to attend as a result of her joint employment by both DSI and the City. **Exhibit C.**

27. On May 29, 2018, in her capacity as Executive Director of DSI, Plaintiff submitted a proposal to the City for DSI to become the Main Street manager for Salisbury's Downtown Municipal Service District. **Exhibit D**.

28. In June, Plaintiff submitted her Main Street Director's Work Plan for 2018-2019. **Exhibit E.**

29. When Whitney Williams became chair of the DSI board and Diane Yong became Vice-Chair, they engaged in a constant stream of communications and complaints about Plaintiff to Bailey and Zack Kyle about Plaintiff's alleged failure to prioritize the work of the DSI board over any other responsibilities she had as a result of her department chair position with the City. Plaintiff was aware of the deferential nature of the previous interim director of DSI and she was also aware that Williams expected her to be at her beck and call and that she simply could not satisfy Williams, who clearly preferred to deal with Bailey and Kyle, instead of Plaintiff.

30. In September 2018, Plaintiff was given an instruction to respond to all voicemails and emails within the same day or within 24 hours regardless of her workload or out of office responsibilities. On December 19, 2018, Zach Kyle issued Plaintiff a disciplinary action report for "lateness," "failure to follow instructions" and "other." In it, he indicated that one of the DSI board members emailed Plaintiff on

7

October 31 and she did not respond until November 12. Further he indicated that he had reviewed her email box and noted that "a number of emails" in her box had not been opened or responded to. Plaintiff knew that she was being treated differently from other male department heads whose email and response times were not being scrutinized like hers. **Exhibit F.**

31. Beginning in January 2019, Plaintiff began keeping a calendar of the extra hours she was required to work outside of regular business hours unlike any of the male department heads. **Exhibit G.**

32. In June 2019, Plaintiff became aware of the constant complaints by Williams to Zach Kyle and learned that Kyle had sent Williams and Dianne Young, the vice chair, and email asking them to contact Plaintiff directly with their concerns. This email was to no avail as Williams and Young made it clear to Plaintiff they did not want to work with her, though they seemed to have warm collegial relationships with many male colleagues.

33. On June 18, 2019, Bailey's assistant, Zach Kyle issued Plaintiff another disciplinary action report. Kyle noted that he had audited Plaintiff's email when he learned she had not responded to one email. Kyle noted in the report that Plaintiff had over 1600 emails in her inbox and that "a lot" of those emails had not been "opened/read." He noted this despite the fact that Plaintiff had informed him in December that she often kept emails in her inbox marked open/unread to remind her of certain things.

8

34.     Kyle's report also noted that Plaintiff had not completed a task she was purportedly assigned on May 19, 2019, which required one of her subordinate staff to track their time and activities, and that she had failed to make changes to a PowerPoint presentation that had been requested.  Finally, Kyle indicated that her key scan entries to the building had been audited and that she had not been in her office during regular business hours between 8:30am and 5:00pm, and had been arriving after 9:30am.  Kyle noted this even though he was aware that Plaintiff had out of office meetings with downtown business owners and DSI board members and other individuals which were routinely scheduled outside of "regular" business hours.

35.     Kyle indicated that Plaintiff would be suspended for three days on June 19, 20, and 21.  Plaintiff signed the report but included a note about her belief that the disciplinary report was unwarranted and she reiterated that she had had many successes in her position.

36.     Despite her suspension, Plaintiff was required to work on those days and was not paid for them.  On June 28, 2019, Plaintiff requested that Kyle advise her about how to code her timesheet for the period of time when she worked but was actually on suspension.  Kyle told her to check with HR and refused to allow her to get paid for the time she worked.

37.     On July 2, 2019, Kyle threatened to terminate Plaintiff in an email on which he copied Brianna Kenny if she did not have a project done by July 3, the deadline which he had given her.

9

38.     Between July and her November performance review, Plaintiff continued to attempt to meet the expectations of both the City and DSI though with a constant lack of support from Bailey and his subordinate Kyle. She continued to be scrutinized in a manner unlike any of the other male department heads.

39.     In November, when Kyle completed her review, he gave her unsatisfactory marks for being punctual (but noted she had improved in the last 4-6 months) and also noted she had challenges with utilizing staff to assure work was being completed.     Otherwise, her marks were all 2's (satisfactory) and 3's (exceptional).

40.     In December 2019, in response to a DSI board member complaint about a late email (7:51pm), Kyle questioned Plaintiff who indicated that she was balancing her work load during the preceding holiday weeks and exercising her discretion to prioritize her work and that the complaint was an example of how she was being micromanaged.

41.     On March 17, 2020, certain members of the DSI board wrote a letter to Lane Bailey, Zack Kyle, and Graham Corriher, the City Attorney accusing Plaintiff of "inappropriate actions," a "deliberate breach of the Board's trust" and "potential criminal acts and violations of City of Salisbury Employee policy." Apparently, at a January 2020 and February 2020 board meeting, Chair Whitney Williams called for a closed session of the board to meet. **Exhibit H.**

42.     Although the letter speaks for itself, after several back and forth

conversations and emails about whether the closed session was or was not recorded and listened to, at some point, assistant City Manager Kyle reached out to Chair Williams and told her that Plaintiff had listened to the closed session meeting. The letter indicates that **after** he told Williams that Plaintiff had listened to the email, he **subsequently** confirmed with Plaintiff that she had done so.

43. The letter, believed to have been authored by Chair Williams, further stated that while

> we recognize that the DSI Board has no voice in City personnel disciplinary matters, it is the opinion of the majority of Organization Committee that Harper should have been suspended, or at the very least removed from DSI matters and communication with the DSI Board, pending an internal investigation promptly upon the City's learning of her terminable and potentially criminal violation. As she was not, our Board - which continues to work actively to help downtown business owners in the retail, restaurant, and service sector who are facing the most critical test to their business's viability ever – has been placed in a difficult situation of continuing to work with an Executive Director who we hold in contempt. As it stands now, Organization Committee does not see a workable scenario where the existing Board remains intact with the current Executive Director.

44. Plaintiff was provided a copy of the letter to which she responded on April 12, 2020. **Exhibit I.** In this letter, Plaintiff detailed the hostile work environment that she had been subjected to and the treatment she had received which was quite different from how other male department heads working for the City had been treated. Plaintiff detailed how the DSI board members resented her for standing up for herself and refusing to let them bully her, which they would not have done had she been a male colleague based on her observation of how they

11

interacted with other male colleagues.

45.     On June 19, 2020, Plaintiff determined that she was going to have to ask for Family and Medical Act leave in order to cope with the stress from dealing with the conflicting demands of the DSI board and the City's failure to provide her with support in her position.  However, before she could do so, she was summoned to a meeting with Lane Bailey.

46.     Plaintiff met with Lane Bailey who indicated that he had solicited "performance evaluations" from the DSI board members.  Bailey did not provide the evaluations nor did he disclose any particulars about them.  Bailey indicated that he had concerns about Plaintiff's ability to lead the Downtown Development Department.

47.     On June 22, 2020, Bailey delivered a letter to Plaintiff indicating that he was considering dismissing her and instructing her to meet with him and the City's Human Resources office on June 24, 2020.  **Exhibit J**

48.     On June 23, 2020, Plaintiff resigned her position with the City indicating that her resignation was due to the hostile work environment and work place harassment to which she had been subjected.  **Exhibit K**

### COUNT ONE – TITLE VII
### (SEX DISCRIMINATION AND
### HOSTILE WORK ENVIRONMENT DUE TO SEX)

49.     Plaintiff  incorporates the allegations contained in ¶¶ 1 – 48 as though fully set forth herein.

50. During her employment, Defendants jointly employed Plaintiff and jointly subjected her to performance expectations far in excess of the expectations imposed upon any other City employees similarly situated to Plaintiff.

51. As a result of these untenable and unsustainable and discriminatory expectations, Plaintiff could not fully satisfy either the City or DSI even though she still managed to achieve many accomplishments during her employment.

52. The disciplinary actions which she was issued reflected these discriminatory performance expectations as did the final performance evaluation which Defendant Bailey solicited from those he knew to be her detractors at DSI.

53. Defendants created a hostile work environment for Plaintiff which eventually resulted in her coerced resignation.

54. As a result of Defendants' action which were undertaken with malice or reckless indifference to the federally protected rights of Plaintiff, Plaintiff suffered damages and is entitled to compensatory and punitive damages and any allowable equitable relief.

## COUNT TWO – TITLE VII
## (RETALIATION FOR COMPLAINING ABOUT SEX DISCRIMINATION AND A HOSTILE WORK ENVIRONMENT DUE TO SEX)

55. Plaintiff incorporates the allegations contained in ¶¶ 1 – 54 as though fully set forth herein.

56. Plaintiff complained about how she was treated unfairly compared to other male department heads and about the hostile work environment to which she

13

had been subjected.

57.     Defendants failed to take any action to remedy the discriminatory job assignments given her or to address her concerns about her hostile work environment.

58.     Instead, Defendants worked together to sabotage Plaintiff's employment and ultimately to terminate her employment in retaliation for her opposing the discriminatory work assignments and hostile work environment.

59.     As a result of Defendants' action which were undertaken with malice or reckless indifference to the federally protected rights of Plaintiff, Plaintiff suffered damages and is entitled to compensatory and punitive damages and any allowable equitable relief.

## COUNT THREE – WAGE AND HOUR VIOLATIONS IN VIOLATION OF THE NCWHA AND THE FLSA

60.     Plaintiff incorporates the allegations contained in ¶¶ 1 – 59 as though fully set forth herein.

61.     As part of its regular practice, Defendants intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiff. This policy and pattern or practice includes, but is not limited to:

(a) Willfully misclassifying Plaintiff as exempt from the overtime provisions of the FLSA;

(b) Willfully failing to pay Plaintiff overtime for hours that she worked in excess of 40 hours per workweek; and

14

(c) Willfully failing to record all of the time that Plaintiff has worked for the benefit of Defendant.

62.    Defendants were aware or should have been aware that federal and state law required them to pay Plaintiff the minimum wage for all hours worked, and to pay an overtime premium for hours worked in excess of 40 per workweek.

63.    Defendant's conduct has been widespread, repeated, and consistent.

64.    Defendant is liable under the FLSA and the NCWHA for, inter alia, failing to properly compensate Plaintiff

65.    Plaintiff is entitled to recover back pay, attorney's fees, costs and any equitable remedy available to her.

## COUNT THREE – VIOLATION OF STATE AND FEDERAL CONSTITUTIONAL GUARANTEES OF EQUAL PROTECTION IN VIOLATION OF SECTION 1983 (FEDERAL) AND SECTIONS 1 AND 19 (STATE *CORUM* CLAIM)

66.    Plaintiff incorporates the allegations contained in ¶¶ 1 – 65 as though fully set forth herein.

67.    The acts of Defendants in engaging in intentional sex discrimination, the creation and maintenance of a hostile work environment based on sex, and retaliation for opposing the same constitute violations of Sections 1 and 19 of the N.C. Constitution and the equal protection clause of the U.S. Constitution which prohibit discrimination on the basis of sex in the operation of public employment and which prohibits denial of equal protection of the law.

68.    The hostile and discriminatory treatment of was motivated, in part,

15

because Plaintiff is female and because she stood up for herself and resisted being treated differently because of her sex.

69.     As a direct and proximate result of the above described unlawful and malicious acts of Defendants, Plaintiff has suffered a loss of earnings, bonuses, retirement benefits, employment opportunities, emotional and mental anguish, all of which are in violation of her civil rights under the N.C. and U.S. Constitutions and State and Federal laws, and in an amount to be determined at trial.

70.     Plaintiff is entitled to compensatory and punitive damages, attorneys fees, costs, and any equitable relief to which she is entitled.

WHEREFORE, PLAINTIFF requests judgment as follows:

A.     On Count One - Three, awarding compensatory and punitive damages in favor of Plaintiff in an amount to be determined at trial, plus interest, attorneys' fees, and costs and any equitable relief to which Plaintiff may be entitled; and

B.     Granting Plaintiff such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 18th day of October 2021.

**/S/ VALERIE BATEMAN**
NC State Bar: 13417
T/F 919-436-3592
valerie.bateman@forrestfirm.com
FORREST FIRM, P.C.
3211 Shannon Road, Ste 100
Durham, NC 27707

**/S/ RACHEL M. BLUNK**
NC State Bar: 42694
T/F 336-663-1052
rachel.blunk@forrestfirm.com
FORREST FIRM, P.C.
125 S Elm St., Suite 100
Greensboro, NC 27401

***Attorneys for Plaintiffs***



Downtown Development Director
Salisbury, NC
© Meandering Passage

About Salisbury:

The City of Salisbury was founded in 1753. The area is rich with centuries of history and adventure while maintaining the charm and character distinct to the region. By 1855, Salisbury had become an important rail junction, connecting the Piedmont to eastern North Carolina.

The City of Salisbury, the county seat of Rowan County, is located in the Piedmont area of North Carolina. Located on Interstate 85, 35 miles northeast of Charlotte and southeast of Winston-Salem, Salisbury is within one days' travel time of any major city on the east coast and is located at the crossroads of I-85, U.S. 29, 52, 70, 601 and N.C. 150. Over 3 million people live within 90 miles of Salisbury, 1.5 million within 55 miles and 60% of the population of the United States is located within an overnight drive of the City.

The Culture:

The Salisbury community presents an area rich in cultural resources with tremendous citizen support and stewardship for arts and cultural development. Salisbury boasts a tradition of valuing arts and diligently strives to protect existing resources while linking arts and cultural resources to key economic, neighborhood development, educational, and social goals of the broader community.

Salisbury is characterized by a strong commitment to historic preservation, high levels of arts and cultural activity, a citizen base that places high value on arts education, and a strong local tradition of civic volunteerism. The city offers a growing, strong population of professional and amateur artists drawn from many disciplines with vast support from local patrons and foundations. The City of Salisbury welcomes diversity.

Responsibilities:

The Executive Director will perform professional work for the initiation and promotion of programs to improve, preserve, and enhance the downtown, and to promote the improvements, overall appearance and economic vitality in the City of Salisbury.

Specific Responsibilities:

- Develops and oversees downtown development and revitalization activities and projects
- Develops marketing strategies for plans and projects for downtown development
- Builds cooperative working relationships with boards, property owners, business and community partners
- Promotes downtown programs and business activities using the media and promotional materials
- Provides appropriate market research, data and technical assistance to developers, businesses and entities seeking to initiate economic development in Downtown Salisbury
- Prepares and submits annual budgets for Downtown Salisbury Inc.
- Seeks to establish new economic development initiatives for Downtown Salisbury as outlined in the master plan

Qualifications

- Excellent communication skills
- At least 3 years of experience and proven record of accomplishment in managing a downtown organization, in business and economic development, real estate development or management
- Ability to establish and maintain effective working relationships with associates, officials, contractors, public groups and general public
- Extensive experience in economic development for Main Street Program
- Bachelor's degree in Business, Planning, or Public Administration, or equivalent combination of education and experience
- Valid North Carolina Driver's License

Salary Range

$67,800.00 - $95,000.00 (Depending on Experience)

Application Process:

Apply online at www.salisburync.gov/hr

Closing Date:  Open until filled

First Review of Applications: May 12, 2017



# *City of Salisbury*
### *North Carolina*

August 28, 2017

Larissa B. Harper
1520 Nash Street
Wilson, NC 27893

Dear Ms. Harper,

We are very pleased that you have decided to become a full-time employee of the City of Salisbury. As we discussed, I feel you will be an asset to the City of Salisbury as the Downtown Development Director, which is a <u>salary/exempt</u> position. I am extending an offer of employment to include the following elements of compensation and benefits.

1. Base pay of $2,884.62 bi-weekly which when annualized is equivalent to $75,000.12 per year.
2. A 5% increase in salary following successful completion of 6 months of employment.
3. A 5% increase in salary following completion of one year employment with successful performance evaluation.
4. Paid relocation expenses, up to $5,000.
5. Annual performance evaluations with eligibility for merit increases based on the City's merit schedule.
6. An annual 1% bonus following completion of one full calendar year of employment.
7. Free individual health insurance benefits for employee with participation in the base plan.
8. Coverage for dependents is also available for additional cost. The following tiers are: Parent/Child, Employee/Spouse and Family.
9. Free life insurance equal to one time your salary, with double indemnity for accidental death and dismemberment. Family life insurance coverage ($10,000/spouse and $5,000 each eligible child) is available for an additional cost.
10. Eligibility in the 401K Plan. The City will contribute 3% of your salary and you may make voluntary contributions to the plan.
11. Participation in the Local Government Retirement System (6% mandatory employee contributions in addition to employer contributions set annually by North Carolina legislation).
12. Eligibility for participation in the 457 Deferred Compensation Plan.
13. Annual leave at an accrual rate of 7.5 hours per month.
14. Sick Leave at an accrual rate of 7.5 hours per month
15. 13 Paid Holidays

While we look forward to having you join our City of Salisbury team, we recognize that you retain the option of ending your employment with us at any time, with or without notice and/or just because. At the same time, the City acknowledges having the authority to exercise the same option. Thus, we emphasize that your employment with the City is "at-will" and neither this letter nor any other oral or written communication may be considered a contract of employment for any specific period of time.

*132 N. Main Street        P.O. Box 479        Salisbury, N.C. 28145        Phone: (704) 638-5217 Fax: (704) 638-8454*

Case 1:21-cv-00814-CCE-JLW   Document 1-1   Filed 10/18/21   Page 4 of 6
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 21 of 107

During the course of your employment, you will be given access to confidential, proprietary information and trade secrets of the organization and its affiliates. By accepting this offer of employment, you acknowledge and agree that the protection of the Confidential Information is necessary to protect and serve the value of the Organization, its affiliates and their businesses. You agree that, without the prior consent of the Organization, you will not at any time (whether during or at any time after your employment), directly or indirectly, disclose any Confidential Information to any person or entity outside the Organization and you will not directly or indirectly use any Confidential Information other than for the purpose of performing your job duties for the Organization.

In order for the process to be as smooth as possible we need all forms to be in HR by noon the Friday before you begin working. These forms include:

- Tax forms
- I-9 forms
- Direct Deposit forms
- 401k forms

Information on employee benefits and enrollment forms may be found at: http://www.salisburync.gov/hr/employeebenefits.html. Upon acceptance of this offer of employment you will be sent instructions on benefit enrollment using BenefitFocus our on-line enrollment portal. Please complete the on-line enrollment by 5:00 p.m. on Friday of your first week of employment. If you have any questions about benefits please contact us at (704) 638-5217.

We would like for you to begin employment on Monday, October 9th, 2017 and would like to proceed expeditiously to complete the pre-employment process. Please review above items and if you are in agreement, sign the statement of acceptance below.

The above offer of employment is contingent upon: **(a) satisfactory background check; and (b) successful completion of a drug screen and possibly a physical examination.**

Again, we look forward to having you join our team. I feel that you will make a significant contribution to our organization and community.

Sincerely,


W. Lane Bailey
City Manager

## STATEMENT OF ACCEPTANCE

I, _Larissa Harper,_ accept the terms of the employment offer outlined above in the

letter dated _08-28-2017._

_Larissa B. Harper_          _08-28-17_
Prospective Employee Signature          Date



# *City of Salisbury*
## *North Carolina*

THIS INSTRUMENT HAS BEEN PREAUDITED IN THE MANNER REQUIRED
BY THE LOCAL GOVERNMENT BUDGET AND FISCAL CONTROL ACT.

_____ FINANCE DIRECTOR
OR AUTHORIZED SIGNATURE

*132 N. Main Street*        *P.O. Box 479*        *Salisbury, N.C. 28145*        *Phone: (704) 638-5217 Fax: (704) 638-8454*

**THIS INDEPENDENT CONTRACTOR AGREEMENT** (hereinafter, this "Agreement"), entered into this ⎯⎯ of ⎯⎯⎯⎯⎯⎯⎯, 2018, by and between the **CITY OF SALISBURY**, a North Carolina municipal corporation (hereinafter, the "City") and **DOWNTOWN SALISBURY, INC.**, (hereinafter "Contractor").

**WHEREAS**, the City and Contractor desire to enter into an Agreement whereby Contractor shall provide the following Service:

- **Administer the Downtown Salisbury Municipal Service District (MSD) Program;**
- **Contractor will provide services requested as summarized above and detailed in Appendix A "Scope of Services";**
- **Contractor is organized to provide services and deliverables set forth in Appendix A and as outlined in Contractor's Proposal attached hereto and incorporated herein by reference;**
- **Contractor will provide services July 1, 2018-June 30, 2019. Contract shall be renewable annually through June 30, 2023.**

**NOW, THEREFORE**, in consideration of the mutual promises and obligations herein set forth, the sufficiency and adequacy of which is hereby acknowledged, the parties, and their respective successors, assigns, executors, administrators and legal representatives, hereby agree as follows:

**General Terms.**  The Contractor shall provide the Service set forth hereinabove, in consideration for the estimated payment of **One Hundred Thirty-Five Thousand Dollars and 00/100 ($135,000.00)** as allocated in the City's approved FY2019 budget and equivalent to the amount the City will receive in MSD tax revenue. The Contractor's Proposal dated **May 29, 2018,** is attached hereto and incorporated herein by reference. Should any term of the attached proposal conflict with the terms contained in this Agreement, the terms of this Agreement shall control and supersede those terms of the Contractor's proposal.  The Contractor warrants that it will perform the Scope herein in a good and workmanlike manner and that it knows and is familiar with all applicable laws, regulations, and standard practices regarding these Services and has the expertise necessary to properly perform the obligations undertaken by this Agreement. The Contractor, and its employees and subcontractors, shall perform the Services herein as Independent Contractors and are <u>not</u> entitled to employee benefits of any kind. This Agreement will not be construed in any way to be a joint venture, partnership or employer-employee relationship.  The Contractor further understands and agrees that he is responsible for the payment of all state and federal income taxes.  In addition, the Contractor shall provide the City any licenses or certifications required by federal, state, or local law as well as copies of any amendments or renewals thereof.  The Contractor shall give the City at least thirty (30) days written notice prior to any cancellation, modification, or non-renewal of any license and/or certification required by federal, state, or local law.  Neither party may assign, transfer, or delegate any of the rights or obligations herein without the prior written consent of the other party.  This Agreement shall be governed by and construed in accordance with the laws of the State of North Carolina, and the venue for any litigation arising out of this Agreement shall be Rowan County.

**Payment.** Contractor shall invoice at least quarterly. The City has the right to request that the Contractor provide reasonable documentation to support an invoice.

**Release and Indemnity.** The Contractor hereby releases and forever discharges the City, its agents, officers, officials, and employees, from any and all claims, demands, expenses, costs, and liabilities of any kind or nature directly or indirectly related to any personal injury and/or property damage arising out of the performance of the Service, except those claims that result from the sole negligence of the City or a City employee acting within the scope of the employment. The Contractor shall indemnify, defend and hold harmless the City, its agents officers, officials, and employees from and against any and all claims, demands expenses, costs and liabilities of any kind or nature, directly or indirectly caused by, arising out of, or related to the intentional, negligent, or reckless acts or omissions of the Contractor and its agents or employees in the performance of these services.

**Insurance.** During the performance of the Service described herein, the Contractor shall:
(1) Maintain Commercial General Liability to protect the Contractor, its subcontractors, and the City against any and all injuries to third parties, including personal injury and property, and special and consequential damages, resulting from any action, omission or operation by the Contractor or in connection with the services described herein. The insurance shall also include coverage for explosion, collapse, and underground hazards, where required. This insurance shall provide bodily injury and property damage limits of not less than $1,000,000 for each occurrence, respectively. The minimum liability coverage required may be increased depending on the nature of the services provided.
(2) Maintain Owned, non-owned, and hired Automobile Liability insurance, including property damage insurance, covering all owned, non-owned, borrowed, leased, or rented vehicles operated by the Contractor in furtherance of these services. In addition, all mobile equipment used by the Contractor in connection with the contract work will be insured under either a standard Automobile Liability policy or a Comprehensive General Liability policy. This insurance shall provide bodily injury and property damage limits of not less than $1,000,000 combined single limit/aggregate.
(3) Maintain Workers' Compensation insurance as required by North Carolina law with liability limits of no less than $1,000,000 for bodily injury and property damage.
(4) Provide to the City's Purchasing Officer, before beginning the Service, an original, signed Certificate of Insurance, evidencing such insurance, naming the City as an additional insured, and stating that the coverage is primary to any other coverage the City may possess. The Contractor shall furnish the City immediate written notice of any changes or cancellation of the policy. The failure of the Contractor to deliver a new and valid certificate will result in suspension of all payments until the new certificate is furnished to the City's Purchasing Officer. Insurance coverage required in these specifications shall be in force throughout the Term. Municipal Exclusions, if any, for General Liability coverage shall be deleted. Should Contractor fail to immediately provide acceptable evidence of current insurance at any time during the Term, the City shall have the absolute right to terminate the Contract without any further obligation to the Contractor, and the Contractor shall be liable to the City for all available remedies – in equity and at law.

