

LARISSA HARPER HAIRGROVE,   )
                              )
      Plaintiff,           )
                              )
        v.              )
                              )
CITY OF SALISBURY, DOWNTOWN )
SALISBURY INC., and LANE    )
BAILEY, in his individual and official )
capacity,                    )
                              )
      Defendant.     )

**PLAINTIFF'S RESPONSES TO DEFENDANTS's FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION TO PLAINTIFF**

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, Plaintiff herewith responds to the following Interrogatories and Requests for Production of Documents.

**INTERROGATORIES**

1.    Identify each and every person who assisted in the preparation of the answers and responses that follow.

RESPONSE:

Plaintiff, Larissa Harper Hairgrove, together with counsel.

2.    Provide the name, business and home address, and business and home telephone number of any person whom the Plaintiff alleges has knowledge of or

1

information about any matter that relates to any fact or issue in this lawsuit, and briefly describe for each such person his or her such knowledge or information.

**RESPONSE:**

Defendants isolated Plaintiff and her staff's in offices which were located on the first floor of City Hall. The following individuals however have knowledge that Plaintiff was working in excess of 40 hours per week and that she was micro-managed and although classified as an exempt employee, was treated as an hourly employee. The following individuals are also aware that Plaintiff was treated differently from other male department heads with regard to the assignment of duties, supervision, micro-management, timekeeping, and performance evaluation and inconsistently with best practices for downtown development employees operating under the Main Street program.

1) Lane Bailey,
2) Zack Kyle,
3) Kelly Baker,
4) Ruth Kennerly
5) Brianna Price
6) Liz Parham
7) Brian Miller
8) Alvena (Al) Heggins
9) David Post
10) Karen Alexander
11) Candice Brown
12) Katelin Rice
13) Heather Teeter
14) Gianni Moscardini
15) Diane Young
16) Whitney Williams
17) Greg Shields
18) Pete Bogle
19) Dileika Wilson
20) Cheryl Goins
21) Bob Potter

2

Plaintiff specifically reserves the right to amend and/or supplement this response based upon information that may be discovered in the future or revealed during discovery.

3. For any administrative charge (EEOC charges of discrimination, employment- related claims filed with the United States or North Carolina Department of Labor, or claims for unemployment benefits filed with the North Carolina Employment Security Commission) and for any civil action that the Plaintiff has filed or that has been filed on behalf of the Plaintiff, and for any administrative charge or claim or civil action in which the Plaintiff has participated as a class member, party, or beneficiary of a settlement or judgment, identify such by names of parties, agency or jurisdiction, filing date, and type and basis or bases of claim. True and accurate copies of the documents described by this interrogatory may be provided, at the option of the Plaintiff, in lieu of a narrative response to this interrogatory.

RESPONSE:

Bank of America class-action lawsuit, approx. year 2012; unable to attain any records. Award was of nominal value. No other claims or litigation involving Plaintiff.

4. Provide the employment history of the Plaintiff for the last ten years (including the Plaintiffs employment which is the subject of this action) and include in your response the following:

    a.    Name of employer, business address and telephone number, the employer at the particular business location at which plaintiff was or is employed, and the business address and telephone number of the corporate headquarters or primary place of business of each such employer;

    b.    Inclusive dates of each period of employment;

    c.    Job title or titles, job description or descriptions, and job responsibilities and duties;

    d.    Every rate of pay, inclusive dates thereof, the manner in which each such rate of pay was or is calculated, e.g., hourly, salary, commission, etc. and

the reason for every change in rate of pay, e.g., merit raise, general increase, etc.;

e.  Fringe benefits of each employment, including but not limited to use of car, car allowance, group or individual medical, health, disability or life insurance, vacation pay entitlement, paid holidays, paid sick leave, paid disability leave, worker's compensation benefits paid, paid bereavement leave, pension and profit sharing, stock or securities purchase or distribution plans, bonus, overtime compensation, commissions and any type of deferred compensation;

f.  Any disciplinary action which has been taken against you as an employee of any company identified, whether verbal or written, and of any kind or nature whatsoever;

g.  State the reason or reasons for temporary or permanent separation from employment, and whether each such separation from employment was initiated by each plaintiff or by the employer; and

h.  State the inclusive dates during which the Plaintiff was or has been self-employed, either part-time or full-time, including the total earnings for each period of self-employment, and the reasons for ceasing or interrupting each period of self-employment.

RESPONSE: Plaintiff is responding for last twelve years, and objects to any further look back as unreasonably burdensome.

## Community Economic Specialist/Director, Sanford Holshouser LLP
## Nov. 2021 – April 2022

- Primary duty is business development with existing and new clients to expand the current community economic development services offered by Sanford Holshouser LLP law group
- Secondary duty is to assist in the set up and marketing of the new affiliate firm, Eagle Rock LLC, for services that do not require an attorney. Some advisory areas include:

  - Organizing downtown development efforts
  - Board Efficiency Training & Strategic Planning

  - Community Strategic Planning
  - Providing Resources for Small Businesses
  - Procuring Funding for redevelopment projects
    *(including writing & administering incentive grants)*

4

- ➤ Advising on Positioning & Marketing historic commercial buildings for redevelopment
- ➤ Providing assistance to city staff/public-private partners *desiring to designate* within the national Main Street America & state Main Street programs*

