# ZACK KYLE

# DEPOSITION EXCERPTS

```
             IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
             Civil Action No.: 1:21-cv-00814-CCE-LRW


LARISSA HARPER HAIRGROVE,       )
                                )
                  Plaintiff,    )
                                )
     vs.                        )
                                )
CITY OF SALISBURY, DOWNTOWN     )
SALISBURY INC., and LANE        )
BAILEY, in his individual and   )
official capacity,              )
                                )
                  Defendants.   )
                                )
---------------------------------
```

                        _____

                              DEPOSITION
                                 OF
                              ZACK KYLE

                        _____


TAKEN AT THE SALISBURY, NC CITY HALL:
217 SOUTH MAIN STREET
SALISBURY, NC 28144


                            01-30-2023
                         1:53 O'CLOCK P.M.
                        _____

                          Gretchen Wells
                          Court Reporter

                         Chaplin & Associates
                    132 Joe Knox Ave, Suite 100-G
                        Mooresville, NC 28117
             (704) 606-1434 | (336) 992-1954 | (919) 649-4444

1  you the exact date, because it was on my birthday.
2  June 17th.
3       Q.    Okay.
4       A.    2014.
5       Q.    And he was replaced by?
6       A.    It would have been Lane Bailey. We had a
7  interim, but ---
8       Q.    And who was the interim?
9       A.    Interim was John Sofley.
10      Q.    Okay. Can you spell his last name?
11      A.    S-o-f-l-e-y.
12      Q.    And then he was replaced by?
13      A.    Lane.
14      Q.    Lane. And do you recall when Lane came?
15      A.    Maybe around 2015. I'm not sure.
16      Q.    Okay. All right. So I'm just going to put
17 this there. Okay. I'm going to show you what we
18 previously marked P3 and ask you if you recall seeing
19 this before.
20      A.    Yes.
21      Q.    And can you tell me what it is?
22      A.    It's a disciplinary action.
23      Q.    And who issued it?
24      A.    I did.
25      Q.    And you issued it to who?

01-30-23 Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW          COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 3 of 12

```
 1        A.    Larissa.
 2        Q.    All right.  And it's signed off by you
 3   and ---
 4        A.    Larissa.
 5        Q.    And Larissa.  And who's the name at the
 6   bottom?
 7        A.    Kelly Baker.
 8        Q.    Kelly Baker.  And she was there why?
 9        A.    Witness.
10        Q.    Okay.  And this disciplinary action was
11   dated December 5th, 2018?
12        A.    Okay.
13        Q.    Is that right?
14        A.    Again, I -- you know...
15        Q.    Well, the date's right at the top if you
16   look at it.
17        A.    Yeah, December 5th.
18        Q.    Okay.  And where it says, "Description of
19   infraction" ---
20        A.    Okay.
21        Q.    --- it says, "In a September 12 memo, you
22   were advised to respond to phone calls and emails
23   within the same day or 24 hours.  An email was sent to
24   you on October 31st by one of the DSI board members
25   and you did not respond until November 12th."
```

01-30-23 Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW          COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 4 of 12

1  Q.  Okay. What I'm trying to figure out is, if
2  Larissa ever told you, "Hey, I open an email and I
3  read it, and then I make it look like I've never read
4  it so that I remember to do something based on that
5  email."
6  A.  She never told me that.
7  Q.  Ever?
8  A.  No.
9  Q.  She never gave you any ---
10 A.  No.
11 Q.  --- response to this?
12 A.  No.
13 Q.  Okay.
14 A.  No. Not -- nothing like that.
15 Q.  Okay. And it says, "It's also been brought
16 to my attention that you have not been responsive to
17 our EDC director."
18 A.  Correct.
19 Q.  And who was the EDC director?
20 A.  Rod Crider.
21 Q.  Pardon me?
22 A.  Rod Crider.
23 Q.  And when you say, "our EDC director," who is
24 "our"?
25 A.  The city's.

01-30-23 Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW    COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 5 of 12

1    Q.  So the city had its own independent EDC
2 director?
3    A.  I don't know if it's independent.  It works
4 with us and the county.  But they are -- they're a
5 separate entity, pretty much like DSI was before.
6    Q.  Is he a city employee?
7    A.  He's not a city employee.
8    Q.  Okay.  So what was Mr. Crider?
9    A.  Uh-huh (yes).
10   Q.  What was his concern?
11   A.  I have no idea with Larissa what the issue
12 was.
13   Q.  Okay.  And then you noted that she showed up
14 late on November 20th for a DSI meeting?
15   A.  Correct.
16   Q.  And it said, "After many discussions on the
17 need for you to be on time for meetings."  Who had
18 those discussions with her?
19   A.  I would have.
20   Q.  And on how many occasions was she late to
21 meetings?
22   A.  I would not -- I couldn't tell you that.
23   Q.  Well, did you document them?
24   A.  I'm sure at the time we did.
25   Q.  Okay.  So if there is documentation, that

01-30-23 Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW          COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 6 of 12

1  ought to be in her personnel file, right?
2      A.   It would have been in my working papers.  I
3  don't know that it necessarily had to be in her
4  personnel file.
5      Q.   Okay.  So did you ever give her any of those
6  dates?
7      A.   I'm sure we had those discussions.
8      Q.   Okay.  And it says, "Finally, your lack of
9  responsiveness to the North Carolina Main Street
10 personnel prompted a call from them to the city
11 manager and myself, which has led to my asking the
12 marketing person in your department to lead our North
13 Carolina Main Street Conference Coordination."
14          So I have several questions about that.
15     A.   Sure.
16     Q.   Who was the Main Street personnel who
17 called?
18     A.   Again, I -- I'm not sure if it was Liz
19 Parham, or I was trying to think of the other lady
20 that was working with us, and I cannot think of her
21 name.  Because I -- I've looked over some of this
22 stuff.  And I was trying to think of -- but there was
23 another person that was involved.
24     Q.   And who do you -- which one do you think
25 called you?  Do you know?

