# ROBIN CAGLE

# DEPOSITION EXCERPTS

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.: 1:21-cv-00814-CCE-LRW


LARISSA HARPER HAIRGROVE,    )
    )
            Plaintiff,    )
    )
   vs.    )
    )
CITY OF SALISBURY, DOWNTOWN    )
SALISBURY INC., and LANE BAILEY,    )
in his individual and official    )
capacity,    )
    )
           Defendants.    )
    )
--------------------------------


DEPOSITION
OF
ROBIN CAGLE


TAKEN AT THE OFFICES OF:
LEGAL AID OF NORTH CAROLINA
122 NORTH ELM STREET, SUITE 700
GREENSBORO, NC 27401


01-31-2023
9:42 O'CLOCK A.M.


Gretchen Wells
Court Reporter

Chaplin & Associates
132 Joe Knox Ave, Suite 100-G
Mooresville, NC 28117
(704) 606-1434 | (336) 992-1954 | (919) 649-4444

Robin Cagle

1      A.   We interviewed three people.

2      Q.   And do you recall who you interviewed?

3      A.   I do not.  One was, I recall, not qualified

4  at all.

5      Q.   Okay.

6      A.   The other one -- we actually only interviewed

7  two people.  The other one did not show up for the

8  interview.

9      Q.   I'm sorry.  The other one ---

10     A.   The other one did not show up for the

11  interview.

12     Q.   Okay.

13     A.   The vice chair at the time sat in the

14  interviews with me.

15     Q.   And who was that?

16     A.   Greg Taylor.

17     Q.   And so the upshot of those interviews was

18  that you offered Larissa the job?

19     A.   I did.

20     Q.   And how did she do?

21     A.   How did she do when?

22     Q.   After she was hired.

23     A.   She did okay.

24     Q.   All right.  Did you ever have discussions

25  with her about assuming your position?

01-31-23   Hairgrove v. City of Salisbury, et al.

Case 1:21-cv-00814-CCE-JLW   Document 42-34   Filed 04/04/23   Page 3 of 22

```
 1        A.   I did.
 2        Q.   And tell me more about those discussions, if
 3   you can.
 4        A.   It was my desire that someone work with me
 5   for a good amount of time and be able to assume that
 6   position.  But I also discussed with her the fact that
 7   that was not my decision to make.
 8        Q.   Got it.  And I just want to go back for a
 9   moment to the decision to even create that position.  I
10   think what you said was that tourism had been down, and
11   you thought if you hired a person who focused on
12   marketing, it might be -- it might -- how can I say it?
13   Give it a jump start.
14        A.   Correct.
15        Q.   Is that right?
16        A.   Uh-huh, that's pretty good assessment.
17        Q.   So did Larissa have a probationary period?
18        A.   She did.
19        Q.   And how long was that?
20        A.   Ninety days.
21        Q.   How many?
22        A.   Ninety.
23        Q.   Ninety days?
24        A.   Uh-huh (yes).
25        Q.   Okay.  And I'm going to show you a document,
```

1    90 Day Probationary Evaluation.

2              MS. BATEMAN:  We're going to mark that

3    29.

4                   (PLAINTIFF'S EXHIBIT

5                   NUMBER 29 WAS MARKED

6                   FOR IDENTIFICATION)

7         Q.   (Ms. Bateman)  Does that look familiar to

8    you?

9         A.   I think this is a little -- that looks a

10   little bit different than what I recall.

11        Q.   Okay.  And tell me how it looks different.

12        A.   Because on it was a record of all of her --

13   of the time she had been late for work.

14        Q.   Okay.  And did you talk to her about that?

15        A.   I did.

16        Q.   Okay.  And what did you say to her?

17        A.   That -- just, I gave her all the times she

18   had been late for work, and that for me, that was

19   unacceptable.

20        Q.   I'm sorry.  For that ---

21        A.   That was unacceptable.

22        Q.   Okay.

23        A.   And I would appreciate her -- she had a

24   problem with time management, and I would appreciate

25   her considering that.  And we discussed it and she

01-31-23   Hairgrove v. City of Salisbury, et al.

Robin Cagle

1   agreed that she understood that, and she would work on

2   that.

3       Q.   Okay.  And did she?

4       A.   Somewhat.

5       Q.   Okay.  So ---

6       A.   We also discussed during that, that she had

7   such a desire to be perfect that she sometimes had

8   difficulty getting a job done.

