IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LARISSA HARPER HAIRGROVE,        )
                                 )
            Plaintiff,           )
                                 )
      v.                         )        1:21-CV-814
                                 )
CITY OF SALISBURY,               )
DOWNTOWN SALISBURY, INC.,        )
and LANE BAILEY, in his          )
individual and official capacity, )
                                 )
            Defendants.          )

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, Chief District Judge.

The plaintiff Larissa Hairgrove has sued her former employer, the City of

Salisbury, the City Manager, Lane Bailey, and Downtown Salisbury, Inc., a non-profit

with which she worked while employed by the City.  She asserts statutory and

constitutional claims of sex discrimination and retaliation, as well as wage and hour

violations under the state and federal law.  Because she offers no evidence creating

disputed questions of material fact, the defendants' motions for summary judgment will

be granted.

## I.      Applicable Legal Standard and the Unsigned "Declaration"

A court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023).

The moving party has the initial burden of demonstrating the absence of any material issue of fact; once the moving party meets its initial burden, the non-moving party must come forward with evidence demonstrating the existence of a genuine issue of material fact requiring a trial. *Id.* at 709–10; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "[T]he nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, citing to particular parts of the materials of record." *United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 252 (4th Cir. 2022) (cleaned up); *see also Celotex Corp.*, 477 U.S. at 324 (non-movant must respond to a motion for summary judgment with affidavits or other evidence).

Here, Ms. Hairgrove's consolidated response brief repeatedly cites to an unsigned and incomplete declaration, filed at Doc. 47. *See, e.g.*, Doc. 65 at 1–5, 10, 14–16. Some weeks ago, her counsel filed a motion to replace that declaration with a different declaration, signed by Ms. Hairgrove[1] under oath, because counsel had accidentally filed a draft version. Doc. 56. The Court granted the request to replace the unsigned declaration at Doc. 47 with a corrected and signed declaration at Doc. 56-2. *See* Doc. 57.

---

[1] Some of the underlying documentation refers to the plaintiff as Larissa Harper. *See, e.g.*, Doc. 47-1. She has since changed her name to Larissa Harper Hairgrove. For clarity, the Court always refers to the plaintiff as Ms. Hairgrove.

2

Yet Ms. Hairgrove's brief does not cite to the signed declaration at Doc. 56-2 once. *See generally* Doc. 65. The unsigned document is not identical to the signed declaration. *Compare, e.g.*, Doc. 47 at ¶ 3 (discussing pre-employment communications and start date), *with* Doc. 56-2 at ¶ 3 (discussing history of Salisbury, North Carolina); Doc. 47 at ¶ 84 (discussing an email Ms. Hairgrove sent Mr. Kyle on June 14, 2019), *with* Doc. 56-2 at ¶ 84 (discussing events Ms. Hairgrove attended on November 23 and 24, 2018); Doc. 47 at ¶ 154 (discussing a question an attorney asked Ms. Hairgrove during a deposition), *with* Doc. 56-2 at ¶ 154 (discussing a meeting with Mr. Kyle on June 18, 2019). The specific citations in Ms. Hairgrove's briefing match up with the unsigned draft declaration and not the final signed declaration.

In evaluating a motion for summary judgment, the Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (cleaned up); *see also Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 396 (4th Cir. 1994) (noting that a district court would be "well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate"); *Hughes v. B/E Aerospace, Inc.*, No. 12-CV-717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do.").

Here, the Court will disregard the unsigned draft declaration at Doc. 47 because Ms. Hairgrove's counsel explicitly asserted that it was a draft, *see* Doc. 56 at ¶ 3; because it contains obvious mistakes, strike-throughs, blanks, questions, and internal notes, *see,*

Case 1:21-cv-00814-CCE-JLW   Document 69   Filed 09/14/23   Page 3 of 24

*e.g.*, Doc. 47 at ¶¶ 10, 30, 32, 51, 55, 58, 64–65, 79, 101, 109, 118; and because it was

not signed under oath. *Id.* at 112.

Nor will the Court examine the signed but uncited version at Doc. 56-2. That

version is over 150 pages long, its paragraph numbers do not consistently match up to the

unsigned cited document, and the Court has no duty to excavate any potentially material

facts from that massive exhibit.[2]

Otherwise, the Court will consider the evidence of record, including Ms.

Hairgrove's deposition,[3] and will view the evidence in the light most favorable to Ms.

Hairgrove.

## II.     Overview of Relevant Facts

In 2017, defendant Lane Bailey, City Manager, hired Ms. Hairgrove as the

Downtown Development Director for the city of Salisbury. *See* Doc. 38-1 at 24;[4] Doc.