(5) The Contractor will secure evidence of all insurance policies of its subcontractors which shall be made available to the City prior to subcontractor performing in work. The Contractor shall require its subcontractors to name the Contractor and the City as additional insured parties on the subcontractor's general and automobile liability insurance policies. The Contractor shall be as fully responsible to the City for the acts and omissions of its subcontractors and of persons employed by them as it is for the acts and omissions of persons directly employed by it.

(6) Contractual and other Liability insurance provided under this Contract shall not contain a supervision inspection or engineering services exclusion that would preclude the City from supervising and/or inspecting the project as to the end result.

**Termination.** Unless otherwise agreed upon in writing by the parties, this Agreement may be terminated by either party for convenience with no less than ten calendar days' notice. In the event of termination, the Contractor will be paid for all Services properly rendered to the date of termination and shall promptly discontinue all Services affected (unless a termination notice from the City directs otherwise). In the event of any termination, the Contractor will be paid for all Services properly rendered to the date of termination and shall (i) promptly discontinue all Services affected (unless a termination notice from the City directs otherwise); and (ii) deliver to the City all documents, data, reports, estimates, summaries, and such other information and materials as may have been accumulated by the Contractor in performing the Services herein. Other than being paid for Services properly rendered to the date of termination, Contractor hereby waives any and all other claims for lost profits, lost opportunity, and for any and all other direct, indirect special and consequential damages. In the event that the City terminates this Agreement due to the Contractor's poor workmanship, failure to perform the Service set out herein or otherwise, for breach of the Agreement, or in the event that the Contractor terminates this agreement for convenience or otherwise, the City may pursue and recover all remedies available at law or in equity, as these remedies are cumulative and do not exclude each other.

**Reuse of Documents.** All documents, including drawings, specifications, supporting calculations, computer software, etc., prepared by the Contractor pursuant to this Agreement are instruments of service with respect to this Agreement and Contractor shall provide at least one copy of each to City upon City's request. The reuse of these documents by the City or by others authorized by the City, whether in this project or any other project, entitles the Contractor to no additional compensation. The City reserves the right to require the Contractor to submit copies to the City of any Service information and documentation during and after the completion of the Service with the Contactor's compensation being limited to the direct printing and copying expense and/or direct expenses to copy and supply computer information on a diskette. The Contractors indemnity, release, and warranty are limited to the use contemplated in this Agreement, and Contractor shall not be liable to the City or any third party for any claim arising out of the use of the Contractors documents apart from this Agreement.

**Notices.** Any notice or other communication herein shall be in writing and shall be sent via a method permitting confirmed receipt (such as registered U.S. mail or an overnight courier service such as Federal Express). All notices shall be confirmed by email. All notices shall be deemed given when deposited, postage prepaid, in the United States mail or to the overnight courier service, addressed as set forth below, or to such other address as any one party shall advise the other in writing:

| If to the City: | | If to the Contractor: | |
|---|---|---|---|
| Name: | Gayla Long | Name: | Gregory Shields |
| Position: | Purchasing Coordinator | Position: | Board Chair |
| Address: | PO Box 479 | Address: | 415 S. Fulton St. |
| | Salisbury, NC 28145 | | Salisbury, NC 28144 |
| Email: | glong@salisburync.gov | Email: gshields@me.com | |

**Severability.** If any provision of this Agreement is held to be void, invalid, illegal or unenforceable under any law or regulation, such void, invalid, illegal or unenforceable provision shall be deemed stricken, and all remaining provisions shall continue to be valid and binding upon the City and the Contractor, and this Agreement shall be considered as if such void, invalid, illegal or unenforceable provision had never been including herein.

**Entire Agreement.** This Agreement and attached bid response represents the entire understanding and agreement between the parties hereto relating to the Services and supersedes any and all prior negotiations, discussions, and agreement, whether written or oral, between the parties regarding same. Headings within the Agreement are for convenience only and do not define, limit, or construe the contents of such sections.

**Amendment or Modification.** This Agreement cannot be amended or modified except by another written document duly signed and executed by the City and the Contractor.

**Waiver.** Failure or delay on the part of the City to exercise any right, remedy, power or privilege hereunder shall not operate as a waiver of any current or future default. Further, a waiver of one provision of this Agreement is not a waiver of all or future provisions of this Agreement.

**ADA, OSHA and Equal Opportunity.** The Contractor shall comply with the applicable provisions of the Americans with Disabilities Act (ADA), the State of North Carolina Occupational/Safety and Health Act (OSHA), and the State and Federal Equal Opportunity Statutes, as well as all rules and regulations promulgated thereunder.

**Suspension and Debarment.** Contractor hereby certifies that neither it, nor its agents or subcontractors: (1) are presently debarred, suspended, proposed for suspension or debarment from contracting by any Federal or State Department or Agency, or (2) have been declared ineligible or voluntarily excluded from contracting by or with any Federal or State Department or Agency. Any contract entered into with a contractor or subcontractor that has been debarred or suspended, declared ineligible, or voluntarily excluded from contracting with or by any Federal or State Department or Agency may be terminated at the sole discretion of the City.

**E-Verify Compliance.** In accordance with the Reclaim Act, Session Law 2013-418, and Article 2 of Chapter 64 of North Carolina General Statutes, Contractor must execute, either before or simultaneous with this contract, the attached E-Verify Verification attesting to: (1) its compliance with E-Verify or the non-applicability of the E-Verify requirements due to an employee population of less than 25 employees in North Carolina; and (2) its subcontractors' compliance with E-Verify or the non-applicability of such due to an employee population of less

than 25 in North Carolina. Said Verification is attached hereto and incorporated herein. A violation of this provision or the E-Verify requirements shall be just cause for the City to terminate this contract. Any contract entered into without an executed E-Verify affidavit shall be void.

**Iran Divestment Act Certification.** Contractor hereby certifies that Contractor, and all subcontractors, are not on the Iran Final Divestment List ("List") created by the North Carolina State Treasurer pursuant to N.C.G.S. 143-6A-4. Contractor shall not utilize any subcontractor that is identified on the List.

       **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives and signed under seal effective as of the date first written above.



**CITY OF SALISBURY**

_____ (SEAL)
Al Heggins, Mayor

_____ (SEAL)
Witness

This instrument has been pre-audited in the manner required by the Local Government and Fiscal Control Act.

This _15th_ day of _August_, 2018.

_____
Gayla Long, Purchasing Coordinator

**BUSINESS NAME:**

_____ (SEAL)
Gregory Shields, Board Chair

_____
Printed Name / Title

_____

# APPENDIX A

**Scope of Work**

The private or non-profit agency selected to administer the MSD shall be responsible for working in coordination with the Downtown Development Director on the following:

- Administer the City of Salisbury's Main Street Program
- Develop and manage business retention and recruitment efforts downtown
- Establish partnerships with city staff, county staff, area non-profits and others as needed to advance downtown plans for public improvements and private redevelopment
- Work with property owners to identify development opportunities, including upper floor re-use
- Work with the NC Main Street Program, financial institutions, city staff and others to identify additional funding opportunities for downtown development
- Plan and implement downtown promotions and signature events
- Recruit and build the volunteer base to help support committees and events
- Advocate for redevelopment of the Empire property
- Attend to the prevalent needs of the MSD identified by property owners and residents
- Prepare and present to City Council an annual report of needs of the service district, completed projects, and pending projects
- Carry out any other activities that may be determined during the contract negotiations between the City and the private/non-profit agency

Specific requirements associated with the City of Salisbury's designation as a North Carolina Main Street community:

- Participate in all services provided to the local community by the N.C. Main Street Center.
- Employ a full-time - 40 hours/week paid professional Main Street Manager as required, that is dedicated to downtown and that will coordinate and facilitate the work of the program. (***The Downtown Development Director employed by the City of Salisbury fulfills this role.***)
- Support the Main Street Manager to attend New Main Street Manager Orientation, held each month in Raleigh, within three months of start date (if not previously attended).
- Support the Main Street Manager to attend Main Street Basic Training each time there is a change in management (if not previously attended).
- Support the Main Street Manager to attend Main Street Managers' Meetings held once a year in August.
- Support the Main Street Manager to attend Two of Three Tri-annual Regional Meetings each year. (Held in January, July and October.)
- Support the Main Street Manager and a minimum of one volunteer to attend the annual N.C. Main Street Conference - (NCMS provides each designated MS community with two complimentary registrations).
- Designation as a 501(c) 3, 4, or 6 nonprofit organization, or obtain within the contract term

- Establish broad-based support for the commercial district revitalization process, with strong support from both the public and private sectors.
- Establish and maintain an active Board of Directors and Committees using the Main Street Four-Point Approach® and develop a comprehensive Main Street Work Plan using the Main Street Four-Point Approach®.
- Establish an annual work plan/planning process for downtown.
- Adopt and exhibit a Historic Preservation Ethic and design management program.
- Demonstrate an established vision for downtown and a mission that defines the role of the organization that will manage the downtown initiative.
- Fund the local Main Street program through both public and private partnerships at a level allowing for full implementation of the program based on the Four-Point Approach® and the adopted annual work plan.
- Submit annual Statistical data in July and Budget & Salary information and Program Assessment Survey in January as requested to the NCMS Center.
- Maintain an annual membership with the National Main Street Center at a $350 designated level.

Reimburse the NCMS Center's staff travel expenses when they are traveling to the local community at the IRS state rate plus meals at the state per diem rate and lodging.

# DSI Director's Report

*Add for Bod* — *What I have done month from last meeting*

## Timeline: October 5th, 2017 - March 9th, 2018

| Meetings: | # of Meetings: |
| --- | --- |
| Cheerwine | 5 |
| Management Team/EPR | 12 |
| Pre-Council | Reoccuring |
| Post-Council | Reoccuring |
| DSI-Board | Reoccuring |
| DSI-ORG | Reoccuring |
| Design | Reoccuring |
| Promo | 7 |
| Marketing | 3 |
| Econ | 2 |
| ED | 2 |
| Regional | 2 |
| Empire | 26 |
| Tour | 9 |
| TDA | 1 |
| Wayfinding | 2 |
| PAC | 3 |
| Chamber | 3 |
| City Council (1st & 3rd Tues.) | Reoccuring 2x/mo. |

| Events Worked: | Date: |
| --- | --- |
| Halloween Fun Fest | 10/28/2017 |
| Thanks & Giving | 11/3/2017 |
| Holiday Night Out | 11/24/2017 |
| Santa & Grinch at Bell Tower | 11/25/2017 |
| Jingle Mingle | 12/1/2017 |
| Wine About Winter | 2/2/2018 |
| | Total Events: 6 |

### PRESENTATIONS:

| Presentations Given for Empire: | Date: |
| --- | --- |
| Public Presentation and Tour | 10/5/2017 |
| Landmarks Application Status Presentation | 12/14/2017 |
| Presentation to Council and Tour | 1/16/2018 |
| Presentation to Council and Tour | 1/27/2018 |
| Presentation to Council and Tour | 2/5/2018 |
| Presentation to Community Appearance Comm | 2/7/2018 |
| Presentaiton Given to Regional Marketing w/ TDA | 10/13/2017 |
| Presentation given to NCCCMA | 2/1/2018 |
| | TOTAL PRESENTATIONS: 8 |

### Total # of Meetings Per Month:

| Month | |
| --- | --- |
| October: | 10 |
| Novemebr | 14 |
| Decemeber | 10 |
| January | 26 |
| February | 11 |
| March (As of 3-9) | 6 |
| | 77 |

### REOCCURRING

| | |
| --- | --- |
| City Council Meetings | 1st and 3rd Tuesday |
| Pre-Council 1st and 3rd Tuesdays | 1st Tues and 3rd Mon |
| Post-Council 1st and 3rd Wednesdays | 1st Wed and 3rd Wed |
| Management Team Meetings | Every Monday |
| DSI- Board | 4th Tuesday |
| Chamber Board Meetings | 3rd Monday |
| DSI- Org | 2nd Monday |
| DSI-Deisgn Committee | 2nd Tuesday |
| ED | 1st Tuesday |
| Empire Hotel Call | Every 2 Weeks |

Case 1:21-cv-00814-CCE-JLW   Document 1-3   Filed 10/18/21   Page 1 of 1

 

**MAIN STREET AMERICA™**

Janet Gapen
City of Salisbury
Community Planning Services
132 N. Main Street
Salisbury, NC 28144

May 29, 2018

Downtown Salisbury, Incorporated (DSI) is pleased to provide our response to the Request for Proposal for management of Salisbury's Downtown Municipal Service District.

DSI is a not for profit, 501C 3 organization which was formed in the early 1980's and holds a core mission to "To promote, enhance and manage the development of the central business district of Salisbury, accomplishing this by improving and expanding the district to become the economic, governmental, social and cultural center of Rowan County". Through planning, the development of partnerships, and adherence to our mission, we have managed the Downtown MSD funds and program with great success for more than 30 years.

We are an accredited Main Street program, recognized by both the National and North Carolina Main Street Programs. DSI is managed by a 21 person Board of Directors, representing downtown stakeholders and a full time Executive Director who oversees the progress and purpose of the organization.

To obtain and maintain the accredited status we must adhere to the four point approach to development of the downtown, utilizing four core committees to enact the standards of the Main Street Program. Our four main committees are Economic Vitality, Organization, Design/Master Plan and Promotions/Marketing. Staff of DSI facilitate the meetings of these committees but they are comprised of and managed by volunteers.

Using this model and structure, DSI has provided a great deal of success in the downtown of Salisbury. Since 1980, we have facilitated more than 128 million dollars in private investment, achieved the development of a net of 1100 jobs, and developed and sustained more than 343 net businesses in the MSD. So that the high level of success and standards will continue, DSI will utilize the Main Street Model of downtown development while implementing the goals and strategies that address downtown needs and development in the 2018-19 contract year.

The vision, mission, goals, strategies, and tasks of the organization and all four committees were reviewed and updated in April 2018 at a strategic action planning workshop facilitated by NC Main Street Center staff. In the planning session for Fiscal Year 2018-19, it was determined that three main goals would continue to guide the activities of the organization. They are as follows:

**Downtown Salisbury Inc. • 217 South Main Street • Salisbury, NC 28144**
www.DowntownSalisburyNC.com • 704.637.7814                    Page 1 of 2

Case 1:21-cv-00814-CCE-JLW   Document 1-4   Filed 10/18/21   Page 1 of 9
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 32 of 107




1) Downtown Salisbury is the hub of technology, shopping, and business in Rowan County
2) Downtown Salisbury is the center for Urban Living in Rowan County
3) Downtown Salisbury is the center of arts, history, culture, & entertainment in Rowan County

The updated goals and strategies for the organization closely reflect a response to information gleaned from the 2016-17 Salisbury Downtown MSD-Public Input Summary which will continue to include strategies such as:

- Engage in a public process to evaluate the scope and design of downtown public improvement projects (this project to consider but not be limited to design of streetscapes, sidewalks, downtown bathrooms, parking, development of a park, multimodal transportation solutions and accessibility and signage)
- Attract and develop opportunities for downtown businesses through promotional events, the provision of assistance for new and existing businesses and programs which will assure marketing and financial stability
- Develop Empire Hotel Property into mixed use/market rate apartments
- Develop businesses and retail opportunities that support the culture, arts, and active needs of residents and daily users of downtown.

The DSI Board of Directors believe that this organization is uniquely qualified to provide vision and lead the downtown into further success with downtown improvements, historic renovation, upper level housing, business retention, recruitment, overall economic development and sustainability of the Municipal Service District. We have a long standing, firm foundation for planning, development and leadership in the downtown and look forward to continuing our relationship into the 2018-19 fiscal year contract.

On behalf of the Board of Directors, and as an authorized signature and submittal source for this document, I thank you for the opportunity to respond to this Request for Proposal for the City of Salisbury Downtown Municipal Service District Contract. Attached you will find the full response to RFP as required by the City of Salisbury.

Sincerely,

Larissa Harper, Executive Director
Downtown Salisbury Incorporated

Downtown Salisbury Inc. • 217 South Main Street • Salisbury, NC 28144
www.DowntownSalisburyNC.com • 704.637.7814          Page 2 of 2

Case 1:21-cv-00814-CCE-JLW   Document 1-4   Filed 10/18/21   Page 2 of 9
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 33 of 107




## Experience and Qualifications

In 1980 Salisbury was chosen as one of the four original "Main Street Cities" in North Carolina. Following, in the early 1980s the Downtown MSD was established with Downtown Salisbury Incorporated (DSI) being the lead agency working to promote, develop, and preserve the historic buildings, arts, and culture in the MSD since. The Downtown MSD currently contains roughly 27 blocks, stretching from Jackson Street to Long Street and from Horah Street to Cemetery Street.

For many years DSI has been developing yearly goals and utilizing committee structures which follow the National Main Street Four Point Approach to downtown revitalization. This methodology combined with the development and use of the Downtown Master Plan has provided our committees structure and has been our key planning guide since the first edition of the Master Plan in 2000. Our Design Committee and Master Plan subcommittee are currently working on an update version of the Master Plan.

Our results are substantial and our statistics provide a good indication of DSI's qualifications and experience to manage the 2018-19 MSD management contract with the City of Salisbury. Since 1980, DSI had effectively worked in the downtown MSD and initiated more than 128 million dollars in private investment, facilitated the development of a net of 1100 jobs, and developed and sustained more than 343 net businesses

Some of DSI's accomplishments over the past four years are as follows:

- Assisted in major redevelopment projects resulting in job creation and tourism, particularly New Sarum Brewery and Morgan Ridge Brewery and Eatery, as well as more than 4 business expansions and a net gain of 42 jobs;
- Assisted in 16 facades improvements/renovations ;
- Partnered in May 2018 with City Parks & Recreation Department, as well as many other City departments, to bring back 2017's successful Cheerwine Festival, after public demand, which brought approximately 30,000 attendees (preliminary numbers) back into downtown. Due to its success, this will most likely be an additional "signature downtown event", with which DSI will continue to partner with the City to plan and implement, with the date set for May 18, 2019;
- Continue to successfully manage the development process for the Empire Hotel Project;

At each turn and in every instance Downtown Salisbury has been integral to the planning, implementation, and success of historic renovation and economic development projects in the downtown. We are aware that our success is predicated upon the development of partnerships, advocacy, our longevity, a strong committee structure and good planning. Our tract record, knowledge, history and partnerships provides that Downtown Salisbury, Inc. is uniquely qualified to manage and implement the 2018-19 contract with the City of Salisbury to manage the MSD. We have been working in the downtown MSD since the early 1980s with an exemplary record of success. See contact Information below:

**Downtown Salisbury Inc.** • **217 South Main Street** • **Salisbury, NC  28144**
www.DowntownSalisburyNC.com • **704.637.7814**        **Page 1 of 1**

Case 1:21-cv-00814-CCE-JLW   Document 1-4   Filed 10/18/21   Page 3 of 9
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 34 of 107



## Organizational Structure

Downtown Salisbury, Incorporated is a 501 C 3 organization, incorporated Downtown Salisbury, Inc. (DSI) is a not for profit organization that was formed with the mission of revitalizing, preserving and developing Downtown Salisbury. Therefore, DSI has a lengthy history of leadership and active involvement in downtown revitalization, involvement and implementation of programs and projects to benefit the downtown Municipal Service District. We are managed by a Board of Directors, comprised of 21 persons who are stakeholders in the downtown.

Key Personnel:

**Larissa Harper, Executive Director**
Qualifications: Current Director of the Downtown Development Dept. and Executive Director to DSI; Five (5) years as Downtown Business Specialist for City of Wilson in the Planning and Community Development Dept., staffing two (2) non-profit development partners (Wilson Downtown Development Corp. and Wilson Downtown Properties); Two (2) years Executive Director of Kernersville Downtown Preservation & Development Council; BS in Political Science; 20 years as Real Estate Broker (Current Inactive Status); Former small business owner
Role: Full-time City staff, liaison for organization as well as for all MSD business and property owners. Provide goal planning oversight and implementation planning for Board and Committees. Oversee daily duties of the non-profit business office; Facilitate meetings between City Departments and developers/property/business owners; Assist with business recruitment and retention efforts; Supervise staff. Provide communication to Board, stakeholders and community.

**Katelin Rice, Promotions Coordinator**
Qualifications: BA- Writing and Literature, Published author
Role: Part-time to Full-time paid position with DSI since 2016, engaging in downtown promotions, marketing and event planning and implementation.

**Greg Shields, Board Chair**
Qualifications- Downtown Business owner and consultant.
Role: Lead Board of Directors, facilitate meetings.

**Tim Proper, Treasurer**
Qualifications- Treasurer for several local non- profit organizations, banker with specialty in commercial loans, employee of F & M bank
Role: Review and monitor financial position for Board and organization.

DSI utilizes the Main Street Four Point approach to Downtown development and revitalization. This approach is implemented in our organization through committees. The Economic Restructuring Committee works to develop and implement strategies that identify buildings available for renovation and repurposing, attracting businesses, providing programs to assist established businesses, minority business development in the downtown, and guide the economic development of the downtown. The Promotions Committee plans and implements programs, activities, marketing projects, and events designed to attract and promote Downtown Salisbury. The Design Master Plan committee sets goals and strategies that impact the design of the downtown. Finally, the Organizational Committee manages the personnel, budgetary and legal aspects of DSI.

All of the committees and Board participation are voluntary, with our organization implementing most of its goals, strategies and activities through substantial volunteer participation. To accomplish this we partner with more than 30 organizations, the local businesses, and are honored to have more than 3000 hours of annual volunteer service to our organization.




# Project Narrative

The Board of Directors for Downtown Salisbury, Inc. conducts an annual goal planning session. At the planning session, a review of the current year's goals and achievements are presented, information from surveys and focus groups with stakeholders and property owners is reviewed and an examination of the state and needs of Downtown is created. Thereafter, goals and strategies are developed by Board members to address the preservation, design, property development, business retention, recruitment, and overall economic development of downtown. In the planning session for Fiscal Year 2018-19, it was determined that the current three main goals would continue to guide the activities of the organization. Strategies for implementing goal were established and sent to appropriate committees. The Goals and strategies for the organization reflect a response to information gleaned from the Salisbury Downtown MSD-Public Input Summary as well as Focus Group sessions, and the yearly work of committees are noted as:

## Schedule of Activities, Promotions and Events

The following are activities, promotions and events that DSI has engaged in within the past two years and will engage in to ensure the further exploration, progress, development and achievement of the FY 2018-19 Goals and Strategies

_Public Input Activities:_

September 2016- Downtown Infrastructure Public Input session 1

October 2016- Downtown Infrastructure Public Input Session 2

April 2017- Downtown Infrastructure Public Input Session 3

October- Public Open House for Empire Hotel Project

December- DSI and Tourism Development Authority's Regional Marketing Plan Presentation

January 2018- Three Community Engagement Sessions (Empire Hotel Project Progress)

1) Presentation at City Council of October Open House Results & Response to Feedback
2) Downtown Property and Business Owner Tour
3) Community Leader Tour

_Committee Meeting schedules:_

Design Master Plan- 2nd Tuesday of each month at 8:00 am

Promotions Committee- 3rd Friday of each month at 8:00 am

Economic Vitality Committee- 2nd Tuesday of month at 5:00 pm

DSI Board of Directors meeting- 4th Tuesday of each month at 7:45 am

**Downtown Salisbury Inc. • 217 South Main Street • Salisbury, NC 28144**
www.DowntownSalisburyNC.com • 704.637.7814          Page 1 of 3

Case 1:21-cv-00814-CCE-JLW   Document 1-4   Filed 10/18/21   Page 5 of 9
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 36 of 107




With feedback from business owners that affirmed the substantial decrease in attendance of the 1st Friday events, and more Main Street communities reporting success with a quarterly model of "destination" type of events, the DSI Board of Directors made the decision to change to a fresh model for their 2018 event schedule. This new event schedule model, which includes a strong partnership with the City Parks and Recreation Department, continue to improve upon the well-attended signature DSI events, adds the schedule larger-scaled, themed events per quarter that feature more dynamic activities for residents and visitors from farther reaching communities, large and small, and provide room to assist other organizations' downtown based events, in order to create more of an economic impact on downtown.

*2018 Calendar of Events:*

**1st Quarter**
*Wine About Winter*
1st Friday of February
Downtown Salisbury's signature wine tasting event. Ticket holders visit participating businesses to shop and sip a variety of wine from Rowan County and beyond.

*Ring in Spring at the Bell Tower*
Saturday, March 24, 2018
A professional photographer will be onsite offering free photos with the Easter Bunny. Spring crafts, snacks and family fun. After, spend the afternoon shopping and strolling in downtown boutiques and gift shops. Bell Tower Park is located on corner of S Jackson and W Innes Street.

**Second Quarter**
*2018 Cheerwine Festival*
Saturday, May 19th, 2018
A day-long event celebrating Salisbury's own Cheerwine! Live music, craft vendors, food, shopping and more!