- ➤ Public Engagement with third party consultants
- ➤ Providing assistance *to sustain designation* for current
  Main Street program managers & interim services for
  vacant management positions*

  *(i.e., compiling annual report data, vacant building inventory, business/property owner engagement)*

Salary: $63,500/Year + cell stipend + Flexible Schedule + travel expenses

Reason for leaving: Firm restructured and downsized roles for these expanded services

### Marketing Coordinator, Lexington (NC) Tourism Authority & Visitor Center
### Nov. 2020 – Aug. 2021
- Developed a new position, created specifically for Plaintiff to transition into Director position as part of succession planning
- Increased operational efficiency for the organization's mission to recruit visitors
- Created and/or Managed multiple projects in the areas of digital and print media, promotion of hotels & attractions, website improvements, 24/7 information avenues, and visitor tracking, documenting results and ROI
- Researched and shared the latest trends, current best practices and methods of analyzing digital advertising & marketing through webinars, video conferences, and discussions with experts in the tourism marketing industry
- Accomplishments: Increase to the communications database, e-newsletter, and social media followers (on all three platforms) due to my involvement with projects, visitor conversations, public and private meetings, all of which has improved the presence, purpose and services of the tourism authority to residents and visitors.

Salary $53,000/Year + the following benefits: vacation pay, paid holidays, paid sick leave, paid disability leave, worker's compensation benefits (Plaintiff did not choose medical insurance as she was on spouses' coverage plan.)

Reason for leaving: The day after Director learned from an unknown source about Plaintiff's EEOC claim and unsuccessful mediation with the attorneys for the City of Salisbury and DSI, Director became concerned that the succession plan in place for Plaintiff to become Director would put a "black eye" on the organization she had led for 16 years. Director convinced the board members that the Marketing position that was created specifically for the Plaintiff in order to train under the Director was no longer necessary, the budget could not afford to pay for this position at the same time as pay for

5

the Director's continued employment while training a new Director. Although more qualified than the candidate chosen who is currently directing the Tourism Authority, Plaintiff did not receive an interview for the position.

## Downtown Development Director, City of Salisbury NC & Downtown Salisbury, Inc.
### 2017 – 2020

- Built new department and merged economic development duties through new quasi-governmental structure
- Managed 2 Full-Time Staff members (Events & Marketing Coordinator and Admin.) plus 20 Member Board
- Overall duties: To enhance the downtown municipal service district through business retention, recruitment, property development, creative marketing & memorable events; Generating reports for NC Dept. of Commerce
- City Management Team Member Duties/Accomplishments:
- Department Head/Management Team Member responsible for overseeing planning and development in center city "Downtown" MSD, staying within budget, always analyzing for cost-efficiency
- Worked extensively with Planning & Community Development Dept. and consultants on a downtown parking study, market study, updating the Downtown Master Plan and other internal & external programs & projects
- Attended City Council meetings every 1st & 3rd Tuesday of the month, gave presentations to educate & update
- Non-Profit Organization Operation Duties/Accomplishments:
- Led board meetings, multiple committee meetings, oversight of budget, operational documents & policies
- Updated by-laws/operational documents, assets/inventory, created and implemented surveys in all areas
- Established productive, quarterly Downtown Stakeholders Meetings with continual increase in attendance
- Assisted with designing new logos and branding campaign consistent with Rowan County
- Both organizations gained rapport with business & property owners, and long-time vacant/underutilized, maintenance-deferred properties received repair, improvements, and active tenants
- Hosted, Led Tours and Presented Workshop at 2019 NC Main Street Conference (record attendance of 750)
- Grant Writing Projects & Awards:
- $543,000 Federal Paul Bruhn Historic Redevelopment Grant (1 of 10 nationwide)-- *Awarded August 2020*
- $10-20,000 EPA/USDA Local Foods, Local Grant for technical assistance—*Awarded April 2020*
- $1 Million RISE Grant for Empire Hotel Redevelopment in Governor's Budget—*Cut*

6

*out of final FY20 State budget*

Salary $81,000/Year + Cell Stipend + group medical, health, disability, long & short term life options, vacation pay, paid holidays, paid sick leave, paid disability leave, worker's compensation benefits offered.

Reason for leaving: Constructive Discharge due to Hostile Work Environment.

## Downtown Business Specialist, City of Wilson NC Planning Dept.
### 2012 – 2017
- In-kind city staff for two (2) non-profit agencies providing assistance with property development of vacant/underutilized buildings, both public and privately owned, recruiting developers/investors & tenants
- Managed Strategic Action Plan for Economic Development Committee for Wilson Downtown Development Corp. (WDDC), a 509a1, charged with administering MSD funding of approx. $75,000
- Performed admin & financial reporting duties for Wilson Downtown Properties, Inc., (WDP) a 501c3 property holding company for econ dev projects
- Assisted in updating city ordinances and codes pertaining specifically to sidewalk dining, alcohol consumption, food truck management, and new issues facing growing downtowns
- Coordinated meetings regarding streetscape between downtown business/property owners & city staff
- Worked with various consultants, including UNC School of Government's Development Finance Initiative staff to analyze the downtown district, areas for growth, tools for investors, & Historic Cherry Hotel RFP
- Offer business assistance tools/resources for existing & new businesses located within MSD
- Assisted in various ways to bring Vollis Simpson Whirligig Park to fruition (Catalyst development project)
- Co-managed regular merchant meetings, worked Downtown events and assisted with Dept. of Commerce--NC Main Street Reporting/Assessments and Awards

Salary: $65,000/Year + Dedicated Cell Phone + Flexible Schedule + use of City-owned vehicles + + group
    medical, health, disability, long & short term life insurance options, vacation pay, paid holidays, paid sick leave, paid disability leave, worker's compensation benefits offered.