01-30-23  Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW          COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 7 of 12

```
 1      A.   No.
 2      Q.   And did they call both of you on the same
 3 call?
 4      A.   No.
 5      Q.   They called you separately?
 6      A.   I'm sure it would have been separately.
 7      Q.   And ---
 8      A.   I don't remember having a joint call.
 9      Q.   And do you recall what the concern was?
10      A.   It was -- Main Street Program was coming
11 here for their conference.  And they were having
12 issues with Larissa responding or taking care of
13 things.
14      Q.   Okay.  And did they say specifically what
15 things?
16      A.   At the time, you know...
17      Q.   Okay.  So you said, "I'm now going to ask
18 the marketing person in your department."  So you went
19 over her to her report and said, "I'm going to tell
20 you to lead our Main Street Conference."  Is that
21 right?
22      A.   Yes.
23      Q.   And who was that person?
24      A.   Latoya Price.
25      Q.   Okay.  And did Latoya Price thereafter lead
```

01-30-23 Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW          COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 8 of 12

1       A.   No.

2       Q.   And why not?

3       A.   I don't think we follow that progression ---

4       Q.   Okay.

5       A.   --- necessarily.

6       Q.   All right.  So you can go right to

7    suspension?

8       A.   Yes.

9       Q.   Okay.  So you go through that in the

10   beginning, first paragraph, right?  You say you

11   already got this, written warning for being untimely

12   with email and phone call responses, being late to

13   meetings, right?

14      A.   Yes.

15      Q.   And then it says, "After being notified that

16   an email on certified retirement communities had not

17   been responded to from June 5th" -- okay, "it was

18   necessary to audit your emails."

19           And you say, "It was found that over 1,600

20   emails are currently in your inbox and a lot of those

21   emails had not been opened and read."

22           And it's your testimony today that she never

23   told you that she leaves -- reads them and leaves them

24   open in order to remember to go back to them?

25      A.   No.  Not that I ---

01-30-23 Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW                COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 9 of 12

1        A.   Okay.
2        Q.   And then February 25th, this email goes to
3    you from Greg Shields ---
4        A.   Okay.
5        Q.   --- with a cc to Whitney Wallace, Tim Proper
6    and Lane.
7        A.   Okay.
8        Q.   Do you see that?
9        A.   Oh, yes.  Okay.
10   (Witness examines document)
11       A.   Okay.
12       Q.   Okay.  So at the bottom of this email, it's
13   an email from you?
14       A.   Uh-huh (yes).
15       Q.   And it says, "Good afternoon
16   Greg/Whitney/Tim, thank you for meeting with me on
17   Friday to express your concerns related to Larissa's
18   performance.  I am working toward preparing
19   documentation concerning her performance, and I need
20   your assistance in providing me with specifics related
21   to her performance that warranted your decision to
22   request termination."
23            So it sounds like, at some point, you had a
24   meeting with them and they said, "We want you to fire
25   her."

01-30-23 Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW           COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 10 of 12

```
 1      A.   Okay.
 2      Q.   Is that right?  I mean, this is your email.
 3      A.   Yeah, it's my email.  Again ---
 4      Q.   Right.  And did they request that she be
 5 terminated?
 6      A.   I'm sure they did.
 7      Q.   Okay.  And you said, "Okay.  I need your
 8 help doing that," right?
 9      A.   Right.
10      Q.   So he responds and says, "Emails to Larissa
11 are routinely unanswered even after repeated attempts
12 to contact her."
13           Did you ever ask him to provide you with
14 examples?
15      A.   I'm not sure.  We could have had
16 conversation ---
17      Q.   I mean, that's kind of a broad statement?
18      A.   Yes, it is.  Yes.
19      Q.   Okay.  "For most meetings she is late and
20 rarely prepared."  Did you ask him to give you any
21 examples?
22      A.   I'm sure I did at the time.
23      Q.   Okay.  "In many cases when she has asked to
24 take care of something, she says she is far too busy
25 and delegates it to Candice or Latoya."
```

01-30-23 Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW            COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 11 of 12

```
 1              That's actually a good thing if she's not
 2   utilizing her staff properly, right?
 3         A.   Yes.  Correct.
 4         Q.   So he's -- damned if you do, damned if you
 5   don't, right?
 6              MR. FLANAGAN:  Object to form.
 7         Q.   (Ms. Bateman)  I'm just saying, how does she
 8   win, right?  You say, "You're not delegating," and he
 9   says, "Oh my God, she's delegating.  She's too busy."
10              So I don't -- I mean, I think that's an
11   example of, it was going to be hard to please both
12   people ---
13         A.   Sure.
14         Q.   --- wouldn't you agree?
15         A.   Yes.
16         Q.   Okay.  "It feels like there's a lot of
17   activity but very little progress made."  Did you ask
18   him to give you specific examples?
19         A.   I'm sure they did.
20         Q.   Okay.  "A very specific instance of this was
21   new board member orientation.  It was disorganized.
22   Larissa was late.  We spent a lot of the orientation
23   adding pages to our binders that were not in them to
24   begin with."
25              Did you ever ask Larissa about that specific
```

01-30-23 Hairgrove v Salisbury/1:21-cv-00814-CCE-LRW			COPY

Chaplin & Associates, Inc.
www.chaplinandassociates.com
transcripts@chaplinandassociates.com

Case 1:21-cv-00814-CCE-JLW   Document 42-30   Filed 04/04/23   Page 12 of 12