9       Q.   That's fair.  So we have a saying at my

10  office, "Don't let the perfect be the enemy of the

11  good."  Have you ever heard that?

12      A.   That's a good one.  No, I haven't, but that's

13  a good one.

14      Q.   Okay.  But perfectionism is hard to cure

15  people, isn't it?

16      A.   It's what?

17      Q.   Perfectionism and desire to be perfect is

18  hard to cure in people.

19           Okay.  So the real reason I brought you here

20  today is to ---

21      A.   I'm anxious to know what that is.

22      Q.   --- is to ask you about the call you got at

23  some point from someone that -- to the effect of that

24  Larissa was suing the City of Salisbury.  Do you recall

25  that?

01-31-23    Hairgrove v. City of Salisbury, et al.

1      A.    I didn't.  Larissa told me she was suing the

2  City of Salisbury.

3      Q.    Okay.  And were those her words?

4      A.    She did.  She stood in the doorway of my

5  office and said, "I feel like I should tell you

6  something.  I have a lawsuit against the City of

7  Salisbury."

8      Q.    Okay.  And did she describe it as a lawsuit

9  or a EEOC charge?

10      A.    Well, she first said a lawsuit, and then she

11  said EEOG (sic) charge, or whatever you call that.

12      Q.    But did you ever get a call from somebody

13  that discussed that with you?

14      A.    Someone in the community mentioned it to me;

15  however, I disregard gossip.

16      Q.    I'm sorry, you?

17      A.    Gossip is just gossip to me.

18      Q.    Okay.  But did they mention it to you prior

19  to your talking to Larissa about it?

20      A.    No.

21      Q.    Okay.  So it was after Larissa told you.

22      A.    Yes.

23      Q.    And did you tell her they told you that?

24      A.    I did.

25      Q.    And do you recall what you told her?

1      A.   I just said it's -- "Larissa, it's in the
2   community, in -- small town."
3      Q.   Right.  Who is this community member?
4      A.   I would rather not say that.
5      Q.   I know, but that's the whole reason I brought
6   you here today.
7      A.   Rebecca McGee.
8      Q.   I'm sorry?
9      A.   Rebecca McGee.
10     Q.   Rebecca?
11     A.   McGee.
12     Q.   McGee.  M-c-G-e-e?
13     A.   Uh-huh (yes).
14     Q.   Okay.  And who is she?
15     A.   She was the former Main Street director.
16     Q.   Okay.  Of Lexington?
17     A.   Yes.
18     Q.   Okay.  And how did she find out, if you know?
19     A.   Well, just like the tourism community is a
20   small community, I imagine the Main Street community is
21   as well.
22     Q.   Okay.
23     A.   And Larissa had previously been part of that.
24     Q.   Did Rebecca McGee tell you how she found out?
25     A.   No, she just said, "You know, I've heard

01-31-23   Hairgrove v. City of Salisbury, et al.

1    she's suing the city of Salisbury." And I said, "Well,

2    that's neither here nor there."

3         Q.   Okay. And what was Rebecca McGee doing at

4    the time?

5         A.   She was the -- she was working for another

6    city and, to be honest with you, I think it was

7    Asheboro, but I don't recall her actual position title.

8         Q.   Okay. But she was still in Main---

9         A.   It was something -- yes.

10        Q.   She was still in the Main Street community?

11        A.   Yes.

12        Q.   So is -- the Lexington Tourism Authority,

13   it's not a Main Street entity?

14        A.   No.

15        Q.   Okay.

16        A.   And wasn't really relevant to our agency.

17        Q.   Okay. So at some point after Rebecca McGee

18   came to you, you told Larissa that word was out.

19        A.   Uh-huh.

20        Q.   And did you tell her you felt like you needed

21   to tell somebody else?

22        A.   I did. My board chair.

23        Q.   Your board chair?

24        A.   Yes.

25        Q.   And that was Cecil?

1    Rebecca McGee.

2         A.    Yes.

3         Q.    And when -- do you recall when you heard from

4    Rebecca McGee?

5         A.    It was all right around the same time,

6    actually.

7         Q.    Really?

8         A.    Yes.

9         Q.    Okay.  But Larissa definitely mentioned it

10   first.

11        A.    Yes.

12        Q.    Okay.

13        A.    Yes.  As I recall, yes.

14        Q.    Okay.  Did you ever discuss it with anybody

15   else?