---

[2] The Court has considered whether to give Ms. Hairgrove another opportunity to correct her briefing. But she has already been given several chances to adequately brief the motions. *See* Doc. 45 (granting plaintiff more time to file briefs even though she had not shown good cause); Doc. 57 (accepting plaintiff's late filings and allowing her to replace incorrect documents with corrected versions); Doc. 61 (noting that plaintiff has "one last opportunity to present her case within the confines of the rules"); Doc. 63 (striking erroneous declaration from the record and allowing plaintiff a chance to file a consolidated response brief). It would not be fair to the defendants, who would yet again have to respond. In its discretion, the Court declines to prolong the proceedings.

[3] In their first round of reply briefs, the defendants objected to consideration of the unsigned declaration, contending that it was inconsistent with Ms. Hairgrove's deposition. *See* Doc. 58 at 1–2, 6; Doc. 59 at 5 n.4; Doc. 60 at 2 n.2. The defendants are correct that declarations under oath that differ from sworn deposition testimony are generally not considered, but the Court need not address this concern, as it is not considering the unsigned declaration for other reasons.

[4] The Court has used the pagination appended by the CM-ECF system for this and other deposition cites, not the internal pagination used by the court reporters transcribing the deposition.

47-1. Ms. Hairgrove's employment began in October 2017. *See* Doc. 38-1 at 9; Doc. 38-3; Doc. 38-4; Doc. 38-7 at 1.

Ms. Hairgrove reported to Zack Kyle, the Assistant City Manager. *See* Doc. 38-2 at 1; Doc. 47-4. Under an agreement between the City and Downtown Salisbury Incorporated Nonprofit (DSI), Ms. Hairgrove worked closely with the DSI board and was responsible for DSI's office management and day-to-day operations. Doc. 38-2 at 1–2.

### A. Concerns About Ms. Hairgrove's Employment and Performance

Ms. Hairgrove's tenure at the City was rocky. Throughout her employment, Mr. Kyle and DSI Board members raised concerns about her job performance. In December 2018, Mr. Kyle issued a disciplinary action report to Ms. Hairgrove for "lateness" and "failure to follow instructions" among other offenses. *See* Doc. 38-9. A few months later in a performance review, Mr. Kyle gave her unsatisfactory ratings in four categories, including "relationships" and "planning and organization." Doc. 38-10. Her next evaluation noted improvement but was only slightly better. *See* Doc. 38-11.

In early 2019, some DSI board members expressed concerns to Mr. Kyle about Ms. Hairgrove's performance, specifically her timeliness and efficiency, and they asked that she be terminated. Doc. 38-13. In June 2019, Mr. Kyle issued a disciplinary action report to Ms. Hairgrove for "lateness," "failure to follow instructions," and "unsatisfactory work quality." Doc. 38-12 at 1. He listed specific concerns with Ms. Hairgrove's responsiveness to emails that had resulted in an "audit" of her email inbox and suspended her for three days for "neglect of duties." *Id.*

5

Ms. Hairgrove, for her part, was also dissatisfied with her employment. "[F]rom almost day one," Ms. Hairgrove felt as though DSI and its board of directors were "working against" her. Doc. 38-1 at 9. There was some uncertainty about the exact contours of Ms. Hairgrove's role, *see* Doc. 48 at ¶¶ 14, 28, 32, Doc. 47-19 at 4, 12–13, 18, and both the City and DSI expected her to spend almost all of her time on their projects so that, as summarized by someone who worked for her, Ms. Hairgrove was essentially "working two full-time jobs." Doc. 50 at ¶ 14; *see also* Doc. 38-1 at 8–9, 24; Doc. 50 at ¶¶ 5, 22, 24; Doc. 48 at ¶¶ 14, 25; Doc. 49 at ¶¶ 10, 23–24; Doc. 47-7 at 1. She struggled to keep up with expectations, even while working on evenings and weekends. *See* Doc. 47-21; Doc. 50 at ¶ 34; Doc. 47-17.

DSI Board members were dismissive or demeaning towards Ms. Hairgrove. Doc. 38-1 at 6, 8–10, 12, Doc. 47-8 at 2–3. Ms. Hairgrove felt that "at times," Mr. Kyle bullied her, Doc. 38-1 at 10–11, *see also* Doc. 50 at ¶ 16, and she and at least one other employee believed that she was being subjected to treatment, such as email audits, that other city department heads were not. *See, e.g.*, Doc. 38-1 at 13; Doc. 50 at ¶ 16.

**B. February 25, 2020 Board Meeting and Its Aftermath**

On February 25, 2020, Ms. Hairgrove attended the DSI board's regular monthly meeting in possession of a City recording device, which was typically used in monthly meetings to make it easier to write up the minutes. Doc. 38-14 at 1–2; Doc. 47-8 at 4. At the end of the meeting, Board Chair Whitney Williams called a closed session without any City staff to discuss the partnership between the City and DSI. Doc. 38-14 at 1; *see*

6

Doc. 47-8 at 1–2.  Ms. Hairgrove left before the closed session, but she inadvertently left the recording device in the meeting.  Doc. 47-8 at 4.