*Gallery Gallop*
June 22nd, 2018 5-9 PM
Live artist demonstrations in front of participating downtown shops and restaurants, downtown gallery tours, and more.

**Third Quarter**
*College Night Out*
Thursday, August 23rd, 2018
Downtown Salisbury welcomes students from our local colleges to enjoy an evening in Downtown Salisbury. Games, activities, food, and networking.

*Brewbury Fest*
Friday/Saturday, September 14-15, 2018
Downtown Salisbury celebrates craft beer with a crawl to participating downtown businesses on Friday, and a craft beer festival on Saturday.

**Downtown Salisbury Inc. • 217 South Main Street • Salisbury, NC 28144**
www.DowntownSalisburyNC.com • 704.637.7814          Page 2 of 3

Case 1:21-cv-00814-CCE-JLW   Document 1-4   Filed 10/18/21   Page 6 of 9
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 37 of 107




### Fourth Quarter

*Buskers Bash*
Friday, October 5th, 2018
The best local talent comes together to perform in front of participating downtown businesses. Vote for your favorite, grand finale to follow.

*Halloween Funfest*
October, 2018
Carnival games and activities located in the City Hall parking lot. Downtown trick or treating hosted by participating businesses.

*Holiday Night Out*
Friday, November 23rd, 2018
The biggest shopping night of the year happens in Downtown Salisbury! Live music, hot cocoa, visits from Santa and the Grinch, and so much more. Maybe we'll even see some snow!

*Santa/Grinch Bell Tower and Small Business Saturday*
Saturday, November 24th, 2018
Free photo-op with Santa and the Grinch at the Bell Tower. All-day shopping and activities to support local businesses and celebrate Small Business Saturday.

*Santa/Grinch and Antique Fire Trucks*
Saturday, December 15th, 2018
Families gather for free rides on antique fire trucks with Santa and the Grinch.

Downtown Salisbury Inc. • 217 South Main Street • Salisbury, NC 28144
www.DowntownSalisburyNC.com • 704.637.7814          Page 3 of 3

Case 1:21-cv-00814-CCE-JLW   Document 1-4   Filed 10/18/21   Page 7 of 9
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 38 of 107

**Downtown Salisbury, Inc.**

Budget for FYE June 30, 2018 - General Operating Fund and Revolving Fund

Final

| General Operating Revenues | Proposed FY 2016/2017 | DSI 501c3 Proposed FY 2017/2018 | DSI 501c3 Proposed FY 2018/2019 | |
|---|---|---|---|---|
| 4020 - City Appropriation | $131,500 | $100,000 | | |
| City Appropriation for Community Engagement Proces | $57,778 | $0 | $0 | |
| Empire Refi- carry over funds | $4,000 | $0 | $0 | |
| 4028 - Plaza Leasing | $33,000 | $0 | $0 | |
| 4040 - Interest Income | $0 | $0 | $0 | |
| 4050 - Municipal Service District Tax | $128,000 | $0 | $128,000 | |
| 4090 - General Promotions Sponsorships | $20,000 | $10,000 | $5,000 | |
| 4089 - CVB Promotions Support | $10,000 | $0 | $12,000 | |
| 4093 - Event specific revenue | $45,000 | $45,000 | $40,000 | |
| 40xx- CVB Grants | $5,000 | $0 | $0 | |
| 4095 - Downtown Dollars | $5,000 | $5,000 | $1,200 | |
| 40XX - Event specific sponsorships | $0 | $0 | $0 | |
| 4110 - Other Income | $1,000 | $0 | $0 | |
| | | | | |
| **Support and Revenue** | **$440,278** | **$160,000** | **$186,200** | |
| | | | | |
| | | | | |
| **Expenses** | | | | |
| **Office Expenses** | | | | |
| 6010 - Bank Charges | $300 | $300 | $300 | |
| Ticket Biscuit | $3,500 | $3,500 | $3,500 | |
| 6020 - Office Supplies | $2,000 | $0 | $0 | |
| 6030 - Office Equipment | $1,500 | $0 | $0 | |
| 6040 - Postage | $300 | $0 | $0 | |
| 6049 - Copier | $2,600 | $0 | $0 | |
| 6055 - Rent | $5,525 | $0 | $0 | |
| Cell Phones | $1,500 | $0 | $0 | |
| Virtual Server Expense | $1,440 | $0 | $20 | |
| 6060 - Telephone/Internet | $2,200 | $0 | $0 | |
| **Subtotal - Office Expenses** | **$20,865** | **$3,800** | **$3,820** | |
| | | | | |
| **Office Support** | | | | |
| 6070 - Accounting Fees | $3,000 | $3,000 | $3,000 | |
| 6071 - Tech Support | $2,000 | $0 | $0 | |
| 6080 - Audit | $4,225 | $4,225 | $4,225 | |
| 6090 - Dues and Subscriptions | $3,500 | $1,000 | $350 | |
| 6095 - Entertainment / Meals | $3,500 | $1,500 | $1,500 | |
| 6100 - Insurance | $4,600 | $1,300 | $1,300 | D&O |
| **Subtotal - Office Support** | **$20,825** | **$11,025** | **$10,375** | |
| | | | | |
| **Personnel Expenses** | | | | |
| 6085 - Contract Labor/Internship | $10,000 | $0 | $0 | |
| 6120 - Education and Training | $3,000 | $0 | $0 | |
| 62XX - Full Time EE Expense | $143,649 | $0 | $0 | |
| 62XX - Shared Receptionist Expense | $4,031 | $0 | $0 | |
| 6237 - Workers' Comp | $2,500 | $0 | $0 | |
| 6238 - Travel | $3,000 | $1,000 | $500 | |
| **Subtotal - Personnel Expenses** | **$166,180** | **$1,000** | **$500** | |
| | | | | |
| **Program Expenses** | | | | |
| 6270 - Design Masterplan Comm (downtown improve | $37,748 | $0 | $0 | |
| 6xXX- Economic Development | | | $10,000 | |
| 6275 - Economic Restructuring (public process for em | $20,000 | $0 | $0 | |
| 62XX- Annual Meeting | $1,500 | $1,500 | $500 | |
| 6355 -Miscellaneous | $200 | $100 | $100 | |
| **Subtotal - Program Expenses** | **$59,448** | **$1,600** | **$10,600** | |
| | | | | |
| **Promotions Expenses** | | | | |
| 6305 - Promotional events | $80,000 | $50,000 | $40,000 | |
| 63XX - Downtown Dollars | $10,000 | $5,000 | $5,000 | |
| 63XX - Buy Local/sponsorships of downtown orgs | $2,000 | $1,000 | $1,000 | |
| 6310 - Printed Materials | $5,000 | $0 | $0 | |
| 63XX  CVB Marketing Promotions Joint Venture | $0 | $0 | $0 | |
| **Subtotal - Promotions Expenses** | **$97,000** | **$56,000** | **$46,000** | |
| | | | | |
| **Total Expenses** | **$364,318** | **$73,425** | **$71,295** | |
| | | | | |
| Net Cash Provided By (Used in) General Operatio | $75,960 | $86,575 | $114,905 | |

Case 1:21-cv-00814-CCE-JLW   Document 1-4   Filed 10/18/21   Page 8 of 9
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 39 of 107

| | FY 2016/2017 | FY 2017/2018 | FY 2018/2019 | |
|---|---|---|---|---|
| | | | | |
| **Revolving Fund Revenue** | | | | |
| Empire Hotel Rental Revenue | $18,000 | $18,000 | $10,380 | |
| | | | | |
| | | | | |
| **Revolving Fund Expenses** | | | | |
| Empire Hotel Debt Service | $77,312 | $81,760 | $81,760 | |
| Empire Appraisal | $3,500 | $0 | $0 | |
| Empire Modification / Refi Fee | $2,412 | $0 | $0 | |
| DSI New Market - Tax Return | $500 | $500 | $0 | |
| Empire Utilities | $1,500 | $1,500 | $1,000 | |
| Empire Property Management Fee - 10.0% | $1,800 | $1,800 | $1,200 | |
| Empire Maintenance | $1,000 | $1,000 | $1,000 | |
| Empire Insurance | $13,000 | $13,000 | $13,000 | |
| Revolving Fund Contingency | $1,500 | $0 | $0 | |
| Subtotal - Revolving Fund Expenses | $102,524 | $99,560 | $97,960 | |
| | | | | |
| Net Cash Provided By (Used in) Revolving Fund | ($84,524) | ($81,560) | ($87,580) | |
| | | | | |
| General Contingency | -$8,564 | $5,015 | $27,325 | |

Case 1:21-cv-00814-CCE-JLW    Document 1-4    Filed 10/18/21    Page 9 of 9
Case 1:21-cv-00814-CCE-JLW    Document 42-13    Filed 04/04/23    Page 40 of 107





North Carolina
**MAIN STREET**

## Main Street Director's Roles and Responsibilities + Plan of Work FY 2018-19

**Main Street Director's Role** – The Main Street Director is charged with the day-to-day operations of the local Main Street program and in assisting the Main Street board and committee with the implementation of the Downtown Economic Development Implementation plan, used to transform downtown.

**Implementation Strategy:** Using National Main Street Center's Transformation Strategies and Four-Point Approach* Implementation which includes: organization, promotion, design and economic vitality.

| ORGANIZATION | PROMOTION | DESIGN | ECONOMIC VITALITY |
|---|---|---|---|
| **Planning for Downtown** <ul><li>NC Main Street & Rural Planning Center Basic Training for Organization:<ul><li>☐ 08/07/18 Morehead City</li></ul></li></ul> <ul><li>Conduct or facilitate annual basic Organizational Training for Committee members and new Board members. *(Can be accomplished by all attending training above at $50/person—not including travel expense--or conducted using the materials from the training.)*</li></ul> <ul><li>Required: Attend Annual Main Street Directors Meeting ☆ 08/08-10/18 Morehead City</li></ul> <ul><li>Required: Attend 1 of 2 Bi-Annual Regional Meetings (MS recommends attend both) ☆ 07/23/18 Lexington</li><li>☐ 10/16/18 Mount Airy</li></ul> <ul><li>Maintain and periodically draft</li></ul> | <ul><li>NC Main Street & Rural Planning Center Basic Training for Promotion:<ul><li>☐ 01/09/19 City TBD</li></ul></li></ul> <ul><li>Conduct or facilitate annual basic Promotion Training for Promotion Committee members and new Board members. *(Can be accomplished by all attending training above at $50/person—not including travel expense--or conducted using the materials from the training.)*</li></ul> <ul><li>Using the created data base (see organization under Managing the Main Street program) update as needed the downtown businesses and **identify common threads** for promotion opportunities.<ul><li>☐ **Ongoing throughout year**</li></ul></li></ul> **Image Building Campaigns** <ul><li>Develop policies around use of MS logo and slogans, etc.<ul><li>☐ **Ongoing throughout year**</li></ul></li></ul> | <ul><li>Per Liz, not a requirement for me, but may be good to attend *& encourage committee and board members to attend* the NC Main Street & Rural Planning Center Basic Training for Design:<ul><li>☐ 11/13/19 City TBD *(Salisbury hosted in Nov. 2018)*</li></ul></li></ul> <ul><li>Conduct or facilitate annual Design training for Design Committee members and new Board Members. *(Can be accomplished by all attending training above at $50/person--not including travel expense--or conducted using the materials from the training.)*</li></ul> <ul><li>Facilitate the development of getting/maintaining downtown listed on the National Register of Historic Places. Make sure the NCMS Center has a copy of the listing. Requires coordination with your State Historic Preservation Office and local historic preservation</li></ul> | <ul><li>Per Liz, not a requirement for me, but may be good to attend *& encourage committee and board members to attend* the NC Main Street & Rural Planning Center Basic Training for Economic Vitality:<ul><li>☐ 05/15/19 City TBD</li></ul></li></ul> <ul><li>Conduct or facilitate annual basic Economic Vitality Training for EV Committee members and new Board members. *(Can be accomplished by all attending training above at $50/person—not including travel expense--or conducted using the materials from the training.)*</li></ul> **Understand Current Economic Conditions** **For all of the below in this section: check with the NCMS&RP Center staff regarding existing templates and resources for obtaining information. <ul><li>Obtain and maintain maps of the</li></ul> |

FY2018-19 • DSI Director's Work Plan • June 24, 2018
Page 1 of 8

Case 1:21-cv-00814-CCE-JLW   Document 1-5   Filed 10/18/21   Page 1 of 8

updated planning documents that include economic drivers, vision, mission, community asset mapping, etc.

☐ Update every 3 to 6 months

- Facilitate the development of and manage the implementation of an annual downtown economic development implementation plan.

☐ May-July 2018 Plan & Revise

☐ April-June 2019 Plan & Revise

- Develop an annual list of stakeholders and partners that can assist with MS program.

☐ June & July 2018

☐ May - June 2019

- Develop a budget plan that aligns with the economic development plan and the general operations of the MS organization.

☐ April - June 2019

- Identify most stable sources of income for organizational operations and research tools to further stabilize and develop the budget.

☐ April-June 2019 planning & throughout year

**Managing the Main Street Program**

---

- insure consistency of the downtown and MS brand.

☐ Ongoing throughout year

- Measure the impact of coordinated image building campaigns.

☐ Ongoing throughout year

- Assist the board and committee with the implementation of image building campaigns.

☐ Ongoing throughout year

- Coordinate the purchase, distribution and/or sale of MS collateral materials that reinforce the brand (t-shirts, mugs, etc.) as needed.

☐ Begin in September 2018?, then Ongoing throughout year

**Retail Sales Activities**

- Build a relationship with each retailer and brainstorm ideas for growing their business.

☐ Ongoing throughout year

- Assist the board and committee with the implementation of retail sales efforts.

☐ Ongoing throughout year

---

organizations.    ☐ As needed

- Take detailed before, during and after photographs for each improvement made to downtown property.

☐ Ongoing throughout year

- Solicit, obtain and maintain a resource database of historic photographs of downtown.

☐ Ongoing throughout year

- Maintain a photographic and written records database of each downtown property.

☐ Ongoing throughout year

- Spend time touring/getting to know each building in downtown, including upper floors and basements.

☐ Ongoing throughout year

- Conduct and maintain a count on each element of design, i.e. – number of street trees, number of parking spaces, buildings, etc.

☐ Ongoing throughout year

- Assist property and business owners with design services through the NCMS Center's Designers.

☐ Ongoing throughout year

---

downtown district, including maps of downtown national or local historic districts.

☐ Ongoing throughout year

- Obtain and manage data on tax values of each property. Obtain and manage a database of every parking space.

☐ Ongoing throughout year

- Develop and maintain a building and business inventory. Obtain and maintain a database of the number of employees in each business.

☐ Ongoing throughout year

- Obtain and manage a database of all downtown residents.

☐ Ongoing throughout year

- Obtain and maintain demographic information for downtown.

☐ Ongoing throughout year

- Conduct annual downtown user and downtown business surveys.

☐ Ongoing throughout year as need for information arises

- Obtain, analyze and maintain market data and convert it to a market snapshot. This should be done every five years or before if

- Train new board and committee members at the start of new fiscal year.

  ☐ July - August 2018

- Draft, establish and manage best practices for the local MS organization. Use the NC Main Street Annual Assessment as a guide for establishing Best Practices.

  ☐ Began in October 2018

  ☐ Reassess with 07/10/18 & Ongoing throughout year

- Write drafts, manage, update and file, as needed, all nonprofit paperwork and documentation, including bylaws, solicitation license, annual insurance agreements including Director and Officers Liability Insurance, special event insurance renewal, ASCAP & BMI License renewal, board policies including conflict of interest policy, etc. use the NC Main Street Manage Organizational Checklist as a guide.

  ☐ Began in October 2018

  ☐ Reassess with 07/10/18 & Ongoing throughout year

- Manage all documentation regarding board and volunteer

- Maintain a record or all retail sales efforts and materials coordinated by the MS organization.

  ☐ Ongoing throughout year

- Create or obtain a tool to evaluate and measure the impact of coordinated retail sales activities.

  ☐ September - October 2018
  *(To capture sales data beginning before holidays and beyond.)*

**Special Events**
- Maintain a calendar of all special events in town to help identify opportunities and to avoid conflicts.

  ☐ Ongoing throughout year

- Assist the board and committee with the implementation of special events.

  ☐ Ongoing throughout year

- Maintain a record or all special events and their materials coordinated by the MS organization.

  ☐ Ongoing throughout year

- Create or obtain tool to evaluate and measure the

- Know and understand the Secretary of Interiors Standards and Guidelines as well as review these with the committee. https://www.nps.gov/tps/standards/treatment-guidelines-2017.pdf

  ☐ Ongoing throughout year

**Building Improvements**
- Maintain and update as needed, records and pictures of all improvements made to downtown buildings.

  ☐ Ongoing throughout year

- Assist property owners in writing historic tax credit applications or provide consulting resources.

  ☐ Ongoing throughout year

- Maintain all records to manage local grant programs for property improvements, such as façade grants, and draft grant agreements and manage implementation as needed.

  ☐ Ongoing throughout year

- Develop and maintain a database of contractors and consultants that can help make improvements.

  ☐ Ongoing throughout year

there has been a major change within the downtown community that could impact the data either positively or negatively.

  ☐ June - September 2018

**Strengthen Existing Businesses**
- Identify and assist owners with business resources.

  ☐ Ongoing throughout year

- Provide weekly "feet on the street" to build a relationship with downtown ownership.

  ☐ Ongoing throughout year

**Find New Economic Uses**
- Research and brainstorm potential new uses that support local economic development strategies.

  ☐ Ongoing throughout year

- Assist the board and committee in retention, expansion and recruitment of businesses.

  ☐ Ongoing throughout year

**Develop Financial Incentives & Capital for Building Rehabilitations & Business Development**
- Research and propose incentive programs as needed that support

terms and insure board operates program in accordance to bylaws, etc.

☐ Began in October 2018

☐ Reassess with 07/10/18 & Ongoing throughout year

- Coordinate with Board Secretary to Maintain minutes of the MS board of directors.

  ☐ Began in October 2018

  ☐ Reassess with 07/10/18 & Ongoing throughout year

- Maintain the MS organization's calendar of meetings and provide public notice as necessary, in keeping with the nonprofit status and any contracts for service.

  ☐ Began in October 2018

  ☐ Reassess with 07/10/18 & Ongoing throughout year

- Develop forms, agendas and other materials as needed to assist the board and committee chairs in managing volunteers and tracking volunteer hours.

  ☐ Began in October 2018

  ☐ Reassess with 07/10/18 & Ongoing throughout year

---

impact of coordinated special events.

✓ June 2018 began using SurveyMonkey again to obtain measurement feedback

✓ June 2018 Began using Doodle polling to coordinate best dates and times for workshops

**Marketing**

- Maintain a record or all marketing efforts and their materials coordinated by the MS organization.

  ☐ Ongoing throughout year

- Measure the impact of coordinated marketing efforts.

  ☐ Ongoing throughout year

- Maintain all records of the local MS initiatives.

  ☐ Ongoing throughout year

---

- Assist owners in obtaining contactor quotes as needed to facilitate improvements.

  ☐ Ongoing throughout year

**Displays**

- Coordinate window displays in vacant storefronts to activate the storefront and downtown, including drafting liability releases as needed.

  ☐ Ongoing throughout year

**Streetscape/Public Art**

- Research approaches to streetscape/public art and funding.

  ☐ Ongoing throughout year

- Write policies and RFP/RFQ's as needed to solicit design professionals.

  ☐ Ongoing throughout year

- Write and manage grants as needed to implement streetscape/public art improvements.

  ☐ Ongoing throughout year

---

local economic development strategies.

☐ Ongoing throughout year

**Monitor the Economic Performance of Downtown**

- Gather and maintain statistical data every year.

  ☐ May - July 2018 & throughout year

  ☐ May - July 2019 & throughout year

- Maintain all records of the local MS initiatives.

  ☐ Ongoing throughout year

| | | | |
|---|---|---|---|
| • Write a Director's Monthly Activity Report and present to the Board of Directors at their monthly meeting.<br>☐ Ongoing throughout year<br><br>• Manage MS staff and conduct staff evaluations as needed.<br>☐ Ongoing throughout year<br><br>• Develop and maintain a comprehensive downtown database for quick and efficient communication to all downtown property owners, business owners, and stakeholders, etc.<br>✓ June 2018 Purchased MAESTRO Community Development Database System. Data being inputted currently.<br>• Create a repository for downtown data by collecting, and maintaining all previous and any current studies and data on downtown.<br>☐ Ongoing throughout year<br><br>• File all NC MS Center reports by the deadlines.<br>☐ July 2018 & January 2019 | | • Conduct bi-annual downtown "walk-about" with committee members to assess and evaluate conditions of downtown public spaces and determine priority list for improvements. Report to Public Works Director any immediate safety issues.<br>☐ October & March & Ongoing throughout year<br><br>**Signage**<br>• Work with city planning and zoning to write policies and RFP/RFQ's as needed to solicit design professionals for signage.<br>☐ Ongoing throughout year<br><br>• Write and manage grants as needed to implement signage improvements.<br>☐ Ongoing throughout year<br><br>**Open Space/Parking**<br>• Develop and conduct surveys of open space/parking to become the "eyes on the street" and clean/safe ambassador for the city/town.<br>☐ Ongoing throughout year<br><br>• Maintain all records of the local MS initiatives.<br>☐ Ongoing throughout year | |

Case 1:21-cv-00814-CCE-JLW   Document 1-5   Filed 10/18/21   Page 5 of 8

| | | | |
|---|---|---|---|
| • Maintain membership to the National MS Center and partner agencies as needed. *Please note: not renewing membership to the National MS Center will cause your program to become inactive. Once inactive your program will have to re-apply to the NC MS&RP Center.*<br>☐ July 2018<br><br>• Manage the books of the organization through QuickBooks or other appropriate accounting program as needed.<br>☐ Ongoing throughout year<br><br>• Facilitate audits as needed.<br>☐ July-August 2018<br><br>• Complete 990's or facilitate the completion of 990's and make sure they are filed by the deadline.<br>☐ August-September 2018<br><br>• Be aware of all deadlines for public and private grants and tax dollars, complete appropriate paperwork to solicit funding as needed.<br>☐ March 2019 & Ongoing throughout year<br><br>• Create a system for maintaining | | | |

| | | | |
|---|---|---|---|
| and backing up all files and documents monthly at minimum.<br>☐ Ongoing throughout year<br><br>**Promoting the Main Street Program**<br>• Develop, maintain, implement and update a Communications Plan, including but not limited to, press releases, annual reports, annual meetings, newsletters, etc.<br>☐ July 2018 & Ongoing throughout year<br><br>• Write and submit MS Awards and MS Champions nominations & any other recognition for local MS efforts by the deadlines.<br>☐ Champion Nom. 10/2/18<br>☐ Award Nom. 10/2/18<br><br>• Develop and maintain a scrapbook or record of all Main Street publicity.<br>☐ Ongoing throughout year<br><br>• Coordinate an annual meeting to present your program's annual statistics, plan of work, introduce new board/committee members.<br>☐ September or October 2018<br><br>• Coordinate a local MS awards program to acknowledge | | | |

Case 1:21-cv-00814-CCE-JLW   Document 1-5   Filed 10/18/21   Page 7 of 8

| ORGANIZATION | PROMOTION | DESIGN | ECONOMIC VITALITY |
|---|---|---|---|
| downtown successes. This could be done in association with the annual meeting.<br>☐ **September or October 2018**<br><br>• Develop and maintain a local MS program presentation for a speaker's bureau.<br>☐ **September or October 2018**<br>*(Can use pieces of current PPs)*<br>• Develop, maintain and regularly update the MS organization's website and social media platforms.<br>☐ **Ongoing throughout year**<br><br>• Maintain all records of the local MS initiatives.<br>☐ **Ongoing throughout year** | | | |

Respectfully submitted,

Larissa Harper
June 24, 2018



# City of Salisbury

### Disciplinary Action Report (DAR)

| | |
|---|---|
| Employee Name: Larissa Harper | Date: Dec. 5, 2018 |
| Employee ID: | Job Title: Downtown Development Director |
| Supervisor: Zack Kyle | Department: Downtown Development |

## Type of Offense

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Attendance | ☐ | Carelessness | ☐ | Insubordination |
| ☒ | Lateness | ☒ | Failure to Follow Instructions | ☐ | Rudeness to Employees or Customers |
| ☐ | Standards of Conduct | ☐ | Unsatisfactory Work Quality | ☐ | Violation of Policies or Procedures |
| ☐ | Violation of Safety Rules | ☒ | Other | ☐ | |

## Previous Warnings

| | RECORD OF DISCUSSION | WRITTEN | SUSPENSION | BY WHOM & DATE |
|---|---|---|---|---|
| 1st Warning | | | | |
| 2nd Warning | | | | |
| 3rd Warning | | | | |

## Employer Statement Regarding Incident

**Description of Infraction:**

In a September 12 memo you were advised to respond to phone calls and emails within the same day or 24 hours. An email was sent to you on October 31 by one of the DSI board members and you did not respond until November 12, and there are a number of emails in your "in box" that have not been opened or responded to. It has also been brought to my attention that you have not been responsive to our EDC director.