Plaintiff received merit raises at the top of the pay scale each time given to employees.

Reason for leaving: Plaintiff was offered the opportunity to move closer to her family and take the next, natural step in her career path.

7

**Executive Director, Kernersville Downtown Preservation & Development Council, Inc.**
**2010 – 2012**
- As the sole staff member of this 501c3, successfully expanded the econ dev role and improved operations
- Developed and implemented a strategic plan in conjunction with a 16 member volunteer Board of Directors
- Created and sustained relationships that led to increased merchant support, sponsorships, and donations
- Liaison between town officials and downtown business & property owners to relay concerns, resolve issues
- Connected commercial tenants to property owners/agents in downtown district, including a mixed-use rehab project of former cotton/hosiery/furniture factory called "The Factory" (residential condos/retail/office)
- Gathered data for town planning studies and worked with various town staff on joint projects
- Created org.'s 1st Facebook page, marketing efforts through multiple media outlets, co-op marketing campaigns
- Managed and promoted new town branding campaign (From legal docs, media spots, to light post banners)
- Assisted in developing 5-year plan and fundraising campaigns to renovate the town's historic 1873 Train Depot
- Created income-producing, long-term projects and secured grants to raise funds for the organization's projects
- Purchased promotional products, managed merchandise sales in-house and through website via Pay-Pal
- Assisted with largest town event (25,000 ppl), as well as created and managed small events (up to 4,000 ppl)
- Other duties included daily accounting, producing budgets, financial reports, minutes, and agendas for board and committees, as well as presenting the organization's goals to civic clubs/community organizations

Salary: $37,000/Year + Flexible Schedule

Plaintiff received merit raise the one time it could be offered.

Reason for leaving: Town of Kernersville, who funded the organization's budget at approximately 75%, cut the budgets of all departments and supporting organizations across the board due to a downturn in the economy. The Town Manager helped Plaintiff find the opportunity in Wilson, NC and provided a very complimentary letter of reference.

8

Plaintiff never received any disciplinary action for any employer other than when working for the Defendants City and DSI

5. Describe in detail the factual basis for the Plaintiff's Count Three, alleging claims under the North Carolina Wage and Hour Act and the Fair Labor Standards Act. In your response, please identify separately and with particularity all occasions on which you were not paid all wages (including overtime) which you claim were due, whether you reported the same to any member of DSI management, and if so, the details regarding such report(s), and each and every individual employed by DSI or the City of Salisbury who Plaintiff contends witnessed or has knowledge of any such nonpayment of wages. Please identify any documents which support and corroborate your response.

RESPONSE:

See Daily Hours of Work, Calendar of Events, Timeline, Plaintiff's notes from meetings, Emails and Text Messages. All time sheets from the City of Salisbury are necessary for more documentation. Many of the issues were in-person conversations. Some instances were documented in written notes taken by Plaintiff from meetings with city supervisors and conversations with DSI Board members. Committee and Board Agendas, as well as dates and times of emails and text messages show Plaintiff working nights, early mornings, beyond the hours of 8:30 a.m. to 5 p.m., in order to satisfy the unreasonable expectations of city management and a few DSI board officers. On one occasion (identification of date and time of communication forthcoming), Zack Kyle stated to Plaintiff that he would not agree to allow her to amend her timesheet for the hours she

9

worked during the 3-day suspension, although he knowingly allowed Plaintiff to work through email and text with Downtown Development staff L. Price and C. Brown, in order to prepare for the next week's DSI Board Retreat with State staff facilitating, since her staff had never participated in one before and did not know how to prepare for it. The workload only increased during her employment, and Plaintiff specifically informed Zack Kyle, Defendant Bailey, Whitney Williams and other DSI board members of the excessive hours that Plaintiff was being required to work, but due to an apparent lack of understanding of the Main Street program and the relationship that should have been in place vis a vis DSI and the City, no changes were made to address the overtime issue. Plaintiff constantly tried to reinforce the state Main Street Director's advice given at several meeting with both organizations that the Downtown Director was <u>not</u> responsible for DSI's work and that as a volunteer board, the volunteers needed to do DSI's work because Board members were supposed to participate in their own strategic action plan tasks and activities, with **assistance** from the Downtown Director.

(See video link with specified times containing excerpts from March 2022 Main Street conference session on how a quasi-public-private partnership should operate, NCMS documents and emails from Liz Parham, NC Main Street director.)

As Plaintiff was trying to be the best employee, avoid possible disciplinary actions for "poor performance" from not completing tasks due to being absent, as well as the inquiries, speculation, and scrutiny of certain members of the DSI Board, Plaintiff chose to not take the advice of her health and medical professionals to take sick leave through FMLA. Feeling helpless, Plaintiff wrote a grievance letter to HR during her suspension period but

10

decided not to submit it for fear of retaliation.