16        A.    Terra Green.

17        Q.    Karen Green.

18        A.    Terra, T-e-r-r-a, Green, G-r-e-e-n, the city

19   manager, upon suggestions from Cecil.

20        Q.    Okay.  So Cecil said, "Tell Terra"?

21        A.    He said, "Discuss it with Sarah and see if --

22   Terra, to see if there -- she feels like if there is

23   any relevance to us."

24        Q.    Okay. And did you do that?

25        A.    I did.

Case 1:21-cv-00814-CCE-JLW   Document 42-34   Filed 04/04/23   Page 10 of 22

1    Q.    And what did Terra tell you?

2    A.    She suggested that I speak to an attorney

3    that we have on retainer for -- and I did.  And she

4    said she felt like it was not of any relevance to us.

5    Q.    Okay.  And who was that attorney?

6    A.    She was from Raleigh.  Davis, maybe.  Robin

7    Da -- her name was Robin.  I remember that.

8    Q.    Okay.  And you think her last name might have

9    been Davis?

10    A.    I think it might have been Davis.

11    Q.    Okay.

12    A.    But we only had one conversation.

13    Q.    You only had one discussion?

14    A.    Uh-huh (yes).

15    Q.    Okay.  Did she give you any other advice?

16    A.    Just to -- if there were any issues or

17    concerns to please document them.

18    Q.    Okay.  And so did you report that back to

19    Terra?

20    A.    I don't recall that Terra and I really had

21    another conversation about it.  Cecil, I reported back

22    to Cecil.

23    Q.    Oh, you did?

24    A.    Yes.  As my ---

25    Q.    Okay.  And what did he say?

01-31-23   Hairgrove v. City of Salisbury, et al.

1    A.   As my board chair.  He said, "Well, he felt

2    like we had done what we needed to do."

3    Q.   Okay.  So did you ever have any additional

4    discussion with Larissa about it?

5    A.   About the?

6    Q.   About the alleged suing of Salisbury?

7    A.   I did ask her to -- I did not want her to

8    tell me more than she needed to tell me or wanted to

9    tell me, I just needed to know if there was ever going

10   to be a time that I needed to protect her as an

11   employee -- as my employee.

12   Q.   Okay.  And what did she say?

13   A.   She told me about a conversation that she had

14   had.  We didn't -- after the initial time that she

15   talked to me about it, we didn't really talk about it

16   again.

17   Q.   Okay.  So did you follow the same hiring

18   process for the executive director that you did when

19   you hired Larissa?

20   A.   Hey, you know I did not hire the executive

21   director.

22   Q.   Okay.  Who hired the executive board?

23   A.   The board.

24   Q.   Okay.  So ---

25   A.   I had very little to do with that.

1      Q.   Okay, and tell me why.

2      A.   Because I work for the board and the board

3  hires the director.

4      Q.   Okay.  So you could hire a marketing

5  person ---

6      A.   Right.

7      Q.   But not your replacement?

8      A.   I could not.

9      Q.   Okay.  So did you have input into that

10  process?

11     A.   Actually, they chose not to have my input.

12     Q.   Okay.  And why is that?

13     A.   I can't really answer that question for you.

14  They interviewed me first.

15     Q.   They interviewed you first?

16     A.   They interviewed me first, all about -- it

17  was all about the job.

18     Q.   Okay.

19     A.   And then they set out looking for a director.

20     Q.   Okay.

21     A.   Yes.

22     Q.   Okay.

23     A.   The chairman appointed the vice chair to be -

24  - to head up a committee for hiring.

25     Q.   And remind me who that vice chair was again.

Case 1:21-cv-00814-CCE-JLW   Document 42-34   Filed 04/04/23   Page 13 of 22

1     A.   Meetta Simpson.

2     Q.   Can you spell that for me?

3     A.   Meeta, M-e-e-t-t-a, Simpson.

4     Q.   Simpson.

5     A.   Uh-huh (yes).

6     Q.   Was that a community -- what did Meeta do ---

7     A.   She was a travel agent.

8     Q.   Travel agent.

9     A.   Which is why she served on the board.

10    Q.   Okay.  The vice chair.

11    A.   Uh-huh (yes).

12    Q.   And were you kept apprised of the process or

13 were you completely cut out of it?