Later that day, one of the DSI board members, Diane Young, emailed Ms. Hairgrove and told her that she had the recording device.  *Id.*; Doc. 38-14 at 2–3, 9.  Ms. Hairgrove told Ms. Young that she needed to get the device back that day and noted:  "If the recording was still running after City staff left, and you are worried about that conversation being overheard, I'll be glad to play the recording until we get to that point and erase it in front of you."  Doc. 38-14 at 10.  Ms. Young returned the device to Ms. Hairgrove sometime in the next couple of days, purportedly without the recording of the closed session.  *Id.* at 5; Doc. 47-8 at 5.

On February 27, Ms. Hairgrove realized that the recording device still contained a recording of the closed session.  Doc. 47-8 at 5.  Mr. Kyle "encouraged [Ms. Hairgrove] to listen to the recording," *id.*, which she did.  The next week, Mr. Kyle told Ms. Williams that Ms. Hairgrove had listened to the recording.  *Id.*

Ms. Williams and other DSI board members were upset.  *See generally* Doc. 38-14.  On March 17, they sent a letter to city officials about Ms. Hairgrove's "deliberate breach of the Board's trust."  *Id.* at 1.  The board members wrote that Ms. Hairgrove's "actions were dishonest" and "show[ed] a lack of integrity and good character."  *Id.* at 7.  They asserted that Ms. Hairgrove should have been suspended and that the board "ha[d] been placed in a difficult situation of continuing to work with an Executive Director who we hold in contempt."  *Id.*  They did "not see a workable scenario where the existing Board remains intact with the current Executive Director."  *Id.*

7

On April 12, Ms. Hairgrove submitted a written response, including a "timeline, attachments, and statements" to "clear [her] name," to Mr. Kyle and Brianna Price, who worked in the City's human resources department. *See* Doc. 47-8 at 1. She argued that the closed session was illegal, *id.* at 1, 7–9, and complained of bullying, harassment, and manipulation from DSI board members. *Id.* at 2–3.

### C. Mr. Bailey's Performance Review and Ms. Hairgrove's Resignation

After the Board's March 2020 complaints, Mr. Bailey required Ms. Hairgrove to report directly to him. Doc. 42-12 at 1. He conducted a performance review of Ms. Hairgrove and as part of that process "solicited performance evaluations from the DSI board members that [were] not City employees." *Id.*; *see also* Doc. 38-2 at 1 § 1.D. Thirteen board members evaluated Ms. Hairgrove's performance in several areas and in total gave her "39 ratings of below expectations, 35 ratings of meets expectations, and only 4 ratings of exceeds expectations." Doc. 42-12 at 1 (cleaned up); *see also* Doc. 47-19 (the evaluations). In other words, Ms. Hairgrove received just as many "below expectations" ratings as she did "meets" or "exceeds expectations" ratings.

Some of the evaluations included positive comments on Ms. Hairgrove's performance, *see, e.g.*, Doc. 47-19 at 13–15, 17, or referenced the difficulties Ms. Hairgrove faced in her job for no fault of her own and the lack of clarity as to her role and responsibilities. *See, e.g.*, *id.* at 4, 12–15, 18, 42. But several of the board members referenced the incident with the recording device in their evaluations. *See, e.g.*, *id.* at 13, 31, 34–35. One board member wrote that "[h]aving to carry on with her as ED would unquestionably lead to a series of resignations from the Board," *id.* at 5, and another said

8

that "[t]he board has lost all confidence and trust and is no longer willing to work with her." *Id.* at 3.

Mr. Bailey also solicited evaluations about Ms. Hairgrove's department from the City's Parks and Recreation, Communications, and Planning departments. Doc. 42-12 at 1. According to Mr. Bailey, those evaluations were similarly negative. *Id.*

In June 2020, Mr. Bailey met with Ms. Hairgrove to discuss his concerns with her employment. *See id.* The next business day, June 22, he notified her by letter that he was considering dismissing her "based on a pattern of performance deficiencies," *id.*, and setting a meeting on June 24 to give Ms. Hairgrove an opportunity to respond before he made a final decision about her employment. *Id.* at 3.

The next day, June 23, Ms. Hairgrove informed Mr. Bailey and Ms. Kennerly that she was resigning from her position "due to a hostile work environment and work place harassment." Doc. 42-8 at 1; *see* Doc. 38-17; Doc. 38-1 at 2, 21–22. Mr. Bailey acknowledged receipt of her resignation on June 24, 2020. Doc. 38-17. Ms. Hairgrove's position was temporarily filled by Latoya Price, who had worked with Ms. Hairgrove, and then permanently filled by Sada Troutman. Doc. 38-1 at 10. Both are women.[5]

Additional facts will be discussed as they become relevant.