At the last DSI Org. meeting on November 20 you showed up late for the meeting after many discussions on the need for you to be on time for meetings.

Finally, your lack of responsiveness to the NC Main Street personnel prompted a call from them to the city manager and myself which has led to my asking the marketing person in your department to lead our NC Main Street Conference Coordination.

**Plan for Improvement:** (Include training, follow up meetings etc.)

1. Emails, phone calls and other corresponds must be responded to as stated in the September 12th memo (the same day or within 24 hours).
2. You will be on time for all meetings.
3. You will need to provide me weekly updates at our Wednesday meetings on all work activities including staff development.

| Action to be taken: | ☒ Written ☐ Probation ☐ Suspension ☐ Dismissal ☐ Other _____ |
|---|---|

Consequences should incident occur again _____

The next time you fail to respond to emails or phone calls, repetitive lateness, or your neglect of duties will lead to suspension or possible termination.

## Acknowledgement of Disciplinary Action

**FILE OF COPY OF THIS REPORT WITH THE HUMAN RESOUCES DEPARTMENT**

RECEIVED BY HR ON _____ Name of HR Staff _____

Revised on 11/2017

**Print Name and Signature**



*By signing this form, you confirm that you understand the information in this disciplinary action. You also confirm that you and your manager have discussed the disciplinary action and a plan for improvement. Signing this form does not necessarily indicate that you agree with this warning.*

Larissa Harper    Larissa B. Harper    12-19-18
Employee Name (Print and Signature)                              Date

Dan                                              12-19-18
Supervisor Name (Print and Signature)                            Date

Kelly Baker                                      12-19-18
Witness Name (Print and Signature) if employee understands warning but refuses to sign    Date

FILE OF COPY OF THIS REPORT WITH THE HUMAN RESOUCES DEPARTMENT

RECEIVED BY HR ON 12/19/18 _____    Name of HR Staff Cody L Haire    Cody L Haire
Revised on 11/2017                                         Print Name and Signature

📅 Calendar

January 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

February 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | | |

**Monday, January 07, 2019**
12:00 AM to Tue 1/8/2019 12:00 AM Doodle Poll--Stat Report
9:30 AM to 11:00 AM ⟳ Weekly Team Pow Wow Larissa's Office - Lato
10:00 AM to 11:00 AM Design Cmte Agenda and Minutes out
2:00 PM to 3:00 PM ⟳ Management Team - Agenda Submission Mee

**Tuesday, January 08, 2019**
12:00 AM to Wed 1/9/2019 12:00 AM ⟳ Agenda Items Due Y Drive
8:00 AM to 8:30 AM ⟳ ORG Reminder - Larissa Harper
8:00 AM to 9:00 AM ⟳ DSI Design Cmte Plaza ConfRm--2nd Flr - Laris
10:00 AM to 11:00 AM Invitation: Meet to discuss NC Main Street Conf
1:00 PM to 2:00 PM Farmer's Market Meeting City Hall - Larissa's Office
2:00 PM to 2:50 PM DC McGee Tour Downtown
3:00 PM to 3:30 PM Conference call with Brittb - Zack Kyle
4:00 PM to 5:00 PM Planning Board Meeting
5:15 PM to 6:15 PM Chiro@ 5:15 (leave @4:45)

**Wednesday, January 09, 2019**
8:30 AM to 10:30 AM ⟳ Reminder: WAW Sub-Committee Meeting Bc
9:30 AM to 4:00 PM FW: Promotion Basic Training – Elon Elon, NC, US
12:00 PM to 2:30 PM Scott 12-2:30 pm Front Window - Candice Brown
2:30 PM to 5:00 PM Atalie Covering - Candice Brown
5:00 PM to 6:30 PM DSI | EDC January Meeting City Tavern - Whitney

**Thursday, January 10, 2019**
12:00 AM to Fri 1/11/2019 12:00 AM 13 hrs
8:00 AM to 9:30 AM ⟳ DSI Promotions Committee City Hall--1st Floo
2:00 PM to 3:00 PM FW: Invitation: Meet to discuss conference logisti
2:00 PM to 3:00 PM New Security System Training 1st Floor City Hall -
3:00 PM to 4:00 PM Front Desk Coverage 1st Floor Conference Room ·
6:00 PM to 6:30 PM Rowan Chamber Annual Gala 1935 Jake Alexande
6:00 PM to 8:00 PM Rowan Chamber Annual Gala West End Plaza - Ela

**Friday, January 11, 2019**
12:00 AM to Sat 1/12/2019 12:00 AM ⟳ TIMESHEETS DUE - Larissa Har
12:00 PM to 2:00 PM ⟳ Please Turn your timesheets in to Connie - Cc
1:45 PM to 2:15 PM Empire Check In - Follow up on Ehlers Review Call
2:00 PM to 4:00 PM ⟳ Out and About Downtown
3:00 PM to 5:00 PM Eric Phillips Tour DT & 120 W. Innes
3:00 PM to 5:00 PM Leaving Early - Latoya Price

**Saturday, January 12, 2019**

**Sunday, January 13, 2019**

📅 Calendar

January 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 30 | 31 | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

February 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | | |

**Monday, January 14, 2019**
Mon 1/14/2019 12:00 AM to Wed 1/16/2019 12:00 AM Call Randy Hunt
Mon 1/14/2019 12:00 AM to Wed 1/16/2019 12:00 AM Put WAW Annou
Mon 1/14/2019 12:00 AM to Wed 1/16/2019 12:00 AM Send out Board
Mon 1/14/2019 12:00 AM to Wed 1/16/2019 12:00 AM Write up 1.5 year
12:00 AM to Tue 1/15/2019 12:00 AM ↻ AgendaItemsDueby2 COB-Sta
9:30 AM to 11:00 AM ↻ Weekly Team Pow Wow Larissa's Office - Lato
12:00 PM to 1:30 PM ↻ NCMS Planning Team_Status Report and Upd
2:00 PM to 3:00 PM ↻ Management Team - Agenda Submission Mee
2:00 PM to 3:00 PM ↻ Mgmt Team--Agenda's DUE COB Conf Rm

**Tuesday, January 15, 2019**
Mon 1/14/2019 12:00 AM to Wed 1/16/2019 12:00 AM Call Randy Hunt
Mon 1/14/2019 12:00 AM to Wed 1/16/2019 12:00 AM Put WAW Annou
Mon 1/14/2019 12:00 AM to Wed 1/16/2019 12:00 AM Send out Board
Mon 1/14/2019 12:00 AM to Wed 1/16/2019 12:00 AM Write up 1.5 year
12:00 AM to Wed 1/16/2019 12:00 AM ↻ CCC45
8:00 AM to 9:00 AM ↻ DSI ORG Cmte City Hall 1st Floor Conf Rm - La
8:00 AM to 9:30 AM ↻ DSI Org Committee Meeting First Floor City H
4:00 PM to 5:00 PM Empire Development Meeting City Hall--2nd Floo
4:30 PM to 7:30 PM Toast Master's ribbon cutting: St. John's Lutheran
5:00 PM to 8:00 PM ↻ City Council Mtg City Hall--Council Chambers

**Wednesday, January 16, 2019**
Wed 1/16/2019 12:00 AM to Fri 1/18/2019 12:00 AM Naomi in town for
8:00 AM to 5:15 PM NC Main Street Conference_Visit with Naomi - La
8:30 AM to 10:30 AM ↻ Reminder: WAW Sub-Committee Meeting Bo
9:00 AM to 9:30 AM ↻ Post-Council Mtg@9 COB--4th floor
9:30 AM to 10:00 AM ↻ Canceled: Meet with Larissa office - Zack Kyle
4:00 PM to 4:30 PM ↻ Monthly EMPIRE Check-In Call 1-888-354-009
5:30 PM to 7:30 PM Discuss DSI+BizOwner+PartnerOrgs Mtg LaCava

**Thursday, January 17, 2019**
Wed 1/16/2019 12:00 AM to Fri 1/18/2019 12:00 AM Naomi in town for
7:00 AM to 9:00 AM PIP--Dougherty w/WellsFargo Trinity Oaks
8:00 AM to 10:00 AM Atalie covering Front Window - Candice Brown
8:30 AM to 5:00 PM NC Main Street Conference_Visit with Naomi - La
4:00 PM to 4:30 PM Meet with Larissa office - Zack Kyle

**Friday, January 18, 2019**
12:00 AM to Sat 1/19/2019 12:00 AM ↻ Pay Day!
8:00 AM to 9:00 AM Empire Development City Hall - Zack Kyle
10:00 AM to 11:30 AM Canceled: CIP discussion COB 4th - Zack Kyle
10:30 AM to 11:00 AM Tentative, RCCC/ DSI Education Series Partners
2:00 PM to 4:00 PM ↻ Out and About Downtown
2:00 PM to 3:30 PM NCMS Conf AV Risk Assessment City Hall - larissa
4:30 PM to 5:30 PM Grevious Gallery 111 Bank Street - Larissa Harper

**Saturday, January 19, 2019**

**Sunday, January 20, 2019**
Sun 1/20/2019 12:00 AM to Tue 1/22/2019 12:00 AM 3 hours
5:00 PM to 9:00 PM Grand Opening Grievous Gallery - Latoya Price

📅 Calendar

| | January 2019 | | | | | | | | February 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | | S | M | T | W | T | F | S |
| 30 | 31 | 1 | 2 | 3 | 4 | 5 | | | | | | | 1 | 2 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 | | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 | | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 | | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 27 | 28 | 29 | 30 | 31 | | | | 24 | 25 | 26 | 27 | 28 | | |

**Sunday, January 20, 2019**
Sun 1/20/2019 12:00 AM to Tue 1/22/2019 12:00 AM 3 hours
5:00 PM to 9:00 PM Grand Opening Grievous Gallery - Latoya Price

**Monday, January 21, 2019**
Sun 1/20/2019 12:00 AM to Tue 1/22/2019 12:00 AM 3 hours
Mon 1/21/2019 12:00 AM to Wed 1/23/2019 12:00 AM 13 hours
12:00 AM to Tue 1/22/2019 12:00 AM 🔁 AgendaItemsDueby2 CH--Sta
9:30 AM to 11:00 AM 🔁 Weekly Team Pow Wow Larissa's Office - Lato
12:00 PM to 1:30 PM 🔁 Chamber Board Mtg Gateway 2nd Floor Conf I
2:00 PM to 2:30 PM 🔁 Pre-Council Mtg City Hall
2:00 PM to 3:00 PM 🔁 Management Team - Agenda Submission Mee

**Tuesday, January 22, 2019**
Mon 1/21/2019 12:00 AM to Wed 1/23/2019 12:00 AM 13 hours
12:00 AM to Wed 1/23/2019 12:00 AM 🔁 Agenda Items Due Y Drive
7:45 AM to 9:15 AM 🔁 DSI Board Mtg Plaza Conf Rm 2nd Flr - Larissa
8:00 AM to 9:00 AM 10 hrs
8:00 AM to 9:30 AM Scott Covering Front Window - Candice Brown
11:00 AM to 12:00 PM Empire Mtg Zack's Office - Larissa Harper
2:00 PM to 3:00 PM Management Team - CIP Review 4th COB - Kelly E

**Wednesday, January 23, 2019**
Wed 1/23/2019 12:00 AM to Fri 1/25/2019 12:00 AM 12 hrs
12:00 AM to Thu 1/24/2019 12:00 AM 🔁 BCC
8:30 AM to 1:00 PM Atalie Covering front window - Candice Brown
8:30 AM to 10:30 AM 🔁 Reminder: WAW Sub-Committee Meeting Bc
9:00 AM to 5:00 PM Candice in Notary Class RCCC - Candice Brown
9:30 AM to 10:00 AM 🔁 Meet with Larissa office - Zack Kyle
11:30 AM to 12:00 PM Viewing of Heritage Room AV Equip The Heritag
1:00 PM to 5:00 PM Scott covering front window - Candice Brown
2:00 PM to 2:30 PM Larissa Harper COB4 - Zack Kyle

**Thursday, January 24, 2019**
Wed 1/23/2019 12:00 AM to Fri 1/25/2019 12:00 AM 12 hrs
9:30 AM to 10:30 AM Review WAW Insurance LH Office - Latoya Price
11:00 AM to 12:00 PM Window SubCommittee Mtg first floor conferen
6:00 PM to 8:00 PM Plaza Meeting Plaza - Zack Kyle

**Friday, January 25, 2019**
Fri 1/25/2019 12:00 AM to Sun 1/27/2019 12:00 AM 9.5hrs
12:00 AM to Sat 1/26/2019 12:00 AM 🔁 TIMESHEETS DUE - Larissa Ha
9:00 AM to 12:00 PM Candice out at SWAY event Civic Center - Candic
9:00 AM to 10:30 AM Main Street RFQ selection meeting COB1 - One S
12:00 PM to 2:00 PM 🔁 Please Turn your timesheets in to Connie - Co
1:30 PM to 3:30 PM WAW Site Visit Visitors Center - Latoya Price

**Saturday, January 26, 2019**
Fri 1/25/2019 12:00 AM to Sun 1/27/2019 12:00 AM 9.5hrs
8:00 AM to 9:00 AM Oyster Roast

|  | January 2019 |  |  |  |  |  |  | February 2019 |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | S | M | T | W | T | F | S | S | M | T | W | T | F | S |
|  | 30 | 31 | 1 | 2 | 3 | 4 | 5 |  |  |  |  |  | 1 | 2 |
|  | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|  | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|  | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
|  | 27 | 28 | 29 | 30 | 31 |  |  | 24 | 25 | 26 | 27 | 28 |  |  |

**Sunday, January 27, 2019**

**Wednesday, January 30, 2019**
- 8:30 AM to 10:30 AM 🔄 Reminder: WAW Sub-Committee Meeting Bo
- 9:30 AM to 10:00 AM 🔄 Meet with Larissa office - Zack Kyle
- 10:00 AM to 12:00 PM Certified Retirement Community Designation -
- 10:00 AM to 11:30 AM CRC Designation-Retiree Action Cmte Meeting
- 3:00 PM to 3:30 PM NC Main Street conference interview Meet in Lob
- 6:30 PM to 8:00 PM ALE MTG FOR WAW City Hall Council Chamber

**Monday, January 28, 2019**
- 9:30 AM to 11:00 AM 🔄 Weekly Team Pow Wow Larissa's Office - Lato
- 11:30 AM to 12:30 PM PAC 1 Water St - Candice Brown
- 12:00 PM to 1:30 PM 🔄 NCMS Planning Team_Status Report and Upd
- 2:00 PM to 3:00 PM 🔄 Management Team - Agenda Submission Mee
- 2:45 PM to 3:45 PM Management Team - agenda submittal meeting

**Thursday, January 31, 2019**
- 8:30 AM to 10:00 AM Dr. Davis Lexington

**Tuesday, January 29, 2019**
- 8:00 AM to 10:00 AM New Date for Board Orientation 1st Floor Confer
- 11:30 AM to 12:30 PM Empire #s meeting 132 N. Main, Salisbury - laris
- 11:45 AM to 12:15 PM Historic Revitalization Subgrant Program 888-3!
- 12:45 PM to 1:45 PM Tour w/ Regional EDC DIRECTORS

**Friday, February 01, 2019**
- 12:00 AM to Sat 2/2/2019 12:00 AM 🔄 Pay Day!
- 12:00 AM to Sat 2/2/2019 12:00 AM Wine About Winter
- 9:00 AM to 10:00 AM HRSP MTG 132 N Main - larissa.harper@salisbury
- 11:00 AM to 11:30 AM Larissa Harper COB4 - Zack Kyle
- 12:00 PM to 12:30 PM Grand Opening - Full Force Studios Time, TBD -
- 3:00 PM to 4:00 PM 🔄 Out and About Downtown

**Saturday, February 02, 2019**

📅 Calendar

|  | February 2019 |  |  |  |  |  |  |  | March 2019 |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |  | S | M | T | W | T | F | S |

February 2019: S M T W T F S — 1 2; 3 4 5 6 7 8 9; 10 11 12 13 14 15 16; 17 18 19 20 21 22 23; 24 25 26 27 28

March 2019: S M T W T F S — 1 2; 3 4 5 6 7 8 9; 10 11 12 13 14 15 16; 17 18 19 20 21 22 23; 24 25 26 27 28 29 30; 31

**Sunday, February 03, 2019**

**Wednesday, February 06, 2019**
- 12:00 AM to Thu 2/7/2019 12:00 AM Call Jeanne with Final Edits and a
- 8:30 AM to 10:30 AM 🔁 Reminder: WAW Sub-Committee Meeting Bc
- 9:00 AM to 9:30 AM 🔁 Post-Council Mtg COB--4th
- 9:30 AM to 10:00 AM 🔁 Meet with Larissa office – Zack Kyle
- 11:00 AM to 11:45 AM Empire Display Areas Prep--Hugo & Weston Em
- 12:15 PM to 1:30 PM Empire Tour - larissa.harper@salisburync.gov
- 1:30 PM to 2:30 PM Updated: Meeting with Joan City Hall - Latoya Pric
- 3:00 PM to 4:00 PM 🔁 CAC Grants Committee 1 Water Street - Alyssa
- 3:00 PM to 3:30 PM Empire Hotel Grant Call 1-888-354-0094, code 84:
- 4:00 PM to 5:30 PM 🔁 CAC 1 Water Street - Alyssa Nelson

**Monday, February 04, 2019**
- 9:30 AM to 11:00 AM 🔁 Weekly Team Pow Wow Larissa's Office - Lato
- 2:00 PM to 3:00 PM 🔁 Management Team - Agenda Submission Mee
- 4:00 PM to 5:00 PM Website Mtg - larissa.harper@salisburync.gov
- 5:30 PM to 6:30 PM Hair appointment Greystone Downtown

**Thursday, February 07, 2019**
- 9:00 AM to 5:00 PM Train the Trainer Workshop COB, HR Training Roo

**Tuesday, February 05, 2019**
- 12:00 AM to Wed 2/6/2019 12:00 AM 🔁 Design Cmte Reminder - Laris
- 12:00 AM to Wed 2/6/2019 12:00 AM 🔁 EconVitality Cmte Reminder -
- 8:15 AM to 8:45 AM Chiro
- 9:00 AM to 11:00 AM Updated: DSI Website 2nd Floor Conference Roo
- 10:00 AM to 10:30 AM IDEA Center meeting 132 North Main Street, 4th
- 11:00 AM to 12:00 PM Weekly Meeting Zack's Office – Larissa Harper
- 2:00 PM to 3:00 PM 🔁 Digital Marketing Monthly Meeting TDA--1st I
- 5:00 PM to 8:00 PM 🔁 City Council City Hall--Council Chambers

**Friday, February 08, 2019**
- 12:00 AM to Sat 2/9/2019 12:00 AM 🔁 TIMESHEETS DUE - Larissa Harp
- 12:00 PM to 2:00 PM 🔁 Please Turn your timesheets in to Connie - Cc
- 2:00 PM to 4:00 PM 🔁 Out and About Downtown

**Saturday, February 09, 2019**

📅 Calendar

February 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | | |

March 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**Sunday, February 10, 2019**

**Monday, February 11, 2019**
- Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
- 12:00 AM to Tue 2/12/2019 12:00 AM ⟳ AgendaItemsDueby2 COB-Sta
- 9:30 AM to 11:00 AM ⟳ Weekly Team Pow Wow Larissa's Office - Lato
- 12:00 PM to 1:30 PM ⟳ NCMS Planning Team_Status Report and Upd
- 2:00 PM to 3:00 PM Management Team - Agenda Submittal Meeting
- 2:00 PM to 3:00 PM ⟳ Management Team - Agenda Submission Mee
- 2:00 PM to 3:00 PM ⟳ Mgmt Team--Agenda's DUE COB Conf Rm
- 6:00 PM to 9:00 PM City Council Retreat Livingstone College Hospitalit

**Tuesday, February 12, 2019**
- Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
- Tue 2/12/2019 12:00 AM to Thu 2/14/2019 12:00 AM Marketing & Spec
- 12:00 AM to Wed 2/13/2019 12:00 AM ⟳ Agenda Items Due Y Drive
- 8:00 AM to 9:00 AM ⟳ DSI Design Cmte Plaza ConfRm--2nd Flr - Laris
- 8:00 AM to 8:30 AM ⟳ ORG Reminder - Larissa Harper
- 9:00 AM to 11:00 AM Council Retreat IDEA Center Presentation Livings
- 9:00 AM to 6:00 PM City Council Retreat Livingstone College Hospitalit

**Wednesday, February 13, 2019**
- Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
- Tue 2/12/2019 12:00 AM to Thu 2/14/2019 12:00 AM Marketing & Spec
- 12:00 AM to Thu 2/14/2019 12:00 AM EMAIL ORG Mins, Agenda, Finan
- 9:30 AM to 10:00 AM ⟳ Meet with Larissa office - Zack Kyle
- 11:00 AM to 11:30 AM HRSP Grant Strategy Call 888-354-0094 – Bobby
- 1:00 PM to 2:00 PM Call Gianni
- 2:00 PM to 3:00 PM Management Team 4th Floor COB - Kelly Baker
- 5:00 PM to 6:30 PM DSI: Economic Vitality Committee City Tavern – W

**Thursday, February 14, 2019**
- Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
- 8:00 AM to 9:30 AM ⟳ DSI Promotions Committee City Hall--1st Floo
- 9:00 AM to 9:30 AM SWAY Passport Liaison Meeting COB 4th Floor – (
- 10:45 AM to 11:00 AM Valentine's Day Photo Op City Hall - Kaisha Bro
- 3:00 PM to 3:30 PM Phone Conference RSS/DSI Back to School Events
- 5:15 PM to 6:15 PM Bell Tower Green Park Meeting Council Chambers

**Friday, February 15, 2019**
- Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
- 12:00 AM to Sat 2/16/2019 12:00 AM ⟳ CCC45
- 12:00 AM to Sat 2/16/2019 12:00 AM ⟳ Pay Day!
- 10:30 AM to 11:30 AM Stantec - Main Street Design presentation 1 Wa
- 12:00 PM to 12:30 PM Background check for NC Main Street Courthou

**Saturday, February 16, 2019**
- Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
- 8:00 AM to 9:00 AM Town Mountain Concert

📅 Calendar

February 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 27 | 28 | 29 | 30 | 31 | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | | |

March 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**Sunday, February 24, 2019**
Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (

**Monday, February 25, 2019**
Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
9:00 AM to 10:00 AM Management Team - Conference Call w/Dr. Mar
9:30 AM to 11:00 AM ⟳ Weekly Team Pow Wow Larissa's Office – Lato
11:30 AM to 1:00 PM PAC meeting 1 Water St – Candice Brown
12:00 PM to 1:30 PM ⟳ NCMS Planning Team_Status Report and Upd
2:00 PM to 3:00 PM ⟳ Management Team - Agenda Submission Mee

**Tuesday, February 26, 2019**
Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
12:00 AM to Wed 2/27/2019 12:00 AM ⟳ Agenda Items Due Y Drive
7:45 AM to 9:15 AM ⟳ DSI Board Mtg Plaza Conf Rm 2nd Flr – Larissa
5:15 PM to 7:30 PM Chit, Chat & Chew TBD – Kelly Baker

**Wednesday, February 27, 2019**
Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
Wed 2/27/2019 12:00 AM to Sat 3/2/2019 12:00 AM Parking Study--Lis
7:30 AM to 9:00 AM Small Business Seminar Council Chambers – Laris
2:30 PM to 3:30 PM Invitation: Meet to discuss AV and tour details fo

**Thursday, February 28, 2019**
Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
Wed 2/27/2019 12:00 AM to Sat 3/2/2019 12:00 AM Parking Study--Lis
9:00 AM to 10:30 AM Sway Passport itineraries – Latoya Price

**Friday, March 01, 2019**
Mon 2/11/2019 12:00 AM to Sat 3/2/2019 12:00 AM Take off 4/4 after (
Wed 2/27/2019 12:00 AM to Sat 3/2/2019 12:00 AM Parking Study--Lis
12:00 AM to Sat 3/2/2019 12:00 AM ⟳ Pay Day!
2:00 PM to 4:00 PM ⟳ Out and About Downtown

**Saturday, March 02, 2019**

# March 2018

| March 2018 | | | | | | | | April 2018 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa | | Su | Mo | Tu | We | Th | Fr | Sa |
| | | | | 1 | 2 | 3 | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 | | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 | | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 | | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 | | 29 | 30 | | | | | |