6.    Describe in detail the factual basis for the allegations in Paragraph 15 of the Complaint.  In your response, identify the person or persons who "strongly urged" Plaintiff to come to work "without pay," recite the exact words stated by any such persons identified by you in your response, provide the date and location of any conversations you had regarding this subject matter and identify any witnesses to such conversations. Further, identify any documents that corroborate your response.

RESPONSE:

Zack Kyle, Assistant City Manager, texted Plaintiff on 8/28/17 if it would be possible to introduce her at the City Council meeting on Sept. 5, 2017 at 5 p.m.  Plaintiff stated that she could not as she was still working for the City of Wilson.  Within the same text thread, Plaintiff asked Zack Kyle if she could attend the Oct. 3, 2017 meeting, instead of Sept. 5th, to introduce her to the City Council, as a city staff member.  To the best of Plaintiff's knowledge and recollection, in a phone conversation prior to her start date of Oct. 9, 2017 with Kelly Baker, Assistant to the City Manager at the time, Plaintiff agreed to an "after city working hours" meeting to introduce Plaintiff to the downtown merchants and other City staff.  The meet and greet was scheduled and took place Oct. 10, 2017, approximately from 6:00 p.m. to 8:00 p.m. on the second day of Plaintiff's employment.  In a text message from Zack Kyle on 10/4/17, possibly following a conversation through email or phone, Plaintiff was invited to attend a DSI marketing and promotions committee meeting at the office of the Rowan County Tourism Authority and Convention and Visitors Bureau

11

meeting on 10/5/17, prior to her start date.

7.     Describe in detail the factual basis for the allegations in Paragraphs 16 and 23 of the Complaint, that you were required to work two full-time jobs. In your response, identify the person or persons who told you that this was a requirement, recite the exact words stated by any such persons identified by you in your response, provide the date and location of any conversations you had regarding this subject matter and identify any witnesses to such conversations. Further, identify any documents that corroborate your response.

RESPONSE:

Plaintiff was required to attend all meetings held by the city with respect to Department heads as well as help with City events, plus attend all board and committee meetings and DSI events. DSI Board Chair at the time, Greg Shields, and Plaintiff would discuss issues regarding attending City functions that were taking time away from DSI matters, causing Plaintiff to seem unavailable to DSI members. These meetings were held outside of her office, generally before or after working hours. Zack Kyle told Plaintiff to not discuss nor disclose fully her schedule to DSI Board members after several discussions and requests from Shields and Williams to either be able to share her calendar or daily schedule. See "Timeline: Oct. 5, 2017 -- March 9, 2018" submitted and discussed with DSI Executive Committee and Zack Kyle at March 9 meeting. Whitney Williams agreed that it seemed to be an overwhelming schedule that was not sustainable (paraphrasing to best of Plaintiff's recollection). Zack Kyle visibly took offense to Plaintiff's attempt to explain to

12

the DSI board officers what her first four months of employment had entailed and even said that Plaintiff's document was false (paraphrasing) to contradict Plaintiff.

A few notable occurrences are described below, but it should be understood that the unrealistic expectations were nearly on a daily basis. Plaintiff answered the requests from City management to assist the Parks & Rec department on Saturday, June 19, 2018 for the 1st Juneteenth celebration. Plaintiff took photos of the event, assisted with set up and working the Parks & Rec tent with staff, members of the Human Relations committee, and contractors who were gathering input and educating about a new project. When she was not working the event, Plaintiff went inside the City Hall building to work in her office. When arriving at the Juneteenth event, Zack Kyle was visibly disturbed and seemed angry at Plaintiff for working that event. When asked why she was there, Plaintiff explained that she was answering the request for any and all staff to assist with this initial event and she took the place of Downtown Event Coordinator Latoya Price due to Price having worked a recent event and did not need to work any more hours that week. Plaintiff's other staff member, an hourly, non-exempt status employee was directed not to work "after hours" events, or attend internal city staff events, unless she was on a committee, per Zack Kyle's direction. In addition, the following documents support Plaintiff's allegations that Defendants City, Bailey and DSI were aware of her excessive workload and took no action to reduce it: Job descriptions, MOU between DSI & City, NCMS Agreement for DSI, signed by both the city management and DSI Board Chairperson. These State and City legal partnership documents required members of both organizations to work in tandem with the Director through a public-private partnership.

13

Yet, both city management and a vocal minority of the DSI volunteer, advisory board disregarded the best practices structure and refused to allow Plaintiff to work only as the development director for the City, and ignored Plaintiff's expertise in how the public-private partnerships were supposed to function. Zack Kyle told Plaintiff to do whatever the DSI board asked, directly, during in-person conversations and indirectly through email communications. See notes and emails between Z. Kyle, Plaintiff, and DSI board members. However, Lane Bailey told Plaintiff to only do 3 things. (See Plaintiff's Notes on the meeting). Lane Bailey also required Plaintiff to take on applying for and, if awarded, operating the NC Certified Retirement Community program in addition to the rest of her duties as Downtown Development Director and Executive Director for the non-profit partner organization charged with operating the NC Main Street program with Salisbury going into its 40th year as a national and state accredited program. (See emails/texts regarding application timeframe and eventual award.) Defendants City, Bailey and DSI were aware that in order to obtain a NC Main Street designation and participate in the program with tax benefits to the City, a full-time Director is required. Liz Parham, State Program Director had multiple phone calls and a meeting with the Director, DSI Officers, Zack Kyle, and Lane Bailey about this issue prior to Plaintiff's hire as well as during, at the request of DSI board officers and Plaintiff on several occasions. Plaintiff provided NCMS contracts and other educational information from the National Main Street America Association and from the NC Department of Main Street, as well as provided trainings from State Main Street staff in order for DSI board members and city staff to gain an understanding that all of her work, both for the City and DSI was intertwined and