14    A.   I was completely cut out of it.

15    Q.   And were you okay with that?

16    A.   Yes, because I trusted the board members.

17    Q.   Okay.  And were you aware that Larissa

18 applied?

19    A.   Yes, I encouraged her to.

20    Q.   Okay.  And you encouraged her to apply even

21 after you knew this information about the EEOC charge?

22    A.   I didn't think it was relevant.

23    Q.   Okay.  And so do you recall when the

24 applications were submitted for the job?

25    A.   Yes, in July.

Case 1:21-cv-00814-CCE-JLW   Document 42-34   Filed 04/04/23   Page 14 of 22

Robin Cagle

1    Q.   In July.

2    A.   I announced my retirement in June.

3    Q.   In June.

4    A.   At the June board meeting.

5    Q.   And do you know how many applicants there

6  were?

7    A.   I don't.  I'm sorry.

8    Q.   Okay.

9    A.   As I said, I was not part of that.

10    Q.   So no one specifically asked you to step away

11  from the hiring process, it just happened?

12    A.   I -- yeah, it just happened.

13    Q.   Did you ever have any discussions with

14  anybody about your being involved in the hiring

15  process?

16    A.   No, not really.  I trusted them.

17    Q.   Okay.  And do you know how many people were

18  interviewed?

19    A.   I know -- I don't really know their process.

20  I was called to come to City Hall for an interview

21  process that I think was a second interview.  They had

22  narrowed down, and the reason I was called is because

23  the applicants would enter through a locked door that

24  someone would have to man, and I was asked to man that

25  door.  That was the first time I saw any of the

Case 1:21-cv-00814-CCE-JLW   Document 42-34   Filed 04/04/23   Page 15 of 22

1   applicants.

2        Q.   And who was that applicant?

3        A.   There were four of them that's -- on one day.

4        Q.   There were four?

5        A.   It was a -- yes, it was a day process.

6        Q.   Okay.  So you were there for the whole day?

7        A.   Yes.

8        Q.   So you saw each one of them come through?

9        A.   Yes, I did.

10       Q.   And were any of them Larissa?

11       A.   No.

12       Q.   So she was not interviewed for the position?

13       A.   No.

14       Q.   Did anybody ever tell you why?

15       A.   No.

16       Q.   Did you ever ask anybody why?

17       A.   No, I didn't.

18       Q.   Okay.  Was it ever discussed with anybody?

19       A.   No.

20       Q.   So how many people were on the interview

21   team?

22       A.   I think it was four.

23       Q.   Okay.  So Meeta Simpson?

24       A.   Uh-huh (yes).

25       Q.    And who else would have been?

```
1       A.   Jeannie Leonard.

2       Q.   Say that one more time.

3       A.   Jeanne Leonard.

4       Q.   Jeanne?

5       A.   Uh-huh (yes).

6       Q.   J-e-a-n-n-i-e?

7       A.   J-e-a-n-n-e.

8       Q.   "E," okay.

9       A.   Leonard.  Maria -- gosh, I don't remember

10   Maria's last name.  She was not on our board very long.

11   She was a hotelier; they kind of come and go.

12      Q.   Do you remember what she did in the

13   community?

14      A.   She was a hotelier.  She worked for Quality

15   Inn.  Maybe it was three.  That's all I can recall, are

16   those three names.

17      Q.   Okay.  And do you remember the applicants?

18      A.   The girl that was hired.

19      Q.   And who was that?

20      A.   Morgan Brookshire; she's now Brookshire-

21   Brinkle.  And I remember one more.

22      Q.   Okay.  Who?

23      A.   Stephanie Saintsing.

24      Q.   Okay.

25      A.   And that's it.
```

01-31-23   Hairgrove v. City of Salisbury, et al.

1    Q.   --- because she told you she didn't get an

2    interview?

3    A.   Yes.

4    Q.   So was it pretty much a foregone conclusion

5    at that point she was not going to be hired?

6    A.   I would say, if she did not get an interview.

7    Q.   Okay.

8    A.   I mean, in my mind.  I don't know what they

9    were thinking.

10   Q.   Right.  So do you think they should have

11   interviewed her?

12   A.   I would have.

13   Q.   Okay.  And why is that?

14   A.   Just the courtesy if nothing else.

15   Q.   Okay.  So you knew and she knew that she

16   wasn't going to be hired.

17   A.   Correct.

18   Q.   Was there ever a time at which you ended up

19   having a formal conversation with her about it?