## III. Discussion

### A. Title VII and Section 1983

---

[5] In her deposition, Ms. Hairgrove refers to each with "she/her" pronouns. *See, e.g.*, Doc. 38-1 at 10.

Ms. Hairgrove asserts three Title VII claims against the City and Mr. Bailey in his official capacity.[6]  First, she claims she was subject to sex discrimination during her employment and alleges both disparate treatment and a hostile work environment. Second, she brings a retaliation claim, asserting that the City terminated her employment in retaliation for her complaints of discrimination.  Finally, she brings a retaliation claim alleging that the City and Mr. Bailey sabotaged her employment with the Lexington Tourism Authority because she filed an EEOC charge against them.

Ms. Hairgrove also brings a § 1983 claim against the City and Mr. Bailey in his individual and official capacities for violations of equal protection.  The Court discusses the Title VII and § 1983 claims together, as Ms. Hairgrove did in the briefing; in this context the law for each is the same.  *See Pitts v. Baltimore Police Dep't*, No. 22-CV-1404, 2023 WL 3158705, at *6 n.7 (D. Md. Apr. 28, 2023) (noting that the elements to establish a retaliation claim are the same under Title VII and § 1983); *Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and . . . § 1983, the elements of the required prima facie case are the same."); *Young v. Hous. Auth. of Baltimore City*, No. 21-CV-996, 2022 WL 4484221, at *8 (D. Md. Sept. 27, 2022) (collecting cases); *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004).

### 1.  Sex Discrimination – Disparate Treatment

To make out a disparate treatment claim of sex discrimination under Title VII or § 1983, Ms. Hairgrove may either provide direct evidence of discrimination or rely on the

---

[6] In 2022, the Court dismissed Ms. Hairgrove's Title VII claims against DSI.  Doc. 20.

Case 1:21-cv-00814-CCE-JLW   Document 69   Filed 09/14/23   Page 10 of 24

*McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649 (4th Cir. 2021); *Love-Lane*, 355 F.3d at 786; *Brinston v. City of Easley*, No. 20-CV-3660, 2022 WL 19404465, at *5 (D.S.C. Aug. 5, 2022). Ms. Hairgrove points to no direct evidence of sex discrimination. *See generally* Doc. 65.

Under the *McDonnell Douglas* framework, Ms. Hairgrove has the initial burden to establish a prima facie case of employment discrimination by showing that: "(1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination, including because the employer left open the position or replaced the plaintiff with someone outside the protected class." *Sempowich*, 19 F.4th at 649–50.

To the extent Ms. Hairgrove is asserting a disparate treatment claim, it will be dismissed, both because she has abandoned it and on the merits. While she has offered evidence that she is a member of a protected class, she has not responded to defense arguments directed specifically to the remaining elements. Nowhere in her brief does she discuss whether she suffered an adverse action when she resigned, for example, or whether she was fulfilling her employer's legitimate expectations at the time.[7] She has

---

[7] The City and Mr. Bailey in his official capacity specifically argued that Ms. Hairgrove did not meet her burden to establish the second, third, or fourth element. In her briefing directed to both the Title VII and § 1983 claims, Doc. 65 at 37, she was silent as to these elements.

thus abandoned any such claim. *See Stanley v. Wentworth Voluntary Fire Dep't, Inc.*, No. 10-CV-380, 2011 WL 3665009, at *9 (M.D.N.C. Aug. 17, 2011) (Mag. J., opinion, order, and recommendation); *Barclay v. USAA Gen. Indem. Co.*, No. 20-CV-249, 2023 WL 2773540, at *2 (E.D.N.C. Feb. 23, 2023) (Mag., J., memorandum and recommendation), *adopted*, 2023 WL 2733398 (E.D.N.C. Mar. 31, 2023).

On the merits, and in the alternative, the evidence summarized earlier establishes that Ms. Hairgrove resigned and that she was not meeting her employer's legitimate expectations. She has failed to rebut that evidence with any evidence to the contrary. Similarly, her position was filled by women, and she has pointed to no circumstances raising a reasonable inference that her employment was terminated based on her sex.

### 2. Sex Discrimination – Hostile Work Environment

Title VII and § 1983 prohibit employers from "subjecting an employee to a hostile work environment." *See Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 781 (4th Cir. 2023). As the Fourth Circuit has recently explained, "[a] hostile work environment exists only when the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that it would reasonably be perceived, and is perceived, as hostile or abusive." *Id.* (cleaned up). Courts "apply a four-part test to see if this standard is met." *Id.*

Under this test, Ms. Hairgrove must show (1) that she experienced unwelcome harassment; (2) that the harassment was based on her sex; (3) that the harassment was so "severe or pervasive" that it altered the conditions of her employment and created an abusive work environment; and (4) that the harassment was imputable to her employer.