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| Feb 25 | 26 | 27 | 28 | **Mar 1** $39 PF annual payment, Promo Cmte, Slides to Dan Becker (Email), 10:00am 2019 NC Main | **2** Pay Day!, 9:30am Discuss DSI, 11:00am Budget Work, 12:00pm Lunch (K&W) -, 2:00pm Out and About | **3** Teen Center Grand Opening (1402 W. Bank St.) |
| 4 | **5** ORG Reminder, 10:30pm Call Deb | **6** CCC, Design Cmte Reminder, ED Reminder, 1:30pm Management, 2:00pm Pre-Council | **7** 8:30am BUDGET DUE, 9:00am Post-Council, 9:30am Kelly & Larissa, 11:00am, 12:00pm Meeting with | **8** Liz P--Announcement Call (Call), Visits & Poster Delivery (White's Barber Shop, 11:00am EmpireMLEASE | **9** TIMESHEETS DUE -, Visits (CandyStore, Zack (Call), 2:00pm Out and About, 4:00pm Pam Coffield | 10 |
| 11 | **12** AgendaItemsDueby2, 8:30am Coffee (Mean, 9:30am International, 10:00am Discuss ORG, 12:00pm Management | **13** 8:00am, Agenda Items Due (Y, 8:00am DSI Design, 10:00am Plaza Space -, 5:00pm ED Cmte | **14** NC Main Street Conference, 9:30am Kelly & Larissa Meet (Kelly's Office) -, 4:00pm Empire Hotel Check-in Call | **15** | **16** Pay Day!, 9:15am Meeting to discuss Special Events, 11:00am Cheerwine, 2:00pm Out and About | 17 |
| 18 | **19** AgendaItemsDueby2, 8:30am SECU LOAN, 12:00pm Hotwire Reps, 12:00pm Chamber, 3:00pm Management | **20** CCC, 8:00am Spring SWAY, 3:30pm Conference call, 4:00pm Ribbon, 5:00pm City Council Mtg | **21** 9:00am Post-Council Mtg@9 (COB--4th, 9:30am Kelly & Larissa, 10:15am See Davis's, 1:00pm Council Retreat | **22** 8:30am Coffee (Mean Mug Coffee Company 1024 S Fulton St., 1:00pm Council Retreat 'til 7pm | **23** BCC, TIMESHEETS DUE -, 9:00am Meeting (COB4), 10:00am See Davis's, 12:00pm DSI ORG Cmte | **24** 10:00am Ring In Spring Event (Bell Tower) |
| 25 | **26** National Main Street Conference (Kansas City, MO), 8:30am Chiro, 2:00pm Mgmt Team Mtg (COB Conf Rm) | **27** Agenda Items Due (Y Drive), 7:45am DSI Board Mtg (Plaza Conf Rm 2nd) | **28** 9:30am Kelly & Larissa Meet (Kelly's Office) -, 4:00pm Empire Hotel Check-in Call | **29** 8:30am Coffee (Mean Mug Coffee Company 1024 S Fulton St., 2:30pm CAC grants (One Stop conference | **30** Pay Day!, 2:00pm Out and About (Downtown) | 31 |

Larissa Harper

1

3/23/2018 11:14 AM

Case 1:21-cv-00814-CCE-JLW   Document 1-7   Filed 10/18/21   Page 8 of 19

Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 58 of 107

| March 2019 | | | | | | | April 2019 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S |
| 24 | 25 | 26 | 27 | 28 | 1 | 2 | | 1 | 2 | 3 | 4 | 5 | 6 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 | 28 | 29 | 30 | | | | |
| 31 | | | | | | | | | | | | | |

## Sunday, March 03, 2019

## Monday, March 04, 2019
- 9:30 AM to 11:00 AM     Weekly Team Pow Wow Larissa's Office - Lato
- 11:00 AM to 11:30 AM Projector Testing Meroney - Latoya Price
- 12:00 PM to 1:30 PM Last NCMS Conference Committee Meeting 2nd
- 2:00 PM to 3:00 PM     Management Team - Agenda Submission Mee
- 3:00 PM to 4:00 PM AV Equipment for Conference 1st Floor Conferenc

## Tuesday, March 05, 2019
- 12:00 AM to Wed 3/6/2019 12:00 AM     Design Cmte Reminder - Laris
- 8:30 AM to 9:00 AM Chiro
- 2:00 PM to 3:00 PM     Digital Marketing Monthly Meeting TDA--1st I
- 3:00 PM to 5:00 PM City Council Meeting Council Chambers - Kelly Ba

## Wednesday, March 06, 2019
- 12:00 AM to Thu 3/7/2019 12:00 AM     EconVitality Cmte Reminder -
- 9:00 AM to 9:30 AM     Post-Council Mtg COB--4th
- 9:30 AM to 10:00 AM     Meet with Larissa office - Zack Kyle
- 11:00 AM to 12:00 PM Conference Volunteer Training Council Chamber
- 2:00 PM to 3:00 PM Volunteer Training 1st Floor Conference Rm, City I
- 3:00 PM to 4:00 PM     CAC Grants Committee - cancelled 1 Water Str
- 4:00 PM to 5:30 PM     CAC 1 Water Street - Alyssa Nelson
- 6:00 PM to 7:00 PM Conference Volunteer Training Council Chambers

## Thursday, March 07, 2019
- 8:30 AM to 10:30 AM Conference Bag Assembling Empire - Latoya Pric
- 9:00 AM to 9:30 AM Depot AV Assessment
- 11:00 AM to 12:00 PM Conference Volunteer Training 2nd Floor Confer
- 1:00 PM to 2:30 PM Fair Labor Standards Act (FLSA) Training PD Traini
- 5:30 PM to 7:00 PM Hotwire Q&A Product Demo Council
- 6:00 PM to 7:00 PM Conference Volunteer Training 2nd Floor Conferer

## Friday, March 08, 2019
- Fri 3/8/2019 12:00 AM to Sun 3/10/2019 12:00 AM Email Rodney Bus ti
- 12:00 AM to Sat 3/9/2019 12:00 AM     TIMESHEETS DUE - Larissa Harp
- 11:00 AM to 11:30 AM talk with Scott from USA Today - Larissa Harper
- 12:00 PM to 12:30 PM Mean Mug's Ribbon Cutting 110 N. Main - Lato
- 12:00 PM to 2:00 PM     Please Turn your timesheets in to Connie - Cc
- 2:00 PM to 4:00 PM     Out and About Downtown

## Saturday, March 09, 2019
- Fri 3/8/2019 12:00 AM to Sun 3/10/2019 12:00 AM Email Rodney Bus ti

📅 Calendar

|  | March 2019 |  |  |  |  |  |  | April 2019 |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S |
| 24 | 25 | 26 | 27 | 28 | 1 | 2 | | 1 | 2 | 3 | 4 | 5 | 6 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 | 28 | 29 | 30 | | | | |
| 31 | | | | | | | | | | | | | |

**Sunday, March 24, 2019**

**Wednesday, March 27, 2019**
Mon 3/25/2019 12:00 AM to Fri 3/29/2019 12:00 AM National Main Str
9:30 AM to 10:00 AM ⟳ Meet with Larissa office - Zack Kyle
11:15 AM to 11:45 AM Britt & Tax Assessor 402 N Main Street, Ste 201.
12:00 PM to 1:30 PM Lunch w/Britt&Zack

**Monday, March 25, 2019**
Mon 3/25/2019 12:00 AM to Fri 3/29/2019 12:00 AM National Main Str
9:30 AM to 11:00 AM ⟳ Weekly Team Pow Wow Larissa's Office - Lato
10:00 AM to 11:00 AM McAdams - Main Street Design presentation 1 Wa
11:30 AM to 12:30 PM McGill - Main Street Design presentation 1 Wate
11:30 AM to 1:00 PM PAC meeting 1 Water St - Candice Brown
2:00 PM to 3:00 PM ⟳ Management Team - Agenda Submission Mee
3:30 PM to 4:30 PM LandDesign - Main Street Design presentation 1 \
4:30 PM to 5:00 PM Main Street firm selection 1 Water Street - Alyssa

**Thursday, March 28, 2019**
Mon 3/25/2019 12:00 AM to Fri 3/29/2019 12:00 AM National Main Str
12:00 AM to Fri 3/29/2019 12:00 AM ANDRE--CRC Present Date!
8:00 AM to 8:30 AM Photos of Empire to Bobby
11:00 AM to 12:00 PM Brewbury Meeting New Sarum Brewing, 109 N L
1:30 PM to 2:00 PM Get dates in April to Andre Email
6:00 PM to 8:00 PM Service Recognition Banquet 315 S Martin Luther

**Tuesday, March 26, 2019**
Mon 3/25/2019 12:00 AM to Fri 3/29/2019 12:00 AM National Main Str
12:00 AM to Wed 3/27/2019 12:00 AM ⟳ Agenda Items Due Y Drive
7:45 AM to 9:15 AM ⟳ DSI Board Mtg Plaza Conf Rm 2nd Flr - Larissa
6:00 PM to 9:00 PM Women In Biz Mix & Mingle Belk 1455 Klumac Rd
6:00 PM to 9:00 PM Women in Business - Latoya Price

**Friday, March 29, 2019**
12:00 AM to Sat 3/30/2019 12:00 AM ⟳ Pay Day!
9:00 AM to 10:00 AM Sway Passports - DSI Tour DSI - City Hall - Claire
2:00 PM to 4:00 PM ⟳ Out and About Downtown

**Saturday, March 30, 2019**

📅 Calendar

**April 2019**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |   |   |   |   |

**May 2019**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

**Sunday, April 07, 2019**

**Monday, April 08, 2019**
- 12:00 AM to Tue 4/9/2019 12:00 AM ⟳ AgendaItemsDueby2 COB-Staf
- 9:30 AM to 11:00 AM ⟳ Weekly Team Pow Wow Larissa's Office - Lato
- 10:30 AM to 12:00 PM Conference Recap 2nd FLoor Plaza - Latoya Pric
- 1:00 PM to 4:00 PM McAdams Main Street walk Koco Java - S. Main -
- 2:00 PM to 3:00 PM ⟳ Mgmt Team--Agenda's DUE COB Conf Rm
- 2:00 PM to 3:00 PM ⟳ Management Team - Agenda Submission Mee
- 4:00 PM to 5:00 PM Work on Advertorial Larrisa's Office

**Tuesday, April 09, 2019**
- 12:00 AM to Wed 4/10/2019 12:00 AM ⟳ Agenda Items Due Y Drive
- 8:00 AM to 9:00 AM ⟳ DSI Design Cmte Plaza ConfRm--2nd Flr - Lari:
- 8:00 AM to 8:30 AM ⟳ ORG Reminder - Larissa Harper
- 10:00 AM to 12:00 PM Website meeting 2nd Floor Conference Room -
- 1:00 PM to 4:00 PM Stantec Main Street walk Koco Java - S. Main - Aly
- 4:00 PM to 5:00 PM Larissa to meet with Zack - Latoya Price
- 4:00 PM to 4:30 PM Meet with Larissa office - Zack Kyle

**Wednesday, April 10, 2019**
- 12:00 AM to Thu 4/11/2019 12:00 AM Econ Vitality Training w/MS Staff
- 9:30 AM to 10:00 AM ⟳ Meet with Larissa office - Zack Kyle
- 5:00 PM to 6:30 PM ⟳ DSI Economic Vitality Committee | Regular Me

**Thursday, April 11, 2019**
- 8:00 AM to 9:30 AM ⟳ DSI Promotions Committee City Hall--1st Floo
- 1:00 PM to 2:00 PM Work on Advertorial
- 2:00 PM to 3:00 PM Main Street Firm selection COB 1st floor conferen

**Friday, April 12, 2019**
- 12:00 AM to Sat 4/13/2019 12:00 AM ⟳ Pay Day!
- 9:30 AM to 11:30 AM Website meeting #2 2nd floor conference room -
- 1:00 PM to 2:30 PM Newsletter Discussion - Latoya Price
- 2:00 PM to 4:00 PM ⟳ Out and About Downtown

**Saturday, April 13, 2019**

# 4/28/2019 to 5/4/2019

📅 Calendar

April 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |   |   |   |   |

May 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

### Sunday, April 28, 2019

### Monday, April 29, 2019
- 8:00 AM to 10:00 AM Canceled: Management Team Sway Cafe City Ha
- 9:30 AM to 11:00 AM ♻ Weekly Team Pow Wow Larissa's Office - Lato
- 2:00 PM to 3:00 PM ♻ Management Team - Agenda Submission Mee

### Tuesday, April 30, 2019
- 8:15 AM to 9:45 AM DT Stakeholders Mtg - Larissa Harper
- 8:15 AM to 9:45 AM Downtown Stakeholders Meeting - Larissa Harper
- 10:00 AM to 10:30 AM ♻ ORG minutes to Diane - Candice Brown
- 10:30 AM to 11:00 AM ♻ Review Board Meeting Minutes - Candice Br
- 11:30 AM to 1:30 PM Lunch w/VHB
- 3:30 PM to 4:00 PM Call Phil Kirk Larissa's office
- 6:00 PM to 7:30 PM Mayors Spirit Forum/Dinner Council Chambers @

### Wednesday, May 01, 2019
- 12:00 AM to Thu 5/2/2019 12:00 AM Historic Salisbury Station Stats
- 9:30 AM to 10:00 AM ♻ Meet with Larissa office - Zack Kyle
- 10:00 AM to 2:00 PM Benefits Fair Civic Center - Latoya Price
- 11:00 AM to 2:00 PM Meet with City of Asheboro - Justin
- 1:30 PM to 2:30 PM Preliminary Film Production Team Mtg Council Ch
- 3:00 PM to 4:00 PM ♻ CAC Grants Committee 1 Water Street - Alyssa
- 4:00 PM to 5:30 PM ♻ CAC 1 Water Street - Alyssa Nelson
- 4:00 PM to 4:30 PM Conference Call (Empire) - Zack Kyle

### Thursday, May 02, 2019
- 12:00 AM to Fri 5/3/2019 12:00 AM Disney Institute RCCC - Larissa Har
- 4:00 PM to 5:00 PM Sign NC Main Street Annual Agreement - Latoya
- 5:15 PM to 7:30 PM Canceled: Chit, Chat & Chew Grace United Method

### Friday, May 03, 2019
- 12:00 AM to Sat 5/4/2019 12:00 AM ♻ TIMESHEETS DUE - Larissa Harp
- 8:00 AM to 9:00 AM Invitation: DSI Breakfast @ Fri May 3, 2019 8am -
- 12:00 PM to 2:00 PM ♻ Please Turn your timesheets in to Connie - Co
- 2:00 PM to 4:00 PM ♻ Out and About Downtown
- 4:00 PM to 5:00 PM Latoya"s 6 mo. Eval LH's Office - Larissa Harper

### Saturday, May 04, 2019

📅 Calendar

**May 2019**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

**June 2019**

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | | | | | | |

**Sunday, May 26, 2019**

**Wednesday, May 29, 2019**
- 9:30 AM to 10:00 AM ⟳ Meet with Larissa office - Zack Kyle
- 11:00 AM to 11:45 AM Maestro 201 Onboarding - Larissa Harper
- 2:00 PM to 3:00 PM Cheerwine Debrieff Meeting Council Chambers -
- 3:45 PM to 4:45 PM Presentation to S-R Society of the Triangle Gatew

**Monday, May 27, 2019**
- 12:00 AM to Tue 5/28/2019 12:00 AM *MEMORIAL DAY HOLIDAY* Not
- 9:30 AM to 11:00 AM ⟳ Weekly Team Pow Wow Larissa's Office - Lato
- 11:30 AM to 1:00 PM PAC meeting 1 Water St - Candice Brown
- 2:00 PM to 3:00 PM ⟳ Management Team - Agenda Submission Mee

**Thursday, May 30, 2019**
- 10:30 AM to 11:00 AM ⟳ Review Board Meeting Minutes - Candice Br
- 2:00 PM to 3:00 PM Restaurant Week/Krazy Klearance Meeting Sweet
- 4:30 PM to 5:00 PM Empire Conf Call W/ Bob and Ashley 1-800-511-7
- 5:00 PM to 7:30 PM Chit, Chat & Chew Grace United Methodist Church

**Tuesday, May 28, 2019**
- 12:00 AM to Wed 5/29/2019 12:00 AM ⟳ Agenda Items Due Y Drive
- 12:00 AM to Wed 5/29/2019 12:00 AM FINISH Incent Letter Items for I
- 7:45 AM to 9:15 AM ⟳ DSI Board Mtg Plaza Conf Rm 2nd Flr - Larissa
- 12:00 PM to 1:00 PM LP Covering Lunch - Latoya Price
- 2:00 PM to 3:00 PM Management Team HR Conference Room - Kelly E
- 2:00 PM to 3:00 PM Salisbury Parking Study Conference Call Conferer
- 4:00 PM to 6:00 PM Planning Board Mtg

**Friday, May 31, 2019**
- 12:00 AM to Sat 6/1/2019 12:00 AM ⟳ TIMESHEETS DUE - Larissa Harp
- 11:30 AM to 1:00 PM Jason's Birthday Lunch China Grove Family Restau
- 12:00 PM to 2:00 PM ⟳ Please Turn your timesheets in to Connie - Cc
- 2:00 PM to 4:00 PM ⟳ Out and About Downtown

**Saturday, June 01, 2019**
- 1:00 PM to 7:00 PM Beaver Brothers, Inc. is celebrating their 100th bus

# 5/5/2019 to 5/11/2019

📅 Calendar

May 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |   |

June 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |   |   |   |   |   |   |

## Sunday, May 05, 2019

## Monday, May 06, 2019
- 9:30 AM to 11:00 AM ⟳ Weekly Team Pow Wow Larissa's Office – Lato
- 10:00 AM to 11:00 AM Meet with Britt office – Zack Kyle
- 11:30 AM to 12:30 PM Canceled: Jason's birthday lunch China Grove Fa
- 2:00 PM to 3:00 PM ⟳ Management Team – Agenda Submission Mee
- 4:15 PM to 4:45 PM group photo city hall – Candice Brown

## Tuesday, May 07, 2019
- 12:00 AM to Wed 5/8/2019 12:00 AM ⟳ Design Cmte Reminder – Laris
- 12:00 AM to Wed 5/8/2019 12:00 AM ⟳ EconVitality Cmte Reminder –
- 10:00 AM to 10:30 AM ⟳ Board Minutes to Diane – Candice Brown
- 2:00 PM to 3:00 PM ⟳ Digital Marketing Monthly Meeting TDA--1st I
- 5:00 PM to 8:00 PM ⟳ City Council City Hall--Council Chambers

## Wednesday, May 08, 2019
- 12:00 AM to Thu 5/9/2019 12:00 AM Send CRC Next tasks to Committe
- 9:30 AM to 10:00 AM ⟳ Meet with Larissa office – Zack Kyle
- 12:15 PM to 1:15 PM Lisa Wear LH's Office
- 12:30 PM to 1:30 PM Birthday Lunch Wink's King Barbeque & Seafood,
- 5:00 PM to 6:30 PM ⟳ DSI Economic Vitality Committee | Regular Me

## Thursday, May 09, 2019
- 8:00 AM to 10:00 AM Management Team Sway Cafe COB, HR Training
- 8:00 AM to 9:30 AM ⟳ DSI Promotions Committee City Hall--1st Floo
- 12:00 PM to 12:30 PM Invitation: VIP meeting DSI with the Post @ Thu
- 4:15 PM to 4:45 PM Call Liz Moomy

## Friday, May 10, 2019
- 12:00 AM to Sat 5/11/2019 12:00 AM ⟳ Pay Day!
- 10:31 AM to 2:31 PM Regional Meeting – Southwest 42 Union St S Suite
- 2:00 PM to 4:00 PM ⟳ Out and About Downtown

## Saturday, May 11, 2019

📅 Calendar

| | | | May 2019 | | | | | | | June 2019 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S |
| 28 | 29 | 30 | 1 | 2 | 3 | 4 | | | | | | | 1 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 26 | 27 | 28 | 29 | 30 | 31 | | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| | | | | | | | 30 | 1 | 2 | 3 | 4 | 5 | 6 |

**Sunday, May 12, 2019**

**Wednesday, May 15, 2019**
12:00 AM to Thu 5/16/2019 12:00 AM 🔁 CCC45

10:00 AM to 11:00 AM Laurinburg DT Dir & TDA Visit--Discuss DSI/TDA

2:00 PM to 2:30 PM Conference Call - Candice Brown

2:30 PM to 3:30 PM Open Enrollment Session Park Ave

4:00 PM to 4:30 PM 🔁 Monthly EMPIRE Check-In Call 1-888-354-009

**Monday, May 13, 2019**
12:00 AM to Tue 5/14/2019 12:00 AM 🔁 AgendaItemsDueby2 COB-Sta

9:30 AM to 11:00 AM 🔁 Weekly Team Pow Wow Larissa's Office - Lato

11:00 AM to 12:00 PM Film Project 1Stop Conference Room - 132 N. Ma

2:00 PM to 3:00 PM 🔁 Mgmt Team--Agenda's DUE COB Conf Rm

2:00 PM to 3:00 PM 🔁 Management Team - Agenda Submission Mee

4:00 PM to 4:30 PM Call with Britt office - Zack Kyle

4:00 PM to 4:30 PM Empire Call gotomeeting.com - Candice Brown

**Thursday, May 16, 2019**

**Tuesday, May 14, 2019**
12:00 AM to Wed 5/15/2019 12:00 AM 🔁 Agenda Items Due Y Drive

8:00 AM to 9:00 AM 🔁 DSI Design Cmte Plaza ConfRm--2nd Flr - Laris

8:00 AM to 8:30 AM 🔁 ORG Reminder - Larissa Harper

2:00 PM to 2:30 PM Review FINAL Org and Board Minutes - Larissa Ha

2:30 PM to 3:00 PM FW: Cheerwine Festival - Volunteer Meeting Civic

3:30 PM to 4:30 PM Discuss City Hall Coverage HR - Brianna Kenny

5:00 PM to 7:00 PM Women in Business: Derby Party! Trinity Oaks - La

**Friday, May 17, 2019**
12:00 AM to Sat 5/18/2019 12:00 AM 🔁 TIMESHEETS DUE - Larissa Har

12:00 PM to 2:00 PM 🔁 Please Turn your timesheets in to Connie - Co

2:00 PM to 4:00 PM 🔁 Out and About Downtown

2:00 PM to 3:00 PM SEP-12-2019 JUNETEENTH 1STOP CONF ROOM -

**Saturday, May 18, 2019**
10:00 AM to 9:30 AM Cheerwine Festival Salisbury - Latoya Price

12:00 PM to 10:00 PM Cheerwine Festival Downtown - Latoya Price

# 5/19/2019 to 5/25/2019

📅 Calendar

May 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 28 | 29 | 30 | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 | |

June 2019

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 1 | 2 | 3 | 4 | 5 | 6 |

**Sunday, May 19, 2019**

**Monday, May 20, 2019**
- 12:00 AM to Tue 5/21/2019 12:00 AM 🔁 AgendaItemsDueby2 CH--Sta
- 9:30 AM to 11:00 AM 🔁 Weekly Team Pow Wow Larissa's Office - Lato
- 12:00 PM to 1:30 PM 🔁 Chamber Board Mtg Gateway 2nd Floor Conf I
- 2:00 PM to 2:30 PM 🔁 Pre-Council Mtg City Hall
- 2:00 PM to 3:00 PM 🔁 Management Team - Agenda Submission Mee
- 3:30 PM to 4:00 PM Benefits City Hall

**Tuesday, May 21, 2019**
- 8:00 AM to 9:00 AM MSD Expansion Conversation Richard's BBQ - Lar
- 11:00 AM to 12:00 PM EverWondr Networking Meeting 217 S Main St,
- 12:30 PM to 1:30 PM Reception Window
- 5:00 PM to 8:00 PM 🔁 City Council Mtg City Hall--Council Chambers

**Wednesday, May 22, 2019**
- 9:30 AM to 10:00 AM 🔁 Meet with Larissa office - Zack Kyle
- 11:30 AM to 1:00 PM Lunch Los Arcos - Ruth Chaparro
- 1:00 PM to 2:00 PM Downtown Salisbury 217 South Main St. (City Hall)
- 2:00 PM to 3:00 PM Downtown Plans Zack's Office - Hannah Jacobson

**Thursday, May 23, 2019**
- 12:00 AM to Fri 5/24/2019 12:00 AM 🔁 BCC
- 10:00 AM to 10:30 AM 🔁 Review ORG minutes - Candice Brown
- 12:30 PM to 1:30 PM Lunch w/Eric Hake Palermo's Downtown - Larissa
- 2:00 PM to 2:45 PM Maestro 101 Onboarding - Larissa Harper
- 3:00 PM to 3:30 PM Meet with Larissa Larissa's Office - Zack Kyle
- 6:00 PM to 8:00 PM NC Dept. of Cultural Resources--Presentation on

**Friday, May 24, 2019**
- 12:00 AM to Sat 5/25/2019 12:00 AM 🔁 Pay Day!
- 8:30 AM to 9:30 AM Film Project - Meet with applicant 1Stop Confere
- 12:00 PM to 12:00 PM Descripts & other relevant info of OZ Projects to
- 2:00 PM to 4:00 PM 🔁 Out and About Downtown