14

that she should not be required to work two separate 40-hour/week positions, one for the City and one for DSI. Plaintiff repeatedly asked for the discretion that she should have had as an exempt employee not earning overtime to determine what hours she would work and make daily decisions as to the priority of work for herself and the Downtown Development department staff, her direct reports. Time and again, Plaintiff was ignored by a couple of DSI board officers who influenced other board members to believe Plaintiff was "not doing her job" and by city management who demeaned Plaintiff in front of the influencing board officers, who micro-managed her time, scrutinizing her office hours, and failing to give her credit for work done outside of regular business hours. This untenable situation led to, as Plaintiff explained many times to both parties and others in the community, a "tug of war" between the two organizations, which ultimately required her to work two full-time jobs in order to fulfill the daily requests of each, and even then, Plaintiff was still subjected to disciplinary action for her inability to work an 80+ hour week and keep multiple bosses / employers happy. Plaintiff was also treated with disrespect from city staff members and members of the community due to this situation. On April 16, 2020, at 6:06 p.m., Z. Kyle texted Plaintiff the following message: "Can you have Latoya on the Org. call tomorrow instead of you?" Plaintiff did not believe this was a request, rather a demand, that her staff member L. Price, Downtown Event Coordinator, would run the 8 a.m. Organization Committee (Executive Officers) meeting instead of Plaintiff. Plaintiff is unsure if the direction of that action came from DSI board officers, Zack Kyle, or with their mutual consent. In a communication with Plaintiff (either email, phone call or text), Latoya Price voiced her surprise and concern to Plaintiff, stating that

15

she did not feel comfortable with that and would like Human Resources staff, either Brianna Price Kenny or another staff person from HR to be in the room with her and Zack. Latoya was to meet in Zack Kyles' office and conduct the meeting via Zoom with the DSI officers. In addition to this, Zack Kyle met with Price on at least two occasions without Plaintiff's knowledge and assigned her tasks, only telling Plaintiff afterward.

8.      Describe in detail each and every occasion on which you reported to City or DSI management that you had not been paid your regular wages for any time worked during a workweek or that you had worked over 40 hours in a workweek. In your response, identify the person or persons to whom you so reported, the content of your reports, the dates and locations of those reports, any witnesses to such reports and any documents you submitted supporting your claim for overtime or non-payment of regular wages.

RESPONSE:

Most reports to Defendants were verbal. Such reports were made to direct supervisor, Zack Kyle, Human Resources staff Brianna Price, DSI Board members/officers, specifically Greg Shields (Chair Prior to 2017, 2018), Whitney Wallace (Vice-Chair from 2017-2018, Chair from 2018-2020), Diane Young (Vice Chair from 2018-2020), Gianni Moscardini (Promotions & Events Committee Chair from 2017-2020), Dileika Wilson (Secretary from 2019-2020).

9.      Describe in detail the factual basis for your contention that you were not in

16

fact a salaried exempt employee.

RESPONSE:

Plaintiff was hired to manage the new department and new quasi-governmental structure with DSI; however, Plaintiff was constantly micromanaged in her position to the detriment of her mental and physical health. Plaintiff contends that she was treated as exempt or non-exempt whenever it was convenient to City management. She is unsure that DSI Board members knew what "exempt" meant in the terms of employment. Supposedly, according to conversations over the phone and in a text message dated on 8/25/17 with Zack Kyle, the position required a 7.5 hr/day, with 9.38 days/mo. Vacation after one first month on the job, for persons with 7-14 years of service within a municipality. Plaintiff had five years serving the City of Wilson at the time. In the same message thread, Mr. Kyle stated the Downtown Director position had a pay grade of 30, range of $67,760-$108,417.36; her Event Coordinator, hired prior to Plaintiff, had a pay grade of 18 with pay range between $37,731 - $60,370. Mr. Kyle noted that city management was looking at possibly changing the pay grades at the time but did not expand upon that statement. In addition, the Disciplinary Action Report from June 18, 2019 for working hours specified to 8:30 a.m. to 5 p.m. and supervisor Zack Kyle ordered the City IT Department to monitor Plaintiff's key card and report to him Plaintiff's entrance and exit times from City Hall, where her office was located. Although these specific "office hours" were made a requirement, Plaintiff's dual role required meetings offsite with business and property owners, as well as four DSI committees, plus city outreach programs and events that took place before and after city working hours, some