20   A.   I don't recall us really having a formal

21   conversation about it, except that she asked me what

22   was going to happen to that marketing position.

23   Q.   And what did you say?

24   A.   I said that it was a -- you know, the board

25   considered the funds for that for a one-year position

1    and I didn't imagine that it would continue; that would

2    be up to the new director, the direction she wanted to

3    go with that.

4         Q.   And do you recall when that conversation was?

5         A.   It would have been sometime between July and

6    the September hiring.

7         Q.   Okay.

8         A.   In fact, we had several conversations about

9    it.

10        Q.   Okay.  Can you tell me more about those?  Was

11   it the same conversation ---

12        A.   Just the same conversation every time.

13        Q.   Okay.

14        A.   What's going to happen to the marketing

15   position if -- when the new director comes on.

16        Q.   Okay.  And you said it will be up ---

17        A.   Yes.

18        Q.   --- to the board?

19        A.   To the board, yes.

20        Q.   Okay.

21        A.   Correct.

22        Q.   And so at some time, did you tell Larissa who

23   got the job?

24        A.   I don't recall doing that.

25        Q.   Okay.

Case 1:21-cv-00814-CCE-JLW   Document 42-34   Filed 04/04/23   Page 19 of 22

```
 1        Q.    And the mayor?
 2        A.    Yes.  Small town.  Everybody has more than
 3   one job.
 4        Q.    Okay.  All right.  So did they give a reason
 5   why they selected, don't tell me, Morgan Brookshire?
 6        A.    They felt she was very qualified for the job,
 7   for the position.
 8        Q.    And what was her background, if you know?
 9        A.    She actually studied marketing and tourism.
10        Q.    Okay.  In school?
11        A.    Yes.
12        Q.    Had she had any marketing and tourism jobs?
13        A.    She worked for Childress Vineyards in
14   Marketing.
15        Q.    Okay.
16        A.    And she had worked at Biltmore in marketing.
17        Q.    So when was the decision made to stop funding
18   her position, Larissa's position?
19        A.    The same day.
20        Q.    The same day?
21        A.    The same day that they determined to -- they
22   voted to hire the new marketing director.
23        Q.    So in the same meeting that they hired Morgan
24   Brookshire, they said, "And we're not going to fund the
25   marketing position anymore."
```

01-31-23   Hairgrove v. City of Salisbury, et al.

1    A.   Correct.

2    Q.   And did they tell you to communicate that?

3    A.   Yes.

4    Q.   And who told you?

5    A.   The board chair.

6    Q.   Okay.  And that was Cecil.

7    A.   Cecil.

8    Q.   And so you met with her?

9    A.   I did.

10   Q.   And is that the same meeting with Angel

11  Lineberry?

12   A.   Yes, it is.

13   Q.   Okay.  And what did you say?

14   A.   I -- there was a preprepared letter that I

15  was to share with her, and I just shared that that day

16  the job had been -- the board had discussed and voted

17  to eliminate the position, effective immediately, upon

18  hiring the new director.

19   Q.   All right.

20            MS. BATEMAN:  We're going to mark that

21  20 -- no, 30.

22                 (PLAINTIFF'S EXHIBIT

23                 NUMBER 30 WAS MARKED

24                 FOR IDENTIFICATION)

25   Q.   (Ms. Bateman)  I'm going to show you that

01-31-23   Hairgrove v. City of Salisbury, et al.

1   letter, and ask you if that looks like the letter?

2        A.   Yes, that looks like the letter.

3        Q.   Okay.

4             MR. ADAMS:  Do you have other copies?

5             MS. BATEMAN:  I don't, but I'm going to

6   get you some.

7             MR. ADAMS:  Okay.

8        Q.   (Ms. Bateman)  And so that was her last day

9   of employment?

10        A.   Correct.

11        Q.   She signed that letter?

12        A.   She did.

13        Q.   And went home?

14        A.   She did.

15        Q.   And took her stuff?

16        A.   She did.

17        Q.   And that was it?

18        A.   Yes.

19        Q.   Okay.  I mean, did you ever talk to her after

20   that?

21        A.   Maybe emailed.

22        Q.   Okay.  All right.  I mean, do you have any

23   regrets about how all that went down?

24        A.   I was just working under the advisement of

25   the board.

01-31-23   Hairgrove v. City of Salisbury, et al.