Case 1:21-cv-00814-CCE-JLW   Document 69   Filed 09/14/23   Page 12 of 24

*See id.*; *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011).  "While the first element is subjective, the rest of the test is made up of objective components based on a 'reasonable person' standard."  *Robinson*, 70 F.4th at 781–82.  And to determine whether an environment was hostile "the Court must look at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 118 (4th Cir. 2021) (cleaned up).

The evidence shows that Ms. Hairgrove regularly had disagreements with her supervisor and various members of the DSI board.  But Ms. Hairgrove points to no evidence tending to prove that these disagreements were a result of harassment because of her sex.  It does not violate Title VII for an employer to have unreasonable expectations of an employee.

Ms. Hairgrove claims that the City treated her differently than male department heads, but she does not provide evidence to support this claim.  *See* Doc. 65 at 6–7 (contending that Mr. Bailey and Mr. Kyle treated her differently than other male department heads but with no citation to any evidence in support); *id.* at 20 (same); *id.* at 13–14 (same, citing to defendant's responses to discovery requests).  Conclusory assertions and opinions are insufficient to create a disputed question of fact.[8]  *See* Fed. R.

_____

[8] In its review of the record, the Court did independently identify an isolated comment arguably related to sex:  a comment by a DSI board member that Ms. Hairgrove "needed to be more like" a certain man who worked for the City and who wore "nice suits."  Doc. 38-1 at 10.

13

Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record"); *see also Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) ("A party opposing a properly supported motion for summary judgment . . . must set forth specific facts showing that there is a genuine issue for trial." (cleaned up)); *Thomas v. JPMorgan Chase*, No. 5-CV-1573, 2006 WL 8456581, at *3 (D. Md. June 15, 2006).

Nor could any reasonable jury find that the harassment was "so severe and pervasive" that it altered the conditions of Ms. Hairgrove's employment and created an abusive work environment. The evidence shows that Mr. Kyle criticized Ms. Hairgrove's work performance on numerous occasions. Doc. 38-9; Doc. 38-10; Doc. 38-11; Doc. 38-12. It is undisputed that Ms. Hairgrove and Mr. Kyle's relationship was strained and that they often had disagreements about how Ms. Hairgrove was doing her job and how the department was run. *See, e.g.*, Doc. 47-10 at 2; Doc. 47-16; Doc. 38-8 at 4, 12; Doc. 38-1 at 7, 10–11, 16–17. And there is evidence in the record of heated exchanges between Ms. Hairgrove and DSI board members, *see* Doc. 38-1 at 8–10, 12, and that Ms. Hairgrove felt board members were harassing her, *id.* at 9, and treating her as a "scapegoat," *id.* at 6, or "punching bag." *Id.* at 9.

---

This isolated incident does not rise to the level of a hostile work environment based on sex. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (en banc) (noting that "viable hostile work environment claims often involve repeated conduct," but "an isolated incident of harassment can amount to" discrimination "if that incident is extremely serious"); *see also Cuthbertson v. First Star Logistics, LLC*, 638 F. Supp. 3d 581, 593 (W.D.N.C. Nov. 1, 2022).

But "[e]valuation and criticism of one's work performance, while perhaps unpleasant, is not abusive." *Holloway v. Maryland*, 32 F.4th 293, 301 (4th Cir. 2022). Ms. Hairgrove's "disagreement with the decisions or management style of" Mr. Kyle "does not rise to the level of a hostile workplace claim." *Valluzzi v. Azar*, No. 18-CV-3602, 2020 WL 128457, at *8 (D. Md. Jan. 10, 2020) (cleaned up); *see also Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019) ("[C]allous behavior by one's superiors[] or a routine difference of opinion and personality conflict with one's supervisor are not actionable under Title VII."). Nor does the DSI board's "rudeness, anger, and hostility" towards Ms. Hairgrove create a hostile workplace claim. *Valluzzi*, 2020 WL 128457, at *9; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) ("[E]ven incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard."); *Evans*, 936 F.3d at 192 ("[R]ude treatment from coworkers . . . [is] not actionable under Title VII."); *Britt v. DeJoy*, No. 20-1620, 2022 WL 4280495, at *3 (4th Cir. 2022) (per curiam) (unpublished).

Because no reasonable jury could find on the record in this case that Ms. Hairgrove was subjected to "severe and pervasive" harassment because of her sex, the defendants' motion for summary judgment will be granted on these claims.