**Saturday, May 25, 2019**

📅 Calendar

| June 2019 | | | | | | | | July 2019 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | | S | M | T | W | T | F | S |
| | | | | | | 1 | | | 1 | 2 | 3 | 4 | 5 | 6 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 | | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 | | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 | | 28 | 29 | 30 | 31 | | | |
| 30 | | | | | | | | | | | | | | |

**Sunday, June 02, 2019**

**Monday, June 03, 2019**
- 8:00 AM to 11:30 AM GOV's LIP Support Letter
- 9:30 AM to 11:00 AM 🔁 Weekly Team Pow Wow Larissa's Office – Lato
- 2:00 PM to 3:00 PM 🔁 Management Team - Agenda Submission Mee
- 3:30 PM to 4:00 PM Meeting with Josh Barnhardt

**Tuesday, June 04, 2019**
- 12:00 AM to Wed 6/5/2019 12:00 AM 🔁 Design Cmte Reminder – Laris
- 12:00 AM to Wed 6/5/2019 12:00 AM 🔁 EconVitality Cmte Reminder -
- 8:00 AM to 9:00 AM =Meet with DSI Officers Palms – Zack Kyle
- 9:30 AM to 10:30 AM Parking Study - Downtown Growth Dev Services
- 2:00 PM to 3:00 PM 🔁 Digital Marketing Monthly Meeting TDA--1st
- 3:00 PM to 3:30 PM 🔁 ORG minutes to Diane – Candice Brown
- 5:00 PM to 8:00 PM 🔁 City Council City Hall--Council Chambers

**Wednesday, June 05, 2019**
- 12:00 AM to Thu 6/6/2019 12:00 AM DUE--DSI PRESENTATION Zack &
- 9:00 AM to 9:30 AM 🔁 Post-Council Mtg COB--4th
- 9:30 AM to 10:00 AM 🔁 Meet with Larissa office - Zack Kyle
- 11:00 AM to 12:30 PM Work on NC Retirement Community App Larissa
- 12:30 PM to 4:30 PM Finish DSI Presentation
- 3:00 PM to 4:00 PM 🔁 CAC Grants Committee 1 Water Street – Alyssa
- 4:00 PM to 5:30 PM 🔁 CAC 1 Water Street – Alyssa Nelson

**Thursday, June 06, 2019**
- 10:00 AM to 10:30 AM DSI: New Employee Orientation Video City Hall
- 11:00 AM to 12:30 PM Work on NC Retirement Community App Larissa
- 1:00 PM to 2:30 PM Car Inspection Auto Works 429 S. Main, Salisbury
- 2:00 PM to 4:00 PM FW: Sway Ideas Swap City Hall - Council Chamber
- 4:00 PM to 4:30 PM Review DSI Presentation Larissa's Office – Zack Kyl

**Friday, June 07, 2019**
- 12:00 AM to Sat 6/8/2019 12:00 AM 🔁 Pay Day!
- 9:00 AM to 9:30 AM Empire Developers Request – Larissa Harper
- 10:00 AM to 10:30 AM 🔁 Board Minutes to Diane – Candice Brown
- 11:00 AM to 12:30 PM College Night Out Meeting City Tavern – Latoya
- 2:00 PM to 4:00 PM 🔁 Out and About Downtown

**Saturday, June 08, 2019**
- 8:30 AM to 5:00 PM RE Update Course 4537 Country Club Rd., Winstor

📅 Calendar

| | June 2019 | | | | | | | July 2019 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S |
| | | | | | | 1 | | 1 | 2 | 3 | 4 | 5 | 6 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 | 28 | 29 | 30 | 31 | | | |
| 30 | | | | | | | | | | | | | |

**Sunday, June 09, 2019**

**Monday, June 10, 2019**
- 12:00 AM to Tue 6/11/2019 12:00 AM ♻ AgendaItemsDueby2 COB-Sta
- 8:30 AM to 9:30 AM Cyber Security Training City Hall – Candice Brown
- 9:30 AM to 11:00 AM ♻ Weekly Team Pow Wow Larissa's Office – Lato
- 2:00 PM to 3:00 PM ♻ Management Team - Agenda Submission Mee
- 2:00 PM to 3:00 PM ♻ Mgmt Team--Agenda's DUE COB Conf Rm
- 3:30 PM to 4:30 PM Social Media Session Conference Call conference

**Tuesday, June 11, 2019**
- 12:00 AM to Wed 6/12/2019 12:00 AM ♻ Agenda Items Due Y Drive
- 8:00 AM to 9:00 AM Special Called DSI ORG Cmte Mtg City Hall--1st F
- 8:00 AM to 8:30 AM ♻ ORG Reminder - Larissa Harper
- 8:00 AM to 9:00 AM ♻ DSI Design Cmte Plaza ConfRm--2nd Flr – Laris
- 9:00 AM to 10:00 AM FW: Summer Youth Employment Overview HR –
- 10:00 AM to 11:00 AM FILM PROJECT - FINAL REVIEW 1STOP CONF RO
- 10:30 AM to 3:00 PM Budget Work Session 1 Water Street - Kelly Bake

**Wednesday, June 12, 2019**
- 8:30 AM to 10:00 AM Candice Dentist - Candice Brown
- 9:30 AM to 10:00 AM ♻ Meet with Larissa office - Zack Kyle
- 3:00 PM to 4:30 PM DSI Website TBD - Larissa Harper
- 5:00 PM to 6:30 PM ♻ DSI Economic Vitality Committee | Regular Me

**Thursday, June 13, 2019**
- 8:00 AM to 9:30 AM ♻ DSI Promotions Committee City Hall--1st Floo
- 1:30 PM to 2:00 PM Empire Call
- 2:00 PM to 2:30 PM Meet with Candice to Review Budget Candice's D
- 3:00 PM to 4:00 PM Discuss Council Presentation for June 18th meetin

**Friday, June 14, 2019**
- 12:00 AM to Sat 6/15/2019 12:00 AM ♻ TIMESHEETS DUE - Larissa Ha
- 9:30 AM to 11:00 AM Community Engagement
- 12:00 PM to 2:00 PM ♻ Please Turn your timesheets in to Connie - Cc
- 2:00 PM to 4:00 PM ♻ Out and About Downtown

**Saturday, June 15, 2019**
- 12:00 AM to Sun 6/16/2019 12:00 AM ♻ CCC45
- 12:00 AM to Sun 6/16/2019 12:00 AM Juneteenth - Latoya Price

📅 Calendar

| June 2019 | | | | | | | July 2019 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S |
| 26 | 27 | 28 | 29 | 30 | 31 | 1 | | 1 | 2 | 3 | 4 | 5 | 6 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 | 28 | 29 | 30 | 31 | | | |
| 30 | | | | | | | | | | | | | |

**Sunday, June 16, 2019**

**Monday, June 17, 2019**
- 12:00 AM to Tue 6/18/2019 12:00 AM 🔁 AgendaItemsDueby2 CH--Sta
- 12:00 AM to Tue 6/18/2019 12:00 AM CALL LORA BELL BABY OWNER
- 8:00 AM to 9:00 AM Chiro
- 9:30 AM to 11:00 AM 🔁 Weekly Team Pow Wow Larissa's Office - Lato
- 11:45 AM to 1:15 PM Lunch for Zack's Birthday K&W - Kelly Baker
- 12:00 PM to 1:30 PM 🔁 Chamber Board Mtg Gateway 2nd Floor Conf I
- 2:00 PM to 3:00 PM 🔁 Management Team - Agenda Submission Mee
- 2:00 PM to 2:30 PM 🔁 Pre-Council Mtg City Hall
- 2:30 PM to 3:00 PM Meet with Larissa office - Zack Kyle
- 6:00 PM to 9:00 PM Council Meeting - Public Hearing Fame Statue Cc

**Tuesday, June 18, 2019**
- 8:00 AM to 9:00 AM 🔁 DSI ORG Cmte City Hall 1st Floor Conf Rm - La
- 12:30 PM to 2:30 PM Call Mr. Paul Fisher
- 2:00 PM to 3:00 PM Meeting with Larissa Brianna Zack's Office - Zack
- 3:00 PM to 4:00 PM Meet with Bob and Ashley 4th floor - Zack Kyle
- 5:00 PM to 8:00 PM 🔁 City Council Mtg City Hall--Council Chambers

**Wednesday, June 19, 2019**
- 9:00 AM to 9:30 AM 🔁 Post-Council Mtg@9 COB--4th floor
- 9:30 AM to 10:00 AM 🔁 Meet with Larissa office - Zack Kyle
- 10:00 AM to 11:00 AM Management Team After Council Meeting COB
- 1:00 PM to 2:30 PM Brewbury Festival La Cava Restaurant, 329 S Churc

**Thursday, June 20, 2019**
- 8:30 AM to 9:30 AM Welcome Packet sub-committee TBD - Larissa Ha
- 8:30 AM to 9:30 AM Updated invitation: Welcome Packet -Sub Comm
- 10:00 AM to 11:00 AM meeting about DSI website and possible phone
- 11:00 AM to 11:30 AM Board Retreat Meeting City Hall - Latoya Price
- 1:00 PM to 2:00 PM Downtown Incentives Toolkit Discussion COB4 Kyl

**Friday, June 21, 2019**
- 12:00 AM to Sat 6/22/2019 12:00 AM 🔁 Pay Day!
- 8:00 AM to 9:30 AM Breakfast Breakfast Time - Ruth Chaparro
- 2:00 PM to 4:00 PM 🔁 Out and About Downtown
- 5:00 PM to 9:00 PM Gallery Gallop Downtown - Latoya Price

**Saturday, June 22, 2019**



# DOWNTOWN SALISBURY

## NORTH CAROLINA

*A Main Street Original*

March 17, 2020

SENT VIA ELECTRONIC MAIL

Lane Bailey, City Manager
lbail@salisburync.gov

Zack Kyle, Assistant City Manager
zkyle@salisburync.gov

Graham Corriher, City Attorney
Graham.Corriher@salisburync.gov

**CONFIDENTIAL COMMUNICATION**

Dear Lane, Zack, and Graham,

Please allow this correspondence to memorialize and preserve DSI Organization Committee's concern over inappropriate actions taken by our Board's Executive Director, Larissa Harper. Due to the gravity of her actions, which include a deliberate breach of the Board's trust in addition to potential criminal acts and violations of City of Salisbury Employee Policy, we believe it important to get our concerns and all of the facts concerning this matter in writing, for your review and ongoing consideration. We thank you for working with us thus far on this sensitive and upsetting matter.

By way of background, as you are aware, it has been almost three years since the merger and/partnership between Downtown Salisbury, Inc.'s 501(c)(3) nonprofit board and the City of Salisbury, whereby all employees of the nonprofit board are City of Salisbury employees.

At DSI's January 28, 2020 board meeting, DSI's Chair Whitney Wallace Williams called a Closed Session discussion, which was openly intended to <u>exclude</u> all City personnel and our City Council liaison for the purpose of promoting a candid discussion on how the nonprofit Board felt the partnership was going since it was established 2.5 years ago. After the completion of our regular board meeting in January, all City staff, management, and DSI staff persons left the room.

Similarly, at DSI's February 25, 2020 Board Meeting, the Agenda set by the Executive Director again included a second closed session discussion, as requested by Chair Williams, to

1



**DOWNTOWN**

**SALISBURY**

NORTH CAROLINA

*A Main Street Original*

discuss a recent meeting that DSI's Organization Committee had with City management and DSI staff, which was facilitated by North Carolina Main Street Director, Liz Parham – where the City and Nonprofit representatives openly discussed pros and cons of the merger. The closed session meeting was also intended to, and did, discuss modified terms that DSI had provided to the City regarding modifications to the MOU.

It was crystal clear to all Board members, all DSI staff, and all City employees and management that the closed session meetings explicitly <u>excluded</u> City-affiliated representatives, including DSI staff, City employees, management, and our City liaison. On both the January and February Board Agendas, prepared by Harper, it stated: **"Closed Session without City Staff/Liaison".**

After our February closed session discussion, as people started getting up to leave, Chairwoman Williams noticed a device left on the table, which was noted to be the City's recording device that had been brought into the meeting, and left in the meeting, by Harper.

The error and pending issue was immediately acknowledged by DSI nonprofit Board members standing by, including DSI Chair Williams and Vice-Chair Diane Young.

After the meeting, Williams and Young met for several minutes to develop a plan about what to do with the recording. It was decided to type up the Minutes from the open session, and then delete the recording from the device. Young offered to type the Minutes, delete the recording, and then deliver the device back to Harper.

Shortly thereafter, the following email exchange took place between Young and Harper, with Williams copied:

**From:** Diane Young [mailto:dianeyoung96@gmail.com]
**Sent:** Tuesday, February 25, 2020 10:34 AM
**To:** Larissa Harper <larissa.harper@salisburync.gov>; Whitney Wallace <wwallace@wallacegraham.com>
**Subject:** Recording device

Larissa,

Good news for you. I have the recording device and will do the minutes of today's meeting. Bad news is I won't get to this until Friday, so your recorder will be returned early next week.

Thanks.

2



# D O W N T O W N

## S A L I S B U R Y

### N O R T H   C A R O L I N A

*A Main Street Original*

Diane

**(Exhibit 1)**

Harper responded that she needed the device back sooner and that plan was not acceptable.  She stated:

> **From:** Larissa Harper <larissa.harper@salisburync.gov>
> **Sent:** Tuesday, February 25, 2020 11:46 AM
> **To:** Diane Young <dianeyoung96@gmail.com>; Whitney W. Williams <wwallace@wallacegraham.com>
> **Subject:** RE: Recording device
>
> I certainly appreciate your offer, Diane.  However, Dileika and I already planned for the Secretary to type up the Minutes this month, so I will need it back in order to save and send the file to her.  If you do not have time to drop it off at City Hall today, I can help with that--I need to pick up checks from the accountant and collect a second signature anyway.  I can stop by wherever you may be in town, get your signature and the device.
>
> If the recording was still running after City staff left, and you are worried about that conversation being overheard, I'll be glad to play the recording until we get to that point and erase it in front of you.
>
> Thanks!  --Larissa

(Exhibit 2)

That afternoon, Young responded to Harper:

> **From:** Diane Young [mailto:dianeyoung96@gmail.com]
> **Sent:** Tuesday, February 25, 2020 1:01 PM
> **To:** Larissa Harper <larissa.harper@salisburync.gov>; Whitney Wallace <wwallace@wallacegraham.com>
> **Subject:** Re: Recording device
>
> That works. I can bring the recorder by early tomorrow afternoon if you are going to be there. Will find the time stamp where we need to remove the rest of the recording.
>
> Thank you.

3



D O W N T O W N

# SALISBURY
### N O R T H   C A R O L I N A
*A Main Street Original*

**From:** Larissa Harper <larissa.harper@salisburync.gov>
**Sent:** Tuesday, February 25, 2020 1:33 PM
**To:** Diane Young <dianeyoung96@gmail.com>; Whitney W. Williams <wwallace@wallacegraham.com>
**Subject:** RE: Recording device

Good deal.  Want to meet at 1 p.m.?  If it helps, I think the recording had been going about 7 mins. and 30 sec. before we began the meeting and staff left at 9:15 a.m. —LH

**(Exhibit 3)**

That afternoon, Young and Williams talked and decided to involve DSI Secretary Dileika Wilson to see what her thoughts were on returning the device with the recording still on the device.  Wilson agreed with Young and Williams that it was <u>not</u> a good idea to return the recording device with the closed session recording still on it.

A new plan was formed by Wilson and Young.  They decided to *record* the open session on a *new* device (Young's phone) and then transfer those files electronically to Harper so that she could have a recording by which to do the Minutes, or for Wilson to do the Minutes, but would <u>not</u> have access to the closed session private meeting conversation.  The plan was to record the open session portion of the recording, and to delete the device completely before returning it.

Young spent the afternoon re-recording our open session on her cell phone.

On Wednesday morning at 7:59 am, Young sent Harper, with Williams copied, three separate emails with three files of the re-recorded open session meeting. 1/3 is below:

**From:** Diane Young <dianeyoung96@gmail.com>
**Sent:** Wednesday, February 26, 2020 7:59 AM
**To:** Larissa Harper <larissa.harper@salisburync.gov>
**Cc:** Whitney W. Williams <wwallace@wallacegraham.com>
**Subject:** Fwd: Diane Young shared "My recording 1.wav" with you

Larissa,

Good morning. I am sending you the recording from yesterday's Board meeting via dropbox. It is in three files. The recording you are receiving is as good as the quality that was on the recorder

4



itself, there are times where you have to work hard to understand what someone is saying but it is no different than if you were listening to the actual recording device.

I will drop off the recorder at some point today.

Thank you.

Diane

**(Exhibit 4)**

After Young sent the drop-box recording, she had trouble deleting the recording device of all the recorded files. She spent time pulling up the online operations manual on the device, and could not figure out how to delete the recordings. She called Williams to ask if someone from her office could help with the deletion.

In the late afternoon on Wednesday, Young came to Williams' office, at 525 N. Main Street, and the two met with the firm's office's IT specialist to help delete the files from the recording. Young and Williams, deleted all files on the device, to the point where the device read 0/0 files on this device. According to the policy manual on p. 24, if the device states 0/0, the recordings have been deleted.

On Tuesday, Assistant City Manager Zack Kyle reached out to Williams and asked to meet. The meeting was set for Wednesday afternoon. During the meeting, Kyle disclosed to Williams almost immediately that Harper had deliberately listened to the full contents of our closed session meeting.

Williams was visibly upset, and expressed as such to Kyle, that Harper had listened to the recording of the DSI Board's clearly-designated closed meeting. Williams explained to Kyle the efforts the nonprofit board had gone through to delete the recording; the emails in her possession that confirmed Harper's knowledge that the closed session meeting was not intended for her to hear; and the grave act of dishonesty and mistrust that had been committed by her deliberately listening to it anyway. Williams advised Kyle that she would have no choice but to tell the Board what happened, as it was the Board's trust which had been breached.

Kyle later confirmed with Harper that she had listened to the full closed session recording.

Our Committee has since learned, after we pulled the device operation manual from the internet a second time, that there is a fine print section, on a separate page from the How to Erase a Recording entry that states in small print: ***Even when formatting or erasing is performed, only***

5



**DOWNTOWN**

**SALISBURY**

NORTH CAROLINA

*A Main Street Original*

*the file management information of the internal memory is updated and the recorded data is*
*not completely erased. Before giving the voice recorder to somebody or disposing of it,*
*perform initialization and then <u>record silence</u> until there is no recording time remaining in*
*order to prevent the leakage of personal information.*

It is clear that Harper, with full knowledge that the recording was not meant for her to
hear and that the meeting deliberately excluded she and City-affiliates, deliberately endeavored
to pull deleted recordings from the City recording device. At some point, she informed
management that she had deliberately listened, or planned to listen, to the full recording.

\*\*\*\*\*\*\*

As we have discussed in person and/or in phone conversations since, our Committee has
learned that Harper's actions are not only a grave violation of trust but may also be criminal.

<u>**N.C. Gen. Stat. 15A-287**</u> is a North Carolina criminal statute, which makes it illegal, and
in fact a *Class H* felony, for any person, whether a municipal employee or not, to record and/or
endeavor to intercept a recording where they are not a party, or have the consent of a party to the
discussion. The statute states:

**§ 15A-287. Interception and disclosure of wire, oral, or electronic communications**
**prohibited.**
(a)      Except as otherwise specifically provided in this Article, a person is guilty of a
Class H felony if, without the consent of at least one party to the communication, the
person:
(1)      Willfully intercepts, endeavors to intercept, or procures any other person to
intercept or endeavor to intercept, any wire, oral, or electronic communication.

**(Exhibit 5)**

Our Committee has also reviewed the City of Salisbury Policy Manual and has learned
that the "unauthorized recording of conversations in the workplace or video recording of other
City employees," is a first offense, terminable offense.

6



**DOWNTOWN SALISBURY**

NORTH CAROLINA

*A Main Street Original*

The City of Salisbury Policy states:

| OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| Unauthorized recording of conversations in the workplace or video recording of other City employees | Termination | | |

**(Exhibit 6)**

\*\*\*\*\*\*\*\*\*\*\*

In summary, DSI Organization Committee has serious concerns about the act that Harper has committed. Harper's actions were dishonest and deliberate and show a lack of integrity and good character. As an agent of the DSI board, her actions reflect on the DSI Board members, as well as the City of Salisbury and its employees. Her actions further appear to be criminal and in direct conflict and violation of City of Salisbury Employee Policies.

We are sensitive to the needs of the City due to the unthinkable coronavirus pandemic, and we respect the City's needs on a "reasonable" timeline. However, we do not want any responsive action to be delayed for months from now, or for our organization's "new normal" to be working with an Executive Director that we distrust. We struggle to accept that violations of North Carolina law, of the public trust, of the nonprofit's trust, and of City of Salisbury's policies are survivable because of this macro event.

While we recognize that the DSI Board has no voice in City personnel disciplinary matters, it is the opinion of the majority of Organization Committee that Harper should have been suspended, or at the very least removed from DSI matters and communication with the DSI Board, pending an internal investigation promptly upon the City's learning of her terminable and potentially criminal violation. As she was not, our Board - which continues to work actively to help downtown business owners in the retail, restaurant, and service sector who are facing the most critical test to their business's viability ever – has been placed in a difficult situation of continuing to work with an Executive Director who we hold in contempt. As it stands now, Organization Committee does not see a workable scenario where the existing Board remains intact with the current Executive Director.

7



# D O W N T O W N

## S A L I S B U R Y

### N O R T H   C A R O L I N A

*A Main Street Original*

Thank you for your time and attention to this matter.  We hope that we can work together to rebuild our partnership and relationship in light of this serious and unfortunate issue.

Sincerely,

**DSI Organization Committee**

Whitney Wallace Williams (Chair), Diane Young (Vice-Chair and EVC Chair), Greg Shields (Past Chair), Tim Proper (Treasurer), Dileika Wilson-Ballard (Secretary), Cheryl Goins (Design Chair)

Cc:  Brian Miller, City Councilman/ DSI Liaison (bmil@salisburync.gov)
Mayor Karen Alexander (kalex@salisburync.gov)

8

## Whitney W. Williams

**From:** Diane Young <dianeyoung96@gmail.com>
**Sent:** Tuesday, February 25, 2020 10:34 AM
**To:** Larissa Harper; Whitney W. Williams
**Subject:** Recording device

Larissa,

Good news for you. I have the recording device and will do the minutes of today's meeting. Bad news is I won't get to this until Friday, so your recorder will be returned early next week.

Thanks.

Diane


*Diane M. Young, President*
*dianeyoung96@gmail.com*
*704-213-0747*



[www.dgninc.com](http://www.dgninc.com)

1

**Whitney W. Williams**

| | |
|---|---|
| **From:** | Larissa Harper <larissa.harper@salisburync.gov> |
| **Sent:** | Tuesday, February 25, 2020 11:46 AM |
| **To:** | Diane Young; Whitney W. Williams |
| **Subject:** | RE: Recording device |

I certainly appreciate your offer, Diane. However, Dileika and I already planned for the Secretary to type up the Minutes this month, so I will need it back in order to save and send the file to her. If you do not have time to drop it off at City Hall today, I can help with that--I need to pick up checks from the accountant and collect a second signature anyway. I can stop by wherever you may be in town, get your signature and the device.

If the recording was still running after City staff left, and you are worried about that conversation being overheard, I'll be glad to play the recording until we get to that point and erase it in front of you.

Thanks! --Larissa

**From:** Diane Young [mailto:dianeyoung96@gmail.com]
**Sent:** Tuesday, February 25, 2020 10:34 AM
**To:** Larissa Harper <larissa.harper@salisburync.gov>; Whitney Wallace <wwallace@wallacegraham.com>
**Subject:** Recording device

CAUTION: *** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. ***

Larissa,

Good news for you. I have the recording device and will do the minutes of today's meeting. Bad news is I won't get to this until Friday, so your recorder will be returned early next week.

Thanks.

Diane

*Diane M. Young, President*
*dianeyoung96@gmail.com*
*704-213-0747*

Exhibit

2

1

www.dgninc.com

**Whitney W. Williams**

| | |
|---|---|
| **From:** | Larissa Harper <larissa.harper@salisburync.gov> |
| **Sent:** | Tuesday, February 25, 2020 1:33 PM |
| **To:** | Diane Young; Whitney W. Williams |
| **Subject:** | RE: Recording device |

Good deal. Want to meet at 1 p.m.? If it helps, I think the recording had been going about 7 mins. and 30 sec. before we began the meeting and staff left at 9:15 a.m. --LH

**From:** Diane Young [mailto:dianeyoung96@gmail.com]
**Sent:** Tuesday, February 25, 2020 1:01 PM
**To:** Larissa Harper <larissa.harper@salisburync.gov>; Whitney Wallace <wwallace@wallacegraham.com>
**Subject:** Re: Recording device

CAUTION: ***This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.***

That works. I can bring the recorder by early tomorrow afternoon if you are going to be there. Will find the time stamp where we need to remove the rest of the recording.