17

taking place in City Hall, yet mostly held outside of City Hall. There were many instances where Plaintiff was undermined by Zack Kyle leading to disintegration of authority and demotion of status in front of Plaintiff's department staff and DSI board members, which encouraged board members to continue ordering Plaintiff to do the work within their board and committee action plans for them, instead of in conjunction with the other DSI members and Plaintiff assisting. This piling on of tasks, large to small, from DSI board and committee members and city management, along with her daily duties as a city department head to develop the municipal service district, participate in city staff meetings and professional development sessions, tending to needs of downtown property owners and business owners, as well as attending out of town meetings required of Main Street directors, led to work and expectations that equated to two full-time jobs, with her hours, emails, and texts as evidence. At no time was Plaintiff given the authority or discretion to make final decisions about any of the assignments she was given as she should have been had she actually been treated as an employee who was exempt. Plaintiff was not allowed to:

- manage the downtown development department;
- direct the work of at least two or more other full-time employees or their equivalent;
- have the authority to hire or fire other employees or be deferred to in such matters;

Nor did Plaintiff's work directly related to the management or general business operations of the employer or the employer's customers and Plaintiff's was not allowed to exercise discretion and engage in any exercise of independent judgment with respect to matters of significance.

18

10.  Describe in detail the factual basis for the allegation in paragraph 21 that you complained to Lane Bailey or anyone else in City or DSI management that your "workload was not sustainable." In your response, identify the person or persons to whom you complained, the content of your complaints, the dates and locations of those complaints, any documents you submitted supporting your complaints, and the identity of any witnesses to such complaints.

RESPONSE:

To the best of Plaintiff's recollection, the conversations were mainly verbal, except when noting her disagreement either on the disciplinary action forms or as a follow up document. Plaintiff's complaints were made, starting approximately November 2017 and continued throughout her employment. Yet, Plaintiff's requests for management to back her up and allow her to do the job according to best Main Street management practices went ignored, even caused more scrutiny from all parties involved here. (See disciplinary action reports, follow up documents and Plaintiffs notes from meetings). These conversations were with Lane Bailey, Zack Kyle, Katelin Rice, Brianna Price, and DSI Board members including those listed in Interrogatory Answer #2. Plaintiff also had conversations with Liz Parham in the NC Department of Commerce about her concerns. See Timeline of Events

11.  Describe in detail the factual basis for the allegations contained in paragraph 22. In your response, identify the person or persons who were scrutinizing your daily

19

hours and duties and complaining that you were not responsive to their needs, the content of any discussions you had with these individuals regarding this subject matter, the dates and locations on which these incidents occurred, any witnesses to these incidents and any documents that support and corroborate your response.

RESPONSE:

Plaintiff was subjected to tremendous pressure by being micromanaged and not allowed to do her job as she saw fit by the following:

1. Zack Kyle, Assistant City Manager

2. Lane Bailey, former City Manager

3. Greg Shields—DSI Board Chair and Past-Chairperson (2017-2019)

4. Whitney Wallace—DSI Board Economic Vitality Committee Chair; Vice-Chair, then Board Chair, and Past-Chairperson (2017-2021)

5. Diane Young—DSI Board Economic Vitality Committee Chair and Vice-Chair (2018-2021)

Plaintiff cannot pinpoint specific dates and locations of these conversations though most would be in City offices with city staff, in-person and through email. Board officers often wanted to meet off city premises when meeting in-person with Plaintiff to discuss the rigors of the jobs and progress on tasks, otherwise email and texts with board officers were utilized. When communicating with the DSI Board members and city staff, dates are noted on emails and Plaintiff's written Notes included herewith.

12. Describe in detail any instructions given to you by either the City or DSI

20

regarding recording the hours that you worked each day. In your response, identify the person or persons who provided those instructions, the content of the instructions, the dates and locations on which those instructions were given, the identity of any witnesses to your receipt of these instructions, and any documents that support and corroborate your response.

RESPONSE:

DSI never required specific because the board members who interacted with Plaintiff made it clear that she was required to be present at board and committee meetings (which took place mainly before 8:30 a.m. and after 5 p.m.). In addition, they emailed and texted Plaintiff throughout the week, days/nights, and weekends, which essentially meant Plaintiff was "on call" at all times, 24/7, whenever they needed Plaintiff. In addition, Greg Shields and Whitney Williams made many attempts to gain access to Plaintiff's work (Outlook) calendar and schedule in some way, stating that DSI was not getting enough of Plaintiff's time, which the City resisted. Completed timesheets were required by the City every two weeks. Plaintiff was told not to place any weekend hours on the form, or overtime, and to simply place 37.50 hours/week on the form, and log vacation/personal and sick time on forms. Directions on how to complete the timesheet changed at least once. See copy of two timesheets, one that was submitted according to instructions from Z. Kyle/Human Resources from 1/26/19 to 2/08/19 date, the second after Plaintiff was instructed by Connie Snyder Administration Assistant to L. Bailey and Z. Kyle, dated 06/15/19 to 06/28/19 to "fill it out the way Lane does." This format was to place no number of hours, only log time of vacation/personal and sick leave, when that occurred.

21

13. Identify each and every computing device (including desktop and laptop computers, tablets, cell phones, personal digital assistants, thumb drives, flash drives, external hard drives or similar devices) used by the Plaintiff (including but not limited to devices on which any documents, including e-mail, which concern, discuss, or relate in any way to DSI and/or the facts of this case were created or stored) during and since Plaintiffs resignation as set forth in Paragraph 48. For each such computing device identified, state the following:

    a.    the make(s) and model(s);  (SEE BELOW)

    b.    the activities routinely performed on the device; (SEE BELOW)

    c.    the software routinely used for these activities;

        Microsoft Office.-Word, Powerpoint, Outlook, Excel, etc,

    d.    the name of each and every employee, agent, or other individual who had access to or used these devices.

    e.    whether the Plaintiff, or anyone acting on his behalf, has deleted or attempted to delete files from any devices identified in response to this Interrogatory.