### 3. Retaliation – Termination of Employment

Ms. Hairgrove claims that she was retaliated against for complaining about a hostile work environment. Ms. Hairgrove does not have direct evidence of retaliation and is instead proceeding under the *McDonnell Douglas* burden-shifting framework. *See Walton v. Harker*, 33 F.4th 165, 177 (4th Cir. 2022). Under this framework, Ms.

15

Hairgrove is required to show that "(1) she engaged in a protected activity, (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action." *Id.* (cleaned up); *see also Sempowich*, 19 F.4th at 653; *Pitts*, 2023 WL 3158705, at *6 n.7 (noting that the elements to establish a retaliation claim are the same under Title VII and § 1983).

While Ms. Hairgrove has offered evidence that she complained about her work environment, she has not offered any clear evidence that she "engaged in a protected activity" by complaining about sex discrimination or a hostile work environment based on her sex. *See* Doc. 38-1 at 10–11, 13; *see generally* Doc. 65. In her complaint, she seems to identify her response letter to Mr. Kyle and Ms. Price about the recording device incident as the protected activity. *See* Doc. 12 at ¶ 44. But nowhere in this letter, Doc. 47-8, does she mention discrimination based on any protected status. *See McIver v. Bridgestone Ams., Inc.*, 42 F.4th 398, 411 (4th Cir. 2022) (holding that the plaintiff's failure to put her employer on notice of the plaintiff's belief that unwelcome conduct was on account of protected status defeated retaliation claim).

Even if she has shown protected activity, the City and Mr. Bailey are entitled to summary judgment. Ms. Hairgrove claims several times that she was fired from her employment, *see* Doc. 65 at 26–27, 33–35, but the uncontradicted evidence shows that she resigned. *See* Doc. 38-17; Doc. 38-18; Doc. 38-1 at 2, 21–22. "[A]n employee's voluntary resignation does not, as a matter of law, constitute an adverse" action sufficient to sustain a retaliation claim. *High v. R & R Transp., Inc.*, 242 F. Supp. 3d 433, 446 (M.D.N.C. 2017); *see, e.g., Holleman v. Colonial Heights Sch. Bd.*, 854 F. Supp. 2d 344,

16

355 (E.D. Va. 2012); *Willis v. Cleveland Cnty.*, No. 18-CV-292, 2020 WL 3578297, at *8 (W.D.N.C. July 1, 2020).

To the extent that the complaint and briefing can be read as claiming that Ms. Hairgrove was constructively discharged, the evidence is insufficient to show that her working conditions became "so intolerable that a reasonable person" in her position "would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (cleaned up); *see also Shomo v. Napa Mgmt. Servs. Corp.*, No. 22-CV-989, 2022 WL 17477066, at *3 (E.D. Va. Dec. 6, 2022). Choosing to resign when faced with unsatisfactory work conditions and termination based on poor performance is not a constructive discharge.

### 4. Retaliation – Sabotaging Future Employment

Ms. Hairgrove also claims that the City and Mr. Bailey sabotaged her employment with the Lexington Tourism Authority (LTA) after she filed an EEOC charge of discrimination against the City. Ms. Hairgrove does not have direct evidence of retaliation and is again proceeding under the *McDonnell Douglas* burden-shifting framework, discussed *supra* in Part III.A.3.

In the fall of 2020, Ms. Hairgrove started a new job as the Tourism Marketing Coordinator at LTA. *See* Doc. 38-1 at 18–19; Doc. 42-9. She reported to Robin Bivens, the Executive Director.

Shortly after starting with LTA, Ms. Hairgrove filed an EEOC charge of discrimination against the City, *see* Doc. 38-20, and in April 2021 the charge was mediated. *See* Doc. 38-1 at 18. At some unidentified point, Ms. Hairgrove informed Ms.

Case 1:21-cv-00814-CCE-JLW   Document 69   Filed 09/14/23   Page 17 of 24

Bivens about the EEOC charge. *See id.* at 18–19; Doc. 38-15 at 3. Afterwards, Ms. Bivens also heard about the lawsuit in what she characterized as meaningless gossip. Doc. 38-15 at 3–4. Ms. Bivens informed some coworkers and spoke with an attorney about any potential issues. *Id.*

Ms. Bivens announced that she was retiring from the Executive Director position in June 2021. *Id.* at 5. The LTA board established a committee to hire a new Executive Director. *Id.* at 4. Ms. Hairgrove, with Ms. Bivens' encouragement, applied for the position but did not get it. *Id.* at 5. In August of 2021, Ms. Hairgrove's position was eliminated from the LTA. Doc. 38-16.