Thank you.


*Diane M. Young, President*
*dianeyoung96@gmail.com*
*704-213-0747*



www.dgninc.com


On Tue, Feb 25, 2020 at 11:47 AM Larissa Harper <larissa.harper@salisburync.gov> wrote:

I certainly appreciate your offer, Diane. However, Dileika and I already planned for the Secretary to type up the Minutes this month, so I will need it back in order to save and send the file to her. If you do not have time to drop it off at City Hall today, I can help with that--I need to pick up checks from the accountant and collect a second signature anyway. I can stop by wherever you may be in town, get your signature and the device.



Exhibit

3

1

If the recording was still running after City staff left, and you are worried about that conversation being overheard, I'll be glad to play the recording until we get to that point and erase it in front of you.

Thanks!  --Larissa

**From:** Diane Young [mailto:dianeyoung96@gmail.com]
**Sent:** Tuesday, February 25, 2020 10:34 AM
**To:** Larissa Harper <larissa.harper@salisburync.gov>; Whitney Wallace <wwallace@wallacegraham.com>
**Subject:** Recording device

CAUTION: *** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. ***

Larissa,

Good news for you. I have the recording device and will do the minutes of today's meeting. Bad news is I won't get to this until Friday, so your recorder will be returned early next week.

Thanks.

Diane

*Diane M. Young, President*

*dianeyoung96@gmail.com*

*704-213-0747*

2

www.dgninc.com

## Whitney W. Williams

**From:** Diane Young <dianeyoung96@gmail.com>
**Sent:** Wednesday, February 26, 2020 7:59 AM
**To:** Larissa Harper
**Cc:** Whitney W. Williams
**Subject:** Fwd: Diane Young shared "My recording 1.wav" with you

Larissa,

Good morning. I am sending you the recording from yesterday's Board meeting via dropbox. It is in three files. The recording you are receiving is as good as the quality that was on the recorder itself, there are times where you have to work hard to understand what someone is saying but it is no different than if you were listening to the actual recording device.

I will drop off the recorder at some point today.

Thank you.

Diane


*Diane M. Young, President*
*dianeyoung96@gmail.com*
*704-213-0747*

www.dgninc.com


---------- Forwarded message ---------
**From: Diane Young (via Dropbox)** <no-reply@dropbox.com>
Date: Wed, Feb 26, 2020 at 7:50 AM
Subject: **Diane Young shared "My recording 1.wav" with you**
To: <dianeyoung96@gmail.com>


Hi Diane,

Diane Young (diane@concorddowntown.com) invited you to view the file **"My recording 1.wav"** on Dropbox.



Exhibit

4

1



Enjoy!

The Dropbox team

Report to Dropbox

© 2020 Dropbox

2

### § 15A-287. Interception and disclosure of wire, oral, or electronic communications prohibited.

(a)     Except as otherwise specifically provided in this Article, a person is guilty of a Class H felony if, without the consent of at least one party to the communication, the person:

        (1)     Willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication.

        (2)     Willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:

                a.     The device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communications; or

                b.     The device transmits communications by radio, or interferes with the transmission of such communications.

        (3)     Willfully discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through violation of this Article; or

        (4)     Willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this Article.

(b)     It is not unlawful under this Article for any person to:

        (1)     Intercept or access an electronic communication made through an electronic communication system that is configured so that the electronic communication is readily accessible to the general public;

        (2)     Intercept any radio communication which is transmitted:

                a.     For use by the general public, or that relates to ships, aircraft, vehicles, or persons in distress;

                b.     By any governmental, law enforcement, civil defense, private land mobile, or public safety communication system, including police and fire, readily available to the general public;

                c.     By a station operating on any authorized band within the bands allocated to the amateur, citizens band, or general mobile radio services; or

                d.     By any marine or aeronautical communication system; or

        (3)     Intercept any communication in a manner otherwise allowed by Chapter 119 of the United States Code.

(c)     It is not unlawful under this Article for an operator of a switchboard, or an officer, employee, or agent of a provider of electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of employment while engaged in any activity that is a necessary incident to the rendition of his or her service or to the protection of the rights or property of the provider of that service, provided that a provider of wire or electronic communication service may not utilize service observing or random monitoring except for mechanical or service quality control checks.

(d)     It is not unlawful under this Article for an officer, employee, or agent of the Federal Communications Commission, in the normal course of his employment and in discharge of the monitoring responsibilities exercised by the Commission in the enforcement of Chapter 5 of Title 47 of the United States Code, to intercept a wire or electronic communication, or oral communication transmitted by radio, or to disclose or use the information thereby obtained.

(e)     Any person who, as a result of the person's official position or employment, has obtained knowledge of the contents of any wire, oral, or electronic communication lawfully intercepted pursuant to an electronic surveillance order or of the pendency or existence of or implementation of



an electronic surveillance order who shall knowingly and willfully disclose such information for the purpose of hindering or thwarting any investigation or prosecution relating to the subject matter of the electronic surveillance order, except as is necessary for the proper and lawful performance of the duties of his position or employment or as shall be required or allowed by law, shall be guilty of a Class G felony.

(f)    Any person who shall, knowingly or with gross negligence, divulge the existence of or contents of any electronic surveillance order in a way likely to hinder or thwart any investigation or prosecution relating to the subject matter of the electronic surveillance order or anyone who shall, knowingly or with gross negligence, release the contents of any wire, oral, or electronic communication intercepted under an electronic surveillance order, except as is necessary for the proper and lawful performance of the duties of his position or employment or as is required or allowed by law, shall be guilty of a Class 1 misdemeanor.

(g)    Any public officer who shall violate subsection (a) or (d) of this section or who shall knowingly violate subsection (e) of this section shall be removed from any public office he may hold and shall thereafter be ineligible to hold any public office, whether elective or appointed. (1995, c. 407, s. 1.)

# POLICY MANUAL



# CITY OF SALISBURY

February 2018



Exhibit

6

Case 1:21-cv-00814-CCE-JLW   Document 1-8   Filed 10/18/21   Page 19 of 24
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 88 of 107

City of Salisbury may transfer your employment from one position to another with or without notice, as required by production or service needs, or upon request by an employee and management approval. Transfers in excess of 90 days may be considered final and your paycheck may be increased or decreased consistent with the pay scale for your new position.

For a period of six (6) months following an employee's transfer, an employee will be restricted from applying for an open transfer or promotion absent extenuating circumstances, in which case Department Head and Human Resource approval is required.

## 5.6 WORKFORCE REDUCTIONS (LAYOFFS)

The City recognizes that layoffs or restructuring may be necessary due to shortage of funds or work, program shifts, reorganization or consolidation, or other changes as determined by management. In the event a workforce reduction is necessary, Department Heads will develop and submit a departmental plan to the City Manager, evaluating each position and designating positions to be eliminated. The City will then follow these guidelines to determine which employees will be retained:

- Essentiality of Position
- Education, skills, and abilities necessary to perform the remaining job(s)
- The Employee's Performance
- Length of Continuous Service

Employees occupying positions to be eliminated will be subject to reassignment, transfer, demotion, or layoff/outplacement.


## 5.7 STANDARDS OF CONDUCT

City of Salisbury wishes to create a work environment that promotes job satisfaction, respect, responsibility, integrity, and value for all of our employees and the community at large. Every employee has a shared responsibility toward improving the quality of our work environment. By deciding to work for the City of Salisbury, you agree to follow the City of Salisbury's rules.

*While it is impossible to list every item that could be considered misconduct in the workplace*, what is outlined below is a list of common-sense infractions that could result in discipline, up to and including immediate termination of employment. This policy is not intended to limit the City of Salisbury's right to discipline or discharge employees for any reason permitted by law, or to initiate discipline at any step for the examples of infractions listed. In fact, while we value our employees, the City of Salisbury retains the right to terminate an employee on an "at-will" basis.

This list is not intended to be and should not be construed as a comprehensive list. The City reserves the right to issue discipline up to and including termination for instances of misconduct not specified on this list. In addition, and as stated above, the City reserves the right to initiate discipline at any stage, including termination, depending on the circumstances of the offense and prior disciplinary/performance history.

| OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| | | | |
| Attendance: | | | |
| • Unauthorized absence | See Section 4.8, Attendance | See Section 4.8, Attendance | See Section 4.8, Attendance |
| • Repeated unexcused tardiness or <br> • Failure to observe work hours | See Section 4.8, Attendance | See Section 4.8, Attendance | See Section 4.8, Attendance |
| Criminal Charges | | | |
| • Arrest or indictment on felony charges | Written warning to suspension | | |
| • Conviction, plea of guilty, or plea of nolo contendere to a charge of theft, drug laws, sexual misconduct or crime of moral turpitude | Written warning to termination | Termination | |
| Disclosure of confidential City information/trade secrets | Written warning to Termination | Termination | |
| Excessive use of work time for personal matters such as telephone calls, emails, internet usage and visitors | Record of Discussion to Written Warning | Written Warning to Suspension | Suspension to Termination |
| Failure to possess a valid driver's license when required by job duties | Suspension to Termination | Termination | |
| Failure to wear proper uniform or safety equipment; failure to follow dress code policy | Record of Discussion to Written Warning | Written Warning to Suspension | Suspension to Termination |
| Falsification of records, including time records, or willful false statement to supervisors. This includes providing inaccurate, incomplete or misleading information verbally or in writing related to employment or City business | Suspension to Termination | Termination | |

Page 28

| OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| Fighting with a fellow employee, vendor, or a member of the community | Suspension to Termination | Termination | |
| Fraudulent use of sick leave | Written Warning to Termination | Suspension to Termination | Termination |
| Gambling on City premises | Written Warning | Suspension to Termination | Termination |
| Horseplay | Written Warning to Termination | Suspension to Termination | Suspension to Termination |
| Insubordination or disrespectful behavior to a supervisor | Written Warning to Termination | Suspension to Termination | |
| Interference with work of other employees | Record of Discussion to Written Warning | Written Warning to Suspension | Suspension to Termination |
| Leaving assigned work area without authorization | Written Warning to Termination | Suspension to Termination | Termination |
| Lending City keys or keycards to unauthorized persons | Record of Discussion to Termination | Written Warning to Termination | Suspension to Termination |
| Loitering or loafing | Record of Discussion | Written Warning to Suspension | Termination |
| Manufacture, possession, purchase, sale, or use of non-prescribed drugs or illegal substances, including marijuana off the job | Suspension to Termination | Termination | |
| Physical or verbal abuse or harassment of a fellow employee or a citizen of the community | Suspension to Termination | Termination | |
| Possession of, using, distributing, selling or being under the influence of alcohol, non-prescribed medication or illegal drugs while on City property, in City vehicles, in City uniform or on City business | Termination | | |
| Sexual or other unlawful harassment or sexual misconduct at a City workplace, while on City business or in a City uniform | Written Warning to Termination | Termination | |

Page 29

| OFFENSE | 1ST OFFENSE | 2ND OFFENSE | 3RD OFFENSE |
|---|---|---|---|
| Sleeping while on duty | Written Warning to Termination | Termination | |
| Smoking in an unauthorized area | Record of Discussion | Written Warning | Termination |
| Stealing | Termination | | |
| Threatening, coercing or intimidating another employee at any time for any purpose | Written Warning to Termination | Termination | |
| Unauthorized possession of a firearm, illegal weapon, knife having a blade longer than 2 ½ inches, or other potentially dangerous or hazardous property while on duty, at a City function or on City property | Termination | | |
| Unauthorized possession, use or removal of City property | Written Warning to Termination | Termination | |
| Unauthorized posting or distribution of any materials or solicitation on City property | Record of Discussion to Written Warning | Written Warning to Termination | |
| Unauthorized recording of conversations in the workplace or video recording of other City employees | Termination | | |
| Use of vulgar, profane, obscene or abusive language | Record of Discussion to Suspension | Suspension to Termination | Termination |
| Violation of City parking regulation | Record of Discussion | Written Warning | Suspension to Termination |
| Violation of City policies or procedures | Record of Discussion to Termination | Written Warning to Termination | Suspension to Termination |
| Violation of safety rules, negligence or engaging in unsafe activities | Written Warning to Suspension | Suspension to Termination | Termination |
| Willful damage to, destruction or misuse of City property | Suspension to Termination | Termination | |
| Working unauthorized overtime | Record of Discussion | Written Warning | Suspension to Termination |

Page 30

Nothing in this policy is intended to limit employee rights under the National Labor Relations Act. Failure to comply with this policy can result in disciplinary action, up to and including immediate termination of employment.

## 5.8 CRIMINAL ACTIVITY; ARRESTS

Involvement in criminal activity, whether on or off the City's property, may result in disciplinary action including suspension or termination of employment. Disciplinary action depends upon a review of all factors involved, including whether or not the employee's action was work-related, the nature of the act, or circumstances which adversely affect attendance or performance. Any disciplinary action is not dependent upon the disposition of any case in court.

Employees are expected to be on the job, ready to work, when scheduled. Inability to report to work as scheduled, must be notified to the HR Director and immediate supervisor within five (5) days. As a result of an arrest, related to drug or alcohol offense, may lead to disciplinary action, up to and including termination of employment, for violation of the attendance policy or job abandonment.

The City will take disciplinary action based on information reasonably available. This information may come from witnesses, police, or any other source as long as management has reason to view the source as credible.

## 5.9 DRUG AND ALCOHOL POLICY

The City of Salisbury considers drug and alcohol abuse a serious matter which will not be tolerated. The City absolutely prohibits employees from using, selling, possessing, or being under the influence of illegal drugs, alcohol, or a controlled substance or prescription drug not medically authorized while at their job, on City property, or while on work time.

Therefore, it is the City's policy that an employee shall:

1. Not report to work or be subject to duty while his/her ability to perform job duties is impaired due to alcohol or drug use which occurred on or off duty.

2. Not possess or use drugs or alcohol, or have the odor of alcohol or drugs on his/her breath or person, during working hours, on breaks, during meal periods while on City property, while on the job or while operating any City equipment or vehicles.

3. Not directly or through a third party sell, distribute, or provide drugs or alcohol to any person or to any other employee while either employee or both employees are on duty, "on call", in uniform, on City property, or operating City equipment.




April 12, 2020

**SENT VIA ELECTRONIC MAIL**

Zack Kyle, Assistant
zkyle@salisburync.gov

Brianna Price
bprice@salisburync.gov

Dear Zack, and Brianna,

Thank you for allowing me time to compose this message. I take these most egregious charges communicated to you in a letter on March 17, 2020 very seriously and believe a thorough response is necessary. Since March 13, the COVID-19 health and economic crisis has taken my full attention. Other than dealing with Downtown Development Department actions related to this abrupt change in operations, there has been increased pressure to shift the work plan of the Downtown Salisbury, Inc. Board and all four committees to take immediate, new actions to assist downtown business owners. My timeline, attachments, and statements below should help clear my name, which I believe to be defamed by the sharing of this letter with the Mayor and Councilman Miller, the Organization Committee members, and possibly the whole 21 member board.

In the pages to follow, as requested, I **first provide a timeline of actions regarding the compromised, city-owned recording device** between the DSI Board Chair Whitney Wallace Williams and Vice-Chair Diane Young, Assistant City Manager Zack Kyle *(designated City staff DSI Ex-Officio Board Member)* and me. **(See Timeline in section I. beginning on page 4.)** I believe this, as well as excerpts I cite later in this letter, will show illegal actions through the blatant attempts by two volunteer board members to involve other members of the board, and one member at least of the general public, to assist the delay of returning a city-issued, city-owned device, taking extraordinary measures to tamper and delete the information, per their own words in the March 17 letter.

**Second**, very simply, **the premise of a "closed session" that excludes a single board member is an illegal action taken at the reckless insistence of Chairwoman Whitney Williams.** (See section **II.** and the paragraph to follow here.) NC Main Street Director Liz Parham has reviewed the DSI Bylaws and believes that a closed session dismissing *only* the City appointed, Ex-Officio board member (Zack Kyle), with full voice and voting rights, is *not legal.* This is the point Zack and I have been pressing with Chair Williams prior to the January DSI Board meeting, when she first insisted this type of discussion occur between her and the rest of the board, minus the City partners. Moreover, in all the communities she served as Executive Director of Main Street organizations, before becoming the NC Dept. of Commerce NCMS & Rural Planning Director, Liz Parham stated that she *always attended* closed sessions unless it was related to her annual compensation. This type of disrespectful action by Chair Williams and any board officer who agreed with her stance, also, shows deliberate measures of deceit and, at the very least, non-transparent relations with the City, with whom the non-profit is to work collaboratively to administer public funds per our Independent Contract Agreement, MOU, and contracts with the NC Dept. of Commerce Main Street Center.

**Third** (section **III.**), if our quasi-governmental organizational structure operates under public meeting laws, my research shows that **closed sessions** (assuming they are legal in scope and procedure), **must be transcribed**. In addition, when a recording must be utilized to perform a normal work-related function, such as creation of Minutes, then listening to a recording is not an unlawful act per the very same statute used as the basis for the accusations in the March 17 letter, **NC General Statute 15A-287**. I hope that our City Attorney can provide us with guidance regarding our **City contracts with DSI and the counterpoints in my response below**. Please let me know if Graham Corriher can be of assistance interpreting our public-private contracts to determine, since he is currently reviewing and revising the City's contracts for FY20-21.

The **fourth** (section **IV.**) point I wish to relay is my disappointment in a few of the DSI board members that have behaved badly, had ulterior motives, and have been a constant source of undue stress for all of Downtown Development Dept. and other City staff members. I will only speak for myself in this response. I understood advancing a new structure for the existing Main Street program by joining the non-profit and new City Downtown Development department, for which I was charged with developing, would not be without challenges. However, **needless micromanaging of my position by two to three temporary, volunteer board members has caused undue stress, physical ailments, and has affected my ability to devote undivided attention to achieving the best partnership between the two organizations after 2.5 years of my employment.** As you know, this is a struggle that has persisted from the beginning, caused undue stress, harmed business and personal relationships, and wasted the time of City staff.

I was very glad to become a part of a passionate community that is always seeking improvement and tangible progress. However, I did not expect to be subjected to intimidation, belittling, disrespect, condescension, demeaning of my knowledge and experience *in front of members of the public,* and constant criticism of the non-profit's work that is supposed to be completed by the volunteers *with staff assistance* from a few volunteer, temporary board members who have influence over others in the community. It equates to bullying and harassment.

Other than trying to manipulate and bullying me, I believe **Chair Williams and Vice-Chair Young have used intimidation to force other board members to sign the March 17 letter.** Just recently, I learned that some of the **Organization Committee members were told they had only 30 minutes to review and sign that letter**. At least two Organization Committee members who signed (Dileika Ballard and Cheryl Goins) did not have the full story of the disagreements between City Staff and their Chair and Vice-Chair regarding how this structure should operate, nor that City staff tried to explain that a closed session without one board member was not a good decision, invalid even. **Promotions committee Chair Gianni Moscardini refused to be bullied and is adamant that this is a false accusation, a scheme to separate from utilizing City staff so that the non-profit can resume having total control over the tasks performed by the Director, yet still believing these actions would not harm the organization from receiving the City-issued contract for MSD funding.**

It has been a waste of City personnel time and has caused unnecessary anxiety to be forced to constantly defend my work as a City Department Head and Executive Director operating a structure known well to me and not known by any DSI volunteer, including Vice-Chair Diane Young who admitted so in an Organization Committee meeting, since she has only been in the role of a non-profit Director, never part of a City Management Team. There has needlessly been a constant battle, beginning with current Past-Chair Greg Shields who aligned with former Vice-Chair, now Chair Williams, since shortly after I was hired in Fall of 2017. Then, in 2018, Vice-Chair Young joined Chair Williams in the needling actions to bombard me with tasks, unrealistic, arbitrary deadlines, harassing, multiple emails often from both Williams and Young. And not only to me, but also to the other two Downtown staff members. These two volunteers are more interested in squabbling over the Executive Director's time than for the partnership's goal of improving economic conditions for all of downtown Salisbury. Although the Independent Contractor Agreement and MOU state differently, these two cannot accept that they do not function as my supervisor, only in an advisory capacity to the City.

Page **2** of 10

Case 1:21-cv-00814-CCE-JLW   Document 1-9   Filed 10/18/21   Page 2 of 10
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 95 of 107

From the time of hire, I have been targeted and criticized for every piece of minutiae regarding tasks to complete, sometimes in a very unrealistic timeframe, by Chair Williams and Vice-Chair Diane Young. I believe there constant battering of emails, condescending remarks, and finger-pointing at me for any real or unreal action of "nonperformance" of the board and committees' tasks, with which staff is *assisting,* plus the solicitation of other board members for consent to their audacious actions, (again, with none of the current board members knowing the details of how this partnership should work either), has stunted the growth as one unit, stymied rapport with downtown stakeholders, and thwarted the common goals of City's Downtown Development Department and Downtown Salisbury, Inc. non-profit. In addition to verbal and written criticism, I believe I was manipulated by Vice-Chair Young, a former colleague in the Main Street community with whom I thought I had good rapport. In one-on-one discussions, she agreed to assist me with reinforcing the Main Street principles with the other board members who did not fully understand the concept and outcomes. There were a few times her support helped, especially with Chair Williams, who Young describes as unusually "hands on" in her role as Board Chair. I have seen more divisiveness than support, unfortunately. But she has given me mixed messages. For instance, before we met in January with NCMS Director Parham to discuss the constant disagreement about how the partnership is operating between the City and the non-profit, Young sent me an email stating she wanted to give me a "heads up" before I was caught off-guard with what was going to happen during the meeting. *(This email is attached.)*

Unfortunately, I have never been given credit by the two most influential board members, Williams and Young, for reinforcing the crumbling foundation of the non-profit, implementing more structure, systems, adding full-time staff and constantly working to please *mainly* the Past-Chair Greg Shields, Current Chair Williams, and Vice-Chair Young, all of whom have had personal agendas. It is my belief that they have all three originally wanted Young as their Director, as she had applied for the position as Executive Director of the non-profit and City Downtown Development Department. So, it may not be the issues stated in the March 17 letter making accusations against me, but anyone who would have come into this would be a target to destroy until they got what they wanted. However, other board members have seen great improvement to this new structure and do NOT agree with the actions spearheaded by Chair Williams and Vice-Chair Young to ruin my character and career. As you know, Zack, there is at least one board member that has spoken to you about this ludicrous plot, but some are fearful of retaliation and have spoken to me and other board members in confidence.

Other than the actions of a minority of board members, which seem to me very much like libel and slander, by not submitting that letter to only my supervisor and Human Resources, it seems my confidential personnel information has been placed in the hands of people who are not directly involved and who can spread this defamation of my character around so that my rapport with my City colleagues and downtown stakeholders, whom we all represent, could be harmed. Luckily, so far, I have not found any board member nor any other downtown stakeholder unwilling to work with me, as the letter claims. I believe this is because the reputation of Williams and Young by the rest of the board and within the downtown community is known to be brusque and aggressive when they feel there is a point to be made on which only their answer can be the right one.

In closing, should the full board decide it would be best to revert to their former operational system—hopefully in a totally transparent discussion with City staff and Council liaison/board members--I am very willing to provide you with my experienced skill set in a healthy working environment in order to support the overall mission of economic revitalization for the City of Salisbury. As I have mentioned before, if the board decides they want to separate the structure and maintain their own personnel again, that is fine with me as long as I have a position with the City still. I believe I am valuable to this organization. I have suggested we maintain the Downtown Development Department, where our three staff could still work alongside Hannah, Wendy, and our other management team colleagues. A Downtown staff member could join DSI in their board and committee meetings as an active participant. Or, I would be interested in developing an Economic Development Dept. for the City to encompass a larger area for business retention, recruitment, property development, and tourism. The Certified Retirement Community program would fit nicely in an Economic Development Department.

I believe you both feel as I do, that we must all work together to help one another, not degrade one another. As I have stated before, I am not one to hold grudges, so I am glad to continue working collaboratively as long as board members realize the goal is to drive economic development into downtown, incrementally, through positive working relationships for the good of all.

Best regards,

Larissa Harper
Executive Director
Downtown Salisbury Inc.
City of Salisbury—Downtown Development Dept.

*Timeline and Other points related to follow on page 4*

## I. TIMELINE of Tampered City-Issued Recording Device

*(NOTE: Being given no instructions before or after the meeting from board members, I had no idea whether they would leave the recording device running for me to be able to assist with the creation of the Board Minutes, as staff typically does, and to know when the meeting actually ended. They did not tell me ahead of time that they would not want staff to listen to the recording of the closed session. What if I could help in advocating for their needs, as I always try to do? If they forgot to turn off the device that was sitting in plain sight, directly in front of the whole membership and beside the Board Chair, then why did they not come straight to me with this issue, instead of beginning a deceitful plot to erase recordings of past meetings, yet leave the full conversation of this meeting on the device?)*

**Feb. 25 @ 9:15 a.m.**--I waited at least 30 minutes in the downstairs lobby and outside of the Plaza building (where we meet) for the Board meeting to adjourn after the City-appointed Board member and all City staff were dismissed. Having not adjourned within that time, I left with the intent to come back after they adjourned to finish cleaning up and locking the room. While waiting, I realized the recording device was still in the room. Having arranged for the Board Secretary, Dileika Wilson, to assist staff with the minutes, I believed I would reconnect with her to get the recording device or it would be left in the room for me.