RESPONSE:

Plaintiff mainly used city-owned devices during her employment. The make and models of the devices are unknown to Plaintiff but should be identifiable by the City IT Department or current Downtown Development Department staff members. Plaintiff believes the city-owned laptop was a Dell. During the course of business, when Plaintiff

22

was employed with the City, Plaintiff and Downtown Development Department Administrative Specialist, Candice Brown, would sometimes share Plaintiff's work laptop, from time to time, to compile Notes, Minutes, present Powerpoints, etc., during DSI board or Executive Committee meetings. Occasionally, Plaintiff's personal cell phone was used for recording DSI board and committee meetings when the City-owned meeting recorders were not available. Plaintiff did not use the city-issued laptop after June 22, 2020.

On these city-owned devices, daily work duties of communicating through email and compiling documents were completed using MS Word, Excel, PowerPoint, Outlook Calendar, typically. On occasion, if Plaintiff did not have her city-issued laptop at home, she used her home computer, through the city's VPN access to compile Minutes, respond/send emails. She would, also, use her personal cell phone for which she received a stipend from the City.

Home (personal) computer = Toshiba Satellite C-55A (est. model year 2014)

Personal cell phones:

a. Motorola XT1254 (est. model year 2015);

b. Google Pixel 2 (est. model year 2018)

Plaintiff has no knowledge of specific deleted recordings. Candice Brown would sometimes delete recordings of meetings after the minutes were typed.

14. Identify each and every e-mail address and phone number you have used for

23

any reason (business and personal reasons) both during and after your employment with the City.

RESPONSE:
During Employment
Business Main Phone: 704-637-7814; Business Direct: 704-638-5239
Business Email: Larissa.Harper@salisburync.gov; info@downtownsalisbury.com
Personal and Business Cell Phone: 336-686-0870 (City paid a $87/mo. stipend)
Personal Email: send2rissa@gmail.com

After Employment
Personal Email: send2rissa@gmail.com; Larissa.Hairgrove@gmail.com
Personal Cell: 336-686-0870
Business Emails: lhairgrove@visitlexingtonnc.com; larissa@shlawgroup.com

15. State the name, web address, and username for all blogs, online forums, and social media and networking websites on which the Plaintiff has posted, since the commencement of her employment with the City, any content regarding DSI, including but not limited to content relating to the claims asserted and allegations contained in Plaintiffs Complaint.

RESPONSE:

To the best of Plaintiff's knowledge, online and social media sites listed below were used only for personal and business purposes. No content regarding the Plaintiff's Complaint was posted on any of the following sites.

Personal
Facebook.com/Rissy.harper
Instagram: miss_rissy and send2rissa
LinkedIn.com/in/4larissah/
Twitter: @Larissatweets

Business
DSI Website: www.Downtownsalisburync.com; Facebook: downtownsalisbury;

24

Facebook Merchant Groups:
Instagram: Downtownsalisburync;
Twitter: downtownsalisnc (Cannot recall posting to Twitter for/about Downtown
Salisbury, Inc. or the City of Salisbury)
City of Salisbury: www.Salisburync.gov; Facebook: CitySalisburyNC;
Instagram: citysalisburync
Shared Google Drive with Downtown Development Department Staff

Employers' sites, after employment with DSI & City of Salisbury:
Websites: www.VisitLexingtonNC.com; www.Shlawgroup.com

16.    Identify with particularity all damages the Plaintiff contends she has suffered
as a result of DSI's conduct as alleged in the Complaint, identifying in your response the
amount, nature, components, and manner of calculation of such alleged damages.

RESPONSE:

Plaintiff is owed for time of suspension (June 19-21, 2019); back pay from June 2020 to

present except for intermittent periods of time worked for City Of Lexington Tourism (9

months) and period worked for Sanford Holshouser. (November 1 2021 -April 2022 (6) six

months); lost contributions of health saving account; medical bills for counseling,

medication, other stress related medical services.


## REQUEST FOR PRODUCTION OF DOCUMENTS

In accordance with Rule 34 of the Federal Rules of Civil Procedure, Defendant

requests that the Plaintiff provide the documents hereinafter described, applying the

definition of "document" hereinabove. The documents are to be presented within thirty

(30) days of service of this request to Defendant's undersigned counsel, at the address

noted below. In lieu of tendering originals of the documents requested, the Plaintiff at its

25

option may tender complete, true and accurate copies thereof.

1. Every document described, identified in, or relied upon in the preparation of Plaintiff's responses to Defendant's First Set of Interrogatories.

2. Any document authored or created by Plaintiff or created or authored at the direction or request of Plaintiff that memorializes or addresses any of the facts or allegations in the Complaint, including, but not limited to, correspondence, personal notes and memoranda, daybook, diary or calendar entries, and the like. The Plaintiff's attorney's case file notes and other work product associated with this lawsuit are not subject to this request and do not need to be described.

3. Any document or tangible thing which constitutes evidence supporting any claim raised in the Complaint.

4. All documents which evidence or support Plaintiff's claim that she is owed wages and/or overtime pay as alleged in the Complaint.