Ms. Hairgrove claims that "there are genuine issues of material fact as to whether the City is responsible for the . . . dissemination of the rumor in the Main Street community which resulted in [her] losing her job for the Lexington Tourism Authority." Doc. 65 at 37. She offers no other argument and points to no evidence supporting this claim. *See generally id.* She has not provided any direct evidence of retaliation nor met her burden to establish a prima facie case of retaliation under the *McDonnell-Douglas* framework. Summary judgment for the City and Mr. Bailey is appropriate.

**B. First Amendment Claim**

In her revised briefing, Ms. Hairgrove addresses a purported First Amendment retaliation claim. Doc. 65 at 25–35. There is no such claim in her complaint, Doc. 12, and a complaint cannot be amended in a brief. *See S. Walk at Broadlands Homeowners Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d.175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing").

18

Additionally, in making this argument Ms. Hairgrove violated a Court order. Because her first set of response briefs violated the Local Rules and this Court's orders, *see* Doc. 61, Doc. 63, the Court struck them from the record and allowed Ms. Hairgrove a chance to file a consolidated response brief. Doc. 63. The Court specifically ordered Ms. Hairgrove to not "make any new argument" in this consolidated brief and to "limit her arguments to those made in her original briefing." *Id.* at 2. She had not made any First Amendment argument in her original briefing. *See* Doc. 56-3; Doc. 52; Doc. 53.

Ms. Hairgrove has made no motion to amend her complaint or otherwise persuasively explained why she should be able to assert the First Amendment claim for the first time in a revised summary judgment brief. There being no First Amendment claim pending, the Court need not address this claim.

## C. Wage and Hour Violations

Ms. Hairgrove asserts North Carolina Wage and Hour Act (NCWHA) claims against all defendants. She also asserts wage and hour violations of the federal Fair Labor Standards Act (FLSA) against the City and Mr. Bailey in his official and individual capacities.[9] Because no reasonable jury could find, based on the evidence of record, that Ms. Hairgrove was not an exempt executive employee, summary judgment will be granted on these claims.

---

[9] Ms. Hairgrove's FLSA claims against DSI have been dismissed. Doc. 20.

Both the FLSA and the NCWHA[10] require an employer to "pay each employee who works longer than 40 hours in any workweek at a rate of not less than time and one half of the regular rate of pay of the employee for those hours in excess of 40 per week." N.C. Gen. Stat. § 95-25.4(a); *see* 29 U.S.C. § 207(a)(1).  But these provisions do not apply to certain "executive" employees.  *See* 29 U.S.C. § 213(a)(1); N.C. Gen. Stat. § 95-25.14(b)(4) (adopting the definitions of the FLSA for this exemption).  Under the FLSA, an exempt executive employee is any employee:

> (1) Compensated on a salary basis . . . at a rate of not less than $684 per week . . .;
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more other employees; and
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

This exception must be narrowly construed, and the defendants have the burden to prove it applies.  *See Pugh v. Lindsay*, 206 F.2d 43, 46 (4th Cir. 1953); *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 619 (E.D. Va. 2014).  "The question of how an

---

[10] The NCWHA's overtime provision does not apply to "any city, town, county, or municipality, or any State or local agency or instrumentality of government."  N.C. Gen. Stat. § 95-25-14(d).  As such, Ms. Hairgrove's NCWHA claims against the City and Mr. Bailey in his official capacity are likely barred.  But these defendants did not raise this argument until their reply brief, and, generally, parties are not permitted to raise new arguments in a reply brief.  *See Tyndall v. Maynor*, 288 F.R.D. 103, 108 (M.D.N.C. 2013).  The Court need not resolve this issue because, as explained *infra*, Ms. Hairgrove was correctly classified as an exempt employee.

employee spends [her] time is a question of fact, while the question of whether [her] activities fall within an exemption is a question of law."  *Hantz*, 11 F. Supp. 3d at 619.

Ms. Hairgrove's offer letter described her position as "salary/exempt."  Doc. 47-1 at 1.  Shortly after beginning employment, Ms. Hairgrove received a copy of the City's Employee Handbook and received an orientation covering its contents, Doc. 38-4, Doc. 38-1 at 42, which included the policy that exempt employees would not receive overtime compensation.  Doc. 38-5 at 2; Doc. 38-1 at 42.  Ms. Hairgrove also signed a statement of understanding acknowledging that she had "been told the FLSA status of [her] position" and that she understood "the overtime policy as it relate[d]" to her.  Doc. 38-3. Throughout her employment, she was paid on a salary basis and was not paid overtime wages for hours she worked past 40 each week.

Ms. Hairgrove now contends that the defendants misclassified her and that she was not exempt from the overtime provisions.  She does not dispute that she met the first two requirements of the exemption, *see* Doc. 65 at 41, and focuses her argument on whether she "customarily and regularly direct[ed] the work of two or more other employees" and had "the authority to hire or fire other employees" or if her recommendations were given particular weight.