*It is important to point out that other board members have come to me with their concerns about the way in which Whitney and Diane are running the organization. One instance on the evening of the Board meeting is to follow:*

**At 8:35pm** on the day of the meeting, I received a text from one Organization Cmte member who wanted to have an informal meeting with me solely. I told Zack about this and met with the board member where he told me what was discussed at the closed session meeting. That board member recounted that taking lead from the Board Chair, the other members were being asked to decide whether to separate from the City so that they could have more control over the tasks of the Director. This concerned board member stated in the meeting to the rest of the membership that what they were proposing in the MOU with the City was micromanaging the Director, which he was in opposition, it would be disaster for the organization, DSI would have to give up all of the benefits of the partnership in order to operate in a way that had not been successful with the past interim and previous Directors. Plus, the MSD funding for programs would have to go to personnel and office expenses again. A couple of other board members dissented along with this person who was not scared to speak out and would like to be voted Chair next year to help keep this successful structure in place that is only going through growing pains.

**Feb. 25th @ 10:34 a.m.**—Diane emailed me that she would be typing the Minutes this month and would not be able to return the device until early next week (March 1st).

Page **4** of **10**

Case 1:21-cv-00814-CCE-JLW   Document 1-9   Filed 10/18/21   Page 4 of 10
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 97 of 107

**Sometime between 11:00 and 11:46 a.m.,** I read Diane's email and called Zack over the phone to discuss why Diane would not simply return the device to me, as she has never offered to type the Board Minutes before and seemed to be hesitant to get the device to me any sooner. (Typically this duty is completed by staff and the Board Secretary.) Zack and I had a conversation regarding whether to let her keep the device until early next week or get it back right away. Zack wanted me to get it back as soon as possible, preferably that very day. We both had a feeling she was trying to keep the device from being immediately returned to Downtown Dev. Dept. staff. Zack and I spoke about how to respond to Diane's email.

**@ 11:46 a.m.** I responded to Diane's email that Board Secretary, Dileika Wilson, and I already planned for Dileika to type up the Minutes, so I needed the recorder back to save the file and send it to her. I offered to come meet Diane wherever she may be in town, if she could not come by City Hall, as I could get her signature at the same time on the DSI checks that I had to run out and pick up. Trying to be transparent, trustworthy and accommodating, I concluded my email by noting if there was something she was worried about on the device, I would delete that recording with her in person.

**@ 1:01 p.m.** Diane responded, "That works." However, she could not meet with me until the following day, early afternoon. I tried to schedule a 1 p.m. meeting but Diane did not get back in touch with me with a particular time until much later, possibly the next day.

**Feb. 26th**—Diane changed her previously scheduled "early afternoon" time to meet with me and did not arrive at City Hall until sometime between 3:45 and 5 p.m. I had left a little after 3:30 p.m. for the opening of the Women's Economic Development Network (WEDN) conference in Concord, waiting as long as I could for Diane to bring the recorder by as agreed upon.

**Feb. 27—4:30 p.m.** I attended the second day of the WEDN conference, arriving back at the office to find the device on my desk. I called Zack when I realized this and the February board meeting was fully intact (showing the time of the meeting, date, and file 1/1 on the display). He encouraged me to listen to the recording and let him know what it said.

**March 3rd (I think).--** Zack met one-on-one with Whitney to express the legality of how she is operating closed session meetings by excluding only 1 board member and not being transparent with the City, with whom DSI is legally contracted to do downtown revitalization (city work) in order to receive MSD funding. That meeting resulted in the allegations and issue at hand regarding the recorder. I will be glad to provide more information to you, if you deem necessary, to protect your City staff. Zack told me that he informed Whitney of his instruction for me to listen to the recording.

I have had other conversations initiated by board members since March 3rd. To follow are a few synopsis of phone calls:

**03-26-2020 @ 2:30 p.m.:** Spoke to Gianni Moscardini: He and Dileika feel that they are being pushed out to ORG committee because they have dissenting view from Whitney and Diane. He had spoken to Past-Chair Greg Shields about this and Greg states he is confused as well right now. And Gianni said that he believes I was set because they were joyful and cheering at a meeting at Vice-Chairwoman Young's house.

**03-31-2020 @ 12:30 p.m.:** In a phone call to brief Gianni on today's the Design Committee meeting he missed, he brought up the letter and noted it was sent from Whitney with only 30 minutes for the Officers and Committee chairs to review and decide whether to sign before it was to be submitted. This shows undue pressure on the rest of the group to be either with the few or against in this action. Thus, I exonerate Cheryl, who has only been the Design Committee chairperson for a month, only attended one Organization Committee meeting and does not know the other side of how this structure should work. I believe Gianni when he said Dileika was "compelled" to have her name as part of this letter, yet does not fully support the actions of Diane and Whitney. In my conversations with Dileika in the past, she has openly voiced her frustrations to staff about the micromanagement styles of both Whitney and Diane and often questions their abrupt and knee-jerk actions.

Page **5** of **10**

Case 1:21-cv-00814-CCE-JLW   Document 1-9   Filed 10/18/21   Page 5 of 10
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 98 of 107

**04-24-2020 @ 6:30 p.m.:** Gianni called me to relay that he told Greg Shields he would resign from the board if the organization separates from the City and Diane Young becomes Director. Greg told him there was no need for that as Diane was going to retire. Also, **Gianni discussed the Closed Session with Greg and let him know that he does not believe it was valid because in reading the Bylaws, they threw out a Board Member to do so.** Although Greg Shields has presided over the board for years and the board membership term sheet has been reviewed many times since 2017, **Greg was shocked to realize that Zack Kyle was a board member. Gianni also stated that he discussed this invalidity with other board members who are of the same mind-set as Gianni and do not believe the closed session was valid either.**

## II. Reference DSI Bylaws already submitted and bylaw excerpt below in Section III. 1) B.

## III. Request for NCGS 15A-287 Interpretation from City Attorney

I believe we all need to know the answers to the following questions that pertain to whether there is any basis to the criminal allegations (see attached documents pertaining to Open Meetings of Public Boards and Article 16 of NCGS 15A) :

1) **In general, what are the public meeting rules for a Public-Private partnership where City work is accomplished through an Independent Contractor that receives and administers MSD Tax Revenue?**

2) **Is there a violation of fundamental rights** *(or does the City take issue with the mistrust of their contracted partner organization)* **with a "closed session" of a public-private board when the designated City Ex-Officio board member, with full voting rights, is compelled to leave the room by volunteer members of the non-profit organization contracted to do city-issued work?**

3) **Is there a right to access information by the employee of the City who must, in the normal course of employment, use the communication device to complete work?**

4) **Is there an issue when volunteer members of the non-profit organization, contracted to do City work, tamper with a city-owned device?**

With my limited knowledge, here are the points that I found in my research of the above questions:

1) As a quasi-governmental public-private partnership, contracted for City-issued downtown development projects, the DSI Board meetings are subject to laws that regulate open, public meetings, as well as the transcription of closed sessions. In addition, per the DSI Bylaws, two of the eight Ex-Officio Directors, *with full voice and voting rights*, include a member of City Council and a City staff member. *(See below my own experience in a similar structure and excerpts from two sources cited.)*

   A. My own experience in this type of structure in a previous community leads me to believe that DSI Board meetings are open to the public. That non-profit Board of Directors received MSD funding and operated, with the management assistance of City staff, under the open meetings regulations. For example, a reporter from the local newspaper was often present at my former community's quasi-governmental, public-private partnership board meetings.

   B. Two City officials are members appointed by City Council to the DSI Board of Directors, with full voice and vote. *(Council liaison Miller happened to be absent in both January and February.)*
   Source: Downtown Salisbury, Inc. Bylaws

Page **6** of 10

Case 1:21-cv-00814-CCE-JLW   Document 1-9   Filed 10/18/21   Page 6 of 10
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 99 of 107

**Section 3. Ex-Officio Directors.**

The eight Ex-Officio Directors shall have full voice and vote and shall be comprised of the following:

  a. A member of the City of Salisbury staff.
  b. A member of the Salisbury City Council.
  c. A member of the Rowan County Commission or the County Manager.
  d. The Executive Director of the Salisbury Rowan Convention & Visitors Bureau.
  e. The Executive Director of the RowanWorks (EDC).
  f. The Executive Director of the Historic Salisbury Foundation.
  g. The President of the Rowan County Chamber of Commerce.
  h. The immediate Past President of Downtown Salisbury, Inc.

Directors selected to serve at the pleasure of their appointing authority shall not stand for re-election. The appointing authority shall notify the corporation when there is a change in the person appointed to fill the position on the board.

C. Open Meetings law requires public body to prepare Minutes of ALL meetings, including closed sessions.
   Source: UNC School of Government Article 53
   **Open Meetings and Other Legal Requirements for Local Government Boards**

**Minutes and General Accounts**

The open meetings law requires public bodies to prepare "full and accurate minutes" of all meetings and a "general account" of closed sessions.[24] Separate statutes for county[25] and city[26] governing boards also require each board, through its clerk, to keep full and accurate minutes of its proceedings. Although the statutes do not detail what full and accurate minutes should include, the proper content of board minutes is suggested by their purpose, which is to provide an official record, or proof, of governing board actions. Therefore, at a minimum the minutes should include two sorts of material: (1) the actions taken by a board, stated specifically enough to be identified and proved; and (2) proof of any conditions necessary to action, such as the presence of a quorum. Additional detail about matters that were discussed or individuals who addressed the board is often included but is not legally required. Minutes should be approved by the public body. The statutes do not establish a specific time frame within which minutes must be prepared or approved.

2) I believe the City should take issue with a closed session *excluding a full voting right member from one organization*, as there is a violation of fundamental rights, especially since this objection has been repeatedly expressed by at least one board member, Zack Kyle. No other Ex-Officios were asked to leave the room. *(See 1. B. for the other organizations that were allowed to stay.)*

The objection to the premise of a closed session was known to the whole board through conversation, actions, and expressions of the city-appointed DSI Board member Kyle and Executive Director prior to and during the January and February board meetings. **Unfortunately, the recording with Mr. Kyle's objection at the January board meeting, before he and all other City staff were dismissed, has been deleted by DSI Officers (Board Chair Whitney Williams and Vice-Chair Diane Young) as admitted in the March 17, 2020 letter of complaint, with their recount of their extensive measures taken to "delete all files on the device, to the point where the device read 0/0 files on this device."**

In addition, purposefully excluding only city staff and *City-designated board member* not only shows **inequality of the City's voice** amongst the board, but also **contrived, deceitful tactics of some members against their contracted partner organization.** Please see below an excerpt from the MOU :

Page **7** of **10**

Case 1:21-cv-00814-CCE-JLW   Document 1-9   Filed 10/18/21   Page 7 of 10
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 100 of 107

2. Duties of the Downtown Salisbury, Inc. Board: The Board agrees to:

   A. Maintain the Board and the 501(c)(3) status.
   B. Continue to function within the guidelines of the Main Street Model with support from the Downtown Director and City staff.
      i. The Board shall use the four point Main Street approach as a guideline for the management of business. Those Main Street points include Design, Economic Restructuring, Organization and Promotions. The Nonprofit will use this approach to enhance the development of the central business district in a manner which will make the district the economic, governmental and cultural center of Rowan County.
   C. Consider any and all input from Assistant City Manager and/or City Manager when making decisions on behalf of Nonprofit and work collaboratively with the Downtown Director and the City for the betterment of Downtown Salisbury and the Community.

3) As a City employee and staff that creates, edits, and reviews the Board Minutes for the organization, I believe I have the right to access information as it is stated NCGS15A-287c, it is "not unlawful under this Article...for an operator, an officer, employee or agent of a provider of electronic communication service...to intercept, disclose, or use that communication in the normal course of employment, while engaged in any activity that is a necessary incident to the rendition of his or her service or to the protection of the rights of the property of the provider of that service..." Thus, it was necessary to use the communication device to complete my work of record keeping for the organization.

As stated in March 17, 2020 letter of complaint, the Agenda was set, as requested by Chair Williams, with a closed session for the second time during monthly Board meeting because of inaction by board member Zack Kyle to respond to my communications as to whether this was going to be allowed again. *(See attached text communication between me and Mr. Kyle discussing and ultimately concluding Zack's decision to contact Councilman Miller to get his view on whether this should be allowed.)*

4) I believe there could be a larger issue when volunteer members of the non-profit organization, contracted to do City work, take extensive measures to deliberately delay returning and tamper with a city-owned device.
I have done extensive research, yet I do not know the full extent of the law, and will have to rely on City attorney to give advice on tampering with city-owned property. At the very least, two board members have kept the city staff from administrative duties, plus have involved outside sources at Williams office, as ordered by the Independent Contract under which we are operating. In addition, using words to describe me, taken from the March 17, 2020 letter, not only does it seem "dishonest", showing a lack of "integrity and good character" by two board officers to "delete all files on the device", but staff cannot fulfill their duties to fully prepare the January Board Minutes (open & closed sessions, according to law) due to the deletion of the recording.

There could be violations by the signers of the letter according to Article 33C "Meetings of Public Bodies" NCGS 143-318.9 Public Policy to 318.11 citing Closed Sessions as follows:
318.10(e) "**Every public body shall keep full and accurate minutes of all official meetings, including any closed sessions** held...minutes may be in written form or, at the option of the public body, may be in the form of sound or video and sound recordings. When a public body meets in closed session, it shall **keep a general account of the closed session so that a person not in attendance would have a reasonable understanding of what transpired.**"

318.11(c) "A public body may hold a closed session only upon a motion duly made and adopted at an open meeting. Every motion to close a meeting shall cite one or more of the permissible purposes.
(This was not done during either the January nor February meetings, as it was "at the request of Chair Williams", per the March 17 letter.)

Page **8** of **10**

Case 1:21-cv-00814-CCE-JLW   Document 1-9   Filed 10/18/21   Page 8 of 10
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 101 of 107

## IV. Charges from the letter/Timeline of Events/Rebuttal

### A . Deliberate Breach of the Board's Trust is False

Normally, the recording device is brought by City personnel and attended to by Downtown Development Dept. Administrative Specialist. Due to the absence of both the Administrative Specialist and Downtown Event Coordinator, I, the Department Head was doing this duty in absence of the Administrative Specialist at the Feb. 25th Board meeting. I had no intention to record anyone in secret and my actions reflected that. Just as the meeting was starting, every board member in attendance witnessed me place the device in plain view of everyone, as well as to the right of Chairwoman Wallace, then I walked back across the room to run the projector and laptop the morning of the meeting.

> **My Rebuttal:** What *does* appear to be a Breach of Trust (Citing from March 17 letter, p. 1, paragraph 3) DSI's chair Williams, "called a Closed Session discussion, which was openly intended to exclude all City personnel and our City Council liaison". At DSI's February 25[th] meeting, again, it included a Closed Session requested by Chair Williams and "was intended to, and did, discuss modified terms that DSI had provided to the City regarding modification to the MOU." Also stated in the March 17 letter ,p. 2, paragraph 2) "It was crystal clear to all Board members, all DSI staff, and all City employees and management that the closed session meeting explicitly excluded city-affiliated representatives, including DSI staff, City employees, management and our City liaison". I question whether this is the desire of the full board of 21 members or simply the wish of Chairwoman Williams. This seems to be in conflict with the signed contract to create a cooperative partnership to meet the goals of the City of Salisbury.

### B. Potential Criminal Acts and Violation is False

In the letter submitted to you on March 17, 2020 from a few members of the DSI Organization committee, it was stated that they believed I committed a crime by violating NC General Statute 15A-287 by actions to "endeavor to intercept a recording". However, *the full recording was dropped off at the office by Vice-Chair Young with every other recording erased, except the February board recording, which was fully intact. The digital screen read 1/1,* which will be explained later in this account. What was missing were all of the recordings that were being kept on the recorder until downloaded, including the January board meeting.

> **My Rebuttal:** As I stated in an email to Brianna on Wed., 4/1 (to give an update until I could compose this full response), **I believe the letter was a conniving way to disengage from the City in the current quasi-governmental structure in order for the non-profit to keep receiving the MSD funding and retrieve total control over their Director.** The requests from the same Organization Committee members for me to continue working with them and the rest of the board and committee members, facilitating and hosting meetings, conducting normal conversations through teleconferences and email, are in opposition to the words in the letter.
>
> I feel it was not me but, volunteer board members, Williams and Young, who deliberately engaged in deceitful actions by 1) Not turning off the recorder which was in their direct view and 2) engaging in desperate measures to delete official public-private partnership communications being used for transcription of required Minutes. Again, as a result of this divisive action to rid the device of all recordings, information for the Jan. 2020 board meeting was deleted, also, leaving no record of that meeting in order to create official Minutes.
>
> **I question the legality of Exhibit 3 & 4, p. 4-5 of the March 17 letter where there was obvious collusion between three volunteer board members,** *possibly without the knowledge and consent of the other 21 board members,* **nor Executive Director to erase and re-record on a new device (Young's personal phone).** Young spent the afternoon recording, then apologized because the quality was not good, and it would be sent to the Director in 3 Dropbox files. I could never access the Dropbox files, due to needing "additional

Page 9 of 10

Case 1:21-cv-00814-CCE-JLW   Document 1-9   Filed 10/18/21   Page 9 of 10
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 102 of 107

access" from Young and asked her to send it another way, possibly through Google Drive. In an email dated March 3 Young stated that she would do so, but never did. In addition, stated in exhibit 4 of the accusing letter, Williams blatantly describes how she and Diane took the official recording of the board meeting to **William's office where they met with an IT specialist at Wallace & Graham attorney firm, to engage a private citizen in the act of deleting information off of City-owned property**. This seems to me **their own criminal action to "willfully intercept, endeavors to intercept, or procures any other person to intercept or endeavor to intercept**, any wire, oral, or electronic communication".

Lastly, I will continue to fight any charges against me, if necessary, but I am hopeful this will conclude without any further hurtful, punitive actions against me. I am willing to forgive and forget if these members of our downtown community are willing and able to move forward with me.

***************************END***********************************

Page **10** of **10**

Case 1:21-cv-00814-CCE-JLW   Document 1-9   Filed 10/18/21   Page 10 of 10
Case 1:21-cv-00814-CCE-JLW   Document 42-13   Filed 04/04/23   Page 103 of 107



*City of Salisbury*
**North Carolina**

*Office of the*
*City Manager*

June 22, 2020

**VIA Hand Delivery**

Larissa Harper
1075 E. Holly Grove Rd
Lexington, NC 27292

**Re:    Notice of Pre-Dismissal Conference**

Dear Larissa,

This letter is to notify you that I am considering dismissing you from your at-will employment as the Downtown Development Director with the City of Salisbury. This decision is based on a pattern of performance deficiencies during your tenure with the City (Section 5.1 of the Policy Manual).

You were hired October 9, 2017. Until recently, you reported to the Assistant City Manager. In March 2020, based on complaints from the Board of Directors of Downtown Salisbury, Inc. (DSI) about your performance, I required that you report directly to me. Since reporting to me, I have reviewed your performance and have concerns about your ability to lead the Downtown Development Department. These concerns were discussed with you during a meeting with me and the Human Resources Director on Friday, June 19, 2020.

<u>Current Performance Concerns</u>
As part of your performance review, consistent with the existing Memorandum of Understanding between the City and DSI, I solicited performance evaluations from the DSI board members that are not City employees. Thirteen members evaluated your performance in six separate categories. Overall, the evaluations demonstrate an inability to perform your job duties up to my expectations or the DSI Board's expectations. In three of the six categories, your performance was rated as "below expectations." Overall, you received 39 ratings of "below expectations," 35 ratings of "meets expectations," and only 4 ratings of "exceeds expectations."

In addition to the DSI performance evaluations, I have reviewed the performance of your department with the City's Parks and Recreation, Communications, and Planning departments, three of the departments that work closely with your department. The sentiment from those departments was consistent with the performance deficiencies in the DSI evaluations. Specifically, there is a lack of organization and timely responsiveness to these departments. These departments also indicated that there is a lack of mutual support from your department, in that these departments are frequently helping your department but there is not the same willingness or ability of your department to help theirs.

Also, within your department, your performance deficiencies have been reflected in the performance of your employees. As you know, one of your employees was recently resigned based on performance issues. It is clear from that case that the employee lacked direction and had been allowed to neglect job duties with little corrective action from you as the supervisor. Another of your employees, though capable and eager and hardworking, has indicated that there is a lack of direction from you as a supervisor. The inability of your departmental employees to perform their jobs, or to be able to clearly articulate their job duties, reflects poorly on your ability to lead the department.

History of Performance Concerns
The current performance concerns identified by the DSI Board and by my review of your performance are consistent with the performance concerns reflected in your personnel file, which I have also reviewed.

On September 18, 2018, as part of your initial six month review, you received a memo from your supervisor expressing concerns about your performance—specifically your responsiveness to emails, telephone calls, and work-related matters—and outlining your future performance expectations.

On December 5, 2018, you received a written warning based on concerns similar to those outlined in the September 2018 memo. Specifically, the warning addressed your responsiveness to telephone calls and emails and your tardiness to meetings. The plan for improvement outlined specific duties that needed improvement. In addition, you were informed that if you continued to fail to meet your duties, you would be suspended or possibly terminated.

On January 18, 2019, you received a performance evaluation that reflected similar performance concerns and a total average performance rating of 1.89 out of 3, which is "below satisfactory." Areas listed for improvement included Ethics, Values and Stewardship. Under "Managerial and Supervisory Competencies," you received an "unsatisfactory" rating in Relationships (responses to other departments) and Planning and Organization (timeliness).

On June 19, 2019, you received a three-day suspension for Lateness, Failure to Follow Instructions, and Unsatisfactory Work Quality. The reasons for this discipline were substantially similar to the September 2018 memo and the December 2018 written warning, and were also similar to the areas identified for improvement in your performance evaluation from January 2019. In particular, you had failed to respond to emails, you were asked to have a staff member turn in a report on her work activity, which was not completed; you failed to make changes to a PowerPoint presentation after being directed to make the changes; and you were consistently late arriving to work. In addition, you acknowledged in writing that if your performance did not improve, you would be subject to further disciplinary action, up to and including termination.

Summary
At the June 19, 2020, meeting, we reviewed all of these concerns. Your responses to my questions about your performance indicated a total unwillingness to accept any responsibility for your performance deficiencies. You blamed other departments, other employees, a lack of direction, and the DSI board. Your inability to acknowledge your pattern of performance deficiencies exhibited during your tenure as director, and your inability to accept any of the

*Page 2*

responsibility as your own, is disappointing and indicates that you are incapable or unwilling to perform your job to the standards required of this organization.

Based on my review of your performance history, it is clear that you are not meeting job standards, and that you are not improving in a way that gives me any assurances that you will be able to meet the standards required of you if you remain employed by the City.

Pre-Dismissal Conference
Based on the information in this letter, you are directed to meet with me and a representative from the City's Human Resources Department on **Wednesday, June 24, 2020, at 8:30 am in the Human Resources Department at the City Office Building, 132 North Main Street, Salisbury, NC.** At this meeting, I will review all of this information with you and you will have the opportunity to respond to the policy violations before a final decision is made about your employment.

If you do not attend the conference and have not discussed rescheduling, I will make a decision based on the information available. You may contact me by telephone or email or you may contact Souwan Kiengkham by telephone at (704) 638-2116 or by email at skien@salisburync.gov.

Sincerely,

W. Lane Bailey
City Manager

cc:     Ruth C. Kennerly, HR Director
        Personnel file

**I acknowledge that I have received this Notice and understand that my signature below does not imply agreement with this action or the incident(s) identified within this Notice but is an acknowledgement of receipt only.**

**Employee's Signature:** _Larissa Harper_     **Date:** _06-23-2020_

*Page 3*

Larissa B. Harper
1075 E. Holly Grove Rd.
Lexington, NC 27292
Ph: 336-686-0870
Email: send2rissa@gmail.com


06-23-2020


Mr. Lane Bailey
City Manager
lbail@salisburync.gov

Ms. Ruth Kennerly
Human Resources Director
rchap@salisburync.gov

City of Salisbury, NC
132 N. Main St.
Salisbury, NC 28144


RE: Letter of Resignation


Mr. Bailey and Ms. Kennerly:


This letter is to notify you that I hereby resign from the position of Downtown Development Director/Executive Director for Downtown Salisbury, Inc., due to a hostile work environment and work place harassment, effective today (June 23, 2020). I am willing to work a two week notice per the requirements of City policy.


Sincerely,

*Larissa Harper*

Larissa Harper