5. All documents which contain, reflect, refer to or relate to any communications, whether oral or written, between the Plaintiff and Defendants, which Plaintiff contends constitutes evidence supporting the claims alleged in Plaintiff's Complaint.

6. All documents which contain, reflect, refer to or relate to any communications, whether oral or written, between Plaintiff and any member of management at DSI or the City, which Plaintiff contends supports her claim that she is owed wages, including overtime pay, and that she rep01ied the same to DSI or the City.

26

7. All documents which contain, reflect, refer to or relate to any complaints, whether oral or written, Plaintiff made to any member of management at DSI or the City about wages, overtime, workload or being misclassified as a salaried, exempt employee.

8. All documents, including but not limited to the calendar Plaintiff began keeping in January 2019, as referenced in Paragraph 31 of the Complaint, which Plaintiff contends reflects or evidences that she worked more than 40 hours in any workweek during her employment with the City or DSI.

9. All documents which contain, reflect, refer to or relate to Plaintiff's allegations that she was required to work two full-time positions for DSI and the City, that she was urged to work without being paid, or that she was required to work overtime.

10. Any document reflecting in any manner Plaintiff's efforts to pursue, secure, and retain employment, since she left the City's employ. By way of illustration and not limitation, such documents include job applications, personal notes of prospective employers contacted by Plaintiff, correspondence between Plaintiff and prospective employers, and the like.

11. All documents, including, but not limited to, W-2s, salary stubs, and commission statements which contain, reflect, refer, or relate in any way to any and all income from employment, including, but not limited to, self-employment, received by Plaintiff from the period of 2018 to the present.

12. All Federal and North Carolina Income Tax Returns and any amendments thereto filed by Plaintiff for the tax years 2018 to the present, together with all schedules,

27

attachments, statements and all other forms comprising the same.

13. All documents Plaintiff has received from any person, including any written statements or affidavits, which relate in any way to the Plaintiffs Third Count or DSI's defenses in this Action.

14. All documents supporting, evidencing or relating in any way to the allegations that Defendant DSI failed to pay Plaintiff any wages or overtime pay.

15. All documents evidencing, concerning or relating in any way to the damages alleged to have been suffered by Plaintiff as a result of the actions of DSI as alleged in the Complaint, including, but not limited to, documents evidencing, concerning or relating in any way to the amount, nature, components, and manner of calculation of such alleged damages.

16. The following documents relating in any way to any employment (whether as an employee or an independent contractor) Plaintiff has held since she resigned from her position with the City:

    a.    All documents evidencing, concerning or relating in any way to the terms and conditions of such employment, including any employment agreements or contracts;

    b.    All documents evidencing, concerning or relating in any way to the compensation you received for such employment, including payroll and other wage records and compensation or commission plans; and

    c.    All documents evidencing, concerning or relating in any way to your job performance, including performance appraisals or evaluations.

28

17.   All text messages, instant messages, Facebook messenger messages, emails or other communications between Plaintiff and Defendants regarding her claim for unpaid wages and overtime pay or DSI's defenses that claim.

18. Copies of any documents, audiotapes, photographs, verbatim transcripts, or videotapes which Plaintiff contends constitutes evidence of any of the matters alleged in the Complaint regarding her claim for unpaid wages and overtime pay or which relate to the DSI's defenses that claim.

19.   All social media posts authored by or received by the Plaintiff evidencing, concerning or relating to the Third Count of her Complaint or DSI's defenses in this action.

20.   Printouts of any and all non-privileged documents, e-mails, charts, notes, and/or memoranda from any personal computer or personal laptop computer owned by you or used by you that evidence, substantiate, or relate to the Plaintiffs claim for unpaid wages and overtime pay.

RESPONSE:

All documents identified as responsive at this stage of discovery may be downloaded from this link:

Bates Files for Defendants


This the 14th day of July 2022.

/S/ VALERIE L. BATEMAN
Valerie L. Bateman
NEW SOUTH LAW FIRM
209 Lloyd Street, Ste 350
Carrboro, North Carolina 27510
Tel: 919-810-3139
Fax: 919-823-6383
NC State Bar No. 13417

/S/ JUNE K. ALLISON
June K. Allison
NEW SOUTH LAW FIRM
233 S. Laurel Avenue
Charlotte, NC 28207
Tel: 704-277-0113
Fax: 919-823-6383
NC State Bar No. 9673

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **PLAINTIFF'S RESPONSES TO DEFENDANT DSI'S DISCOVERY REQUESTS** was served on opposing counsel via email as indicated below, with hard copy via U.S. Mail upon request:

Patrick Flanagan
Cranfill Sumner LLP
2907 Providence Road, Suite 200
Charlotte, NC 28211
Email: phf@cshlaw.com

*Counsel for Defendants City of Salisbury and Lane Bailey*

G. Bryan Adams, III
N.C. Bar No. 17307
VAN HOY, REUTLINGER, ADAMS & PIERCE, PLLC
737 East Boulevard
Charlotte, North Carolina 28203
Email: bryan.adams@vraplaw.com

*Counsel for Defendant DSI*

This the 14th day July 2022.

S/ VALERIE L. BATEMAN
Valerie L. Bateman
NEW SOUTH LAW FIRM