"The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant.  Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."  29 C.F.R. § 541.701. Ms. Hairgrove's own testimony shows that she supervised two full-time staff members

21

"normally and recurrently" starting in October of 2018. *See, e.g.*, Doc. 38-1 at 6 (Ms. Hairgrove "had a staff" that she "would delegate some tasks to"); Doc. 42-7 at 6 (same); Doc. 38-1 at 27 (Ms. Hairgrove "managed two full-time staff members"); Doc. 42-7 at 44 (same); Doc. 38-1 at 29 (stating she "finally" got "two full-time staff" members in October 2018); Doc. 42-7 at 52 (same).

Ms. Hairgrove also had the ability to hire other employees or her suggestions and recommendations during the hiring process were given "particular weight" on hiring decisions. *See* 29 C.F.R. § 541.105 (providing guidance on "determin[ing] whether an employee's suggestions and recommendations are given 'particular weight'"). She was directly involved in the hiring of both full-time staff members she supervised. For example, when hiring for the administrative staff member, Ms. Hairgrove was "given a pool of candidates" to choose from, and she reviewed their resumes, interviewed the candidates, and chose which applicant to hire. Doc. 42-7 at 45–46; Doc. 38-1 at 27–28. She also prepared a public posting to solicit applicants for the marketing position, reviewed all the applications, was involved in interviewing candidates, and was a part of the panel that ultimately decided who to hire. Doc. 42-7 at 47–51; Doc. 38-1 at 28–29.

Ms. Hairgrove has not provided evidence sufficient to create a genuine dispute of material fact as to whether she was an exempt executive employee. Summary judgment for the defendants is proper.

Ms. Hairgrove contends that the defendants have waived this affirmative defense by not pleading it in their answer. Doc. 65 at 37–40. But all defendants asserted in their answers that Ms. Hairgrove was an exempt employee." Doc. 18 at ¶ 19; Doc. 21 at ¶ 19.

22

And "an affirmative defense is not waived when it is first raised in a pre-trial dispositive motion absent unfair surprise or prejudice to the plaintiff." *Morrissey v. CES Comput. Enhancement Sys., Inc.*, No. 21-CV-899, 2023 WL 2432838, at *3 (D. Md. Mar. 9, 2023) (cleaned up). Ms. Hairgrove has not demonstrated that allowing this defense causes her prejudice or unfair surprise, as it has been obvious from the beginning of this case that Ms. Hairgrove's "exempt" status was at issue. *See* Doc. 12 at ¶¶ 19 (second amended complaint alleging that she was "theoretically employed as an exempt department head"), 61 (alleging that the defendants willfully misclassified Ms. Hairgrove as exempt); *Morrissey*, 2023 WL 2432838, at *3 ("[T]he very nature of this lawsuit, which involves a retail employee operating under a seemingly commission-based employment agreement, should have provided [the plaintiff] with ample notice that the bona fide commission exemption would be at issue."). There has been no waiver of this defense.

### D. North Carolina Constitution

Ms. Hairgrove asserts a state common-law claim against the defendants for violations of the North Carolina Constitution. She provides no briefing on this claim. *See generally* Doc. 65. "Failure to address a defendant's arguments for summary judgment in an opposition brief is itself sufficient grounds to grant the defendant's motion." *Pang v. Adult Day Health, Inc.*, No. 19-CV-2283, 2022 WL 2869161, at *7 (D. Md. July 21, 2022) (cleaned up); *see also Stanley*, 2011 WL 3665009, at *9; *Barclay*, 2023 WL 2773540, at *2. Ms. Hairgrove has abandoned this claim and not met her burden to respond to the defendants' showing, so summary judgment will be granted.

23

## IV.    Conclusion

Ms. Hairgrove has not made out a prima facie case of sex discrimination under Title VII or § 1983. Nor has she met her burden to show that she was subjected to a hostile work environment or that any defendant retaliated against her for complaining about sex discrimination. Summary judgment will be granted to the defendants on her Title VII and § 1983 claims. Her claim for violations of the FLSA and NCWHA also cannot move forward because she was an exempt executive employee. Finally, Ms. Hairgrove has abandoned her state constitutional claim by not responding to the defendant's briefing.

It is **ORDERED** that:

1. The defendants City of Salisbury and Lane Bailey's motion for summary judgment in his official capacity, Doc. 37, is **GRANTED**.

2. The defendant Lane Bailey's motion for summary judgment in his individual capacity, Doc. 39, is **GRANTED**.

3. The defendant Downtown Salisbury, Inc.'s motion for summary judgment, Doc. 41, is **GRANTED**.

4. Judgment will be entered separately as time permits.

This the 14th day of September, 2023.

UNITED STATES DISTRICT JUDGE